David S. Stellings (*pro hac vice*)
dstellings@lchb.com
LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, New York 10013-1413
Telephone: 212.355.9500
Facsimile: 212.355.9592

Roland Tellis (SBN 186269)
rtellis@baronbudd.com
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, CA 91436
Telephone: 818.839.2333

*Co-Lead Counsel for Plaintiffs*

*Plaintiffs' Steering Committee Members Listed on Signature Page*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re ZF-TRW Airbag Control Units Products Liability Litigation*<br><br>ALL CASES | MDL No. 2905<br><br>Case No. 2:19-ml-02905-JAK-FFM<br><br>**VOLUME TWO OF CONSOLIDATED AMENDED CLASS ACTION COMPLAINT (NATIONWIDE COUNTS)** |

# **TABLE OF CONTENTS**

VII.   COUNTS ................................................................................560

     A.   Nationwide Counts. ...................................................560

         1.   Nationwide Count 1: Violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(c), on Behalf of the Nationwide Hyundai-Kia Class Against Hyundai Korea, Kia Korea, Hyundai USA, Kia USA, Hyundai Mobis, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia. ...........................................560

         2.   Nationwide Count 2: Violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(d), on Behalf of the Nationwide Hyundai-Kia Class Against Kia Korea, Hyundai Korea, Kia USA, Hyundai USA, Hyundai Mobis, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia. ................................608

         3.   Nationwide Count 3: Violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(c), on Behalf of the Nationwide FCA Class Against FCA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia. ....622

         4.   Nationwide Count 4: Violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(d), on Behalf of the Nationwide FCA Class Against FCA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia. .......................................658

         5.   Nationwide Count 5: Violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(c), on Behalf of the Toyota Nationwide Class Against Toyota USA, Toyota Sales USA, Toyota Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia. ....................................668

         6.   Nationwide Count 6: Violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(d), on Behalf of the Toyota Nationwide Class Against Toyota USA, Toyota Sales USA, Toyota Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia. ................................710

7.  Nationwide Count 7: Violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(c), on Behalf of the Nationwide Honda Class Against Honda Japan, Honda USA, Honda Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia. .............723

8.  Nationwide Count 8: Violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(d), on Behalf of the Honda Nationwide Class Against Honda Japan, Honda USA, Honda Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia. ........................................................................763

9.  Nationwide Count 9: Violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(c), on Behalf of the Nationwide Mitsubishi Class Against Mitsubishi USA, Mitsubishi Japan, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia..............................776

10. Nationwide Count 10: Violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(d), on Behalf of the Nationwide Mitsubishi Class Against Mitsubishi Japan, Mitsubishi USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia. .........812

**[Continued in Volume III]**

# VII.   COUNTS

**A.     Nationwide Counts.**

    **1.      Nationwide Count 1: Violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(c), on Behalf of the Nationwide Hyundai-Kia Class Against Hyundai Korea, Kia Korea, Hyundai USA, Kia USA, Hyundai Mobis, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia.**

1520. Pursuant to 18 U.S.C. § 1962(c): "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Hyundai Korea, Kia Korea, Hyundai USA, Kia USA, Hyundai Mobis, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia are "persons" under 18 U.S.C. § 1961(3) because each was capable of holding "a legal or beneficial interest in property."

1521. A violation of 18 U.S.C. § 1962(c) has four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." ECF 396 at 59 (quoting *Sedima v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

1522. 18 U.S.C. § 1964(c) provides for a civil remedy for any violation of 18 U.S.C. § 1962 for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." In addition to proving a violation of §1962, this remedy requires proximate cause of a cognizable injury. ECF 396 at 59.

1523. Hyundai Korea, Kia Korea, Hyundai USA, Kia USA, Hyundai Mobis, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia, and several nonparties formed the Hyundai-Kia-ZF-ST Enterprise. The members of this Enterprise included Defendants Hyundai Korea, Kia Korea, Hyundai USA, Kia USA, Hyundai Mobis,

ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia. The Hyundai-Kia-ZF-ST Enterprise also included several nonparty individuals and corporations—for example, Hyundai Motor Manufacturing Alabama, LLC and Kia Georgia, Inc. Another nonparty conspirator is an individual named Chris Roberts, who was an engineering manager based in Michigan for a ZF company. He played a key role in drafting memoranda about crashes where airbags failed to deploy in Hyundai-Kia vehicles with the DS84 ACUs. Based on discovery to date, this individual apparently did not receive a paycheck from any of the domestic ZF Defendants, which means there is likely another nonparty ZF corporate entity that was a member of the Hyundai-Kia-ZF-ST Enterprise. Discovery will likely reveal several additional members of the Hyundai-Kia-ZF-ST Enterprise that are not currently known to the Hyundai-Kia Plaintiffs.

1524. Hyundai Korea, Kia Korea, Hyundai USA, Kia USA, Hyundai Mobis, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia are liable under 18 U.S.C. § 1962(c) because they conducted or participated in the conduct of the affairs of an "association-in-fact enterprise"—i.e., the Hyundai-Kia-ZF-ST Enterprise—through a pattern of racketeering activity. In other words, each of these Defendants committed at least two predicate acts in furtherance of the Enterprise's fraudulent scheme.

1525. For reasons explained below, Hyundai Korea, Kia Korea, Hyundai USA, Kia USA, Hyundai Mobis, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia each violated 18 U.S.C. § 1962(c) and injured the business or property of the Hyundai-Kia Plaintiffs and the Nationwide Hyundai-Kia Class. The Hyundai-Kia Plaintiffs claim damages for themselves and the Nationwide Hyundai-Kia Class members under 18 U.S.C. § 1964(c).

a. **Hyundai Korea, Kia Korea, Hyundai USA, Kia USA, Hyundai Mobis, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia each committed at least two predicate acts of mail and wire fraud in furtherance of the Hyundai-Kia-ZF-ST Enterprise's fraudulent scheme to affirmatively mislead consumers and NHTSA.**

1526. The members of the Hyundai-Kia-ZF-ST Enterprise devised a scheme to defraud consumers and NHTSA by concealing or minimizing the ACU Defect in Hyundai-Kia Class Vehicles through affirmatively misleading statements.

1527. In the alternative, the Hyundai-Kia-ZF-ST Enterprise members devised an illicit scheme for the purpose of obtaining money by fraudulent pretenses because they had the purpose of maximizing the sale of Hyundai-Kia Class Vehicles, which ultimately provided revenue to the Hyundai-Kia-ZF-ST Enterprise members.

1528. To carry out, or attempt to carry out the schemes, Hyundai Korea, Kia Korea, Hyundai USA, Kia USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia—each of whom is a person associated-in-fact with the Enterprise—knowingly conducted or participated, directly or indirectly, in the affairs of the Hyundai-Kia-ZF-ST Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c). In furtherance of the schemes, these Hyundai-Kia-ZF-ST Enterprise members each committed *at least* two acts in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud), as described in the subsections below.

**i.    Kia Korea violated the mail fraud statute multiple times in furtherance of the Hyundai-Kia-ZF-ST Enterprise's fraudulent scheme.**

1529. Kia Korea violated the mail fraud statute (18 U.S.C. § 1341) multiple times by causing misleading certification labels, readiness indicators, and airbag labels and imprints to be placed within every Kia Class Vehicle prior to shipment to the dealers that sell or lease the vehicles to consumers. As explained in Section IV.E.1. above, each of these statements misleadingly assured consumers that the Kia Class Vehicles had properly-functioning safety systems, airbags, and seatbelts when, in fact, the safety systems, airbags, and seatbelts had a dangerous safety defect due to the vulnerability of the DS84 ACU and ASIC to EOS. Kia Korea caused the inclusion of these misleading statements within every Kia Class Vehicle with full knowledge and the specific intent that Kia USA would distribute the Kia Class Vehicles to dealers across the United States using private interstate carriers. Accordingly, Kia Korea "knowingly cause[d]" the Kia Class Vehicles with misleading statements "to be delivered by . . . such carrier[s]," in violation of 18 U.S.C. § 1341.

a.    Kia Korea was directly responsible for including all of these misleading statements in all Kia Class Vehicles made in South Korea. The Kia Class Vehicles made in South Korea include Kia Fortes and Kia Sedonas, at the very least. Upon information and belief, Kia Korea placed the misleading certification labels, airbag warning lamps, and airbag labels and imprints in the Korean-made Kia Class Vehicles when Kia Korea manufactured them at the following address: 95 Giajadongcha-ro, Ujeong-eup, Hwaseong-si, Gyeonggi-do, South Korea. The certification labels for these Korean-made vehicles bore Kia Korea's corporate name, "Kia Motors Corp." The Kia Class Vehicles

made by Kia Korea have vehicle identification numbers that begin with the letter "K." Plaintiffs Damens, Dellatorre, King, Ogorek, Sutterfield, Swanson, and Van Houten bought or leased Kia Class Vehicles made by Kia Korea. Kia Korea has records in its possession that will identify the dates when it transferred these Class Vehicles to Kia USA, with the purpose of distributing them to the United States for sale to consumers. The Kia Plaintiffs do not have access to these confidential records that provide the precise dates of transfer.

b.     Although nonparty-Enterprise member Kia Georgia Inc. made the remaining Kia Class Vehicles and placed permanent certification labels on them under its own name, it had no discretion to depart from the mandatory Kia Class Vehicle designs created by Kia Korea. Accordingly, Kia Korea, as the entity responsible for designing these vehicles, was at least jointly responsible for the certifications for these vehicles. Kia Korea was also responsible for the misleading airbag warning lamps and in-vehicle airbag labels and imprints placed within these Kia Class Vehicles because Kia Korea's designs required the inclusion of these misleading statements within the Kia Class Vehicles. The Kia Class Vehicles made by Kia Georgia, Inc. include Kia Optimas.

1530. Although the precise shipment dates for all Kia Class Vehicles are not known to the Kia Plaintiffs, shipments occurred at least in each year from 2010 to 2019. Plaintiffs were exposed to in-vehicle misleading statements prior to, and at the point of, sale or lease. The dates and locations of these transactions are alleged above in Section II.B.1.

1531. Each shipment of a Kia Class Vehicle or Vehicles to a dealer was a violation of the mail fraud statute (18 U.S.C. § 1341) because Kia Korea knew the certification labels, airbag warning labels, and in-vehicle airbag labels and imprints in all Kia Class Vehicles were misleading and would further the scheme to defraud consumers into purchasing or leasing Kia Class Vehicles. Each of these statements misleadingly assured consumers that the Kia Class Vehicles had properly-functioning safety systems, airbags, and seatbelts when, in fact, the safety systems, airbags, and seatbelts had a dangerous safety defect due to the vulnerability of the DS84 ACU and ASIC to EOS.

1532. When Kia USA distributed the Kia Class Vehicles to dealers in the United States, it acted as Kia Korea's agent.

1533. Kia Korea also gave requisite approval or instruction that caused Kia USA to use mail and/or wire to send several misleading statements to NHTSA about the ACU Defect, including:

        a.     a March 1, 2018 phone call with NHTSA using interstate wires (*see* Section IV.F.13);

        b.     a March 16, 2018 mailing of a misleading slide deck dated March 14, 2018 (*see* Section IV.F.16); and

        c.     a June 1, 2018 filing of a misleading 573 Defect Report using mail and/or wire (*see* Section IV.F.19).

1534. Kia Korea intended for each of these misleading statements to NHTSA to further the Hyundai-Kia-ZF-ST Enterprise's fraudulent scheme to defraud consumers and avoid, minimize, and/or delay recalls of Hyundai-Kia Class Vehicles. Avoiding, minimizing, and/or delaying recalls of Hyundai-Kia Class Vehicles enabled the continuation of the scheme to defraud consumers.

ii.    **Hyundai Korea violated the mail fraud statute multiple times in furtherance of the Hyundai-Kia-ZF-ST Enterprise's fraudulent scheme.**

1535. Hyundai Korea violated the mail fraud statute (18 U.S.C. § 1341) multiple times by causing misleading certification labels, readiness indicators, and airbag labels and imprints to be placed within every Hyundai Class Vehicle prior to shipment to the dealers that sell or lease the vehicles to consumers. As explained in Section IV.E.1. above, each of these statements misleadingly assured consumers that the Hyundai Class Vehicles had properly-functioning safety systems, airbags, and seatbelts when, in fact, the safety systems, airbags, and seatbelts had a dangerous safety defect due to the vulnerability of the DS84 ACU and ASIC to EOS. Hyundai Korea caused the inclusion of these misleading statements within every Hyundai Class Vehicle with full knowledge and the specific intent that Hyundai USA would distribute the Hyundai Class Vehicles to dealers across the United States using private interstate carriers. Accordingly, Hyundai Korea "knowingly cause[d]" the Hyundai Class Vehicles with misleading statements "to be delivered by . . . such carrier[s]," in violation of 18 U.S.C. § 1341.

a.    Hyundai Korea was directly responsible for including all of these misleading statements in all Hyundai Class Vehicles made in South Korea. These Hyundai Class Vehicles included Hyundai Sonata Hybrids, at the very least. Upon information and belief, Hyundai Korea placed the misleading certification labels, airbag warning lamps, and airbag labels and imprints in the Korean-made Hyundai Class Vehicles when Hyundai Korea manufactured them at the following address: Hyundai Asan Plant 1077, Hyundai-ro, Inju-myeon Asan-si, Chungcheongnam-do, South Korea. The certification labels for these Japanese-made vehicles bore Hyundai Korea's corporate

name, "Hyundai Motor Co., Ltd." The Hyundai Class Vehicles
made by Hyundai Korea have vehicle identification numbers
that begin with the letter "K." Plaintiff Maurilus bought or
leased a Hyundai Class Vehicle made by Hyundai Korea.
Hyundai Korea has records in its possession that will identify
the dates when it transferred these Class Vehicles to Hyundai
USA, with the purpose of distributing them to the United States
for sale to consumers. The Hyundai Plaintiffs do not have access
to these confidential records that provide the precise dates of
transfer.

b.   Although nonparty-Enterprise member Hyundai Motor
Manufacturing Alabama, LLC made the remaining Hyundai
Class Vehicles and placed permanent certification labels on
them under their own names, it had no discretion to depart from
the mandatory Hyundai Class Vehicle designs created by
Hyundai Korea. Accordingly, Hyundai Korea, as the entity
responsible for designing these vehicles, was at least jointly
responsible for the certification for these vehicles. Hyundai
Korea was also responsible for the misleading airbag warning
lamps and in-vehicle airbag labels and imprints placed within
these Hyundai Class Vehicles because Hyundai Korea's designs
required the inclusion of these misleading statements within the
Hyundai Class Vehicles. The Hyundai Class Vehicles made by
Hyundai Motor Manufacturing Alabama, LLC include Hyundai
Sonatas (i.e., non-hybrid Sonatas).

1536. Although the precise shipment dates for all Hyundai Class Vehicles
are not known to the Hyundai Plaintiffs, shipments occurred at least in each year
from 2010 to 2019. Plaintiffs were exposed to in-vehicle misleading statements

1  prior to, and at the point of, sale or lease. The dates and locations of these

2  transactions are alleged above in Section II.B.1.

3      1537. Each shipment of a Hyundai Class Vehicle or Vehicles to a dealer was

4  a violation of the mail fraud statute (18 U.S.C. § 1341) because Hyundai Korea

5  knew the certification labels, airbag warning labels, and in-vehicle airbag labels and

6  imprints in all Hyundai Class Vehicles were misleading and would further the

7  scheme to defraud consumers into purchasing or leasing Hyundai Class Vehicles.

8  Each of these statements misleadingly assured consumers that the Hyundai Class

9  Vehicles had properly-functioning safety systems, airbags, and seatbelts when, in

10  fact, the safety systems, airbags, and seatbelts had a dangerous safety defect due to

11  the vulnerability of the DS84 ACU and ASIC to EOS.

12      1538. When Hyundai USA distributed the Hyundai Class Vehicles to dealers

13  in the United States, it acted as Hyundai Korea's agent.

14      1539. Hyundai Korea also gave requisite approval or instruction to cause

15  Hyundai USA to use mail and/or wire to send several misleading statements to

16  NHTSA about the ACU Defect, including:

17          a.    a February 27, 2018 filing of a misleading 573 Defect Report

18                   using mail and/or wire (*see* Section IV.F.12) and

19          b.    an April 18, 2018 filing of a misleading 573 Defect Report using

20                   mail and/or wire (*see* Section IV.F.19).

21      1540. Hyundai Korea intended for each of these misleading statements to

22  NHTSA to further the Hyundai-Kia-ZF-ST Enterprise's fraudulent scheme to

23  defraud consumers and avoid, minimize, and/or delay recalls of Hyundai-Kia Class

24  Vehicles. Avoiding, minimizing, and/or delaying recalls of Hyundai-Kia Class

25  Vehicles enabled the continuation of the scheme to defraud consumers.

26

27

28

### iii. Kia USA violated the mail and wire fraud statutes multiple times in furtherance of the Hyundai-Kia-ZF-ST Enterprise's fraudulent scheme.

1541. Kia USA committed mail fraud every time it shipped, or caused to be shipped, a Kia Class Vehicle to dealers in the United States. For every Kia Class Vehicle, Kia USA delivered, or caused delivery of, each vehicle by private or commercial interstate carrier to automobile dealerships across the United States. Kia USA delivered millions of Class Vehicles to execute the Hyundai-Kia-ZF-ST Enterprise's scheme to defraud consumers and NHTSA.

   a. These deliveries furthered the scheme because Kia USA sent the vehicles to the dealerships where consumers would purchase or lease them and because, prior to shipping the Kia Class Vehicles, Kia Korea had affixed, or caused to be affixed, misleading certification labels (*see* Section IV.E.1.b. above), readiness indicators (*see* Section IV.E.1.c. above), and airbag labels and imprints (*see* Section IV.E.1.d. above).

   b. Moreover, prior to shipping each Kia Class Vehicle, Kia USA created Monroney labels for each make and model and placed the applicable one on each Kia Class Vehicle. As explained above in Section IV.E.1.a., the Monroney labels for the Kia Class Vehicles were misleading because they falsely assured consumers that the Vehicles had properly-functional airbags, seatbelts, and safety systems.

   c. Finally, prior to shipping the vehicles, Kia USA also ensured that each Kia Class Vehicle came with an owner's manual with misleading statements about the vehicle's safety system (*see* Section IV.E.2.b.ii above). Kia USA was responsible for the content of these manuals.

1542. Kia USA knew the Monroney labels, certification labels, readiness indicators, airbag labels and imprints, and owners' manuals shipped with each Hyundai-Kia Class Vehicle were misleading because the Kia Class Vehicles all contained the ACU Defect. Kia USA also knew consumers would rely upon these misleading statements when deciding to purchase or lease Kia Class Vehicles.

1543. Although the precise shipment dates for all Kia Class Vehicles are not known to the Kia Plaintiffs, shipments occurred at least in each year from 2010 to 2019. Plaintiffs were exposed to in-vehicle misleading statements prior to, and at the point of, sale or lease. The dates and locations of these transactions are alleged above in Section II.B.1.

1544. Starting in 2010, Kia USA also transmitted, or caused to be transmitted, tens (perhaps hundreds) of thousands of advertisements which stressed the safety of Kia Class Vehicles using mail, wire, radio, or television communications in interstate commerce. Kia USA's misleading advertisements are too numerous to recite completely, given the nationwide scope and decade-long duration of the Hyundai-Kia-ZF-ST Enterprise's fraudulent scheme. Examples of these advertisements are collected in Section IV.E.2.a.ii. and Exhibit 9. Each such mailed advertisement—including brochures sent to dealerships for display to consumers or print advertisements in newspapers or magazines—was a violation of the mail fraud statute (18 U.S.C. § 1341). Each such internet-based, radio, and television advertisement was a violation of the wire fraud statute (18 U.S.C. § 1343). Each advertisement that directly or indirectly assured consumers that the Kia Class Vehicles had properly-functioning safety systems, airbags, and seatbelts was affirmatively misleading because the safety systems, airbags, and seatbelts in Kia Class Vehicles had a dangerous safety defect due to the vulnerability of the DS84 ACU and ASIC to EOS. Kia USA knew advertisements assuring the safety of Hyundai-Kia Class Vehicles were misleading and would further the scheme to defraud consumers into purchasing or leasing Kia Class Vehicles.

1545. Kia USA also placed copies of misleading Kia Class Vehicle owner's manuals on its website. Upon information and belief, the publication of these owner's manuals occurred at or around the commencement of public sales for each model year. The publication of each these manuals on a website was a violation of the wire fraud statute (18 U.S.C. § 1343) because Kia USA knew the owner's manuals for all Kia Class Vehicles were misleading and would further the scheme to defraud consumers into purchasing or leasing Kia Class Vehicles. Each of these manuals contained statements that misleadingly assured consumers the Kia Class Vehicles had properly-functioning safety systems, airbags, and seatbelts when, in fact, the safety systems, airbags, and seatbelts had a dangerous safety defect due to the vulnerability of the DS84 ACU and ASIC to EOS.

1546. Kia USA also used mail and/or wire to send several misleading statements to NHTSA about the ACU Defect, including:

   a. a March 1, 2018 phone call with NHTSA using interstate wires (*see* Section IV.F.13);

   b. a March 16, 2018 mailing of a misleading slide deck dated March 14, 2018 (*see* Section IV.F.16); and

   c. a June 1, 2018 filing of a misleading 573 Defect Report using mail and/or wire (*see* Section IV.F.19).

1547. Kia USA intended for each of these misleading statements to NHTSA to further the Hyundai-Kia-ZF-ST Enterprise's fraudulent scheme to defraud consumers and avoid, minimize, and/or delay recalls of Hyundai-Kia Class Vehicles. Avoiding, minimizing, and/or delaying recalls of Hyundai-Kia Class Vehicles enabled the continuation of the scheme to defraud consumers.

### iv. Hyundai USA violated the mail and wire fraud statutes multiple times in furtherance of the Hyundai-Kia-ZF-ST Enterprise's fraudulent scheme.

1548. Hyundai USA committed mail fraud every time it shipped, or caused to be shipped, a Hyundai Class Vehicle to dealers in the United States. For every Hyundai Class Vehicle, Hyundai USA delivered, or caused delivery of, each vehicle by private or commercial interstate carrier to automobile dealerships across the United States. Hyundai USA delivered millions of Class Vehicles to execute the Hyundai-Kia-ZF-ST Enterprise's scheme to defraud consumers and NHTSA.

   a. These deliveries furthered the scheme because Hyundai USA sent the vehicles to the dealerships where consumers would purchase or lease them and because, prior to shipping the Hyundai Class Vehicles, Hyundai Korea had affixed, or caused to be affixed, misleading certification labels (*see* Section IV.E.1.b. above), readiness indicators (*see* Section IV.E.1.c. above), and airbag labels and imprints (*see* Section IV.E.1.d. above).

   b. Moreover, prior to shipping each Hyundai Class Vehicle, Hyundai USA created Monroney labels for each make and model and placed the applicable one on each Hyundai Class Vehicle. As explained above in Section IV.E.1.a., the Monroney labels for the Hyundai Class Vehicles were misleading because they falsely assured consumers that the Vehicles had properly-functional airbags, seatbelts, and safety systems.

   c. Finally, prior to shipping the vehicles, Hyundai USA also ensured that each Class Vehicle came with an owner's manual with misleading statements about the vehicle's safety system

(see Section IV.E.2.b.ii. above). Hyundai USA was responsible for the content of these manuals.

1549. Hyundai USA knew the Monroney labels, certification labels, readiness indicators, airbag labels and imprints, and owners' manuals shipped with each Hyundai Class Vehicle were misleading because the Hyundai Class Vehicles all contained the ACU Defect. Hyundai USA also knew consumers would rely upon these misleading statements when deciding to purchase or lease Hyundai Class Vehicles.

1550. Although the precise shipment dates for all Hyundai Class Vehicles are not known to the Hyundai Plaintiffs, shipments occurred at least in each year from 2011 to 2019. Plaintiffs were exposed to in-vehicle misleading statements prior to, and at the point of, sale or lease. The dates and locations of these transactions are alleged above in Section II.B.1.

1551. Starting in 2010, Hyundai USA also transmitted, or caused to be transmitted, tens (perhaps hundreds) of thousands of advertisements which stressed the safety of Hyundai Class Vehicles using mail, wire, radio, or television communications in interstate commerce. Hyundai USA's misleading advertisements are too numerous to recite completely, given the nationwide scope and decade-long duration of the Hyundai-Kia-ZF-ST Enterprise's fraudulent scheme. Examples of these advertisements are collected in Section IV.E.2.a.ii. and Exhibit 9. Each such mailed advertisement—including brochures sent to dealerships for display to consumers or print advertisements in newspapers or magazines—was a violation of the mail fraud statute (18 U.S.C. § 1341). Each such internet-based, radio, and television advertisement was a violation of the wire fraud statute (18 U.S.C. § 1343). Each advertisement that directly or indirectly assured consumers that the Hyundai Class Vehicles had properly-functioning safety systems, airbags, and seatbelts was affirmatively misleading because the safety systems, airbags, and seatbelts in Hyundai Class Vehicles had a dangerous safety

defect due to the vulnerability of the DS84 ACU and ASIC to EOS. Hyundai USA knew advertisements assuring the safety of Hyundai-Kia Class Vehicles were misleading and would further the scheme to defraud consumers into purchasing or leasing Hyundai Class Vehicles.

1552. Hyundai USA also placed copies of misleading Hyundai Class Vehicle owner's manuals on its website. Upon information and belief, the publication of these owner's manuals occurred at or around the commencement of public sales for each model year. The publication of each these manuals on a website was a violation of the wire fraud statute (18 U.S.C. § 1343) because Hyundai USA knew the owner's manuals for all Hyundai Class Vehicles were misleading and would further the scheme to defraud consumers into purchasing or leasing Hyundai Class Vehicles. Each of these manuals contained statements that misleadingly assured consumers the Hyundai Class Vehicles had properly-functioning safety systems, airbags, and seatbelts when, in fact, the safety systems, airbags, and seatbelts had a dangerous safety defect due to the vulnerability of the DS84 ACU and ASIC to EOS.

1553. Hyundai USA also used mail and/or wire to send several misleading statements to NHTSA about the ACU Defect, including:

     a.    a February 27, 2018 filing of a misleading 573 Defect Report using mail and/or wire (*see* Section IV.F.12) and

     b.    an April 18, 2018 filing of a misleading 573 Defect Report using mail and/or wire (*see* Section IV.F.19).

1554. Hyundai USA intended for each of these misleading statements to NHTSA to further the Hyundai-Kia-ZF-ST Enterprise's fraudulent scheme to defraud consumers and avoid, minimize, and/or delay recalls of Hyundai-Kia Class Vehicles. Avoiding, minimizing, and/or delaying recalls of Hyundai-Kia Class Vehicles enabled the continuation of the scheme to defraud consumers.

**v.**     **ZF Electronics USA violated the mail fraud statute multiple times in furtherance of the Hyundai-Kia-ZF-ST Enterprise's fraudulent scheme.**

1555. ZF Electronics USA drafted and/or edited the following misleading statements to NHTSA, as discussed in Sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above:

    a.     The slide deck presentation dated February 5, 2016 (which ZF TRW Corp. mailed to NHTSA on March 14, 2016);

    b.     The slide deck presentation dated July 19, 2016 (which, upon information and belief, was mailed to NHTSA in July or August 2016);

    c.     The September 2016 letter signed by Marc Bolitho[1] (which ZF Electronics USA mailed to NHTSA in September 2016); and

    d.     The slide deck presentation dated March 8, 2018 (which ZF TRW Corp. mailed to NHTSA on March 12, 2018).

1556. As explained in sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above, each of these transmittals contained misleading statements about Hyundai-Kia Class Vehicles and the ACU Defect. ZF Electronics USA specifically approved the transmittal of the final versions of these documents to NHTSA, and intended for the misleading statements contained therein to avoid, minimize, and/or delay recalls of Hyundai-Kia Class Vehicles. Avoiding, minimizing, and/or delaying recalls of Hyundai-Kia Class Vehicles enabled the continuation of the scheme to defraud consumers.

1557. ZF Electronics USA caused the delivery of the February 5, 2016 slide deck to NHTSA. ZF Electronics USA's causal role in the delivery is evidenced by the fact that its Vice President of Passive Safety Marc Bolitho signed an affidavit of

---

[1] Mr. Bolitho was simultaneously an employee of ZF Passive Safety USA, the Vice President of Passive Safety for ZF Electronics USA, and Director of Passive Safety Engineering for ZF TRW Corp.

confidentiality that was enclosed with the mailing of the February 5, 2016 slide deck.

1558. Because the July 19, 2016 slide deck closely resembles the February 5, 2016 slide deck, the same personnel and companies were likely responsible for sending it via mail or private interstate carrier to NHTSA. Accordingly, upon information and belief, ZF Electronics USA caused this delivery to NHTSA too.

1559. ZF Electronics USA caused the delivery of the March 8, 2018 slide deck to NHTSA. ZF Electronics USA's causal role in the delivery is evidenced by the fact that its Technical Specialist, Emanuel Goodman, signed the affidavit of confidentiality that was enclosed with the mailing of the March 8, 2018 slide deck. ZF Electronics USA's causal role in the delivery is further evidenced by Mr. Goodman's and Mr. Bolitho's attendance at the March 8, 2018 meeting with NHTSA, where this slide deck was used.

1560. Moreover, because ZF Electronics USA's affiliates would not have sent or approved the four written communications described above without ZF Electronics USA's contributions and approval, ZF Electronics USA was one of the Defendants who jointly caused the delivery of these four communications to NHTSA. Accordingly, its participation in these communications violated the mail fraud statute at least four times. 18 U.S.C. § 1341.

1561. As explained in Section IV.E.1.c. above, ZF Electronics USA worked with ZF Passive Safety USA, ZF Automotive USA, Hyundai Korea, and Kia Korea to design the readiness indicators installed in Hyundai-Kia Class Vehicles. Specifically, ZF Electronics USA assisted with a design of ACUs that would cause the readiness indicator not to illuminate at the point of sale or lease, even though the Hyundai-Kia Class Vehicle's safety systems were not ready to deploy in foreseeable crash events with negative transients due to the ACU Defect. When ZF Electronics USA assisted with this design, it knew Kia USA and Hyundai USA would ship the Hyundai-Kia Class Vehicles to dealers and that consumers would

buy Hyundai-Kia Class Vehicles without the airbag warning lamp illuminating at the point of sale or lease. Because Kia USA and Hyundai USA would not have shipped Hyundai-Kia Class Vehicles without ZF Electronics USA's assistance in designing misleading readiness indicators, ZF Electronics USA jointly caused each shipment of a Hyundai-Kia Class Vehicle, in violation of the mail fraud act (18 U.S.C. § 1341).

1562. Upon information and belief and based on a contract between Hyundai Mobis and ZF TRW Corp., ZF Electronics USA received orders from Hyundai Mobis for the defective DS84 ACUs used in every Hyundai-Kia Class Vehicle and shipped them by private or commercial interstate carrier to the nonparty-Enterprise-members Kia Georgia, Inc. and Hyundai Motor Manufacturing Alabama, LLC. These shipments furthered the Hyundai-Kia-ZF-ST Enterprise's fraudulent scheme because the use of DS84 ACUs in Hyundai-Kia Class Vehicles was essential to the cost-saving goal behind the scheme. When ZF Electronics USA shipped the defective DS84 ACUs to the nonparty-Enterprise-members Kia Georgia, Inc. and Hyundai Motor Manufacturing Alabama, LLC, it knew they would be installed in the Hyundai-Kia Class Vehicles that are marketed to U.S. consumers. ZF Electronics USA was also specifically aware of Hyundai Korea's, Kia Korea's, Hyundai USA's, and Kia USA's practice of making reassuring statements about safety, airbags, and seatbelts in consumer-facing Monroney labels, certification labels, in-vehicle labels, owner's manuals and advertising for all Hyundai-Kia Class Vehicles. ZF Electronics USA knew these statements were false because it knew the Hyundai-Kia Class Vehicles, DS84 ACU, and DS84 ASIC were defective. Accordingly, because ZF Electronics USA shipped each defective DS84 ACU with the purpose of executing a fraudulent scheme with the other Enterprise members, each of ZF Electronics USA's shipments of the defective DS84 ACUs violated the mail fraud statute (18 U.S.C. § 1341). The precise dates and locations of each particular shipment of defective DS84 ACUs is not known to the Hyundai-Kia

Plaintiffs because they have no visibility into the shipments to Hyundai Motor Manufacturing Alabama, LLC and Kia Georgia, Inc., and Defendants have not produced documents that show that information. However, a chart produced by the domestic ZF Defendants to NHTSA identifies the precise volume of DS84 ACUs shipped for each year for each model of Hyundai-Kia Class Vehicles, and identifies Marshall, Illinois as the shipping location. Exhibit 20 includes highlighting added by Plaintiffs to identify the particular information about shipping locations, volumes, vehicle makes and models, and shipping years contained in this chart. *See* Ex. 20 (ZF-MDL-679) at 699-701. Upon information and belief, the shipping address for each of these shipments by ZF Electronics USA from Marshall, Illinois was 902 South 2nd Street, Marshall, Illinois 62441. The shipments for Kia Optimas identified therein would have gone to Kia Georgia, Inc., whereas the shipments for Hyundai Sonatas identified therein would have gone to Hyundai Motor Manufacturing Alabama, LLC. The address for Kia Georgia, Inc. was 7777 Kia Parkway West Point, Georgia 31833. The address for Hyundai Motor Manufacturing Alabama, LLC is 700 Hyundai Blvd. Montgomery, Alabama 36105. The information available in Exhibit 20 and the facts identified above are sufficient for Defendants to identify the precise dates of shipments because Defendants will have backup information that shows additional details about the underlying shipments.

1563. ZF Electronics USA also separately violated the mail fraud act (18 U.S.C. § 1341) by placing orders with ST USA that required ST USA to ship millions of defective DS84 ASICs to ZF Electronics USA at a facility with the following address: 902 South 2nd Street, Marshall, Illinois 62441. When ZF Electronics USA placed these orders, it knew it would install these DS84 ASICs into DS84 ACUs, including those that would be installed in the Hyundai-Kia Class Vehicles that are marketed to U.S. consumers. ZF Electronics USA was also specifically aware of Kia Korea's, Hyundai Korea's, Kia USA's, and Hyundai

USA's practice of making reassuring statements about safety, airbags, and seatbelts in consumer-facing Monroney labels, certification labels, in-vehicle labels, owner's manuals, and advertising for all Hyundai-Kia Class Vehicles. ZF Electronics USA knew these statements were false because it knew the Hyundai-Kia Class Vehicles, DS84 ACU, and DS84 ASIC were defective. Accordingly, because ZF Electronics USA caused shipments of defective DS84 ASICs with the purpose of executing a fraudulent scheme with the other Enterprise members, each of the DS84 ASIC shipments caused by ZF Electronics USA violated the mail fraud statute (18 U.S.C. § 1341). ST USA has produced approximately 9,700 such invoices from the time period between 2014 and the present alone. Plaintiffs have extracted approximate shipping dates from these invoices, which are presented as exemplars in Exhibit 21.[2]

> ### vi. Hyundai Mobis violated the mail fraud statute multiple times in furtherance of the Hyundai-Kia-ZF-ST Enterprise's fraudulent scheme.

1564. Upon information and belief and based on a contract between Hyundai Mobis and ZF TRW Corp., Hyundai Mobis caused ZF Electronics USA use interstate private or commercial carrier(s) to deliver thousands of DS84 ACUs to Kia Georgia, Inc. and Hyundai Motor Manufacturing Alabama, LLC between 2009 and 2019. Hyundai Mobis caused these shipments by placing orders for the DS84 ACU pursuant to its contract with ZF TRW Corp. These shipments furthered the Hyundai-Kia-ZF-ST Enterprise's fraudulent scheme because the use of DS84 ACUs in Hyundai-Kia Class Vehicles was essential to the cost-saving goal behind the scheme.

---

[2] ST USA made similar shipments relevant to the Hyundai-Kia Class Vehicles at least between 2009 and 2014, but ST USA is presently withholding invoices for these shipments from discovery. Upon information and belief, the invoices for this time period will show similar regularity of shipments.

1565. When Hyundai Mobis caused the shipment of the defective DS84 ACUs to the nonparty-Enterprise-members Kia Georgia, Inc. and Hyundai Motor Manufacturing Alabama, LLC, it knew they would be installed in the Hyundai-Kia Class Vehicles that are marketed to U.S. consumers. ZF Electronics USA was also specifically aware of Hyundai Korea's, Kia Korea's, Hyundai USA's, and Kia USA's practice of making reassuring statements about safety, airbags, and seatbelts in consumer-facing Monroney labels, certification labels, in-vehicle labels, owner's manuals and advertising for all Hyundai-Kia Class Vehicles. ZF Electronics USA knew these statements were false because it knew the Hyundai-Kia Class Vehicles, DS84 ACU, and DS84 ASIC were defective.

1566. Accordingly, because Hyundai Mobis caused shipments of the defective DS84 ACU with the purpose of executing a fraudulent scheme with the other Enterprise members, each of ZF Electronics USA's shipments of the defective DS84 ACUs violated the mail fraud statute (18 U.S.C. § 1341). The precise dates and locations of each particular shipment of defective DS84 ACUs is not known to the Hyundai-Kia Plaintiffs because they have no visibility into the shipments to Hyundai Motor Manufacturing Alabama, LLC and Kia Georgia, Inc., and Defendants have not produced documents that show that information. However, a chart produced by the domestic ZF Defendants to NHTSA identifies the precise volume of DS84 ACUs shipped for each year for each model of Hyundai-Kia Class Vehicles, and identifies Marshall, Illinois as the shipping location. Exhibit 20 includes highlighting added by Plaintiffs to identify the particular information about shipping locations, volumes, vehicle makes and models, and shipping years contained in this chart. *See* Ex. 20 (ZF-MDL-679) at 699-701. Upon information and belief, the shipping address for each of these shipments by ZF Electronics USA from Marshall, Illinois was 902 South 2nd Street, Marshall, Illinois 62441. The shipments for Kia Optimas identified therein would have gone to Kia Georgia, Inc., whereas the shipments for Hyundai Sonatas identified therein would have gone to

1   Hyundai Motor Manufacturing Alabama, LLC. The address for Kia Georgia, Inc.

2   was 7777 Kia Parkway West Point, Georgia 31833. The address for Hyundai Motor

3   Manufacturing Alabama, LLC is 700 Hyundai Blvd. Montgomery, Alabama 36105.

4       1567. The information available in Exhibit 20 and the facts identified above

5   are sufficient for Defendants to identify the precise dates of shipments because

6   Defendants will have backup information that shows additional details about the

7   underlying shipments.

8           vii.   **ZF Passive Safety USA violated the mail fraud statute**
9                  **multiple times in furtherance of the Hyundai-Kia-ZF-**
10                 **ST Enterprise's fraudulent scheme.**

11      1568. ZF Passive Safety USA drafted and/or edited the following misleading

12  statements to NHTSA, as discussed in Sections IV.F.2., IV.F.4., IV.F.8., and

13  IV.F.14. above:

14          a.   The slide deck presentation dated February 5, 2016 (which ZF

15               TRW Corp. mailed to NHTSA on March 14, 2016);

16          b.   The slide deck presentation dated July 19, 2016 (which, upon

17               information and belief, was mailed to NHTSA in July or August

18               2016);

19          c.   The September 2016 letter signed by Marc Bolitho[3] (which ZF

20               Electronics USA mailed to NHTSA in September 2016); and

21          d.   The slide deck presentation dated March 8, 2018 (which ZF

22               TRW Corp. mailed to NHTSA on March 12, 2018).

23      1569. As explained in sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above,

24  each of these transmittals contained misleading statements about Hyundai-Kia

25  Class Vehicles and the ACU Defect. ZF Passive Safety USA specifically approved

26

27  [3] Mr. Bolitho was simultaneously an employee of ZF Passive Safety USA, the Vice
28  President of Passive Safety for ZF Electronics USA, and Director of Passive Safety
    Engineering for ZF TRW Corp.

1   the transmittal of the final versions of these documents to NHTSA, and intended for

2   the misleading statements contained therein to avoid, minimize, and/or delay recalls

3   of Hyundai-Kia Class Vehicles. Avoiding, minimizing, and/or delaying recalls of

4   Hyundai-Kia Class Vehicles enabled the continuation of the scheme to defraud

5   consumers.

6      1570. ZF Passive Safety USA caused the delivery of the February 5, 2016

7   slide deck. ZF Passive Safety USA's causal role in the delivery is evidenced by the

8   fact that its employee Marc Bolitho signed an affidavit of confidentiality that was

9   enclosed with the mailing of the February 5, 2016 slide deck. Although Mr. Bolitho

10  also simultaneously served as a Vice President for ZF Electronics USA and a

11  Director of Passive Safety Engineering for ZF TRW Corp., ZF Passive Safety USA

12  alone paid his salary.

13     1571. Because the July 19, 2016 slide deck closely resembles the February 5,

14  2016 slide deck, the same personnel and companies were likely responsible for

15  sending it via mail or private interstate carrier to NHTSA. Accordingly, upon

16  information and belief, ZF Passive Safety USA caused this delivery too.

17     1572. ZF Passive Safety USA caused the delivery of the March 8, 2018 slide

18  deck to NHTSA. ZF Passive Safety USA's causal role in the delivery is evidenced

19  by the fact that its longtime employee, Emanuel Goodman, signed the affidavit of

20  confidentiality that was enclosed with the mailing of the March 8, 2018 slide deck.

21  Although Mr. Goodman also served as the Technical Specialist for ZF Electronics

22  USA, ZF Passive Safety USA alone paid his salary. ZF Passive Safety USA's

23  causal role in the delivery is further evidenced by Mr. Goodman's and Mr.

24  Bolitho's attendance at the March 8, 2018 meeting with NHTSA, where this slide

25  deck was used.

26     1573. Moreover, because ZF Passive Safety USA's affiliates would not have

27  sent or approved the four written communications described above without ZF

28  Passive Safety USA's contributions and approval, ZF Passive Safety USA was one

of the Defendants who jointly caused the delivery of these four communications to NHTSA. Accordingly, its participation in these communications violated the mail fraud statute at least four times. 18 U.S.C. § 1341.

1574. As explained in sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above, each of the four documents described above contained misleading statements about Hyundai-Kia Class Vehicles and the ACU Defect. ZF Passive Safety USA specifically approved the transmittal of the final versions of these documents to NHTSA, and intended for the misleading statements contained therein to avoid, minimize, and/or delay recalls of Hyundai-Kia Class Vehicles. Avoiding, minimizing, and/or delaying recalls of Hyundai-Kia Class Vehicles enabled the continuation of the scheme to defraud consumers. Because ZF Passive Safety USA's affiliates would not have sent or approved the written communications noted in the preceding paragraph without ZF Passive Safety USA's contributions and approval, ZF Passive Safety USA was one of the Defendants who caused the delivery of these four communications to NHTSA. Accordingly, its participation in these communications violated the mail fraud statute at least four times. (18 U.S.C. § 1341).

1575. As explained in Section IV.E.1.c. above, ZF Passive Safety USA worked with ZF Electronics USA, ZF Automotive USA, Hyundai Korea, and Kia Korea to design the readiness indicators installed in Hyundai-Kia Class Vehicles. Specifically, ZF Passive Safety USA assisted with a design of ACUs that would cause the readiness indicator not to illuminate at the point of sale or lease, even though the Hyundai-Kia Class Vehicle's safety systems were not ready to deploy in crash events with negative transients due to the ACU Defect. When ZF Passive Safety USA assisted with this design, it knew Kia USA and Hyundai USA would ship the Hyundai-Kia Class Vehicles to dealers and that consumers would buy the vehicles without the airbag warning lamp illuminating at the point of sale or lease. Because Kia USA and Hyundai USA would not have shipped Hyundai-Kia Class

1  Vehicles without ZF Passive Safety USA's assistance in designing misleading

2  readiness indicators, ZF Passive Safety USA jointly caused each shipment of

3  Hyundai-Kia Class Vehicle, in violation of the mail fraud act (18 U.S.C. § 1341).

4  **viii. ZF Automotive USA violated the mail fraud statute multiple times in furtherance of the Hyundai-Kia-ZF-ST Enterprise's fraudulent scheme.**

5

6

7  1576. ZF Automotive USA drafted and/or edited the following misleading

8  statements to NHTSA, as discussed in Sections IV.F.2., IV.F.4., IV.F.8., and

9  IV.F.14. above:

10      a.    The slide deck presentation dated February 5, 2016 (which ZF

11          TRW Corp. mailed to NHTSA on March 14, 2016);

12      b.    The slide deck presentation dated July 19, 2016 (which, upon

13          information and belief, was mailed to NHTSA in July or August

14          2016);

15      c.    The September 2016 letter signed by Marc Bolitho (which ZF

16          Electronics USA mailed to NHTSA in September 2016); and

17      d.    The slide deck presentation dated March 8, 2018 (which ZF

18          TRW Corp. mailed to NHTSA on March 12, 2018).

19  1577. ZF Automotive USA caused the delivery via mail or private interstate

20  carrier of the February 5, 2016 slide deck, the July 19, 2016 slide deck, and the

21  March 8, 2018 slide deck to NHTSA. ZF Automotive USA's role in causing the

22  delivery of these presentations is evidenced by its admission in a 573 Defect Report

23  that it attended the three meetings with NHTSA where these presentations were

24  used on its behalf.

25  1578. Upon information and belief, ZF Automotive USA caused the delivery

26  of the September 2016 letter via mail or private interstate carrier by giving requisite

27  approval prior to the transmittal of the letter.

28

1579. As explained in sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above, each of these four documents contained misleading statements about Hyundai-Kia Class Vehicles and the ACU Defect. ZF Automotive USA specifically approved the transmittal of the final versions of these documents to NHTSA, and intended for the misleading statements contained therein to avoid, minimize, and/or delay recalls of Hyundai-Kia Class Vehicles. Avoiding, minimizing, and/or delaying recalls of Hyundai-Kia Class Vehicles enabled the continuation of the scheme to defraud consumers. Because ZF Automotive USA's affiliates would not have sent or approved the written communications noted in the preceding paragraph without ZF Automotive USA's contributions and approval, ZF Automotive USA was one of the Defendants who caused the delivery of these four communications to NHTSA. Accordingly, its participation in these communications violated the mail fraud statute at least four times. (18 U.S.C. § 1341).

1580. As explained in Section IV.E.1.c. above, ZF Automotive USA worked with ZF Passive Safety USA, ZF Electronics USA, Kia Korea, and Hyundai Korea to design the readiness indicators installed in Hyundai-Kia Class Vehicles. Specifically, ZF Automotive USA assisted with a design of ACUs that would cause the readiness indicator not to illuminate at the point of sale or lease, even though the Hyundai-Kia Class Vehicle's safety systems were not ready to deploy in crash events with negative transients due to the ACU Defect. When ZF Automotive USA assisted with this design, it knew Kia USA and Hyundai USA would ship the Hyundai-Kia Class Vehicles to dealers and that consumers would buy the vehicles without the airbag warning lamp illuminating at the point of sale or lease. Because Hyundai USA and Kia USA would not have shipped Hyundai-Kia Class Vehicles without ZF Automotive USA's affirmative assistance in designing misleading readiness indicators, ZF Automotive USA jointly caused each shipment of Hyundai-Kia Class Vehicle, in violation of the mail fraud act (18 U.S.C. § 1341).

### ix.   ZF TRW Corp. violated the mail fraud statute multiple times in furtherance of the Hyundai-Kia-ZF-ST Enterprise's fraudulent scheme.

1581.   Prior to their delivery to NHTSA, ZF TRW Corp. reviewed, drafted and/or edited the following misleading statements to NHTSA, as discussed in Sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above:

 a. The slide deck presentation dated February 5, 2016 (which ZF TRW Corp. mailed to NHTSA on March 14, 2016);

 b. The slide deck presentation dated July 19, 2016 (which, upon information and belief, was mailed to NHTSA in July or August 2016);

 c. The September 2016 letter signed by Marc Bolitho[4] (which ZF Electronics USA mailed to NHTSA in September 2016); and

 d. The slide deck presentation dated March 8, 2018 (which ZF TRW Corp. mailed to NHTSA on March 12, 2018).

1582.   ZF TRW Corp. caused the transmittal of the February 5, 2016 slide deck via mail or private interstate carrier. ZF TRW Corp.'s role in the transmittal is confirmed by the cover letter enclosed within the Fed Ex envelope alongside the February 5, 2016 slide deck. This cover letter is signed: "Very truly yours, ZF TRW Automotive Holdings Corp." with a signature from Sheri Roberts, the Senior Counsel of the company. ZF TRW Corp.'s causal role is further confirmed by a footer on every page of the slide deck itself, which reads: "This document is the property of ZF TRW and is disclosed in confidence. It may not be copied, disclosed to others, or used for manufacturing without the written consent of ZF TRW." Based on this footer, ZF TRW Corp. gave requisite written consent to the transmittal of the document to NHTSA.

---

[4] Mr. Bolitho was simultaneously an employee of ZF Passive Safety USA, the Vice President of Passive Safety for ZF Electronics USA, and Director of Passive Safety Engineering for ZF TRW Corp.

1583. ZF TRW Corp. caused the transmittal of the July 19, 2016 slide deck to NHTSA via mail or private interstate carrier. ZF TRW Corp.'s causal role is confirmed by a footer on every page of the slide deck itself, which reads: "This document is the property of ZF TRW and is disclosed in confidence. It may not be copied, disclosed to others, or used for manufacturing without the written consent of ZF TRW." Based on this footer, ZF TRW Corp. gave requisite written consent to the transmittal of the document to NHTSA.

1584. Upon information and belief, ZF TRW Corp. also gave requisite prior authorization for the delivery of the September 2016 letter.

1585. ZF TRW Corp. caused the transmittal of the March 8, 2018 slide deck to NHTSA via mail or private interstate carrier. ZF TRW Corp.'s causal role is confirmed by the cover letter included with the mailing of the slide deck. The cover letter is on the letter head of an "Active & Passive Safety Technology" business unit. Because this is a reference to ZF TRW Corp.,[5] ZF TRW Corp. must have reviewed and approved the transmittal of the slide deck to NHTSA.

1586. As explained in sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above, each of these four documents described above contained misleading statements about Hyundai-Kia Class Vehicles and the ACU Defect. ZF TRW Corp. specifically approved the transmittal of the final versions of these documents to NHTSA, and intended for the misleading statements contained therein to avoid, minimize, and/or delay recalls of Hyundai-Kia Class Vehicles. Avoiding, minimizing, and/or delaying recalls of Hyundai-Kia Class Vehicles enabled the continuation of the scheme to defraud consumers. Because ZF TRW Corp.'s affiliates would not have sent or approved the written communications noted in the

---

[5] According to ZF AG's 2017 Annual Report, the "Active & Passive Safety Technology Division" was "established by ZF Group to manage the business activities of ZF TRW after its acquisition." Because ZF TRW Corp. is the only corporate entity with "ZF TRW" as part of its corporate name, this letter was also sent on behalf of ZF TRW Corp.

1  preceding paragraph without ZF TRW Corp.'s contributions and approval, ZF

2  TRW Corp. was one of the Defendants who caused the delivery of these four

3  communications to NHTSA. Accordingly, its participation in these communications

4  violated the mail fraud statute at least four times. (18 U.S.C. § 1341).

5               **x.    ZF Germany violated the mail fraud statute multiple**
6                       **times in furtherance of the Hyundai-Kia-ZF-ST**
7                       **Enterprise's fraudulent scheme.**

8       1587. Prior to their delivery to NHTSA, ZF Germany reviewed and/or edited

9  the following misleading statements to NHTSA, as discussed in Sections IV.F.2.,

10  IV.F.4., IV.F.8., and IV.F.14. above:

11          a.    The slide deck presentation dated February 5, 2016 (which ZF
12                TRW Corp. mailed to NHTSA on March 14, 2016);

13          b.    The slide deck presentation dated July 19, 2016 (which, upon
14                information and belief, was mailed to NHTSA in July or August
15                2016);

16          c.    The September 2016 letter signed by Marc Bolitho (which ZF
17                Electronics USA mailed to NHTSA in September 2016); and

18          d.    The slide deck presentation dated March 8, 2018 (which ZF
19                TRW Corp. mailed to NHTSA on March 12, 2018).

20      1588. ZF Germany caused the delivery of these communications via mail

21  and wire. The three presentations bear copyright legends attributing ownership to

22  ZF Germany. Accordingly, sending these presentations must have required its

23  involvement and consent. Moreover, the slide decks dated February 5, 2016 and

24  July 19, 2016 identify ZF Germany as the corporate author on the title page.

25      1589. As explained in sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14 above,

26  each of these documents described above contained misleading statements about

27  Hyundai-Kia Class Vehicles and the ACU Defect. ZF Germany specifically

28  approved the transmittal of the final versions of these documents to NHTSA, and

intended for the misleading statements contained therein to avoid, minimize, and/or delay recalls of Hyundai-Kia Class Vehicles. Avoiding, minimizing, and/or delaying recalls of Hyundai-Kia Class Vehicles enabled the continuation of the scheme to defraud consumers. Because ZF Germany's affiliates would not have sent or approved the written communications noted in the preceding paragraph without ZF Germany's contributions and approval, ZF Germany was one of the Defendants who caused the delivery of these four communications to NHTSA. Accordingly, its participation in these communications violated the mail fraud statute at least four times. (18 U.S.C. § 1341).

>           **xi.     ST USA violated the mail fraud statute multiple times**
>                   **in furtherance of the Hyundai-Kia-ZF-ST Enterprise's**
>                   **fraudulent scheme.**

1590.  ST USA regularly received orders from ZF Electronics USA for DS84 ASICs, including all the defective DS84 ASICs used in Hyundai-Kia Class Vehicles. In response to these orders ST USA would work with its affiliate, ST Malaysia, to help it manufacture and ship DS84 ASICs to ST USA's so-called "ST Micro LAX Hub" near Los Angeles, California. Between 2007 and the present, ST USA caused ST Malaysia to ship well over ten million defective DS84 ASICs to this location. In discovery, ST USA has produced approximately 9,700 invoices sent to ZF Electronics USA from the time period between 2014 and the present alone. Each invoice notes the defective DS84 ASICs were made in Malaysia, where ST Malaysia operated. The invoice dates from these documents provide an approximate date for these shipments. Plaintiffs have extracted approximate shipping dates from these invoices, which are presented as exemplars in Exhibit 21.[6]

---

[6] ST USA made similar shipments for Hyundai-Kia Class Vehicles between 2009 and 2014, but is withholding invoices for these shipments from discovery. Upon information and belief, the invoices for this time period will show a similar regularity of shipments of DS84 ASICs from Malaysia.

1591. ST USA also shipped well over ten million defective DS84 ASICs to ZF Electronics USA at a facility with the following address: 902 South 2nd Street, Marshall, Illinois 62441. As explained above, Exhibit 21 provides exemplar approximate shipment dates based on an incomplete set of invoices produced by ST USA.[7]

1592. When ST USA required ST Malaysia to make these shipments and then made its own shipments to ZF Electronics USA, it knew ZF Electronics USA would place the DS84 ASICs into DS84 ACUs, including those that would be installed in Hyundai-Kia Class Vehicles that are marketed to U.S. consumers. ST USA was also aware of Kia Korea's, Hyundai Korea's, Kia USA's and Hyundai USA's practice of making reassuring statements about safety, airbags, and seatbelts in consumer-facing Monroney labels, certification labels, in-vehicle labels, owner's manuals and advertising for all Hyundai-Kia Class Vehicles. ST USA knew these statements were false because it knew the Hyundai-Kia Class Vehicles, DS84 ACU, and DS84 ASIC were defective. Accordingly, because ST USA caused shipments of well over ten million defective DS84 ASICs with the purpose of executing a fraudulent scheme with the other Enterprise members, each of the DS84 ASIC shipments caused by ST USA violated the mail fraud statute (18 U.S.C. § 1341).

> **xii.  ST Malaysia violated the mail fraud statute multiple times in furtherance of the Hyundai-Kia-ZF-ST Enterprise's fraudulent scheme.**

1593. Between 2007 and the 2018, ST USA regularly worked with its affiliate, ST Malaysia, to help it manufacture and ship DS84 ASICs to ST USA's so-called "ST Micro LAX Hub" near Los Angeles, California. During that time

---

[7] ST USA made similar shipments for Hyundai-Kia Class Vehicles between 2009 and 2014, but is withholding invoices for these shipments from discovery. Upon information and belief, the invoices for this time period will show a similar regularity of shipments of DS84 ASICs from the STMicro LAX Hub to the ZF Electronics USA's manufacturing facility in Illinois.

period, ST Malaysia shipped well over ten million defective DS84 ASICs to this location. ST USA has produced approximately 9,700 invoices sent to ZF Electronics USA from the time period between 2014 and the present alone. Each invoice notes the defective DS84 ASICs were made in Malaysia, where ST Malaysia operated. The invoice dates from these documents provide an approximate date for these shipments. Plaintiffs have extracted approximate shipping dates from these invoices, which are presented as exemplars in Exhibit 21.[8]

1594. When ST Malaysia made these shipments, it knew ZF Electronics USA would place the DS84 ASICs into DS84 ACUs, including those ACUs that would be installed in Hyundai-Kia Class Vehicles that are marketed to U.S. consumers. ST Malaysia was also aware of Kia Korea's, Hyundai Korea's, Kia USA's, and Hyundai USA's practice of making reassuring statements about safety, airbags, and seatbelts in consumer-facing Monroney labels, certification labels, in-vehicle labels, owner's manuals, and advertising for all Hyundai-Kia Class Vehicles. ST Malaysia knew these statements were false because it knew the Hyundai-Kia Class Vehicles, DS84 ACU, and ASIC were defective. Accordingly, because ST Malaysia caused shipments of well over ten million defective DS84 ASICs with the purpose of executing a fraudulent scheme with the other Enterprise members, each of the DS84 ASIC shipments made by ST Malaysia violated the mail fraud statute (18 U.S.C. § 1341).

---

[8] ST USA made similar shipments between 2007 and 2014, but is withholding invoices for these shipments from discovery. Upon information and belief, the invoices for this time period will show a similar regularity of shipments.

**b.    Kia Korea, Hyundai Korea, Kia USA, Hyundai USA, Hyundai Mobis, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia advanced their fraudulent scheme by concealing material information about a serious safety defect that they had a duty to disclose.**

1595.   The uses of mail and wire described in the section above violated the mail and wire fraud statutes because they furthered a fraudulent scheme to affirmatively mislead consumers and NHTSA. In addition, these same uses of mail and wire fraud *also* violated the mail and wire fraud statutes because Kia Korea, Hyundai Korea, Kia USA, Hyundai USA, Hyundai Mobis, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia had duties to disclose the ACU Defect.

1596.   Kia Korea, Hyundai Korea, Kia USA, Hyundai USA, Hyundai Mobis, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia each knew for years that the defective DS84 ACUs and ASICs in the Hyundai-Kia Class Vehicles are uniquely vulnerable to EOS. *See* Section IV.D.3. above.

1597.   To further the goals of the Hyundai-Kia-ZF-ST Enterprise and to their mutual gain, Kia Korea, Hyundai Korea, Kia USA, Hyundai USA, Hyundai Mobis, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia concealed what they knew about the existence, scope, and material safety risks of the ACU Defect in the Hyundai-Kia Class Vehicles.

1598.   Their careful efforts to conceal the ACU Defect in the Hyundai-Kia Class Vehicles were critically important to the viability of their scheme. A decision by any one Defendant or nonparty-Enterprise member to tell the truth about the ACU Defect and its impact of vehicle safety to consumers or to NHTSA would have been an existential threat to the Hyundai-Kia-ZF-ST Enterprise. Instead, and

in pursuit of ill-gotten profits, they each kept key information about the ACU Defect hidden for years. This concealment of material facts about the ACU Defect was grounded in and advanced their scheme to defraud consumers through the continued sale of Hyundai-Kia Class Vehicles, and avoidance of costly recalls and related reputational harms.

1599. Kia Korea, Hyundai Korea, Kia USA, Hyundai USA, Hyundai Mobis, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia's concealment of the ACU Defect violated several independent duties to disclose it.[9]

    a.    Kia Korea, Hyundai Korea, Kia USA, Hyundai USA, Hyundai Mobis, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia each had a duty to disclose the ACU Defect because of their exclusive knowledge and far superior information about the ACU Defect.

---

[9] As vehicle manufacturers and component parts suppliers, Defendants are also subject to statutory duties to disclose known safety defects to consumers and to NHTSA pursuant to the Safety Act and its attendant regulations. *See*, *e.g.*, 49 U.S.C. § 30118(c) ("A manufacturer of a motor vehicle . . . shall notify the Secretary by certified mail or electronic mail, and the owners, purchasers, and dealers of the vehicle . . . as provided in section 30119(d) of this section, if the manufacturer . . . learns the vehicle . . . contains a defect and decides in good faith that the defect is related to motor vehicle safety."); 49 U.S.C. §30119(d) (manufacturers must notify "each person registered . . . as the owner and whose name and address are reasonably ascertainable"); 49 C.F.R. §573.6(a) ("Each manufacturer shall furnish a report to the NHTSA for each defect . . . in his items of original . . . equipment that he . . . determines to be related to motor vehicle safety."). Plaintiffs previously pled Defendants had a duty to disclose based on these provisions of the Safety Act, but the Court dismissed an omissions theory based these alleged duties. Plaintiffs reserve the right to appeal this decision at a later date, but do not rely upon the Safety Act as a basis for their omissions theory in this pleading.

b.    These Defendants knew about the vulnerability of the DS84 ACU and ASIC to EOS through their exclusive access to information about their design, development, and testing, and through their confidential and proprietary investigations into suspicious incidents. Given the ACU Defect's hidden and technical nature, Plaintiffs and consumers lack the sophisticated expertise in vehicle components and electrical phenomena that would be necessary to discover the ACU Defect on their own.

c.    In addition, Kia Korea, Hyundai Korea, Kia USA, Hyundai USA, Hyundai Mobis, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia also each had a duty to disclose because they knew that a defect in the Hyundai-Kia Class Vehicles and their DS84 ACUs and ASICs gave rise to serious safety concerns for the consumers who use the vehicles. As sophisticated and well-funded corporate entities that generate billions of dollars in annual revenue from work in the automotive industry, each of these Defendants knew that this information would have been material to consumers. For example, a February 3, 2004, prospectus filed by ZF TRW Corp. with the SEC observed that "85 percent of recent auto purchasers stated that they look for vehicle safety information before making their final decision." Nonetheless, these Defendants still did not disclose it.

d.    Kia Korea, Hyundai Korea, Kia USA, Hyundai USA, Hyundai Mobis, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia also each had a duty to disclose the ACU Defect

because of the actions they took to conceal the ACU Defect in the Hyundai-Kia Class Vehicles from consumers. Each of these Defendants acted to suppress the truth about the ACU Defect through their misleading representations to NHTSA. *See* Sections IV.F.2., IV.F.4., IV.F.8., IV.F.12., IV.F.13., IV.F.14., and IV.F.16 above. Because a truthful and accurate disclosure to NHTSA would have been material to NHTSA's decision whether to require a recall or expand its investigation into the DS84 ACUs and ASICs, the affirmative steps they took to mislead NHTSA about the ACU Defect also precluded Hyundai-Kia Plaintiffs and Nationwide Hyundai-Kia Class members from an opportunity that otherwise have led to their discovery of the truth about the ACU Defect.

e. Finally, Kia Korea, Hyundai Korea, Kia USA, and Hyundai USA affirmatively presented reassuring information about the Hyundai-Kia Class Vehicles' airbags, seatbelts, and overall safety to consumers (*see* section IV.E.1. and I.V.E.2. above). Because they opted to make these representations to consumers about these topics, and because they knew information about the ACU Defect that made those representations misleading or untrue, Kia Korea, Hyundai Korea, Kia USA, and Hyundai USA were under a separate duty to disclose the full truth about the ACU Defect that materially undermined the reassuring information they presented, or caused to be presented, to consumers.

1600. Kia Korea, Hyundai Korea, Kia USA, Hyundai USA, Hyundai Mobis, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia knew and intended that NHTSA

would rely on their and the other members of the Hyundai-Kia-ZF-ST Enterprise's material omissions about the Hyundai-Kia Class Vehicles to approve them for importation, marketing, and sale to consumers in the United States. And conversely, they also understood that disclosing the ACU Defect would require them to recall and fix the Hyundai-Kia Class Vehicles, which would negatively impact the profits of the Hyundai-Kia-ZF-ST Enterprise.

1601. Kia Korea, Hyundai Korea, Kia USA, Hyundai USA, Hyundai Mobis, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia also knew and intended that consumers would rely on their and the other members of the Hyundai-Kia-ZF-ST Enterprise's material omissions when deciding to purchase or lease the Hyundai-Kia Class Vehicles. The Hyundai-Kia Plaintiffs' reliance on this concealment is demonstrated by the fact that they paid money for Hyundai-Kia Class Vehicles that never should have been introduced into the U.S. stream of commerce, and that they overpaid for vehicles with defective safety systems without knowledge of the ACU Defect.

### c. The Hyundai-Kia-ZF-ST Enterprise was an association-in-fact enterprise with a common purpose of misleading consumers and NHTSA as to the ACU Defect in Hyundai-Kia Class Vehicles.

1602. The Hyundai-Kia-ZF-ST Enterprise had a common purpose and ongoing organization and functioned as a continuing unit.

### i. The Hyundai-Kia-ZF-ST Enterprise had a common purpose.

1603. The common purpose of the Hyundai-Kia-ZF-ST Enterprise was to perpetuate a fraudulent scheme to maximize sales and leases of Hyundai-Kia Class Vehicles while hiding the ACU Defect from purchasers and lessees. Because all of the Enterprise members' continued profits from this scheme ultimately depended on

consumers purchasing or leasing Hyundai-Kia Class Vehicles, the Enterprise needed to convince consumers of a false premise: that Hyundai-Kia Class Vehicles had properly-functioning safety systems. Toward this end, the Enterprise needed to make misleading statements to consumers. For this scheme to work, it was also essential for the Enterprise to conceal the ACU Defect from NHTSA, because the agency could halt the sale of Hyundai-Kia Class Vehicles and order recalls that necessarily require public notice of a defect. The expense of these recalls would undermine the profitability of the scheme.

1604. This common purpose served the interests of all members of the Hyundai-Kia-ZF-ST Enterprise. By concealing and minimizing the ACU Defect, Hyundai Korea, Kia Korea, Hyundai USA, Kia USA, Hyundai Mobis, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, ST Malaysia, and the nonparty-Enterprise-members maximized their revenue by selling as many Hyundai-Kia Class Vehicles as possible while avoiding or limiting the substantial costs to recall and repair the Vehicles and their defective DS84 ACUs and ASICs.

1605. The common purpose of the Hyundai-Kia-ZF-ST Enterprise is evidenced by Hyundai Korea's, Kia Korea's, Hyundai USA's, Kia USA's, Hyundai Mobis's, ZF Electronics USA's, ZF Passive Safety USA's, and ZF Automotive USA's repeated, confidential consultations with one another about suspicious crashes involving Hyundai-Kia Class Vehicles, problems with the design of the DS84 ACU and ASIC, observations of EOS on DS84 ACUs and ASICs, and dangerous safety system malfunctions in Hyundai-Kia Class Vehicles. As the Court has held, consultations about "observed evidence of EOS in Class Vehicles" among Defendants "support[s] a reasonable inference" of a "common purpose of misleading consumers and NHTSA as to the existence of a defect in the ACUs." ECF 396 at 61.

1606. The common purpose of the Hyundai-Kia-ZF-ST Enterprise is further evidenced by ST USA, ST Italy, and ST Malaysia's repeated communications with ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA about observations of EOS in Hyundai-Kia Class Vehicles. ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA would regularly share this information with Hyundai Korea, Kia Korea, and Hyundai Mobis by copying excerpts of the reports received from ST USA, ST Italy, and ST Malaysia and sending them to Hyundai Korea, Kia Korea, and Hyundai Mobis, who would then share them with Hyundai USA and Kia USA.

1607. The common purpose of the Hyundai-Kia-ZF-ST Enterprise is also evidenced by coordinated efforts by Hyundai Korea, Kia Korea, Hyundai USA, Kia USA, Hyundai Mobis, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, and ZF Germany to mislead NHTSA about the existence and scope of the ACU Defect by misleadingly blaming wire harnesses for safety system malfunctions that were caused by the ACU Defect.

ii.     **The Hyundai-Kia-ZF-ST Enterprise had an ongoing organization.**

1608. The participation of separate entities or individuals that have an existence outside an alleged enterprise is evidence of an ongoing organization with its own structure, separate and apart from its members. Hyundai Korea, Kia Korea, Hyundai USA, Kia USA, Hyundai Mobis, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia each existed separately from the Hyundai-Kia-ZF-ST Enterprise.

a.     During the relevant period, Hyundai Korea and Kia Korea contemporaneously designed, manufactured, and sold many vehicles that do not contain defective DS84 ACUs and ASICs.

b.     During the relevant period, Hyundai USA and Kia USA contemporaneously provided services to Hyundai Korea and Kia

Korea relating to a large volume of vehicles that do not contain defective DS84 ACUs and ASICs.

c. During the relevant period, Hyundai Mobis manufactured and supplied many parts other than the DS84 ACUs to Hyundai Korea and Kia Korea.

d. During the relevant period, ST USA, ST Italy, and ST Malaysia contemporaneously sold, designed, and/or manufactured many other products aside from the defective DS84 ASICs used in the defective DS84 ACUs.

e. During the relevant period, ZF Passive Safety USA, ZF Electronics USA, and ZF Automotive USA contemporaneously designed, made, and/or sold many other automotive parts aside from the defective DS84 ACUs.

f. ZF TRW Corp. and ZF Germany also engaged in a wide variety of business activities unrelated to the defective DS84 ACUs.

1609. Another hallmark of an ongoing organization is members with delineated roles that further the organization's goals. Each member performed important but separate roles within the Hyundai-Kia-ZF-ST Enterprise organization.

a. Hyundai Korea designed the Hyundai Class Vehicles, and made many of them in South Korea. For the Hyundai Class Vehicles it made itself, Hyundai Korea added permanent labels to each vehicle that certified compliance with U.S. Federal safety standards, as well as readiness indicators and in-vehicle airbag labels and imprints.

b. Nonparty Hyundai Motor Manufacturing Alabama, LLC made the remaining Hyundai Class Vehicles manufactured outside of South Korea, but had no discretion to depart from Hyundai

Korea's mandatory design specifications in the process. Hyundai Korea's mandatory designs required Hyundai Motor Manufacturing Alabama, LLC to add permanent labels to each vehicle that certified compliance with U.S. Federal safety standards, as well as readiness indicators and in-vehicle airbag labels and imprints.

c.   Kia Korea designed the Kia Class Vehicles, and made many of them in South Korea. For the Kia Class Vehicles it made itself, Kia Korea added permanent labels to each vehicle that certified compliance with U.S. Federal safety standards, as well as readiness indicators and in-vehicle airbag labels and imprints.

d.   Nonparty Kia Georgia, Inc. made the remaining Kia Class Vehicles manufactured outside of South Korea, but had no discretion to depart from Kia Korea's mandatory design specifications in the process. Kia Korea's mandatory designs required Kia Georgia, Inc. to add permanent labels to each vehicle that certified compliance with U.S. Federal safety standards, as well as readiness indicators and in-vehicle airbag labels and imprints.

e.   Kia USA received the Kia Class Vehicles made in South Korea from Kia Korea and the Kia Class Vehicles made in the United States from Kia Georgia Inc. It then placed misleading Monroney labels on them and distributed them to dealers. It also was responsible for responding to NHTSA's investigation into Kia Class Vehicles on behalf of Kia Korea and for all misleading advertising of Kia Class Vehicles to United States consumers.

f.   Hyundai USA received the Hyundai Class Vehicles made in South Korea from Hyundai Korea and the Hyundai Class Vehicles made in the United States from Hyundai Motor Manufacturing Alabama, LLC. It then placed misleading Monroney labels on them and distributed them to dealers. It also was responsible for responding to NHTSA's investigation into Hyundai Class Vehicles on behalf of Hyundai Korea and for all misleading advertising of Hyundai Class Vehicles to United States consumers.

g.   ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA jointly designed the defective DS84 ACU for use in the Hyundai-Kia Class Vehicles, with Kia Korea's, Hyundai Korea's, ST Italy's, and ST USA's input. ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA also met with, and made misleading statements about the ACU Defect, to NHTSA.

h.   ZF TRW Corp. and ZF Germany approved actions taken by ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA, and participated directly in making misleading statements to NHTSA about the ACU Defect.

i.   ZF Electronics USA made and shipped the DS84 ACUs to Hyundai Motor Manufacturing Alabama, LLC and Kia Georgia Inc.

j.   Hyundai Mobis also manufactured DS84 ACUs in South Korea and shipped them to Hyundai Korea and Kia Korea.

k.   ST Italy and ST USA jointly designed the defective DS84 ASIC, with input from ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA.

l.      ST Malaysia manufactured the defective DS84 ASICs and shipped them to ST USA in California.

m.    ST USA sold and shipped the defective DS84 ASIC to ZF Electronics USA.

n.     Each of the Defendants separately ensured that NHTSA and consumers did not discover the ACU Defect.

1610. The Enterprise members dedicated personnel to the Hyundai-Kia-ZF-ST Enterprise's scheme, which further evidences the ongoing structure of the Enterprise. For example, ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA dedicated an entire applications team to implement the defective DS84 ACUs in Hyundai-Kia Class Vehicles in 2008. This team included ZF Passive Safety USA employees Hiro Kawakubo, Kyle Pellar-Kosbar, and Ed Wampuszyc, potentially among others.

1611. When the passenger safety systems in Hyundai-Kia vehicles repeatedly malfunctioned due to the ACU Defect over the course of several years (starting at least as early as 2010), Kia Korea, Hyundai Korea, Hyundai Mobis, Kia USA, and Hyundai USA routinely sought the involvement and assistance of ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ST Italy, ST USA, and ST Malaysia. These Defendants repeatedly coordinated, directly or indirectly, with Kia Korea, Hyundai Korea, Hyundai Mobis, Kia USA, and Hyundai USA on these issues, including by assigning several investigations for Hyundai-Kia Class Vehicles to the same personnel. For example, ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA assigned Emanuel Goodman with the task of analyzing DS84 ACUs from Hyundai-Kia Class Vehicles. ███████████████ ████████████████████████████████████████ ███████████████████████

1612. The Hyundai-Kia-ZF-ST Enterprise held multiple meetings to discuss the ACU Defect and observations of ASIC EOS in Hyundai-Kia vehicles with

airbag failures. For example, in May 2012, ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA, Hyundai Korea, Kia Korea, and Hyundai Mobis held a meeting on this topic.

1613.  When NHTSA began to investigate the defective DS84 ACUs in 2015, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF Germany, ZF TRW Corp., Kia Korea, Hyundai Korea, Hyundai Mobis, Kia USA, and Hyundai USA repeatedly met to discuss the subject. In 2016, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF Germany, ZF TRW Corp., shared excerpts of their misleading communications with NHTSA with Kia Korea, Hyundai Korea, and Hyundai Mobis. For the next two years, these companies repeatedly communicated about the ACU Defect and NHTSA investigation with each other, as well as Kia America and Hyundai America. These repeated communications allowed the participants in the Hyundai-Kia-ZF-ST Enterprise to coordinate their efforts to downplay the ACU Defect and avoid and minimize recalls.

### iii.    The Hyundai-Kia-ZF-ST Enterprise functioned as a continuing unit.

1614.  The Hyundai-Kia-ZF-ST Enterprise continued for several years, at least during the time period of 2008 to the present. Although Hyundai USA and Kia USA stopped distributing new Class Vehicles with the DS84 ACU in 2018 or 2019, Hyundai-Kia Class Vehicles continue to sell on the used car market with misleading in-vehicle statements and consumer-facing marketing (such as vehicle brochures) made by the Hyundai-Kia-ZF-ST Enterprise.

1615.  During this protracted time, the members of the Hyundai-Kia-ZF-ST Enterprise remained stable, with Hyundai Korea, Kia Korea, Hyundai Mobis, Hyundai USA, Kia USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ST USA, ST Malaysia, ST Italy, Hyundai Motor Manufacturing Alabama, LLC and Kia Georgia, Inc. remaining active members for

nearly a decade of ongoing production and sales of the Hyundai-Kia Class
Vehicles. ZF Germany, on the other hand, participated in the Hyundai-Kia-ZF-ST
Enterprise shortly after acquiring ZF TRW Corp. in 2015.

> **d.** **The Hyundai-Kia-ZF-ST Enterprise's pattern of
> racketeering caused Hyundai-Kia Plaintiffs and the
> Nationwide Hyundai-Kia Class members to overpay for
> Hyundai-Kia Class Vehicles at the point of sale or lease.**

1616. Hyundai-Kia Plaintiffs and Nationwide Hyundai-Kia Class members
are "person[s] injured in his or her business or property" by reason of the Hyundai-
Kia-ZF-ST Enterprise's RICO violations, within the meaning of U.S.C. § 1964(c).
These The Hyundai-Kia Plaintiffs and Nationwide Hyundai-Kia Class members are
entitled to bring this action for three times their actual damages, as well as
injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18
U.S.C. § 1964(c).

1617. Because of the Hyundai-Kia-ZF-ST Enterprise's pattern of
racketeering activity, the Hyundai-Kia Plaintiffs and Nationwide Hyundai-Kia
Class members have been injured in their business and/or property through their
overpayment at the time of purchase or lease for Hyundai-Kia Class Vehicles with
an undisclosed safety defect.

1618. By making misleading statements and omissions at or before the point
of sale or lease, the Hyundai-Kia-ZF-ST Enterprise directly or indirectly obtained
money from Hyundai-Kia Plaintiffs and the Nationwide Hyundai-Kia Class
members by means of materially false or fraudulent misrepresentations and
omissions of material facts. Had they known what the Hyundai-Kia-ZF-ST
Enterprise members knew about the ACU Defect, the Hyundai-Kia Plaintiffs and
the Nationwide Hyundai-Kia Class members would not have purchased the
Hyundai-Kia Class Vehicles, or would not have paid as much as they did for them.

1619. Had Kia Korea, Hyundai Korea, Kia USA, Hyundai USA, Hyundai Mobis, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia not concealed, and instead decided to disclose, the information they knew about the ACU Defect and its impact on vehicle safety, the Hyundai-Kia Plaintiffs and the Nationwide Hyundai-Kia Class members would have learned of the disclosure.

    a.    The Hyundai-Kia Plaintiffs and the Nationwide Hyundai-Kia Class members would have learned about the ACU Defect through any of the channels through the Hyundai-Kia Class Vehicles were marketed to them. In other words, had Kia Korea, Hyundai Korea, Hyundai USA, and Kia USA made a disclosure in *any* of the places in which it otherwise communicated information about the Hyundai-Kia Class Vehicles, Hyundai-Kia Plaintiffs and Nationwide Hyundai-Kia Class members would have seen it. This includes in Hyundai-Kia Class Vehicle brochures and other advertising, on Monroney labels, certification labels, in-vehicle airbag labels, airbag warning lamps, and in owner's manuals.

    b.    Further, Hyundai-Kia Plaintiffs and Nationwide Hyundai-Kia Class members would have learned about the ACU Defect at the times and places that they purchased or leased their Class Vehicles. For example, had Kia USA or Hyundai USA made a disclosure about the ACU Defect to authorized Hyundai and Kia dealerships, sales personnel at the dealerships would have passed on that material information to consumers at the time of the contemplated purchases.

    c.    Had any of the Defendants listed above disclosed the true scope and existence of the ACU Defect to NHTSA, Hyundai-Kia

Plaintiffs and Nationwide Hyundai-Kia Class members would
have learned of it because NHTSA would have considered this
information material to its decision to require a recall, which
information would have been made public and passed onto
impacted consumers.

d.     Had any of the Defendants listed above disclosed the true scope
and existence of the ACU Defect to consumers or the public,
either through press releases, on their websites, or in any other
public channel or forum, Hyundai-Kia Plaintiffs and Nationwide
Hyundai-Kia Class members would have learned of it due to the
materiality of this information about a serious safety defect in
millions of vehicles. Given the seriousness of the information
and the number of vehicles impacted, the news media and
consumer forums and blogs would pick up the story. This is
particularly so in the wake of the massive Takata recall and
litigation, which confirmed the strong public interest in airbags
and vehicle safety. For example, an April 23, 2019 article
available on ConsumerReports.com described NHTSA's
expanded investigation into the DS84 ACUs to be "the agency's
most in-depth look at airbags since the recall of more than 56
million airbags made by Takata."

1620.   The Hyundai-Kia-ZF-ST Enterprise's misleading statements to
NHTSA between 2016 and the present were essential to the scheme because
NHTSA would not have allowed continued sale of unremedied Hyundai-Kia Class
Vehicles with defective DS84 ACUs and ASICs. At the very least, these misleading
statements delayed NHTSA's broader investigation of the Hyundai-Kia Class
Vehicles until April 2019, when NHTSA launched an Engineering Analysis
covering all unrecalled Hyundai-Kia Class Vehicles. Upon information and belief,

ZF Electronics USA stopped making DS84 ACUs for the 2020 model year based in large part on this investigation. Accordingly, ZF Electronics USA would have stopped making DS84 ACUs if NHTSA had launched a broader investigation in 2016. For this reason, Plaintiffs who purchased and leased Hyundai-Kia Class Vehicles after the first misleading statement to NHTSA by the Hyundai-Kia-ZF-ST Enterprise would have avoided purchasing or leasing their Hyundai-Kia Class Vehicles entirely, or they would have paid less for them.

1621. Consumers are the only direct victims of the Hyundai-Kia-ZF-ST Enterprise's alleged fraudulent and misleading statements to NHTSA. NHTSA has not suffered any reported, direct injury as a result of such conduct.

1622. Damages will not be difficult to ascertain; the Hyundai-Kia Plaintiffs and the Nationwide Hyundai-Kia Class members' damages are the difference between what they paid for Hyundai-Kia Class Vehicles without an ACU Defect, and the value of the Hyundai-Kia Class Vehicles they actually received. In the similar *Takata* airbag litigation, for example, plaintiffs also alleged overpayment damages suffered at the point of sale based on a dangerous airbag defect. Plaintiffs' experts in that case performed a conjoint analysis using surveys of consumers and found that the price premium paid by class members was at least ten percent of the purchase price. A similar analysis could be performed in this litigation. Other methodologies are also viable.

1623. All victims of Defendants' alleged conduct who claim to have overpaid for the purchase or lease of Hyundai-Kia Class Vehicles are within the alleged Nationwide Hyundai-Kia Class. Consequently, there are no issues with respect to reapportionment or multiple recovery.

**2.** **Nationwide Count 2: Violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(d), on Behalf of the Nationwide Hyundai-Kia Class Against Kia Korea, Hyundai Korea, Kia USA, Hyundai USA, Hyundai Mobis, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia.**

1624. As applicable to this case, it is also unlawful "for any person to conspire to violate" 18 U.S.C. § 1962(c). *See* 18 U.S.C. § 1962(d). To conspire in violation of section 1962(c), the defendant must be "aware of the essential nature and scope of the enterprise." ECF 396 at 77. Enterprise members conspire to violate section 1962(c) when "two or more people agree[] to commit a crime" and "knowingly and willfully participate[] in the agreement. . . . The illegal agreement need not be express as long as its existence can be inferred from the words, actions, or interdependence of activities and persons involved." *Id*. A defendant who "agreed to facilitate a scheme" violates section 1962(d) even if he "does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense." *Salinas v. United States*, 522 U.S. 52, 65-66 (1997).

1625. As explained in the section below, Kia Korea, Hyundai Korea, Kia USA, Hyundai USA, Hyundai Mobis, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia were aware of the essential nature and scope of the Hyundai-Kia-ZF-ST Enterprise. Count 1 describes this Enterprise.

1626. As explained in the section below, based on their words, actions, and/or interdependence, Kia Korea, Hyundai Korea, Kia USA, Hyundai USA, Hyundai Mobis, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., and ZF Germany agreed to facilitate the following acts of mail and wire fraud:

    a.    Hyundai USA's and Kia USA's interstate shipments between 2009 and 2019 of millions of Hyundai-Kia Class Vehicles with

1  misleading Monroney labels, readiness indicators, in-vehicle

2  airbag labels and imprints, and owners' manuals; and

3      b.  ZF Electronics USA's interstate shipments between 2008 and

4        2019 of millions of DS84 ACUs to Kia Georgia, Inc. and

5        Hyundai Motor Manufacturing Alabama, LLC.

6      1627. As explained in the section below, based on their words, actions,

7  and/or interdependence, ZF Electronics USA, ZF Passive Safety USA, ST USA, ST

8  Italy, and ST Malaysia also agreed to facilitate the following acts of mail fraud:

9      a.  ZF Electronics USA's interstate shipments between 2009 and

10        2019 of millions of DS84 ACUs to Kia Georgia, Inc. and

11        Hyundai Motor Manufacturing Alabama, LLC;

12      b.  ST Malaysia's interstate shipments between 2008 and 2019 of

13        millions of DS84 ASICs to ST USA in California; and

14      c.  ST USA's interstate shipments between 2008 and 2019 of

15        millions DS84 ASICs to ZF Electronics USA in Illinois.

16      1628. The words, actions, or interdependence of activities of each of these

17  Defendants support the inference of agreement.

18      1629. Accordingly, Kia Korea, Hyundai Korea, Kia USA, Hyundai USA,

19  Hyundai Mobis, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive

20  USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia each

21  violated 18 U.S.C. § 1962(d).

22      1630. Kia Korea, Hyundai Korea, Kia USA, Hyundai USA, Hyundai Mobis,

23  ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW

24  Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia each reached an

25  agreement with certain Enterprise members that one or more of the members of the

26  Hyundai-Kia-ZF-ST Enterprise described in Count 1 above would commit at least

27  two predicate acts of mail and/or wire fraud. Accordingly, each of these Defendants

28  violated 18 U.S.C. § 1962(d).

1631. These violations caused the same injuries and damages described in the prior Count. This Count incorporates by reference the allegations as to injury, damages, and causation from the prior Count.

**a.    Kia Korea, Hyundai Korea, Kia USA, Hyundai USA, ZF Electronics USA, Hyundai Mobis, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia were all aware of the essential nature and scope of the Hyundai-Kia-ZF-ST Enterprise.**

1632. For a Defendant to conspire in violation of the RICO Act, it must be aware of the essential nature and scope of the enterprise, even if some details about the enterprise's illegal activities and members are unknown. Each Defendant had this awareness.

**i.    Kia Korea, Hyundai Korea, Kia USA, and Hyundai USA understood the nature and scope of the Hyundai-Kia-ZF-ST Enterprise's fraudulent scheme.**

1633. Kia Korea, Hyundai Korea, Kia USA, and Hyundai USA were aware of the essential nature and scope of the Hyundai-Kia-ZF-ST Enterprise.

1634. Kia Korea, Hyundai Korea, Kia USA, Hyundai USA, and Hyundai Mobis are, and at all relevant times were, closely related corporate parties, given their crossholdings in each other's stock and longstanding business relationships. They monitor and/or are aware of each other's activities.

1635. As explained in Section IV.D.3. above, Kia Korea, Hyundai Korea, Kia USA, and Hyundai USA knew about the ACU Defect.

1636. When Hyundai Korea and Kia Korea decided to include DS84 ACUs in their mandatory design specifications for each model year of the Hyundai-Kia Class Vehicles, Kia Korea, Hyundai Korea, Kia USA, and Hyundai USA knew that the nonparty-Enterprise members Kia Georgia Inc. and Hyundai Motor Manufacturing Alabama, LLC would follow Kia Korea's and Hyundai Korea's

mandatory design specifications for the Hyundai-Kia Class Vehicles. Because these Hyundai and Kia specifications were available to Hyundai USA and Kia USA, respectively, they have always known precisely which makes and models of the Class Vehicles associated with their brands would have the defective DS84 ACU and DS84 ASIC.

1637. Throughout the relevant period, Hyundai Korea, Kia Korea, Hyundai USA, and Kia USA knew that the STMicroelectronics companies were responsible for designing and manufacturing the DS84 ASIC for the DS84 ACUs used in Hyundai-Kia Class Vehicles.

1638. Between 2008 and the present, Hyundai Korea, Kia Korea, Hyundai USA, and Kia USA have continuously tracked the volume of sales of Hyundai-Kia vehicle makes and models in the United States. Accordingly, during the relevant time period, Hyundai Korea and Hyundai USA knew roughly how many Hyundai Class Vehicles would likely sell in the United States, and Kia Korea and Kia USA knew roughly how many Kia Class Vehicles would likely sell in the United States.

1639. During each year between 2009 and the present, Hyundai Korea, Kia Korea, Hyundai USA, and Kia USA knew that reassuring certification labels, in-vehicle airbag labels and imprints, and readiness indicators would be placed in Hyundai-Kia Class Vehicles prior to the shipment to dealers in the United States. They knew this would occur because Hyundai Korea's and Kia Korea's mandatory designs required these statements to be placed in Hyundai-Kia Class Vehicles. Hyundai Korea, Kia Korea, Hyundai USA, and Kia USA knew that consumers would rely on some or all of these in-vehicle labels when purchasing or leasing Hyundai-Kia Class Vehicles.

1640. During each year between 2009 and the present, Hyundai Korea and Kia Korea knew that Hyundai USA and Kia USA would advertise the Hyundai-Kia Class Vehicles as safe vehicles with properly functioning airbags and seatbelts. Hyundai Korea, Kia Korea, Hyundai USA, and Kia USA knew that consumers

would rely on such advertisements when purchasing or leasing Hyundai-Kia Class Vehicles.

1641. During each year between 2008 and the present, Hyundai Korea and Kia Korea knew that Hyundai USA and Kia USA would ship Hyundai-Kia Class Vehicles with owner's manuals that included misleading statements about the safety systems, airbags, and seatbelts of the Hyundai-Kia Class Vehicles. Hyundai Korea, Kia Korea, Hyundai USA, and Kia USA knew that consumers would rely on such advertisements when purchasing or leasing Hyundai-Kia Class Vehicles.

1642. During each year between 2009 and the present, Kia Korea and Hyundai Korea knew that Kia USA and Hyundai USA would create and affix Monroney stickers with misleading statements about airbags and seatbelts to Kia and Hyundai Class Vehicles, respectively. Hyundai Korea, Kia Korea, Kia USA, and Hyundai USA knew that consumers would rely on Monroney labels when purchasing or leasing Hyundai-Kia Class Vehicles.

1643. During each year between 2008 and the present, Hyundai Korea, Kia Korea, Kia USA and Hyundai USA knew that Hyundai Mobis would place orders with ZF Electronics USA, and that ZF Electronics USA would use private interstate carriers to ship the defective DS84 ACUs to the plants that manufacture Hyundai-Kia Class Vehicles.

1644. During each year between 2008 and the present, Hyundai Korea and Kia Korea knew that Hyundai USA and Kia USA would cause the Hyundai-Kia Class Vehicles to ship from manufacturing plants to automobile dealers across the United States.

1645. Hyundai Korea, Kia Korea, Kia USA, and Hyundai USA knew in 2016 that ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., and ZF Germany had made misleading statement to NHTSA about the defect because in early 2016 they received copies of the misleading slide deck dated February 5, 2016.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

      **ii.**    **Hyundai Mobis understood the nature and scope of the Hyundai-Kia-ZF-ST Enterprise's fraudulent scheme.**

1646. Hyundai Mobis was aware of the essential nature and scope of the Hyundai-Kia-ZF-ST Enterprise.

1647. As explained in Section IV.D.3. above, Hyundai Mobis knew about the ACU Defect.

1648. Hyundai Mobis knew which Hyundai Class Vehicle makes and models would use the DS84 ACU because it needed that information to place the appropriate orders and build the DS84 ACUs for Hyundai Sonata Hybrids, Kia Fortes, and Kia Sedonas.

1649. Throughout the relevant period, Hyundai Mobis knew that the STMicroelectronics companies were responsible for designing and manufacturing the DS84 ASIC for the DS84 ACUs used in Hyundai-Kia Class Vehicles. Upon information and belief, Hyundai Mobis received its own shipments of DS84 ASICs from ST Malaysia.

1650. Hyundai Mobis knew the volume of Hyundai-Kia Class Vehicles with the DS84 ACUs because it placed the orders for the ACUs for the Hyundai-Kia Class Vehicles built in the United States, and because it built the DS84 ACUs for the remaining Hyundai-Kia Class Vehicles itself.

1651. Hyundai Mobis knew ZF Electronics USA would use private or commercial interstate carrier(s) to ship DS84 ACUs to Kia Georgia, Inc. and Hyundai Motor Manufacturing Alabama, LLC because Hyundai Mobis placed the orders that generated these shipments.

1652. During each year between 2009 and the present, Hyundai Mobis knew that reassuring certification labels, in-vehicle airbag labels and imprints, and readiness indicators would be placed in Hyundai-Kia Class Vehicles prior to their shipment to dealers in the United States.

1653. During each year between 2009 and the present, Hyundai Mobis knew that Hyundai USA and Kia USA would advertise the Hyundai-Kia Class Vehicles as safe vehicles with properly functioning airbags and seatbelts.

1654. During each year between 2008 and the present, Hyundai Mobis knew that Hyundai USA and Kia USA would cause the Hyundai-Kia Class Vehicles to ship from manufacturing plants to automobile dealers across the United States.

1655. Hyundai Mobis knew in 2016 that ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., and ZF Germany had made misleading statement to NHTSA about the defect because it received copies of the misleading slide deck dated February 5, 2016 in early 2016.

   **iii.**  **ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA, ZF TRW Corp., and ZF Germany understood the nature and scope of the Hyundai-Kia-ZF-ST Enterprise's fraudulent scheme.**

1656. ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA, ZF TRW Corp., and ZF Germany were aware of the essential nature and scope of the Hyundai-Kia-ZF-ST Enterprise.

1657. ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA, ZF TRW Corp., and ZF Germany were aware of the nature and scope of the ACU Defect, because ZF Automotive USA, ZF Electronics USA, and ZF Passive Safety USA designed, manufactured, and/or sold the DS84 ACUs, confirmed the vulnerability of the DS84 ACU to EOS in testing, and investigated dozens of field incidents and crash tests where the vehicle's safety system malfunctioned due to ASIC EOS. ZF TRW Corp. had access to the information in the possession of these companies because it owned them. ZF Germany gained access to this information in 2015 when it acquired ZF TRW Corp.

1658. ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA, ZF TRW Corp., and ZF Germany knew hundreds of thousands of Hyundai-Kia

Class Vehicles had the DS84 ACU because it made the ACUs for hundreds of thousands of Kia Optimas and Hyundai Sonatas, and knew Hyundai Mobis was making DS84 ACUs for Kia Fortes, Kia Sedonas, and Hyundai Sonata Hybrids.

1659. ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA, ZF TRW Corp., and ZF Germany knew that Hyundai Korea, Kia Korea, Hyundai USA, and/or Kia USA would make reassuring statements about the Hyundai-Kia Class Vehicle's safety systems, airbags, and seatbelts.

### iv.  ST USA, ST Italy, and ST Malaysia understood the nature and scope of the Hyundai-Kia-ZF-ST Enterprise's fraudulent scheme.

1660. ST USA, ST Italy, and ST Malaysia were aware of the essential nature and scope of the Hyundai-Kia-ZF-ST Enterprise.

1661. ST USA, ST Italy, and ST Malaysia were aware of the nature and scope of the ACU Defect, because ST USA, ST Italy, and ST Malaysia sold, designed, and/or manufactured the defective DS84 ASIC. They knew of test results that confirmed the vulnerability of the DS84 ASIC to EOS and confirmed EOS on the DS84 ASICs retrieved from many field incidents and crash tests where the vehicle's safety system malfunctioned due to ASIC EOS.

1662. Upon information and belief, ST Italy, ST Malaysia, and ST USA knew the defective DS84 ASICs would be installed in the Hyundai-Kia Class Vehicles. These companies also understood that automakers like the Hyundai-Kia Defendants would advertise their vehicle's safety systems to consumers, and that those safety systems would not work properly as a result of the DS84 ASIC's vulnerability to EOS.

1663. ST USA, ST Malaysia, and ST Italy were aware of the large scope of the Hyundai-Kia-ZF-ST Enterprise, among other reasons, because ST Malaysia and ST USA made and sold the DS84 ASICs for the Hyundai-Kia Class Vehicles and

all these companies had access to records that showed millions of defective DS84 ASICs were shipping to Illinois per ZF Electronics USA's instructions.

> **b.** **Hyundai Korea, Kia Korea, Hyundai USA, Kia USA, Hyundai Mobis, ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA, ZF TRW Corp., and ZF Germany agreed that one or more members of the Enterprise would commit at least two predicate acts of mail or wire fraud in furtherance of the Hyundai-Kia-ZF-ST Enterprise's fraudulent scheme.**

1664. Hyundai Korea, Kia Korea, and Hyundai Mobis, ZF Passive Safety USA, ZF Electronics USA, and ZF Automotive USA began conspiring in furtherance of the Hyundai-Kia-ZF-ST Enterprise's fraudulent scheme in 2007.

1665. ZF TRW Corp. joined the conspiracy by no later than 2009, when its executive signed a contract with Hyundai Mobis that governed the purchases of the DS84 ACU.

1666. Hyundai USA and Kia USA joined the conspiracy when they began shipping and advertising Hyundai-Kia Class Vehicles in 2009.

1667. ZF Germany joined the conspiracy in or around 2015, when it acquired ZF TRW Corp.

1668. When Hyundai Korea and Kia Korea agreed to use the defective DS84 ACU and ASIC in Hyundai-Kia Class Vehicles, Hyundai Korea, Kia Korea, Hyundai USA, Kia USA, Hyundai Mobis, ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA mutually understood and intended that this agreement would prompt Hyundai Mobis to cause ZF Electronics USA to ship DS84 ACUs across state lines and Kia USA and Hyundai USA to ship the Hyundai-Kia Class Vehicles with misleading statements about the passive safety system, airbags, and seatbelts therein.

> a. Between 2007 and 2009, Hyundai Korea and Kia Korea agreed with ZF Electronics USA, ZF Passive Safety USA, and ZF

Automotive USA on the design specifications for the DS84 ACU installed in Hyundai-Kia Class Vehicles. Hyundai Korea, Kia Korea, ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA continued to agree on specifications for Hyundai-Kia Class Vehicles with the DS84 ACU for every model year until 2019.

b.   Between 2009 and 2019, Kia USA and Hyundai USA used mail and wire to advertise the Hyundai-Kia Class Vehicles as safe vehicles with properly-functioning airbags and seatbelts, and used private interstate carriers to ship the Hyundai-Kia Class Vehicles with misleading Monroney labels, airbag labels and imprints, certification labels, readiness indicators, and owner's manuals. Kia Korea, Hyundai Korea, ZF Passive Safety USA, ZF Electronics USA, ZF Automotive USA, and Hyundai Mobis all knew that Kia Korea and Hyundai Korea were doing this and would do this.

c.   When Kia Korea and Hyundai Korea agreed with ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA on specifications for the DS84 ACUs in Hyundai-Kia Class Vehicles, Kia Korea, Hyundai Korea, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp. (and ZF Germany after 2015), and Hyundai Mobis each mutually understood and planned for Hyundai Mobis to send orders for hundreds of thousands of DS84 ACUs every year via mail or wire to ZF Electronics USA. They also both knew that ZF Electronics USA would then ship hundreds of thousands of DS84 ACUs via private interstate carrier to the nonparty-Enterprise-members Kia Georgia, Inc. and Hyundai Motor

Manufacturing Alabama, LLC. The shipment of the defective ACUs furthered (and was essential to) the scheme because the goal of the scheme was to cause consumers to overpay for vehicles with the defective DS84 ACU.

1669. As explained in Count 1 above, the shipments of Hyundai-Kia Class Vehicles by Kia USA and Hyundai USA, the orders by Hyundai Mobis for DS84 ACUs for Kia Georgia, Inc. and Hyundai Motor Manufacturing Alabama, LLC, and the shipments by ZF Electronics USA of the DS84 ACUs to the same two manufacturers violated the mail fraud statute because they furthered the Hyundai-Kia-ZF-ST Enterprise's fraudulent scheme to cause consumers to purchase or lease vehicles that contain the ACU Defect. To accomplish this goal, the DS84 ACUs needed to be shipped before they could be installed in the vehicles.

    a.     Kia Korea, Hyundai Korea, ZF Passive Safety USA, ZF Electronics USA, and ZF Automotive USA facilitated these mail fraud act violations by collaborating on the defective design of the ACU, the readiness indicators, and Hyundai-Kia Class Vehicles.

    b.     Kia Korea and Hyundai Kia further facilitated these mail fraud violations by (1) requiring all manufacturers of Hyundai-Kia Class Vehicles to install the DS84 ACUs therein, and (2) placing the misleading certification labels, readiness indicators, and airbag labels and imprints within the Hyundai-Kia Class Vehicles it made in Korea, and requiring the Kia Georgia, Inc. and Hyundai Motor Manufacturing Alabama, LLC to do the same.

    c.     ZF TRW Corp. facilitated the scheme because, upon information and belief, its approval was required for the launch

1    of the DS84 ACU, which was one of the company's most

2    popular ACUs.

3        d.    ZF Germany facilitated the scheme because, upon information

4    and belief, its approval was required to continue the sales of the

5    DS84 ACU.

6        1670. The conspiracy among Kia Korea, Hyundai Korea, Kia USA, Hyundai

7    USA, Hyundai Mobis, ZF Passive Safety USA, ZF Electronics USA, ZF

8    Automotive USA, ZF TRW Corp., and ZF Germany is further evidenced by their

9    coordinated effort to cover up the ACU Defect.

10       a.    For several years, Kia Korea, Hyundai Korea, Kia USA,

11   Hyundai USA, Hyundai Mobis, ZF Automotive USA, ZF

12   Electronics USA, and ZF Passive Safety USA uncovered

13   evidence that DS84 ASICs and DS84 ACUs were failing as a

14   result of EOS, but they maintained the confidentiality of these

15   incidents among each other.

16       b.    Kia Korea, Hyundai Korea, Hyundai Mobis, Kia USA, Hyundai

17   USA, ZF Automotive USA, ZF Electronics USA, and ZF

18   Passive Safety USA repeatedly coordinated with each other in

19   response to NHTSA's investigation. In 2016, ZF Electronics

20   USA alerted Hyundai Korea and Kia Korea to NHTSA's

21   investigation of the DS84 ACUs and sent excerpted copies of

22   ZF's misleading February 5, 2016 slide deck to NHTSA as part

23   of an effort to coordinate with Kia Korea and Hyundai Korea to

24   conceal the ACU Defect. In 2015, 2016, 2017, and 2018, Kia

25   Korea, Hyundai Korea, Hyundai Mobis, Kia USA, Hyundai

26   USA, ZF Automotive USA, ZF Electronics USA, and ZF

27   Passive Safety USA repeatedly discussed NHTSA's

28   investigation.

1671. The joint activities of ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., and ZF Germany in support of their misleading statements to NHTSA were predicate acts and also show agreement by these Defendants to further the fraudulent scheme.

1672. ZF Electronics USA's placement of orders for DS84 ASICs and shipments of DS84 ACUs, with knowledge of the ACU Defect, were predicate acts and also show agreement by ZF Electronics USA to further the fraudulent scheme.

1673. The success of the Hyundai-Kia-ZF-ST Enterprise's fraudulent scheme depended upon Kia Korea's, Hyundai Korea's, Kia USA's, Hyundai USA's, Hyundai Mobis's, ZF Passive Safety USA's, ZF Electronics USA's, and ZF Automotive USA's cooperation. All these companies had to maintain strict confidentiality about the ACU Defect for the scheme to continue. Moreover, the Hyundai-Kia companies depended on the ZF companies for the manufacture (and the license to manufacture) of the defective ACUs, whereas the ZF companies could not reach consumers of Hyundai-Kia Class Vehicles without the agreement of Hyundai Korea and Kia Korea. This interdependence further evidences the agreement to further the fraudulent scheme.

> **i.** **ST USA, ST Italy, ST Malaysia, ZF Automotive USA, ZF Electronics USA, and ZF Passive Safety USA agreed on the commission of multiple violations of the mail fraud statute in furtherance of the Hyundai-Kia-ZF-ST Enterprise's fraudulent scheme.**

1674. ST Italy, ST Malaysia, and ST USA began conspiring with ZF Passive Safety USA, ZF Electronics USA, and ZF Automotive USA in 2005, when the two supplier groups began the joint design of an ACU ASIC with unique vulnerability to ASIC EOS. By 2008, all these companies knew about internal thermal testing that confirmed the weakness of the DS84 ASIC.

1675. Even after learning that DS84 ACUs and DS84 ASICs had malfunctioned due to EOS during crashes, ST Italy, ST Malaysia, ST USA, ZF

Passive Safety USA, ZF Electronics USA, and ZF Automotive USA continued to sell and send shipments of the parts. When doing so, these companies all knew that Kia Korea, Hyundai Korea, Kia USA, and Hyundai USA would coordinate to cause the Hyundai-Kia Class Vehicles with the defective DS84 ACU and ASIC to be presented to consumers with misleading certification labels, airbag labels and imprints, and readiness indicators.

1676. Several actions by ST Italy, ST Malaysia, and ST USA further support an inference of agreements with ZF Passive Safety USA, ZF Electronics USA, and ZF Automotive USA to commit at least two predicate acts in furtherance of the conspiracy:

  a. ST Italy met with Hyundai Korea, Kia Korea, Hyundai Mobis, ZF Automotive USA, ZF Electronics USA, and ZF Passive Safety in May 2012 to discuss the ACU Defect.

  b. Between September 2009 and 2018, ST Italy, ST USA, and ST Malaysia regularly communicated with ZF Automotive USA, ZF Electronics USA, and ZF Passive Safety USA about observations of EOS in DS84 ASICs, including some ASICs from Hyundai-Kia vehicles. ST USA, ST Italy, and ST Malaysia's DS84 ASIC team confirmed EOS damage on ASICs retrieved from at least seven Hyundai-Kia vehicles with ACU malfunctions during crashes.

  c. Upon information and belief, in 2016, ZF Automotive USA, ZF Electronics USA, and ZF Passive Safety USA sent each ST Defendant excerpted copies of its misleading statements from its February 5, 2016 slide deck.

  d. Between 2009 and 2018 at the very least, ST USA and ST Malaysia continuously violated the mail fraud act in furtherance of the Hyundai-Kia-ZF-ST Enterprise by shipping defective

DS84 ASICs with a mutual understanding that some of these ASICs would be installed in Hyundai-Kia Class Vehicles, as explained above.

e.   Between 2009 and 2018 at the very least, ST USA, ST Italy, and ST Malaysia maintained public silence about the ACU Defect, despite the observed evidence of the DS84 ASIC's and ACU's unusual vulnerability to transients.

1677. The success of the Hyundai-Kia-ZF-ST Enterprise's fraudulent scheme depended upon ST USA, ST Italy, and ST Malaysia, ZF Passive Safety USA, ZF Electronics USA, and ZF Automotive USA's cooperation. All these companies had to maintain strict confidentiality about the ACU Defect for the scheme to continue. Moreover, the ZF companies depended upon the ST companies for the manufacture of the defective ASICs, whereas the ST companies depended upon the ZF companies for a viable path to profit from the consumers of Hyundai-Kia Class Vehicles. This interdependence further evidences the agreement to further the fraudulent scheme.

### 3.   Nationwide Count 3: Violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(c), on Behalf of the Nationwide FCA Class Against FCA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia.

1678. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1679. Pursuant to 18 U.S.C. § 1962(c): "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." FCA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA,

and ST Malaysia are "persons" under 18 U.S.C. § 1961(3) because each was capable of holding "a legal or beneficial interest in property."

1680. A violation of 18 U.S.C. § 1962(c) has four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." ECF 396 at 59 (quoting *Sedima v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

1681. FCA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia, and several nonparties formed the FCA-ZF-ST Enterprise. The members of this Enterprise included Defendants FCA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia. The FCA-ZF-ST Enterprise also included several nonparty individuals and corporations, for example, FCA Mexico Sa. De Cv., a manufacturing subsidiary based in Toluca, Mexico. FCA's bankrupt predecessor, Chrysler LLC, was also a nonparty-Enterprise member. Discovery will likely reveal several additional members of the FCA-ZF-ST Enterprise that are not currently known to the FCA Plaintiffs.

1682. FCA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia are liable under 18 U.S.C. § 1962(c) because they conducted or participated in the conduct of the affairs of an "association-in-fact enterprise"—i.e., the FCA-ZF-ST Enterprise— through a pattern of racketeering activity. In other words, each of these Defendants committed at least two predicate acts in furtherance of the Enterprise's fraudulent scheme.

1683. 18 U.S.C. § 1964(c) provides for a civil remedy for any violation of 18 U.S.C. § 1962 for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." In addition to proving a violation of § 1962, this remedy requires proximate cause of a cognizable injury. ECF 396 at 59.

1684. FCA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia each violated 18 U.S.C. § 1962(c) and injured the business or property of the FCA Plaintiffs and the Nationwide FCA Class. The FCA Plaintiffs claim damages for themselves and the Nationwide FCA Class members under 18 U.S.C. § 1964(c).

**a. FCA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia each committed at least two predicate acts of mail and wire fraud in furtherance of the FCA-ZF-ST Enterprise's fraudulent scheme to affirmatively mislead consumers and NHTSA.**

1685. The members of the FCA-ZF-ST Enterprise devised a scheme for the purpose of defrauding consumers and NHTSA by concealing or minimizing the ACU Defect in FCA Class Vehicles through a pattern of affirmatively misleading statements.

1686. In the alternative, the FCA-ZF-ST Enterprise members devised an illicit scheme for the purpose of obtaining money by fraudulent pretenses to maximize the sale of FCA Class Vehicles, which ultimately provided revenue to the FCA-ZF-ST Enterprise members.

1687. To carry out, or attempt to carry out, the fraudulent schemes, FCA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia—each of whom is a person associated-in-fact with the Enterprise—knowingly conducted or participated, directly or indirectly, in the affairs of the FCA-ZF-ST Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c). In furtherance of the schemes, these FCA-ZF-ST Enterprise members each committed *at least* two acts in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud), as described in the subsections below.

**i.    FCA violated the mail and wire fraud statutes multiple times in furtherance of the FCA-ZF-ST Enterprise's fraudulent scheme.**

1688. For every FCA Class Vehicle shipped on or after June 10, 2009,[10] FCA delivered, or caused delivery of, each vehicle by private or commercial interstate carrier to automobile dealerships across the United States.[11] FCA delivered millions of Class Vehicles to execute its scheme to defraud consumers and NHTSA. These deliveries furthered the scheme because FCA sent the vehicles to the dealerships where consumers purchased or leased them and because, prior to shipping the FCA Class Vehicles, FCA affixed, or caused to be affixed, several affirmatively misleading statements on the Vehicles, including:

a.    Misleading Monroney labels in every model year for all FCA Class Vehicles shipped on or after June 10, 2009 (*see* Section IV.E.1.a. above);

b.    Misleading certification labels in every model year for all FCA Class Vehicles made on or after June 10, 2009 (*see* Section IV.E.1.b. above);

c.    Misleading readiness indicators in every model year for all FCA Class Vehicles made on or after June 10, 2009 (*see* Section IV.E.1.c. above); and

d.    Misleading in-vehicle labelling in every model year for all FCA Class Vehicles made on or after June 10, 2009 (*see* Section IV.E.1.d. above).

---

[10] Nonparty conspirator Chrysler LLC was responsible for all in-vehicle statements described below for FCA Class Vehicles that shipped prior to June 10, 2009.

[11] In relevant part, the mail fraud statute imposes criminal liability for a person who "deposits or caused to be deposited any matter or thing to be sent or delivered by any private or commercial interstate carrier." 18 U.S.C. § 1341.

1689. Each instance in which FCA shipped, or caused the shipment of, FCA Class Vehicles to a dealer was a violation of the mail fraud statute (18 U.S.C. § 1341) because FCA knew the four categories of affirmatively misleading statements affixed to each Class Vehicle were misleading and would further the scheme to defraud consumers into purchasing or leasing FCA Class Vehicles. Each of these statements misleadingly assured consumers that the FCA Class Vehicles had properly-functioning safety systems, airbags, and seatbelts when, in fact, the safety systems, airbags, and seatbelts had a dangerous safety defect due to the vulnerability of the DS84 ACU and ASIC to EOS. FCA placed the statements on the FCA Class Vehicles made in the United States. For FCA Class Vehicles made in Mexico, FCA's mandatory designs for the FCA Class Vehicles required FCA Mexico Sa. De Cv. to do the same.

1690. Although the precise shipment dates for all FCA Class Vehicles are not known to the FCA Plaintiffs, shipments occurred at least in each year from 2011 to 2019. Plaintiffs were exposed to in-vehicle misleading statements prior to, and at the point of, sale or lease. The dates and locations of these transactions are alleged above in Section II.B.2.

1691. Starting on June 10, 2009, FCA also transmitted, or caused to be transmitted, tens (perhaps hundreds) of thousands of advertisements which stressed the safety of FCA Class Vehicles using mail, wire, radio, or television communications in interstate commerce.[12] FCA's misleading advertisements are too numerous to recite completely, given the nationwide scope and decade-long duration of the FCA-ZF-ST Enterprise's fraudulent scheme. Examples of these advertisements are collected in Section IV.E.2.a.iii. and Exhibit 10. Each such mailed advertisement—including brochures sent to dealerships for display to

---

[12] Nonparty conspirator Chrysler LLC was responsible for all misleading advertisements about FCA Class Vehicles mailed or transmitted prior to June 10, 2009.

consumers or print advertisements in newspapers or magazines—was a violation of the mail fraud statute (18 U.S.C. § 1341). Each such internet-based, radio, and television advertisement was a violation of the wire fraud statute (18 U.S.C. § 1343). Each advertisement that directly or indirectly assured consumers that the FCA Class Vehicles had properly-functioning safety systems, airbags, and seatbelts was affirmatively misleading because the safety systems, airbags, and seatbelts in FCA Class Vehicles had a dangerous safety defect due to the vulnerability of the DS84 ACU and DS84 ASIC to EOS. FCA knew advertisements assuring the safety of FCA Class Vehicles were misleading and would further the scheme to defraud consumers into purchasing or leasing FCA Class Vehicles.

1692. FCA deposited, or caused the deposit of, misleading owner's manuals inside every FCA Class Vehicle that shipped on or after June 10, 2009. These owner's manuals contain affirmatively misleading statements summarized in Exhibit 16. These statements assured consumers that the FCA Class Vehicles had properly-functioning and reliable airbags and seatbelts, and therefore would have suggested to any reasonable consumer that the Occupant Restraint System did not suffer from the ACU Defect and would perform its intended function of activating the seatbelts and airbags during a collision. This was false because the FCA Class Vehicles were equipped with a DS84 ACU and DS84 ASIC, both of which had a defect that can cause the FCA Class Vehicle's airbags and seatbelts to fail. FCA knew the owner's manuals were misleading and would further the scheme to defraud consumers into purchasing or leasing FCA Class Vehicles. Accordingly, each shipment of an owner's manual was a separate violation of the mail fraud statute (18 U.S.C. § 1341).

1693. FCA filed a misleading 573 Defect Report with NHTSA on September 13, 2016. Upon information and belief, FCA used mail to send a paper copy to NHTSA on that day and also used wire communications to send an electronic copy to NHTSA that day. These transmittals violated the mail and wire fraud statutes (18

U.S.C. §§ 1341, 1343) because, as explained in Section IV.F.7., the 573 Defect
Report contained misleading statements denying a defect in the unrecalled FCA
Class Vehicles. FCA knew these statements in the 573 Defect Report were
misleading and would further the scheme to defraud consumers into purchasing or
leasing the unrecalled FCA Class Vehicles by avoiding a recall of these vehicles.
FCA also knew these affirmatively misleading statements in the 573 Defect Report
would be made publicly available to all consumers. Accordingly, sending the
misleading 573 Defect Report to NHTSA violated the mail and wire fraud statutes.
(18 U.S.C. §§ 1341, 1343).

1694. FCA also filed a misleading amended 573 Defect Report with NHTSA
on November 29, 2016. Upon information and belief, FCA used mail to send a
paper copy to NHTSA on that day and also used wire communications to send an
electronic copy to NHTSA that day. These transmittals violated the mail and wire
fraud statutes (18 U.S.C. §§ 1341, 1343) because, as explained in Section IV.F.7.,
the amended 573 Defect Report misleadingly described the recall remedy. FCA
knew these statements in the 573 Defect Report were affirmatively misleading and
would further the scheme to defraud consumers into purchasing or leasing the
unrecalled FCA Class Vehicles by avoiding a more expensive remedy for the
recalled FCA Class Vehicles and allowing FCA to continue to use the same
replacement DS84 ACUs in other unrecalled FCA Class Vehicles. FCA also knew
these misleading statements in the 573 Defect Report would be made publicly
available to all consumers. Accordingly, sending the misleading 573 Defect Report
to NHTSA violated the mail and wire fraud statutes. (18 U.S.C. §§ 1341, 1343).

1695. FCA separately violated the mail fraud act (18 U.S.C. § 1341) by
placing orders with ZF Electronics USA that caused ZF Electronics USA to ship
defective DS84 ACUs by private or commercial interstate carrier to FCA in
Michigan, Illinois, Ohio, and Mexico. These shipments furthered the FCA-ZF-ST
Enterprise's fraudulent scheme because FCA's use of the defective DS84 ACUs in

1 FCA Class Vehicles was essential to the cost-saving goal behind the scheme. FCA

2 caused ZF Electronics USA to make these deliveries knowing it would install the

3 defective DS84 ACUs in the FCA Class Vehicles and market the vehicles to U.S.

4 consumers as safe. Accordingly, each of FCA's orders and ZF Electronics USA's

5 shipments of the DS84 ACU violated the mail fraud statute (18 U.S.C. § 1341). The

6 precise dates and locations of each particular shipment of DS84 ACUs are not

7 known to the FCA Plaintiffs because they have no visibility into the shipments to

8 dealers and Defendants have not produced documents that show that information.

9 Nonetheless, in lieu of information about precise dates and locations of shipments,

10 Plaintiffs provide the following tracking numbers that are available in limited

11 invoicing information produced by FCA: 9991526125, 9991582883, 9991587074,

12 9991575865, 1000298864, 1000863459, 1000232414, 1000300877, 9991284080,

13 9991365356, 9991283893, 1000283858, 1000622256, 1000298860, 9991365322,

14 1000863500, 9991283895, 9991526119, 9991209614, 1000171634, 1000172125,

15 9991361628, 9991361624, 9991361619, 9991582893, 9991365352, 9991209570,

16 9991408172, 9991209559, 9991284020, 9991284021, 9991209577, 1000221360,

17 1000171630, 9991408409, 9991365324, 9991283898, 9991361629, 9991283896,

18 9991283984, 9991361621, 1000232413, 9991209621, 9991408411, 9991361627,

19 9991361626, 9991575866, 9991365327, 9991408194, 1000232415, 9991365316,

20 9991283897, 1000283863, 1000863575, 9991408406, 9991365354, 9991283900,

21 9991526120, 9991587075, 9991575864, 9991567612, 9991365326, 9991408414,

22 9991361620, 9991209603, 9991361625, 9991365319, 9991365325, and

23 1000622261.[13] Upon information and belief, FCA can identify precise dates with

24 particularity using these tracking numbers and its information systems.

25      1696. Moreover, a chart produced by the domestic ZF Defendants to NHTSA

26 identifies the precise volume of DS84 ACUs shipped for each year for each model

27 _____

28 [13] Plaintiffs allege these tracking numbers as illustrative exemplars based on the incomplete information presently available to them.

of the FCA Class Vehicles, and identifies Marshall, Illinois as the shipping

location. Exhibit 20 includes highlighting added by Plaintiffs to identify the

particular information about shipping locations, volumes, vehicle makes and

models, and shipping years contained in this chart. *See* Ex. 20 (ZF-MDL-679) at

705-720. The month and day of each shipment are not known to the FCA Plaintiffs,

but Defendants can determine that information using the backup information in

their possession.

1697. The shipping address for each of these shipments of DS84 ACUs by

ZF Electronics USA from Marshall, Illinois was 902 South 2nd Street, Marshall,

Illinois 62441. For ACUs shipped to FCA for Jeep Patriots in Illinois, the recipient

address was 3000 W Chrysler Drive, Belvidere, Illinois 61008. For ACUs shipped

to FCA for Jeep Wranglers in Ohio, the recipient address was 4400 Chrysler Drive,

Toledo, Ohio 43608. For ACUs shipped to FCA for Chrysler 200s and Chrysler

Sebrings in Michigan, the recipient addresses were 38111 Van Dyke Ave, Sterling

Heights, Michigan 48312. For ACUs shipped to FCA for Dodge Rams in Michigan,

the recipient address was 21500 Mound Rd, Warren, MI 48091. For ACUs shipped

to FCA for Jeep Compasses in Mexico Sa. De Cv., the recipient address was Km

60.5, Carr Tolu–a - México, Delegación Sta Ana Tlapaltitlán, 50160 Toluca de

Lerdo, Méx., Mexico.

> ii. **ZF Electronics USA violated the mail and wire fraud statutes multiple times in furtherance of the FCA-ZF-ST Enterprise's fraudulent scheme.**

1698. ZF Electronics USA drafted and/or edited the following misleading

statements to NHTSA, as discussed in Sections IV.F.2., IV.F.4., IV.F.8., and

IV.F.14. above:

> a. The slide deck presentation dated February 5, 2016 (which ZF TRW Corp. mailed to NHTSA on March 14, 2016);

b.  The slide deck presentation dated July 19, 2016 (which, upon information and belief, was mailed to NHTSA in July or August 2016);

c.  The September 2016 letter signed by Marc Bolitho[14] (which ZF Electronics USA mailed to NHTSA in September 2016); and

d.  The slide deck presentation dated March 8, 2018 (which ZF TRW Corp. mailed to NHTSA on March 12, 2018).

1699. As explained in sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above, each of these transmittals contained misleading statements about the FCA Class Vehicles and/or the ACU Defect. ZF Electronics USA specifically approved the transmittal of the final versions of these documents to NHTSA, and intended for the misleading statements contained therein to avoid, minimize, and/or delay recalls of FCA Class Vehicles. Avoiding, minimizing, and/or delaying recalls of FCA Class Vehicles enabled the continuation of the scheme to defraud consumers.

1700. ZF Electronics USA caused the delivery of the February 5, 2016 slide deck to NHTSA. ZF Electronics USA's causal role in the delivery is evidenced by the fact that its Vice President of Passive Safety Marc Bolitho signed an affidavit of confidentiality that was enclosed with the mailing of the February 5, 2016 slide deck.

1701. Because the July 19, 2016 slide deck closely resembles the February 5, 2016 slide deck, the same personnel and companies were likely responsible for sending it via mail or private interstate carrier to NHTSA. Accordingly, upon information and belief, ZF Electronics USA caused this delivery to NHTSA too.

1702. ZF Electronics USA caused the delivery of the March 8, 2018 slide deck to NHTSA. ZF Electronics USA's causal role in the delivery is evidenced by

---

[14] Mr. Bolitho was simultaneously an employee of ZF Passive Safety USA, the Vice President of Passive Safety for ZF Electronics USA, and Director of Passive Safety Engineering for ZF TRW.

the fact that its Technical Specialist, Emanuel Goodman, signed the affidavit of confidentiality that was enclosed with the mailing of the March 8, 2018 slide deck. ZF Electronics USA's causal role in the delivery is further evidenced by Mr. Goodman's and Mr. Bolitho's attendance at the March 8, 2018 meeting with NHTSA, where this slide deck was used.

1703. Moreover, because ZF Electronics USA's affiliates would not have sent or approved the four written communications described above without ZF Electronics USA's contributions and approval, ZF Electronics USA was one of the Defendants who jointly caused the delivery of these four communications to NHTSA. Accordingly, its participation in these communications violated the mail fraud statute at least four times. 18 U.S.C. § 1341.

1704. As explained in Section IV.E.1.c. above, ZF Electronics USA worked with ZF Passive Safety USA, ZF Automotive USA, and FCA to design the readiness indicators installed in FCA Class Vehicles. Specifically, ZF Electronics USA assisted with a design of ACUs that would cause the readiness indicator not to illuminate at the point of sale or lease, even though the FCA Class Vehicle's safety systems were not ready to deploy in foreseeable crash events with negative transients due to the ACU Defect. When ZF Electronics USA assisted with this design, it knew FCA would ship the FCA Class Vehicles to dealers and that consumers would buy FCA Class Vehicles without the airbag warning lamp illuminating at the point of sale or lease. Because FCA would not have shipped FCA Class Vehicles without ZF Electronics USA's assistance in designing misleading readiness indicators, ZF Electronics USA jointly caused each shipment of a FCA Class Vehicle, in violation of the mail fraud act (18 U.S.C. § 1341).

1705. ZF Electronics USA received orders from FCA and nonparty Chrysler LLC for the defective DS84 ACUs used in every FCA Class Vehicle and shipped them by private or commercial interstate carrier to FCA and nonparty Chrysler LLC in Michigan, Illinois, Ohio, and Mexico. These shipments furthered the FCA-ZF-

1   ST Enterprise's fraudulent scheme because Chrysler LLC's and FCA's use of the

2   defective DS84 ACUs in FCA Class Vehicles was essential to the cost-saving goal

3   behind the scheme. When ZF Electronics USA shipped the defective DS84 ACUs

4   to FCA, it knew they would be installed in the FCA Class Vehicles that are

5   marketed to U.S. consumers. ZF Electronics USA was also specifically aware of

6   FCA's practice of making reassuring statements about safety, airbags, and seatbelts

7   in consumer-facing Monroney labels, certification labels, in-vehicle labels, owner's

8   manuals, and advertising for all FCA Class Vehicles. ZF Electronics USA knew

9   these statements were false because it knew the FCA Class Vehicles, DS84 ACU,

10  and DS84 ASIC were defective. Accordingly, because ZF Electronics USA shipped

11  each defective DS84 ACU with the purpose of executing a fraudulent scheme with

12  its conspirators, each of ZF Electronics USA's shipments of the defective DS84

13  ACU violated the mail fraud statute (18 U.S.C. § 1341). The particularities of these

14  shipments are discussed above. Exhibit 20 includes highlighting added by Plaintiffs

15  to identify the particular information about shipping locations, volumes, vehicle

16  makes and models, and shipping years contained in this chart. *See* Ex. 20 (ZF-

17  MDL-679) at 705-720.

18      1706. Upon information and belief, ZF Electronics USA can identify precise

19  dates with particularity using these tracking numbers and its information systems.

20  The domestic ZF Defendants' ability to identify the dates of its prior shipments of

21  DS84 ACUs to FCA for FCA Class Vehicles is also demonstrated by Ex. 20 (ZF-

22  MDL-679). This document, which the domestic ZF Defendants produced to

23  NHTSA in or around 2019, shows the quantity of defective DS84 ACUs for FCA's

24  U.S. Vehicles for each year. *See* Ex. 20 at ZF-MDL-705-719.

25      1707. ZF Electronics USA also separately violated the mail fraud act (18

26  U.S.C. § 1341) by placing orders with ST USA that required ST USA to ship

27  millions of defective DS84 ASICs to ZF Electronics USA at a facility with the

28  following address: 902 South 2nd Street, Marshall, Illinois 62441. When ZF

Electronics USA placed these orders, it knew it would place these DS84 ASICs into DS84 ACUs, including those that would be installed in the FCA Class Vehicles that are marketed to U.S. consumers. ZF Electronics USA was also specifically aware of FCA's practice of making reassuring statements about safety, airbags, and seatbelts in consumer-facing Monroney labels, certification labels, in-vehicle labels, owner's manuals, and advertising for all FCA Class Vehicles. ZF Electronics USA knew these statements were false because it knew the FCA Class Vehicles, DS84 ACU, and DS84 ASIC were defective. Accordingly, because ZF Electronics USA caused shipments of defective DS84 ASICs with the purpose of executing a fraudulent scheme with its conspirators, each of the DS84 ASIC shipments caused by ZF Electronics USA violated the mail fraud statute (18 U.S.C. § 1341). ST USA has produced approximately 9,700 such invoices from the time period between 2014 and the present alone. Plaintiffs have extracted approximate shipping dates from these invoices, which are presented as exemplars in Exhibit 21.[15]

### iii. ZF Passive Safety USA violated the mail and wire fraud statutes multiple times in furtherance of the FCA-ZF-ST Enterprise's fraudulent scheme.

1708. ZF Passive Safety USA drafted and/or edited the following misleading statements to NHTSA, as discussed in Sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above:

> a. The slide deck presentation dated February 5, 2016 (which ZF TRW Corp. mailed to NHTSA on March 14, 2016);

---

[15] ST USA made similar shipments between 2007 and 2014, but ST USA is presently withholding invoices for these shipments from discovery. Upon information and belief, the invoices for this time period will show similarly regularity of shipments.

b. The slide deck presentation dated July 19, 2016 (which, upon information and belief, was mailed to NHTSA in July or August 2016);

c. The September 2016 letter signed by Marc Bolitho[16] (which ZF Electronics USA mailed to NHTSA in September 2016); and

d. The slide deck presentation dated March 8, 2018 (which ZF TRW Corp. mailed to NHTSA on March 12, 2018).

1709. As explained in sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above, each of these transmittals contained misleading statements about FCA Class Vehicles and/or the ACU Defect. ZF Passive Safety USA specifically approved the transmittal of the final versions of these documents to NHTSA, and intended for the misleading statements contained therein to avoid, minimize, and/or delay recalls of FCA Class Vehicles. Avoiding, minimizing, and/or delaying recalls of FCA Class Vehicles enabled the continuation of the scheme to defraud consumers.

1710. ZF Passive Safety USA caused the delivery of the February 5, 2016 slide deck to NHTSA. ZF Passive Safety USA's causal role in the delivery is evidenced by the fact that its employee Marc Bolitho signed an affidavit of confidentiality that was enclosed with the mailing of the February 5, 2016 slide deck. Although Mr. Bolitho also simultaneously served as a Vice President for ZF Electronics USA and a Director of Passive Safety Engineering for ZF TRW Corp., ZF Passive Safety USA alone paid his salary.

1711. Because the July 19, 2016 slide deck closely resembles the February 5, 2016 slide deck, the same personnel and companies were likely responsible for sending it via mail or private interstate carrier to NHTSA. Accordingly, upon information and belief, ZF Passive Safety USA caused this delivery too.

---

[16] Mr. Bolitho was simultaneously an employee of ZF Passive Safety USA, the Vice President of Passive Safety for ZF Electronics USA, and Director of Passive Safety Engineering for ZF TRW Corp.

1712. ZF Passive Safety USA caused the delivery of the March 8, 2018 slide deck to NHTSA. ZF Passive Safety USA's causal role in the delivery is evidenced by the fact that its longtime employee, Emanuel Goodman, signed the affidavit of confidentiality that was enclosed with the mailing of the March 8, 2018 slide deck. Although Mr. Goodman also served as the Technical Specialist for ZF Electronics USA, ZF Passive Safety USA alone paid his salary. ZF Passive Safety USA's causal role in the delivery is further evidenced by Mr. Goodman's and Mr. Bolitho's attendance at the March 8, 2018 meeting with NHTSA, where this slide deck was used.

1713. Moreover, because ZF Passive Safety USA's affiliates would not have sent or approved the four written communications described above without ZF Passive Safety USA's contributions and approval, ZF Passive Safety USA was one of the Defendants who jointly caused the delivery of these four communications to NHTSA. Accordingly, its participation in these communications violated the mail fraud statute at least four times. 18 U.S.C. § 1341.

1714. As explained in sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above, each of the four documents described above contained misleading statements about the ACU Defect. ZF Passive Safety USA specifically approved the transmittal of the final versions of these documents to NHTSA, and intended for the misleading statements contained therein to avoid, minimize, and/or delay recalls of FCA Class Vehicles. Avoiding, minimizing, and/or delaying recalls of FCA Class Vehicles enabled the continuation of the scheme to defraud consumers. Because ZF Passive Safety USA's affiliates would not have sent or approved the written communications noted in the preceding paragraph without ZF Passive Safety USA's contributions and approval, ZF Passive Safety USA was one of the Defendants who caused the delivery of these four communications to NHTSA. Accordingly, its participation in these communications violated the mail fraud statute at least four times. (18 U.S.C. § 1341).

1715. As explained in Section IV.E.1.c. above, ZF Passive Safety USA worked with ZF Electronics USA, ZF Automotive USA, and FCA to design the readiness indicators installed in all FCA Class Vehicles. Specifically, ZF Passive Safety USA assisted with a design of ACUs that would cause the readiness indicator not to illuminate at the point of sale or lease, even though the FCA Class Vehicle's safety systems were not ready to deploy in crash events with negative transients due to the ACU Defect. When ZF Passive Safety USA assisted with this design, it knew FCA would ship the FCA Class Vehicles to dealers and that consumers would buy the vehicles without the airbag warning lamp illuminating at the point of sale or lease. Because FCA would not have shipped the FCA Class Vehicles without ZF Passive Safety USA's assistance in designing misleading readiness indicators, ZF Passive Safety USA jointly caused each shipment of FCA Class Vehicle, in violation of the mail fraud act (18 U.S.C. § 1341).

> #### iv.    ZF Automotive USA violated the mail and wire fraud statutes multiple times in furtherance of the FCA-ZF-ST Enterprise's fraudulent scheme.

1716. ZF Automotive USA drafted and/or edited the following misleading statements to NHTSA, as discussed in Sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above:

    a.    The slide deck presentation dated February 5, 2016 (which ZF TRW Corp. mailed to NHTSA on March 14, 2016);

    b.    The slide deck presentation dated July 19, 2016 (which, upon information and belief, was mailed to NHTSA in July or August 2016);

    c.    The September 2016 letter signed by Marc Bolitho (which ZF Electronics USA mailed to NHTSA in September 2016); and

    d.    The slide deck presentation dated March 8, 2018 (which ZF TRW Corp. mailed to NHTSA on March 12, 2018).

1717. ZF Automotive USA caused the delivery via mail or private interstate carrier of the February 5, 2016 slide deck, the July 19, 2016 slide deck, and the March 8, 2018 slide deck to NHTSA. ZF Automotive USA's role in causing the delivery of these slide decks is evidenced by its admission in a 573 Defect Report that it attended the three meetings with NHTSA where these slide decks were used on its behalf.

1718. Upon information and belief, ZF Automotive USA caused the delivery of the September 2016 letter to NHTSA via mail or private interstate carrier by giving requisite approval prior to the transmittal of the letter.

1719. As explained in sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above, each of these four documents contained misleading statements about FCA Class Vehicles and the ACU Defect. ZF Automotive USA specifically approved the transmittal of the final versions of these documents to NHTSA, and intended for the misleading statements contained therein to avoid, minimize, and/or delay recalls of FCA Class Vehicles. Avoiding, minimizing, and/or delaying recalls of FCA Class Vehicles enabled the continuation of the scheme to defraud consumers. Because ZF Automotive USA's affiliates would not have sent or approved the written communications noted in the preceding paragraph without ZF Automotive USA's contributions and approval, ZF Automotive USA was one of the Defendants who caused the delivery of these four communications to NHTSA. Accordingly, its participation in these communications violated the mail fraud statute at least four times. (18 U.S.C. § 1341).

1720. As explained in Section IV.E.1.c. above, ZF Automotive USA worked with ZF Passive Safety USA, ZF Electronics USA, and FCA to design the readiness indicators installed in FCA Class Vehicles. Specifically, ZF Automotive USA assisted with a design of ACUs that would cause the readiness indicator not to illuminate at the point of sale or lease, even though the FCA Class Vehicle's safety systems were not ready to deploy in crash events with negative transients due to the

ACU Defect. When ZF Automotive USA assisted with this design, it knew FCA would ship the FCA Class Vehicles to dealers and that consumers would buy the vehicles without the airbag warning lamp illuminating at the point of sale or lease. Because FCA would not have shipped FCA Class Vehicles without ZF Automotive USA's affirmative assistance in designing misleading readiness indicators, ZF Automotive USA jointly caused each shipment of FCA Class Vehicle, in violation of the mail fraud act (18 U.S.C. § 1341).

#### v. ZF TRW Corp. violated the mail and wire fraud statutes multiple times in furtherance of the FCA-ZF-ST Enterprise's fraudulent scheme.

1721. Prior to their delivery to NHTSA, ZF TRW Corp. reviewed, drafted and/or edited the following misleading statements to NHTSA, as discussed in Sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above:

      a.    The slide deck presentation dated February 5, 2016 (which ZF TRW Corp. mailed to NHTSA on March 14, 2016);

      b.    The slide deck presentation dated July 19, 2016 (which, upon information and belief, was mailed to NHTSA in July or August 2016);

      c.    The September 2016 letter signed by Marc Bolitho[17] (which ZF Electronics USA mailed to NHTSA in September 2016); and

      d.    The slide deck presentation dated March 8, 2018 (which ZF TRW Corp. mailed to NHTSA on March 12, 2018).

1722. ZF TRW Corp. caused the transmittal of the February 5, 2016 slide deck via mail or private interstate carrier. ZF TRW Corp.'s role in the transmittal is confirmed by the cover letter, which is signed: "Very truly yours, ZF TRW

---

[17] Mr. Bolitho was simultaneously an employee of ZF Passive Safety USA, the Vice President of Passive Safety for ZF Electronics USA, and Director of Passive Safety Engineering for ZF TRW Corp.

Automotive Holdings Corp." with a signature from Sheri Roberts, the Senior
Counsel of the company. ZF TRW Corp.'s causal role is further confirmed by a
footer on every page of the slide deck itself, which reads: "This document is the
property of ZF TRW and is disclosed in confidence. It may not be copied, disclosed
to others, or used for manufacturing without the written consent of ZF TRW" Based
on this footer, ZF TRW Corp. gave requisite written consent to the transmittal of
the document to NHTSA.

1723. ZF TRW Corp. caused the transmittal of the July 19, 2016 slide deck
via mail or private interstate carrier. ZF TRW Corp.'s causal role is confirmed by a
footer on every page of the slide deck itself, which reads: "This document is the
property of ZF TRW and is disclosed in confidence. It may not be copied, disclosed
to others, or used for manufacturing without the written consent of ZF TRW."
Based on this footer, ZF TRW Corp. gave requisite written consent to the
transmittal of the document to NHTSA.

1724. Upon information and belief, ZF TRW Corp. also gave requisite prior
authorization for the delivery of the September 2016 letter.

1725. ZF TRW Corp. caused the transmittal of the March 8, 2018 slide deck
via mail or private interstate carrier to NHTSA. ZF TRW Corp.'s causal role is
confirmed by the cover letter included with the mailing of the slide deck. The cover
letter is on the letter head of an "Active & Passive Safety Technology" business
unit. Because this is a reference to ZF TRW Corp.,[18] ZF TRW Corp. must have
reviewed and approved the transmittal of the slide deck to NHTSA.

1726. As explained in sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above,
each of these four documents described above contained misleading statements

---

[18] According to ZF AG's 2017 Annual Report, the "Active & Passive Safety
Technology Division" was "established by ZF Group to manage the business
activities of ZF TRW after its acquisition." Because ZF TRW Corp. is the only
corporate entity with "ZF TRW" as part of its corporate name, this letter was also
sent on behalf of ZF TRW Corp.

about FCA Class Vehicles and the ACU Defect. ZF TRW Corp. specifically approved the transmittal of the final versions of these documents to NHTSA, and intended for the misleading statements contained therein to avoid, minimize, and/or delay recalls of FCA Class Vehicles. Avoiding, minimizing, and/or delaying recalls of FCA Class Vehicles enabled the continuation of the scheme to defraud consumers. Because ZF TRW Corp.'s affiliates would not have sent or approved the written communications noted in the preceding paragraph without ZF TRW Corp.'s contributions and approval, ZF TRW Corp. was one of the Defendants who caused the delivery of these four communications to NHTSA. Accordingly, its participation in these communications violated the mail fraud statute at least four times. (18 U.S.C. § 1341).

> ### vi.  ZF Germany violated the mail and wire fraud statutes multiple times in furtherance of the FCA-ZF-ST Enterprise's fraudulent scheme.

1727. Prior to their delivery to NHTSA, ZF Germany reviewed and/or edited the following misleading statements to NHTSA, as discussed in Sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above:

   a.  The slide deck presentation dated February 5, 2016 (which ZF TRW Corp. mailed to NHTSA on March 14, 2016);

   b.  The slide deck presentation dated July 19, 2016 (which, upon information and belief, was mailed to NHTSA in July or August 2016);

   c.  The September 2016 letter signed by Marc Bolitho (which ZF Electronics USA mailed to NHTSA in September 2016); and

   d.  The slide deck presentation dated March 8, 2018 (which ZF TRW Corp. mailed to NHTSA on March 12, 2018).

1728. ZF Germany caused the delivery of these communications via mail and wire. The three slide decks bear copyright legends attributing ownership to ZF

Germany. Accordingly, sending these slide decks must have required its involvement and consent. Moreover, the slide decks dated February 5, 2016 and July 19, 2016 identify ZF Germany as the corporate author on the title page.

1729. As explained in sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above, each of these documents described above contained misleading statements about FCA Class Vehicles and the ACU Defect. ZF Germany specifically approved the transmittal of the final versions of these documents to NHTSA, and intended for the misleading statements contained therein to avoid, minimize, and/or delay recalls of FCA Class Vehicles. Avoiding, minimizing, and/or delaying recalls of FCA Class Vehicles enabled the continuation of the scheme to defraud consumers. Because ZF Germany's affiliates would not have sent or approved the written communications noted in the preceding paragraph without ZF Germany's contributions and approval, ZF Germany was one of the Defendants who caused the delivery of these four communications to NHTSA. Accordingly, its participation in these communications violated the mail fraud statute at least four times. (18 U.S.C. § 1341).

> **vii.  ST USA violated the mail and wire fraud statutes multiple times in furtherance of the FCA-ZF-ST Enterprise's fraudulent scheme.**

1730. ST USA regularly received orders from ZF Electronics USA for DS84 ASICs, including all the defective DS84 ASICs used in FCA Class Vehicles. In response to these orders ST USA would work with its affiliate, ST Malaysia, to help it manufacture and ship DS84 ASICs to ST USA's so-called "ST Micro LAX Hub" near Los Angeles, California. Between 2007 and the present, ST USA caused ST Malaysia to ship well over ten million defective DS84 ASICs to this location. In discovery, ST USA has produced approximately 9,700 invoices sent to ZF Electronics USA from the time period between 2014 and the present alone. Each invoice notes the defective DS84 ASICs were made in Malaysia, where ST

Malaysia operated. The invoice dates from these documents provide an approximate date for these shipments. Plaintiffs have extracted approximate shipping dates from these invoices, which are presented as exemplars in Exhibit 21.[19]

1731. ST USA also shipped well over ten million defective DS84 ASICs to ZF Electronics USA at a facility with the following address: 902 South 2nd Street, Marshall, Illinois 62441. As explained above, Exhibit 21 provides exemplar approximate shipment dates based on an incomplete set of invoices produced by ST USA[20]

1732. When ST USA required ST Malaysia to make these shipments and then made its own shipments to ZF Electronics USA, it knew ZF Electronics USA would place the DS84 ASICs into DS84 ACUs, including those that would be installed in FCA Class Vehicles that are marketed to U.S. consumers. ST USA was also aware of FCA's practice of making reassuring statements about safety, airbags, and seatbelts in consumer-facing Monroney labels, certification labels, in-vehicle labels, owner's manuals, and advertising for all FCA Class Vehicles. ST USA knew these statements were false because it knew the FCA Class Vehicles, DS84 ACU, and ASIC were defective. Accordingly, because ST USA caused shipments of well over ten million defective DS84 ASICs with the purpose of executing a fraudulent scheme with its conspirators, each of the DS84 ASIC shipments caused by ST USA violated the mail fraud statute (18 U.S.C. § 1341).

---

[19] ST USA made similar shipments between 2007 and 2014, but is withholding invoices for these shipments from discovery. Upon information and belief, the invoices for this time period will show a similar regularity of shipments of DS84 ASICs from Malaysia.

[20] ST USA made similar shipments between 2007 and 2014, but is withholding invoices for these shipments from discovery. Upon information and belief, the invoices for this time period will show a similar regularity of shipments of DS84 ASICs from the STMicro LAX Hub to the ZF Electronics USA's manufacturing facility in Illinois.

###### viii. ST Malaysia violated the mail and wire fraud statutes multiple times in furtherance of the FCA-ZF-ST Enterprise's fraudulent scheme.

1733. Between 2007 and the 2018, ST USA regularly worked with its affiliate, ST Malaysia, to help it manufacture and ship DS84 ASICs to ST USA's so-called "ST Micro LAX Hub" near Los Angeles, California. During that time period, ST Malaysia shipped well over ten million defective DS84 ASICs to this location. ST USA has produced approximately 9,700 invoices sent to ZF Electronics USA from the time period between 2014 and the present alone. Each invoice notes the defective DS84 ASICs were made in Malaysia, where ST Malaysia operated. The invoice dates from these documents provide an approximate date for these shipments. Plaintiffs have extracted approximate shipping dates from these invoices, which are presented as exemplars in Exhibit 21.[21]

1734. When ST Malaysia made these shipments, it knew ZF Electronics USA would place the DS84 ASICs into DS84 ACUs, including those ACUs that would be installed in FCA Class Vehicles that are marketed to U.S. consumers. ST Malaysia was also aware of FCA's practice of making reassuring statements about safety, airbags, and seatbelts in consumer-facing Monroney labels, certification labels, in-vehicle labels, owner's manuals, and advertising for all FCA Class Vehicles. ST Malaysia knew these statements were false because it knew the FCA Class Vehicles, DS84 ACU, and ASIC were defective. Accordingly, because ST Malaysia caused shipments of well over ten million defective DS84 ASICs with the purpose of executing a fraudulent scheme with its conspirators, each of the DS84 ASIC shipments made by ST Malaysia violated the mail fraud statute (18 U.S.C. § 1341).

---

[21] ST USA made similar shipments between 2007 and 2014, but is withholding invoices for these shipments from discovery. Upon information and belief, the invoices for this time period will show a similar regularity of shipments.

**b.** **FCA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia advanced their fraudulent scheme by concealing material information about a serious safety defect that they had a duty to disclose.**

1735. The uses of mail and wire described in the section above violated the mail and wire fraud statutes because they furthered a fraudulent scheme to affirmatively mislead consumers and NHTSA.

1736. In addition, these same uses of the mail and wire *also* violated the mail and wire fraud statutes because, while they sent or caused to be sent these mailings, FCA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia had duties to disclose the ACU Defect and failed to do so in order to advance their scheme.

1737. FCA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia each knew for years that the defective DS84 ACUs and ASICs in the FCA Class Vehicles are uniquely vulnerable to EOS. *See* Section IV.D.4. above.

1738. To further the goals of the FCA-ZF-ST Enterprise and to their mutual gain, FCA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia concealed what they knew about the existence, scope, and material safety risks of the ACU Defect in the FCA Class Vehicles.

1739. Their careful efforts to conceal the ACU Defect in the FCA Class Vehicles were critically important to the viability of their scheme. A decision by any one Defendant or nonparty-Enterprise member to tell the truth about the ACU Defect and its impact of vehicle safety to consumers or to NHTSA would have been an existential threat to the FCA-ZF-ST Enterprise. Instead, and in pursuit of ill-gotten profits, they each kept key information about the ACU Defect hidden for years. This concealment of material facts about the ACU Defect was grounded in

and advanced their scheme to defraud consumers through the continued sale of FCA Class Vehicles, and avoidance of costly recalls and their attendant reputational harms.

1740. FCA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia's concealment of the ACU Defect violated several independent duties to disclose it.[22]

   a.   FCA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia each had a duty to disclose the ACU Defect because of their exclusive knowledge and far superior information about the ACU Defect.

   b.   These Defendants knew about the vulnerability of the DS84 ACU and ASIC to EOS through their exclusive access to information about their design, development, and testing, and through their confidential and proprietary investigations into suspicious incidents. Given the ACU Defect's hidden and

---

[22] As vehicle manufacturers and component parts suppliers, Defendants are also subject to statutory duties to disclose known safety defects to consumers and to NHTSA pursuant to the Safety Act and its attendant regulations. *See*, *e.g.*, 49 U.S.C. § 30118(c) ("A manufacturer of a motor vehicle . . . shall notify the Secretary by certified mail or electronic mail, and the owners, purchasers, and dealers of the vehicle . . . as provided in section 30119(d) of this section, if the manufacturer . . . learns the vehicle . . . contains a defect and decides in good faith that the defect is related to motor vehicle safety."); 49 U.S.C. §30119(d) (manufacturers must notify "each person registered . . . as the owner and whose name and address are reasonably ascertainable"); 49 C.F.R. §573.6(a) ("Each manufacturer shall furnish a report to the NHTSA for each defect . . . in his items of original . . . equipment that he . . . determines to be related to motor vehicle safety."). Plaintiffs previously pled Defendants had a duty to disclose based on these provisions of the Safety Act, but the Court dismissed an omissions theory based these alleged duties. Plaintiffs reserve the right to appeal this decision at a later date, but do not rely upon the Safety Act as a basis for their omissions theory in this pleading.

technical nature, Plaintiffs and consumers lack the sophisticated
expertise in vehicle components and electrical phenomena that
would be necessary to discover the ACU Defect on their own.
Had they known what these Defendants knew about the ACU
Defect, FCA Plaintiffs and Nationwide FCA Class members
would not have purchased the FCA Class Vehicles, or would not
have paid as much as they did for them.

c.      In addition, FCA, ZF Electronics USA, ZF Passive Safety USA,
ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA,
ST Italy, and ST Malaysia also each held a duty to disclose
because they knew that a defect in the FCA Class Vehicles and
their DS84 ACUs and ASICs gave rise to serious safety
concerns for the consumers who use the vehicles. As
sophisticated and well-funded corporate entities that generate
billions of dollars in annual revenue from work in the
automotive industry, each of these Defendants knew that this
information would have been material to consumers. For
example, a February 3, 2004, prospectus filed by ZF TRW Corp.
with the SEC observed that "85 percent of recent auto
purchasers stated that they look for vehicle safety information
before making their final decision." Nonetheless, these
Defendants still did not disclose it.

d.      FCA, ZF Electronics USA, ZF Passive Safety USA, ZF
Automotive USA, ZF TRW Corp., and ZF Germany also each
had a duty to disclose because of the actions they took to
conceal the ACU Defect in the FCA Class Vehicles from
consumers. Each of these Defendants acted to suppress the truth
about the ACU Defect through their misleading representations

to NHTSA. *See* Sections IV.F.2., IV.F.4., IV.F.7., IV.F.8., IV.F.10., and IV.F.14. above. Because a truthful and accurate disclosure to NHTSA would have been material to NHTSA's decision whether to require a recall or expand its investigation into the DS84 ACUs and ASICs, the affirmative steps they took to mislead NHTSA about the ACU Defect also precluded the FCA Plaintiffs and Nationwide FCA Class members from an opportunity that otherwise have led to their discovery of the truth about the ACU Defect.

e. Finally, FCA affirmatively disclosed information about the FCA Class Vehicles' airbags, seatbelts, and overall safety to consumers (*see* Sections IV.E.1 and I.V.E.2. above). Because it opted to make these representations to consumers about these topics, and because it knew other information about the ACU Defect that made those representations misleading or untrue, FCA was under a separate duty to disclose the full truth about the ACU Defect that materially qualified the information it provided.

1741. FCA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia knew and intended that NHTSA would rely on their and the other members of the FCA-ZF-ST Enterprise's material omissions made about the FCA Class Vehicles to approve them for importation, marketing, and sale to consumers in the United States. And conversely, they also understood that disclosing the ACU Defect would require them to recall and fix the FCA Class Vehicles, which would negatively impact the profits of the FCA-ZF-ST Enterprise.

1742. FCA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia also knew

and intended that consumers would rely on their and the other members of the
FCA-ZF-ST Enterprise's material omissions when deciding to purchase or lease the
FCA Class Vehicles. The FCA Plaintiffs' reliance on this concealment is
demonstrated by the fact that they paid money for FCA Class Vehicles that never
should have been introduced into the U.S. stream of commerce, and that they
overpaid for vehicles with defective safety systems without knowledge of the ACU
Defect.

> ### c. The FCA-ZF-ST Enterprise was an association-in-fact enterprise with a common purpose of misleading consumers and NHTSA as to the ACU Defect in FCA Class Vehicles.

1743. The FCA-ZF-ST Enterprise had a common purpose and ongoing
organization and functioned as a continuing unit.

> ### i. The FCA-ZF-ST Enterprise had a common purpose.

1744. The common purpose of the FCA-ZF-ST Enterprise was to perpetuate
a fraudulent scheme to maximize sales and leases of FCA Class Vehicles while
hiding the ACU Defect from purchasers and lessees. Because all of the Enterprise
members' continued profits from this scheme ultimately depended on consumers
purchasing or leasing FCA Class Vehicles, the Enterprise needed to convince
consumers of a false premise: that FCA Class Vehicles had properly functioning
airbags and seatbelts. Toward this end, the Enterprise needed to mislead consumers.
For this scheme to work, it was also essential for the Enterprise to conceal the ACU
Defect from NHTSA, because the agency could halt the sale of FCA Class Vehicles
and require recalls that necessarily require public notice of a defect. The expense of
these recalls would undermine the profitability of the scheme.

1745. This common purpose served the interests of all members of the FCA-
ZF-ST Enterprise. By concealing and minimizing the ACU Defect, FCA, ZF
Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp.,

ZF Germany, ST USA, ST Italy, ST Malaysia, and the nonparty-Enterprise members maximized their revenue by selling as many FCA Class Vehicles as possible while avoiding or limiting the substantial costs to recall and repair FCA Class Vehicles and their defective DS84 ACUs and ASICs.

1746. The common purpose of the FCA-ZF-ST Enterprise is evidenced by FCA, ZF Electronics USA's, ZF Passive Safety USA's, and ZF Automotive USA's repeated, confidential consultations with one another about suspicious crashes involving FCA Class Vehicles, problems with the design of the DS84 ACU and ASIC, observations of EOS on DS84 ACUs and ASICs, and dangerous safety system malfunctions in FCA Class Vehicles. As the Court has held, consultations about "observed evidence of EOS in Class Vehicles" among Defendants "support[s] a reasonable inference" of a "common purpose of misleading consumers and NHTSA as to the existence of a defect in the ACUs." ECF 396 at 61.

1747. The common purpose of the FCA-ZF-ST Enterprise is further evidenced by ST USA, ST Italy, and ST Malaysia's repeated communications with ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA about observations of EOS in FCA Class Vehicles. ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA would regularly share this information with FCA by copying excerpts of the reports received from ST USA, ST Italy, and ST Malaysia and sending them to FCA.

1748. The common purpose of the FCA-ZF-ST Enterprise is also evidenced by coordinated efforts by FCA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, and ZF Germany to mislead NHTSA about the existence and scope of the ACU Defect by wrongly blaming wire harnesses for safety system malfunctions that were caused by the ACU Defect.

ii.     **The FCA-ZF-ST Enterprise had an ongoing organization.**

1749. The participation of separate entities or individuals that have an existence outside an alleged enterprise is evidence of an ongoing organization with its own structure, separate and apart from its members. FCA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia each existed separately from the FCA-ZF-ST Enterprise.

a.     During the relevant period, FCA manufactured and sold many vehicles that do not contain defective DS84 ACUs and ASICs.

b.     During the relevant period, the FCA manufacturing subsidiaries manufactured FCA vehicles that do not contain defective DS84 ACUs and ASICs.

c.     During the relevant period, ST USA, ST Italy, and ST Malaysia sold, designed, and/or manufactured many other products aside from the defective DS84 ASICs used in the defective DS84 ACUs.

d.     During the relevant period, ZF Passive Safety USA, ZF Electronics USA, and ZF Automotive USA similarly designed, made, and/or sold many other automotive parts aside from the defective DS84 ACUs.

e.     During the relevant period, ZF TRW Corp. and ZF Germany also engaged in a wide variety of business activities unrelated to the defective DS84 ACUs.

1750. Another hallmark of an ongoing organization is members with delineated roles that further the organization's goals. Each Defendant performed important but separate roles within the FCA-ZF-ST Enterprise organization.

a.    ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA jointly designed the defective DS84 ACU for use in the FCA Class Vehicles, with FCA's, ST Italy's, and ST USA's input.

b.    ST Italy and ST USA jointly designed the defective DS84 ASIC, with input from ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA

c.    ST Malaysia manufactured the defective DS84 ASICs and shipped them to ST USA in California.

d.    ST USA sold and shipped the defective DS84 ASIC to ZF Electronics USA.

e.    FCA designed, made, and distributed the FCA Class Vehicles to dealers, so they could be sold to consumers with misleading statements affixed to the vehicles by FCA. FCA was also responsible for all misleading advertising to consumers.

f.    ZF TRW Corp. and ZF Germany approved actions taken by ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA, and knowingly approved, these activities, and participated directly in making misleading statements to NHTSA about the ACU Defect.

g.    Each of the Defendants separately ensured that NHTSA and consumers did not discover the ACU Defect.

1751. The Enterprise members dedicated personnel to the FCA-ZF-ST Enterprise's scheme, which further evidences the ongoing structure of the Enterprise. For example, ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA dedicated an entire applications team to implement the defective DS84 ACUs in FCA Class Vehicles in 2006, 2007, and 2008. ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA also dedicated a separate team to

analyze EOS occurrences in FCA Class Vehicles in 2013. Moreover, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ST USA, and ST Italy held regular meetings in 2016 concerning the EOS issues, just as NHTSA was investigating FCA's Class Vehicles and the defective DS84 ACUs.

1752. FCA, on the other hand, dedicated its employee Kevin Plante as its primary point of contact with ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA relating to the defective DS84 ACU. Establishing a regular point of contact further organized the FCA-ZF-ST Enterprise.

1753. As the passenger safety systems in FCA Class Vehicles repeatedly malfunctioned due to the ACU Defect over the course of several years (starting at least as early as 2009), FCA routinely sought the involvement and assistance of ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ST Italy, ST USA, and ST Malaysia. These Defendants repeatedly coordinated, directly or indirectly, with FCA on these issues, including by assigning several investigations for FCA Class Vehicles to the same personnel. For example, ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA assigned Emmanuel Goodman with the task of preparing written analyses about DS84 ACU field incidents, and he authored many such analyses over the course of several years. ███████████ ████████████████████████████████████████████████████████████ ████████████████████████

1754. When NHTSA began to investigate the defective DS84 ACUs in 2015, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF Germany, and ZF TRW Corp. maintained the organization of the FCA-ZF-ST Enterprise by sending their joint communications with NHTSA to FCA, ST USA, ST Italy, and ST Malaysia. This allowed the participants in the FCA-ZF-ST Enterprise to coordinate their efforts to downplay the ACU Defect and avoid and minimize recalls.

### iii. The FCA-ZF-ST Enterprise functioned as a continuing unit.

1755. The FCA-ZF-ST Enterprise continued for several years, at least during the time period of 2007 to the present. Although FCA stopped distributing new Class Vehicles with the DS84 ACU in 2018 or 2019, FCA Class Vehicles continue to sell on the used car market with misleading in-vehicle statements and consumer-facing marketing (such as vehicle brochures) made by the FCA-ZF-ST Enterprise.

1756. During this protracted time, the members of the FCA-ZF-ST Enterprise remained stable, with FCA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp. ST USA, ST Malaysia, and ST Italy remaining active members for at least a decade of ongoing production and sales of the FCA Class Vehicles. ZF Germany, on the other hand, participated in the FCA-ZF-ST Enterprise shortly after acquiring ZF TRW Corp. in 2015.

### d. The FCA-ZF-ST Enterprise's pattern of racketeering caused FCA Plaintiffs and the Nationwide FCA Class members to overpay for FCA Class Vehicles at the point of sale or lease.

1757. FCA Plaintiffs and Nationwide FCA Class members are "person[s] injured in his or her business or property" by reason of the FCA-ZF-ST Enterprise's RICO violations, within the meaning of U.S.C. § 1964(c). FCA Plaintiffs and Nationwide FCA Class members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

1758. Because of the FCA-ZF-ST Enterprise's pattern of racketeering activity, FCA Plaintiffs and Nationwide FCA Class members have been injured in their business and/or property through their overpayment at the time of purchase or lease for FCA Class Vehicles with an undisclosed safety defect.

1759. By making misleading statements and omissions at or before the point of sale or lease, the FCA-ZF-ST Enterprise directly or indirectly obtained money

from FCA Plaintiffs and the Nationwide FCA Class by means of materially false or fraudulent misrepresentations and omissions of material facts. Had the FCA Plaintiffs known what the FCA-ZF-ST Enterprise members knew about the ACU Defect, they and Nationwide FCA Class members would not have purchased the FCA Class Vehicles, or would not have paid as much as they did for them.

1760. FCA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, or ST Malaysia not concealed, and instead decided to disclose, the information they knew about the ACU Defect and its impact on vehicle safety, the FCA Plaintiffs and Nationwide FCA would have learned of the disclosure.

    a.    FCA Plaintiffs and Nationwide FCA Class members would have learned about the ACU Defect through any of the channels through the FCA Class Vehicles were marketed to them. In other words, had FCA made a disclosure in *any* of the places in which it otherwise communicated information about the FCA Class Vehicles, the FCA Plaintiffs and Nationwide FCA Class members would have seen it. This includes in FCA Class Vehicle brochures and other advertising, on Monroney labels, certification labels, in-vehicle airbag labels, airbag warning lamps, and in owner's manuals.

    b.    Further, the FCA Plaintiffs and Nationwide FCA Class members would have learned about the ACU Defect at the times and places that they purchased or leased their FCA Class Vehicles. For example, had FCA made a disclosure about the ACU Defect to authorized FCA dealerships, sales personnel at the dealerships would have passed on that material information to consumers at the time of the contemplated purchases.

c.   Had any of the Defendants listed above disclosed the true scope and existence of the ACU Defect to NHTSA, the FCA Plaintiffs and Nationwide FCA Class members would have learned of it because NHTSA would have considered this information material to its decision to require a recall, which information would have been made public and passed onto impacted consumers.

d.   Had any of the Defendants listed above disclosed the true scope and existence of the ACU Defect to consumers or the public, either through press releases, on their websites, or in any other public channel or forum, the FCA Plaintiffs and Nationwide FCA Class members would have learned of it due to the materiality of this information about a serious safety defect in millions of vehicles. Given the seriousness of the information and the number of vehicles impacted, the news media and consumer forums and blogs would pick up the story. This is particularly so in the wake of the massive Takata recall and litigation, which confirmed the strong public interest in airbags and vehicle safety. For example, an April 23, 2019 article available on ConsumerReports.com described NHTSA's expanded investigation into the DS84 ACUs to be "the agency's most in-depth look at airbags since the recall of more than 56 million airbags made by Takata."

1761.  The FCA-ZF-ST Enterprise's misleading statements to NHTSA between 2016 and the present were essential to the scheme because NHTSA would not have allowed continued sale of unremedied FCA Class Vehicles with defective DS84 ACUs and ASICs. At the very least, these misleading statements delayed NHTSA's broader investigation of the FCA Class Vehicles until April 2019, when

1   NHTSA launched an Engineering Analysis covering all unrecalled FCA Class

2   Vehicles. Upon information and belief, ZF Electronics USA stopped making DS84

3   ACUs for the 2020 model year based in large part on this investigation.

4   Accordingly, ZF Electronics USA would have stopped making DS84 ACUs if

5   NHTSA had launched a broader investigation in 2016. For this reason, Plaintiffs

6   who purchased and leased FCA Class Vehicles after the first misleading statement

7   to NHTSA by the FCA-ZF-ST Enterprise would have avoided purchasing or

8   leasing their FCA Class Vehicles entirely, or they would have paid less for them.

9        1762. Consumers are the only direct victims of the FCA-ZF-ST Enterprise's

10  alleged fraudulent and misleading statements to NHTSA. NHTSA has not suffered

11  any reported, direct injury as a result of such conduct.

12       1763. Damages will not be difficult to ascertain; the FCA Plaintiffs and the

13  Nationwide FCA Class members' damages are the difference between what they

14  paid for FCA Class Vehicles without an ACU Defect, and the value of the FCA

15  Class Vehicles they actually received. In the similar *Takata* airbag litigation, for

16  example, plaintiffs also alleged overpayment damages suffered at the point of sale

17  based on a dangerous airbag defect. Plaintiffs' experts in that case performed a

18  conjoint analysis using surveys of consumers and found that the price premium paid

19  by class members was at least ten percent of the purchase price. A similar analysis

20  could be performed in this litigation. Other methodologies are also viable.

21       1764. All victims of Defendants' alleged conduct who claim to have

22  overpaid for the purchase or lease of FCA Class Vehicles are within the alleged

23  Nationwide FCA Class. Consequently, there are no issues with respect to

24  reapportionment or multiple recovery.

25

26

27

28

**4.    Nationwide Count 4: Violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(d), on Behalf of the Nationwide FCA Class Against FCA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia.**

1765. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1766. It is unlawful "for any person to conspire to violate" 18 U.S.C. § 1962(c). *See* 18 U.S.C. § 1962(d). To conspire in violation of section 1962(c), the defendant must be "aware of the essential nature and scope of the enterprise." ECF 396 at 77. Enterprise members conspire to violate section 1962(c) when "two or more people agree[] to commit a crime" and "knowingly and willfully participate[] in the agreement. . . . The illegal agreement need not be express as long as its existence can be inferred from the words, actions, or interdependence of activities and persons involved." *Id*. A defendant who "agreed to facilitate a scheme" violates section 1962(d) even if he "does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense." *Salinas v. United States*, 522 U.S. 52, 65-66 (1997).

1767. As explained in the section below, FCA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia were aware of the essential nature and scope of the FCA-ZF-ST Enterprise. Count 3 describes this Enterprise.

1768. As explained in the section below, based on their words, actions, and/or interdependence, FCA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., and ZF Germany agreed to facilitate the following acts of mail and wire fraud:

> a.    FCA's interstate shipments between 2009 and 2019 of millions of FCA Class Vehicles with misleading Monroney labels,

readiness indicators, in-vehicle airbag labels and imprints, and owner's manuals, and

    b.    ZF Electronics USA's interstate shipments between 2009 and 2019 of millions of DS84 ACUs to FCA and its Mexican subsidiary.

1769. As explained in the section below, based on their words, actions, and/or interdependence, ZF Electronics USA, ZF Passive Safety USA, ST USA, ST Italy, and ST Malaysia also agreed to facilitate the following acts of mail fraud:

    a.    ZF Electronics USA's interstate shipments between 2008 and 2019 of millions of DS84 ACUs to FCA, nonparty FCA Mexico Sa. De Cv., and nonparty Chrysler LLC;

    b.    ST Malaysia's interstate shipments between 2008 and 2019 of millions of DS84 ASICs to ST USA in California; and

    c.    ST USA's interstate shipments between 2008 and 2019 of millions DS84 ASICs to ZF Electronics USA in Illinois.

1770. The words, actions, or interdependence of activities of each of these Defendants support the inference of agreement.

1771. Accordingly, FCA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia each violated 18 U.S.C. § 1962(d).

1772. These violations caused the same injuries and damages described in the prior Count. This Count incorporates by reference the allegations as to injury, damages, and causation from the prior Count.

1773. FCA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia each violated 18 U.S.C. § 1962(c) and injured the business or property of the FCA Plaintiffs and the Nationwide FCA Class. The FCA Plaintiffs claim damages for themselves and the Nationwide FCA Class members under 18 U.S.C. § 1964(c).

### a. FCA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia were all aware of the essential nature and scope of the FCA-ZF-ST Enterprise.

1774. Each Defendant named in this Count was aware of the essential nature and scope of the FCA-ZF-ST Enterprise, even if some specific details about the Enterprise's illegal activities and members were unknown.

### i. FCA understood the nature and scope of the FCA-ZF-ST Enterprise's fraudulent scheme.

1775. FCA was aware of the essential nature and scope of the FCA-ZF-ST Enterprise.

1776. As explained in Section IV.D.4. above, FCA knew about the nature and scope of the ACU Defect.

1777. Between 2009 and 2019, FCA knew that the STMicroelectronics companies were responsible for designing and manufacturing the DS84 ASIC for the DS84 ACUs used in FCA Class Vehicles.

1778. Between 2009 and the present, FCA has continuously tracked the volume of sales of FCA makes and models in the United States. Accordingly, during the relevant time period, it knew roughly how many FCA Class Vehicles would likely sell in the United States.

1779. During each year between 2009 and the present, FCA also knew it would place reassuring Monroney stickers, certification labels, in-vehicle airbag labels and imprints, and readiness indicators on FCA Class Vehicles, and then ship those vehicles to dealers in the United States.

1780. During each year between 2009 and the present, FCA knew it would advertise the FCA Class Vehicles as safe vehicles with properly functioning airbags and seatbelts. FCA knew that consumers would rely on such advertisements when purchasing or leasing FCA Class Vehicles.

1781. During each year between 2009 and the present, FCA knew it would ship FCA Class Vehicles with owner's manuals that include misleading statements about the safety systems, airbags, and seatbelts of the FCA Class Vehicles.

1782. FCA knew in 2016 that ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., and ZF Germany had made misleading statements to NHTSA about the defect because in early 2016 it received copies of the misleading slide deck dated February 5, 2016.

> **ii.    ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA, ZF TRW Corp., and ZF Germany understood the nature and scope of the FCA-ZF-ST Enterprise's fraudulent scheme.**

1783. ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA, ZF TRW Corp., and ZF Germany were aware of the essential nature and scope of the FCA-ZF-ST Enterprise.

1784. As explained in Sections IV.D.1., IV.D.2., and IV.D.4. above, ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA, ZF TRW Corp., and ZF Germany were aware of the nature and scope of the ACU Defect.

1785. ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA, ZF TRW Corp., and ZF Germany knew the approximate number of FCA Class Vehicles with the DS84 ACU because it made the ACUs for those vehicles.

1786. ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA, ZF TRW Corp., and ZF Germany knew that FCA would, consistent with common practice in the automotive industry, make reassuring statements about the FCA Class Vehicle's safety systems, airbags and seatbelts.

### iii. ST USA, ST Italy, and ST Malaysia understood the nature and scope of the FCA-ZF-ST Enterprise's fraudulent scheme.

1787. ST USA, ST Italy, and ST Malaysia were aware of the essential nature and scope of the FCA-ZF-ST Enterprise.

1788. As explained in Section IV.D.1., IV.D.2., and IV.D.4. above, ST USA, ST Italy, and ST Malaysia were aware of the nature and scope of the ACU Defect.

1789. Upon information and belief, ST Italy, ST Malaysia, and ST USA knew the defective DS84 ASICs would be installed the FCA Class Vehicles. These companies also understood that automakers like FCA would, consistent with common practice in the automotive industry, advertise their safety systems to consumers, and that those safety systems would not work properly as a result of the DS84 ASIC's vulnerability to EOS.

1790. ST USA, ST Malaysia, and ST Italy were aware of the large scope of the FCA-ZF-ST Enterprise, among other reasons because ST Malaysia and ST USA made and sold the DS84 ASICs for the FCA Class Vehicles and all these companies had access to records that showed that millions of defective DS84 ASICs were shipping to Illinois per ZF Electronics USA's instructions.

### b. FCA, ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA, ZF TRW Corp., and ZF Germany agreed that one or more members of the Enterprise would commit at least two predicate acts of mail or wire fraud in furtherance of the FCA-ZF-ST Enterprise's fraudulent scheme.

1791. FCA began conspiring with other members of the FCA-ZF-ST Enterprise immediately upon taking control of Chrysler LLC's assets and operations on or around June 10, 2009. After taking over these operations, it continued with the FCA Class Vehicle designs that included the DS84 ASIC for the 2010 model year. ZF Passive Safety USA, ZF Electronics USA, and ZF

Automotive USA had previously agreed to these designs, and FCA ratified that agreement by continuing to make FCA Class Vehicles with the DS84 ACU.

1792. ZF Germany joined the conspiracy in or around 2015, when it acquired ZF TRW Corp.

1793. When FCA agreed to use the defective DS84 ACU and ASIC in FCA Class Vehicles, ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA mutually understood and intended that this agreement would result in FCA instructing ZF Electronics USA to ship DS84 ACUs across state lines and FCA shipping the FCA Class Vehicles with misleading statements about the passive safety system, airbags, and seatbelts therein.

    a.    In 2009, FCA agreed with ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA on the design specifications for the DS84 ACU installed in FCA Class Vehicles. FCA, ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA continued to agree on specifications for FCA Class Vehicles with the DS84 ACU for every model year until 2019.

    b.    Between 2009 and 2019, FCA used mail and wire to advertise the FCA Class Vehicles as safe vehicles with properly-functioning airbags and seatbelts, and used private interstate carriers to ship the FCA Class Vehicles with misleading Monroney labels, airbag labels and imprints, certification labels, readiness indicators, and owner's manuals. ZF Passive Safety USA, ZF Electronics USA, and ZF Automotive USA all knew that FCA was doing this and would do this.

    c.    When FCA agreed with ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA on specifications for the DS84 ACUs in FCA Class Vehicles, ZF Electronics USA, ZF Passive

Safety USA, ZF Automotive USA, and ZF TRW Corp. (and ZF Germany after 2015) had a mutual understanding that this agreement would cause FCA to send orders for hundreds of thousands of DS84 ACUs every year via mail or wire to ZF Electronics USA.

    d.    When FCA agreed with ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA on specifications for the DS84 ACUs in FCA Class Vehicles, FCA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, and ZF TRW Corp. (and ZF Germany after 2015) had a mutual understanding that this agreement would cause ZF Electronics USA to ship hundreds of thousands of DS84 ACUs via private interstate carrier to FCA every year.

1794. As explained in Count 3 above, the shipments of FCA Class Vehicles by FCA, the orders by FCA for DS84 ACUs, and the shipments by ZF Electronics USA of the DS84 ACUs violated the mail fraud statute because they furthered the FCA-ZF-ST Enterprise's fraudulent scheme to cause consumers to purchase or lease vehicles that contain the ACU Defect. To accomplish this goal, the DS84 ACUs needed to be shipped before they could be installed in the vehicles.

    a.    FCA, ZF Passive Safety USA, ZF Electronics USA, and ZF Automotive USA facilitated these mail fraud act violations by collaborating on the defective design of the ACU, the readiness indicators, and FCA Class Vehicles.

    b.    FCA further facilitated these mail fraud violations by requiring (1) all manufacturers of FCA Class Vehicles to install the DS84 ACUs therein, and (2) placing the misleading certification labels, readiness indicators, and airbag labels and imprints within the FCA Class Vehicles it made, and requiring the

| | | |
|---|---|---|
| 1 | | nonparty-Enterprise-member FCA Mexico Sa. De Cv. to do the |
| 2 | | same. |
| 3 | c. | FCA also facilitated this scheme by placing misleading |
| 4 | | Monroney labels on the FCA Class Vehicles it shipped after |
| 5 | | June 10, 2009. |
| 6 | d. | ZF TRW Corp. facilitated the scheme because, upon |
| 7 | | information and belief, its approval was required for the launch |
| 8 | | of the DS84 ACU, which was one of the company's most |
| 9 | | popular ACUs. |
| 10 | e. | ZF Germany facilitated the scheme because, upon information |
| 11 | | and belief, its approval was required to continue the sales of the |
| 12 | | DS84 ACU. |

1795. The conspiracy among FCA, ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA, ZF TRW Corp., and ZF Germany is further evidenced by their coordinated efforts to cover up the ACU Defect.

| | | |
|---|---|---|
| 16 | a. | For several years, FCA, ZF Automotive USA, ZF Electronics |
| 17 | | USA, ZF Passive Safety USA uncovered evidence that DS84 |
| 18 | | ASICs and DS84 ACUs were failing as a result of EOS, but they |
| 19 | | maintained the confidentiality of these incidents among each |
| 20 | | other. |
| 21 | b. | FCA, ZF Automotive USA, ZF Electronics USA, and ZF |
| 22 | | Passive Safety USA repeatedly coordinated with each other in |
| 23 | | response to NHTSA's investigation. In 2016, ZF Electronics |
| 24 | | USA sent FCA excerpted copies of ZF's misleading February 5, |
| 25 | | 2016 slide deck to NHTSA as part of an effort to coordinate |
| 26 | | with FCA to conceal the ACU Defect. Between 2018 and 2019, |
| 27 | | FCA, ZF Electronics USA, ZF Passive Safety USA, and ZF |
| 28 | | Automotive USA met every week to discuss the ACU Defect. |

1796.  The joint activities of ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., and ZF Germany in support of their misleading statements to NHTSA were predicate acts and also show agreement by these Defendants to advance the fraudulent scheme.

1797.  ZF Electronics USA's placement of orders for DS84 ASICs and shipments of DS84 ACUs were predicate acts and also show agreement by ZF Electronics USA to advance the fraudulent scheme.

1798.  The success of the FCA-ZF-ST Enterprise's fraudulent scheme depended upon FCA, ZF Passive Safety USA, ZF Electronics USA, and ZF Automotive USA cooperation. All these companies had to maintain strict confidentiality about the ACU Defect for the scheme to continue. Moreover, FCA depended on the ZF companies for the manufacture of the defective ACUs, whereas the ZF companies could not reach consumers of FCA Class Vehicles without the agreement of FCA. This interdependence evidences the agreement to further the fraudulent scheme.

1799.  The actions detailed above and throughout the Complaint as to each member of the FCA-ZF-ST Enterprise were foreseeable to the other members of the FCA-ZF-ST Enterprise given their direct relationship to and furtherance of the common goals of the scheme.

      c.      **ST USA, ST Italy, ST Malaysia, ZF Automotive USA, ZF Electronics USA, and ZF Passive Safety USA agreed on the commission of multiple violations of the mail fraud statute in furtherance of the FCA-ZF-ST Enterprise's fraudulent scheme.**

1800.  ST Italy, ST Malaysia, and ST USA began conspiring with ZF Passive Safety USA, ZF Electronics USA, and ZF Automotive USA in 2005, when the two supplier groups began the joint design of the DS84 ACU and DS84 ASIC with unique vulnerability to EOS. By 2008, all these companies knew about internal thermal testing that confirmed the weakness of the DS84 ASIC. ST Italy, ST

Malaysia, ST USA, ZF Passive Safety USA, ZF Electronics USA, and ZF
Automotive USA held multiple meetings about this issue.

1801. Even after learning that DS84 ACUs and ASICs had malfunctioned
due to EOS during crashes, ST Italy, ST Malaysia, ST USA, ZF Passive Safety
USA, ZF Electronics USA, and ZF Automotive USA continued to sell and send
shipments of the parts. When doing so, these companies all knew that FCA would
coordinate to cause the FCA Class Vehicles with the defective DS84 ACU and
ASIC to be presented to consumers with misleading certification labels, airbag
labels and imprints, and readiness indicators.

1802. Several actions by FCA further support an inference of agreements
with ZF Passive Safety USA, ZF Electronics USA, and ZF Automotive USA to
commit at least two predicate acts in furtherance of the conspiracy:

     a.    Between 2009 and 2018, ST USA, ST Italy, and ST Malaysia
regularly communicated with ZF Automotive USA., ZF
Electronics USA, and ZF Passive Safety USA about
observations of EOS in DS84 ASICs, including some ASICs
from FCA Class Vehicles. ST USA, ST Italy, and ST Malaysia's
DS84 ASIC team confirmed EOS damage on ASICs retrieved
from at least five FCA vehicles with airbag failures during
crashes.

     b.    Upon information and belief, in 2016, ZF Automotive USA, ZF
Electronics USA, and ZF Passive Safety USA sent each ST
Defendant excerpted copies of its misleading statements from its
February 5, 2016 slide deck.

     c.    Between 2009 and 2018 at the very least, ST USA and ST
Malaysia continuously violated the mail fraud act in furtherance
of the FCA-ZF-ST Enterprise by shipping defective DS84

ASICs with a mutual understanding that some of these ASICs would be installed in FCA Class Vehicles, as explained above.

d. Between 2008 and 2018 at the very least, ST USA, ST Italy, and ST Malaysia maintained public silence about the ACU Defect, despite the observed evidence of the DS84 ASIC's and ACU's unusual vulnerability to transients.

1803. The actions detailed above and throughout the Complaint as to each member of the FCA-ZF-ST Enterprise were foreseeable to the other members of the FCA-ZF-ST Enterprise given their direct relationship to and furtherance of the common goals of the scheme.

1804. The success of the FCA-ZF-ST Enterprise's fraudulent scheme depended upon ST USA, ST Italy, and ST Malaysia, ZF Passive Safety USA, ZF Electronics USA, and ZF Automotive USA's cooperation. All these companies had to maintain strict confidentiality about the ACU Defect for the scheme to continue. Moreover, the ZF companies depended upon the ST companies for the manufacture of the defective ASICs, whereas the ST companies depended upon the ZF companies for a viable path to profit from the consumers of FCA Class Vehicles. This interdependence evidences the agreement to further the fraudulent scheme.

**5. Nationwide Count 5: Violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(c), on Behalf of the Toyota Nationwide Class Against Toyota USA, Toyota Sales USA, Toyota Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia.**

1805. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1806. Pursuant to 18 U.S.C. § 1962(c): "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or

indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Toyota USA, Toyota Sales USA, Toyota Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia are "persons" under 18 U.S.C. § 1961(3) because each was capable of holding "a legal or beneficial interest in property."

1807. A violation of 18 U.S.C. § 1962(c) has four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." ECF 396 at 59 (quoting *Sedima v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

1808. Toyota USA, Toyota Sales USA, Toyota Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Malaysia, and several nonparties formed the Toyota-ZF-ST Enterprise. The members of this Enterprise included Defendants Toyota USA, Toyota Sales USA, Toyota Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia. The Toyota-ZF-ST Enterprise also included several nonparty individuals and corporations, including Toyota Japan, the Japanese parent company of Toyota USA, Toyota Sales USA, and Toyota Engineering USA; and the Toyota manufacturing subsidiaries that built vehicles for distribution throughout the United States.[23] Discovery will likely reveal several additional members of the Toyota-ZF-ST Enterprise that are not currently known to the Toyota Plaintiffs.

1809. Toyota USA, Toyota Sales USA, Toyota Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia are liable under 18 U.S.C. § 1962(c)

---

[23] These manufacturing subsidiaries include Toyota Motor Manufacturing Canada Inc.; Toyota Motor Manufacturing, Indiana, Inc.; Toyota Motor Manufacturing de Baja California S. de R.L. de C.V.; Toyota Motor Manufacturing, Mississippi, Inc.; Toyota Motor Manufacturing, Texas, Inc., and Toyota Motor Manufacturing, Kentucky, Inc.

because they conducted or participated in the conduct of the affairs of an "association-in-fact enterprise"—i.e., the Toyota-ZF-ST Enterprise—through a pattern of racketeering activity. In other words, each of these Defendants committed at least two predicate acts in furtherance of the Enterprise's fraudulent scheme.

1810. 18 U.S.C. § 1964(c) provides for a civil remedy for any violation of 18 U.S.C. § 1962 for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." In addition to proving a violation of § 1962, this remedy requires proximate cause of a cognizable injury. ECF 396 at 59.

1811. Toyota USA, Toyota Sales USA, Toyota Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia each violated 18 U.S.C. § 1962(c) and injured the business or property of the Toyota Plaintiffs and the Nationwide Toyota Class. The Toyota Plaintiffs claim damages for themselves and the Nationwide Toyota Class members under 18 U.S.C. § 1964(c).

     **a.**    **Toyota USA, Toyota Sales USA, Toyota Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia each committed at least two predicate acts of mail and wire fraud in furtherance of the Toyota-ZF-ST Enterprise's fraudulent scheme to affirmatively mislead consumers and NHTSA.**

1812. The members of the Toyota-ZF-ST Enterprise devised a scheme for the purpose of defrauding consumers and NHTSA by concealing or minimizing the ACU Defect in Toyota Class Vehicles through a pattern of affirmatively misleading statements.

1813. In the alternative, the Toyota-ZF-ST Enterprise members devised an illicit scheme for the purpose of obtaining money by fraudulent pretenses to

maximize the sale of Toyota Class Vehicles, which ultimately provided revenue to the Toyota-ZF-ST Enterprise members.

1814. To carry out, or attempt to carry out, the fraudulent schemes, Toyota USA, Toyota Sales USA, Toyota Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Malaysia, the nonparty Toyota Japan, and the nonparty Toyota manufacturing subsidiaries—each of whom is a person associated-in-fact with the Enterprise— knowingly conducted or participated, directly or indirectly, in the affairs of the Toyota-ZF-ST Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c). In furtherance of the schemes, these Toyota-ZF-ST Enterprise members each committed *at least* two acts in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud), as described in the subsections below.

### i.   Toyota USA violated the mail and wire fraud statutes multiple times in furtherance of the Toyota-ZF-ST Enterprise's fraudulent scheme.

1815. Toyota USA violated the mail fraud statute (18 U.S.C. § 1341) multiple times by overseeing the content of Monroney labels for all Toyota Class Vehicles. Upon information and belief, before Toyota Sales USA could affix Monroney labels to the Toyota Class Vehicles, Toyota USA had to approve the content of each label for the relevant make and model years. Toyota USA gave this approval even though it knew about the ACU Defect in the Toyota Class Vehicles. Accordingly, it knew the reassuring statements about Class Vehicle safety features on Monroney labels were misleading. *See* Section IV.E.1.a. above. Toyota USA approved these misleading Monroney labels with full knowledge and the specific intent that Toyota Sales USA would distribute the Toyota Class Vehicles to dealers across the United States using private interstate carriers. Toyota USA also knew that consumers would rely on Monroney labels when purchasing or leasing Toyota

Class Vehicles. Accordingly, Toyota USA "knowingly cause[d]" the Toyota Class Vehicles with misleading Monroney labels "to be delivered by . . . such carrier[s]," in violation of 18 U.S.C. § 1341.

1816. On January 17, 2020, Toyota USA authorized Toyota Engineering USA to file a misleading 573 Defect Report with NHTSA. Upon information and belief, Toyota Engineering USA then used mail to send a paper copy of the 573 Defect Report to NHTSA and also used wire communications to send an electronic copy to NHTSA, both on that day. These transmittals violated the mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343) because, as explained in Section IV.F.20, the 573 Defect Report contained misleading statements denying the ACU Defect in the unrecalled Toyota Class Vehicles. Toyota USA knew these statements in the 573 Defect Report were misleading and would further the scheme to defraud consumers into purchasing or leasing the unrecalled Toyota Class Vehicles by avoiding a recall of these vehicles. Toyota USA also knew these affirmatively misleading statements in the 573 Defect Report would be publicly available to all consumers. Accordingly, Toyota USA's authorization of the transmittal of the misleading 573 Defect Report to NHTSA violated the mail and wire fraud statutes. (18 U.S.C. §§ 1341, 1343).

> **ii.      Toyota Sales USA violated the mail and wire fraud statutes multiple times in furtherance of the Toyota-ZF-ST Enterprise's fraudulent scheme.**

1817. Toyota Sales USA committed mail fraud every time it shipped, or caused to be shipped, a Toyota Class Vehicle to dealers in the United States. For every Toyota Class Vehicle, Toyota Sales USA delivered, or caused delivery of, each vehicle by private or commercial interstate carrier to automobile dealerships across the United States. Toyota Sales USA delivered millions of Class Vehicles to execute the Toyota-ZF-ST Enterprise's scheme to defraud consumers and NHTSA.

a.      These deliveries furthered the scheme because Toyota Sales USA sent the Toyota Class Vehicles to the dealerships where consumers would purchase or lease them and because, prior to shipping the Toyota Class Vehicles, Toyota Japan had affixed, or caused to be affixed, to the vehicles misleading certification labels (*see* Section IV.E.1.b. above), readiness indicators (*see* Section IV.E.1.c. above), and airbag labels and imprints (*see* Section IV.E.1.d. above).

b.      Moreover, prior to shipping each Toyota Class Vehicle, Toyota Sales USA and Toyota USA agreed upon the content for Monroney labels for each make and model. As explained above in Section IV.E.1.a., the Monroney labels for the Toyota Class Vehicles were misleading because they falsely assured consumers that the Toyota Class Vehicles had properly-functional airbags, seatbelts, and safety systems. Toyota Sales USA would then cause these misleading labels to be placed on the Toyota Class Vehicles prior to shipment to dealers. Shipment of the Toyota Class Vehicles with these misleading Monroney labels furthered the Toyota-ZF-ST Enterprise's scheme because consumers relied upon the labels when purchasing or leasing them.

c.      Finally, prior to shipping the vehicles, Toyota Sales USA also ensured that each Toyota Class Vehicle came with an owner's manual with misleading statements about the vehicle's safety system (*see* Section IV.E.2.b.i. above).

1818. Toyota Sales USA knew the Monroney labels, certification labels, readiness indicators, airbag labels and imprints, and owners' manuals shipped with

1  each Toyota Class Vehicle were misleading because the Toyota Class Vehicles all

2  contained the ACU Defect.

3    1819. Although the precise shipment dates for all Toyota Class Vehicles are

4  not known to the Toyota Plaintiffs, on information and belief, these shipments

5  occurred in all years in or about 2010 to 2019. Plaintiffs were exposed to in-vehicle

6  misleading statements prior to, and at the point of, sale or lease. The dates and

7  locations of these transactions are alleged above in Section II.B.3.

8    1820. Starting in 2010, Toyota Sales USA also transmitted, or caused to be

9  transmitted, tens (perhaps hundreds) of thousands of advertisements which stressed

10  the safety of Toyota Class Vehicles using mail, wire, radio, or television

11  communications in interstate commerce. Toyota Sales USA's misleading

12  advertisements are too numerous to recite completely, given the nationwide scope

13  and decade-long duration of the Toyota-ZF-ST Enterprise's fraudulent scheme.

14  Examples of these advertisements are collected in Section IV.E.2.a.i. and Exhibit

15  13. Each such mailed advertisement—including brochures sent to dealerships for

16  display to consumers or print advertisements in newspapers or magazines—was a

17  violation of the mail fraud statute (18 U.S.C. § 1341). Each such internet-based,

18  radio, and television advertisement was a violation of the wire fraud statute (18

19  U.S.C. § 1343). Toyota Sales USA knew these advertisements assuring consumers

20  of the safety of Toyota Class Vehicles were misleading and would further the

21  scheme to defraud consumers into purchasing or leasing Toyota Class Vehicles.

22    1821. Toyota Sales USA also placed copies of owners' manuals for the

23  Toyota Class Vehicles on its website. Upon information and belief, the publication

24  of these owners' manuals occurred at or around the commencement of public sales

25  for each model year. The publication of each these manuals on a website was a

26  violation of the wire fraud statute (18 U.S.C. § 1343) because Toyota Sales USA

27  knew the owners' manuals for all Toyota Class Vehicles were misleading and

28

1   would further the scheme to defraud consumers into purchasing or leasing Toyota

2   Class Vehicles.

### iii.   Toyota Engineering USA violated the mail and wire fraud statutes multiple times in furtherance of the Toyota-ZF-ST Enterprise's fraudulent scheme.

6   1822. On January 17, 2020, Toyota Engineering USA authorized the filing of

7   a misleading 573 Defect Report with NHTSA. Upon information and belief, Toyota

8   Engineering USA then used mail to send a paper copy to NHTSA and also used

9   wire communications to send an electronic copy to NHTSA, both on that day.

10  These transmittals violated the mail and wire fraud statutes (18 U.S.C. §§ 1341,

11  1343) because, as explained in Section IV.F.20., the 573 Defect Report contained

12  misleading statements denying the ACU Defect in the unrecalled Toyota Class

13  Vehicles. Toyota Engineering USA knew these statements in the 573 Defect Report

14  were misleading and would further the scheme to defraud consumers into

15  purchasing or leasing the Toyota Class Vehicles by avoiding a recall of these

16  vehicles. Toyota Engineering USA also knew these affirmatively misleading

17  statements in the 573 Defect Report would be made publicly available to all

18  consumers. Accordingly, Toyota Engineering USA's transmittal of the misleading

19  573 Defect Report to NHTSA violated the mail and wire fraud statutes. (18 U.S.C.

20  §§ 1341, 1343).

21  1823. Toyota Engineering USA separately violated the mail fraud act (18

22  U.S.C. § 1341) by placing orders with ZF Electronics USA that caused ZF

23  Electronics USA to ship defective DS84 ACUs by private or commercial interstate

24  carrier to the nonparty-Enterprise members Toyota manufacturing companies in

25  Canada, Indiana, Mexico, Mississippi, Kentucky, and Texas. These shipments

26  furthered the Toyota-ZF-ST Enterprise's fraudulent scheme because Toyota

27  Engineering USA's use of the defective DS84 ACUs in Toyota Class Vehicles was

28  essential to the cost-saving goal behind the scheme. Toyota Engineering USA

caused ZF Electronics USA to make these deliveries knowing that the defective DS84 ACUs would be placed in the Toyota Class Vehicles and that Toyota Sales USA would market the vehicles to U.S. consumers as safe. Accordingly, each of Toyota Engineering USA's orders and ZF Electronics USA's shipments of the DS84 ACU violated the mail fraud statute (18 U.S.C. § 1341).

1824. The precise dates and locations of each particular order for, and shipment of, DS84 ACUs are not known to the Toyota Plaintiffs because they have no visibility into the shipments to automobile manufacturers and Defendants have not produced documents that show that information. However, a chart produced by the domestic ZF Defendants to NHTSA identifies the precise volume of DS84 ACUs shipped for each year for each model of the Toyota Class Vehicles, and identifies Marshall, Illinois as the shipping location. Exhibit 20 includes highlighting added by Plaintiffs to identify the particular information about shipping locations, volumes, vehicle makes and models, and shipping years contained in this chart. *See* Ex. 20 (ZF-MDL-679) at 686-691. The month and day of each shipment are not known to the Toyota Plaintiffs, but Defendants can determine that information using the backup information in their possession.

1825. The shipping address for each of these shipments of DS84 ACUs by ZF Electronics USA from Marshall, Illinois was 902 South 2nd Street, Marshall, Illinois 62441. For ACUs shipped to Toyota Motor Manufacturing Canada Inc., the recipient address was 1055 Fountain Street North, Cambridge, Ontario, Canada N3H 5K2. For ACUs shipped to Toyota Motor Manufacturing, Kentucky, Inc., the recipient address was 1001 Cherry Blossom Way Georgetown, KY 40324. For ACUs shipped to Toyota Motor Manufacturing, Mississippi, Inc., the recipient address was 1200 Magnolia Way, Blue Springs, MS 38828. For ACUs shipped to Toyota Motor Manufacturing, Indiana, Inc., the recipient address was 4000 Tulip Tree Dr, Princeton, IN 47670. For ACUs shipped to Toyota Motor Manufacturing de Baja California S. de R.L. de C.V., the recipient address was Carretera Libre

1  Tijuana - Tecate #33143 Tijuana, Baja California, Mexico CP 36102. For ACUs

2  shipped to Toyota Motor Manufacturing, Texas, Inc., the recipient address was 1

3  Lone Star Pass, San Antonio, TX 78264.

4          **iv.**    **Nonparty Toyota Japan violated the mail and wire**

5                **fraud statutes multiple times in furtherance of the**

6                **Toyota-ZF-ST Enterprise's fraudulent scheme.**

7      1826. While Toyota Japan is not a named Defendant in this litigation, it is a

8  nonparty-Enterprise member that caused misleading certification labels, readiness

9  indicators, airbag labels and imprints, and owners' manuals to be placed within

10  every Toyota Class Vehicle prior to shipment to the dealers that sell or lease the

11  vehicles to U.S. consumers. As explained in Sections IV.E.1.a. and IV.E.1.b.i.

12  above, each of these statements misleadingly assured consumers that the Toyota

13  Class Vehicles had properly-functioning safety systems, airbags, and seatbelts

14  when, in fact, the safety systems, airbags, and seatbelts had a dangerous safety

15  defect due to the vulnerability of the DS84 ACU and ASIC to EOS. Toyota Japan

16  caused the inclusion of these misleading statements within every Toyota Class

17  Vehicle with full knowledge and the specific intent that Toyota Sales USA would

18  distribute the Toyota Class Vehicles to dealers across the United States using

19  private interstate carriers. Accordingly, Toyota Japan "knowingly cause[d]" the

20  Toyota Class Vehicles with misleading statements "to be delivered by . . . such

21  carrier[s]," in violation of 18 U.S.C. § 1341.

22          a.    Toyota Japan was directly responsible for including all of these

23                misleading statements in all Toyota Class Vehicles made in

24                Japan. Upon information and belief, Toyota Japan placed the

25                misleading certification labels, airbag warning lamps, and airbag

26                labels and imprints in the Japanese-made Toyota Class Vehicles

27                when they manufactured them at the following address: 1,

28                Toyota-cho, Toyota-city, Aichi-pref., 471-8571, Japan. The

certification labels for these Japanese-made vehicles bore Toyota Japan's corporate name, "Toyota Motor Corp." The Toyota Class Vehicles made by Toyota Japan have vehicle identification numbers that begin with the letter "J." Toyota Japan has records in its possession that will identify the dates when it transferred these Class Vehicles to Toyota Sales USA, with the purpose of distributing them to the United States for sale to consumers. The Toyota Plaintiffs do not have access to these confidential records that provide the precise dates of transfer.

b.   Although other, nonparty-Enterprise members (Toyota Motor Manufacturing Canada Inc.; Toyota Motor Manufacturing, Indiana, Inc.; Toyota Motor Manufacturing de Baja California S. de R.L. de C.V.; Toyota Motor Manufacturing, Mississippi, Inc.; Toyota Motor Manufacturing, Texas, Inc.; and Toyota Motor Manufacturing, Kentucky, Inc.) made the remaining Toyota Class Vehicles and placed permanent certification labels on them under their own names, they had no discretion to depart from the mandatory Toyota Class Vehicle designs created by Toyota Japan. Accordingly, Toyota Japan, as the entity responsible for designing these vehicles, was at least jointly responsible for the certifications for these vehicles. Toyota Japan was also responsible for the misleading airbag warning lamps and in-vehicle airbag labels and imprints placed within these Toyota Class Vehicles because Toyota Japan's designs required the inclusion of these misleading statements within the Toyota Class Vehicles.

      c.     Toyota Japan was also responsible for the content of the owners' manuals for Toyota Class Vehicles. It also owns the copyright interest in these manuals. As explained in Section IV.E.2.b.i. above, these owners' manuals contained misleading statements about the vehicles' safety systems. Insofar as Toyota Sales USA effectuated the shipments of the owner's manuals within Toyota Class Vehicles to dealers in the United States, it acted as Toyota Japan's distribution agent for Toyota Japan's copyrighted material.

1827. Although the precise shipment dates for all Toyota Class Vehicles are not known to the Toyota Plaintiffs, on information and belief, these shipments occurred in all years in or about 2010 to 2019. Plaintiffs were exposed to in-vehicle misleading statements prior to, and at the point of, sale or lease. The dates and locations of these transactions are alleged above in Section II.B.3.

1828. Each shipment of a Toyota Class Vehicle or Vehicles to a dealer was a violation of the mail fraud statute (18 U.S.C. § 1341) because Toyota Japan knew the certification labels, airbag warning labels, in-vehicle airbag labels and imprints, and owner's manuals in all Toyota Class Vehicles were misleading and would further the scheme to defraud consumers into purchasing or leasing Toyota Class Vehicles.

1829. When Toyota Sales USA distributed the Toyota Class Vehicles to dealers in the United States, it acted as Toyota Japan's agent.

1830. Toyota Japan also provided Toyota Sales USA with authorization to place copies of misleading Toyota Class Vehicle owner's manuals on Toyota Sales USA's website. Upon information and belief, the publication of these owner's manuals in print and on the website occurred at or around the commencement of public sales for each model year. The publication of each of these manuals on a website was a violation of the wire fraud statute (18 U.S.C. § 1343) because Toyota

Japan knew the owner's manuals for all Toyota Class Vehicles were misleading and would further the scheme to defraud consumers into purchasing or leasing Toyota Class Vehicles. Toyota Sales USA acted as an agent of Toyota Japan when it published these owner's manuals because Toyota Japan, not Toyota Sales USA, holds the copyright in the manuals.

> **v.      ZF Electronics USA violated the mail fraud statute multiple times in furtherance of the Toyota-ZF-ST Enterprise's fraudulent scheme.**

1831. ZF Electronics USA drafted and/or edited the following misleading statements to NHTSA, as discussed in Sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above:

> a.      The slide deck presentation dated February 5, 2016 (which ZF TRW Corp. mailed to NHTSA on March 14, 2016);
>
> b.      The slide deck presentation dated July 19, 2016 (which, upon information and belief, was mailed to NHTSA in July or August 2016);
>
> c.      The September 2016 letter signed by Marc Bolitho[24] (which ZF Electronics USA mailed to NHTSA in September 2016); and
>
> d.      The slide deck presentation dated March 8, 2018 (which ZF TRW Corp. mailed to NHTSA on March 12, 2018).

1832. As explained in sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above, each of these transmittals contained misleading statements about the ACU Defect. ZF Electronics USA specifically approved the transmittal of the final versions of these documents to NHTSA, and intended for the misleading statements contained therein to avoid, minimize, and/or delay recalls of Toyota Class Vehicles.

---

[24] Mr. Bolitho was simultaneously an employee of ZF Passive Safety USA, the Vice President of Passive Safety for ZF Electronics USA, and Director of Passive Safety Engineering for ZF TRW.

Avoiding, minimizing, and/or delaying recalls of Toyota Class Vehicles enabled the continuation of the scheme to defraud consumers.

1833. ZF Electronics USA caused the delivery of the February 5, 2016 slide deck. ZF Electronics USA's causal role in the delivery is evidenced by the fact that its Vice President of Passive Safety Marc Bolitho signed an affidavit of confidentiality that was enclosed with the mailing of the February 5, 2016 slide deck.

1834. Because the July 19, 2016 slide deck closely resembles the February 5, 2016 slide deck, the same personnel and companies were likely responsible for sending it via mail or private interstate carrier to NHTSA. Accordingly, upon information and belief, ZF Electronics USA caused this delivery to NHTSA too.

1835. ZF Electronics USA caused the delivery of the March 8, 2018 slide deck to NHTSA. ZF Electronics USA's causal role in the delivery is evidenced by the fact that its Technical Specialist, Emanuel Goodman, signed the affidavit of confidentiality that was enclosed with the mailing of the March 8, 2018 slide deck. ZF Electronics USA's causal role in the delivery is further evidenced by Mr. Goodman's and Mr. Bolitho's attendance at the March 8, 2018 meeting with NHTSA, where this slide deck was used.

1836. Moreover, because ZF Electronics USA's affiliates would not have sent or approved the four written communications described above without ZF Electronics USA's contributions and approval, ZF Electronics USA was one of the Defendants who jointly caused the delivery of these four communications to NHTSA. Accordingly, its participation in these communications violated the mail fraud statute at least four times. 18 U.S.C. § 1341.

1837. As explained in Section IV.E.1.c. above, ZF Electronics USA worked with ZF Passive Safety USA, ZF Automotive USA, and Toyota Japan to design the readiness indicators installed in Toyota Class Vehicles. Specifically, ZF Electronics USA assisted with a design of ACUs that would cause the readiness indicator not to

illuminate at the point of sale or lease, even though the Toyota Class Vehicle's safety systems were not ready to deploy in foreseeable crash events with negative transients due to the ACU Defect. When ZF Electronics USA assisted with this design, it knew Toyota Sales USA would ship the Toyota Class Vehicles to dealers and that consumers would buy Toyota Class Vehicles without the airbag warning lamp illuminating at the point of sale or lease. Because Toyota Sales USA would not have shipped Toyota Class Vehicles without ZF Electronics USA's assistance in designing misleading readiness indicators, ZF Electronics USA jointly caused each shipment of a Toyota Class Vehicle, in violation of the mail fraud act (18 U.S.C. § 1341).

1838. ZF Electronics USA received orders from Toyota Engineering USA for the defective DS84 ACUs used in every Toyota Class Vehicle and shipped them by private or commercial interstate carrier to the nonparty-Enterprise-member Toyota manufacturing subsidiaries based in Canada, Indiana, Mexico, Mississippi, Kentucky, and Texas. These shipments furthered the Toyota-ZF-ST Enterprise's fraudulent scheme because the use of DS84 ACUs in Toyota Class Vehicles was essential to the cost-saving goal behind the scheme. When ZF Electronics USA shipped the defective DS84 ACUs to the nonparty Toyota manufacturing subsidiaries, it knew they would be installed in the Toyota Class Vehicles that are marketed to U.S. consumers. ZF Electronics USA was also specifically aware of Toyota Japan's, Toyota USA's, and Toyota Sales USA's practice of making reassuring statements about safety, airbags, and seatbelts in consumer-facing Monroney labels, certification labels, in-vehicle labels, owner's manuals, and advertising for all Toyota Class Vehicles. ZF Electronics USA knew these statements were false because it knew the Toyota Class Vehicles, DS84 ACU, and DS84 ASIC were defective. Accordingly, because ZF Electronics USA shipped each defective DS84 ACU with the purpose of executing a fraudulent scheme with the other Enterprise members, each of ZF Electronics USA's shipments of the

defective DS84 ACU violated the mail fraud statute (18 U.S.C. § 1341). The particularities of these shipments are discussed above. Exhibit 20 includes highlighting added by Plaintiffs to identify the particular information about shipping locations, volumes, vehicle makes and models, and shipping years contained in this chart. *See* Ex. 20 (ZF-MDL-679) at 686-691.

1839. ZF Electronics USA also separately violated the mail fraud act (18 U.S.C. § 1341) by placing orders with ST USA that required ST USA to ship millions of defective DS84 ASICs to ZF Electronics USA at a facility with the following address: 902 South 2nd Street, Marshall, Illinois 62441. When ZF Electronics USA placed these orders, it knew it would install these DS84 ASICs into DS84 ACUs, including those that would be installed in the Toyota Class Vehicles that are marketed to U.S. consumers. ZF Electronics USA was also specifically aware of Toyota Japan's, Toyota USA's, and Toyota Sales USA's practice of making reassuring statements about safety, airbags, and seatbelts in consumer-facing Monroney labels, certification labels, in-vehicle labels, owner's manuals, and advertising for all Toyota Class Vehicles. ZF Electronics USA knew these statements were false because it knew the Toyota Class Vehicles, DS84 ACU, and ASIC were defective. Accordingly, because ZF Electronics USA caused shipments of defective DS84 ASICs with the purpose of executing a fraudulent scheme with the other Enterprise members, each of the DS84 ASIC shipments caused by ZF Electronics USA violated the mail fraud statute (18 U.S.C. § 1341). ST USA has produced approximately 9,700 such invoices from the time period between 2014 and the present alone. Plaintiffs have extracted approximate shipping dates from these invoices, which are presented as exemplars in Exhibit 21.[25]

---

[25] ST USA made similar shipments relevant to the Toyota Class Vehicles at least between 2009 and 2014, but ST USA is presently withholding invoices for these shipments from discovery. Upon information and belief, the invoices for this time period will show similar regularity of shipments.

### vi. ZF Passive Safety USA violated the mail fraud statute multiple times in furtherance of the Toyota-ZF-ST Enterprise's fraudulent scheme.

1840. ZF Passive Safety USA drafted and/or edited the following misleading statements to NHTSA, as discussed in Sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above:

    a.   The slide deck presentation dated February 5, 2016 (which ZF TRW Corp. mailed to NHTSA on March 14, 2016);

    b.   The slide deck presentation dated July 19, 2016 (which, upon information and belief, was mailed to NHTSA in July or August 2016);

    c.   The September 2016 letter signed by Marc Bolitho[26] (which ZF Electronics USA mailed to NHTSA in September 2016); and

    d.   The slide deck presentation dated March 8, 2018 (which ZF TRW Corp. mailed to NHTSA on March 12, 2018).

1841. As explained in sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above, each of these transmittals contained misleading statements about the ACU Defect. ZF Passive Safety USA specifically approved the transmittal of the final versions of these documents to NHTSA, and intended for the misleading statements contained therein to avoid, minimize, and/or delay recalls of Toyota Class Vehicles. Avoiding, minimizing, and/or delaying recalls of Toyota Class Vehicles enabled the continuation of the scheme to defraud consumers.

1842. ZF Passive Safety USA caused the delivery of the February 5, 2016 slide deck. ZF Passive Safety USA's causal role in the delivery is evidenced by the fact that its employee Marc Bolitho signed an affidavit of confidentiality that was enclosed with the mailing of the February 5, 2016 slide deck. Although Mr. Bolitho

---

[26] Mr. Bolitho was simultaneously an employee of ZF Passive Safety USA, the Vice President of Passive Safety for ZF Electronics USA, and Director of Passive Safety Engineering for ZF TRW Corp.

1    also simultaneously served as a Vice President for ZF Electronics USA and a

2    Director of Passive Safety Engineering for ZF TRW Corp., ZF Passive Safety USA

3    alone paid his salary.

4          1843. Because the July 19, 2016 slide deck closely resembles the February 5,

5    2016 slide deck, the same personnel and companies were likely responsible for

6    sending it via mail or private interstate carrier to NHTSA. Accordingly, upon

7    information and belief, ZF Passive Safety USA caused this delivery too.

8          1844. ZF Passive Safety USA caused the delivery of the March 8, 2018 slide

9    deck to NHTSA. ZF Passive Safety USA's causal role in the delivery is evidenced

10    by the fact that its longtime employee, Emanuel Goodman, signed the affidavit of

11    confidentiality that was enclosed with the mailing of the March 8, 2018 slide deck.

12    Although Mr. Goodman also served as the Technical Specialist for ZF Electronics

13    USA, ZF Passive Safety USA alone paid his salary. ZF Passive Safety USA's

14    causal role in the delivery is further evidenced by Mr. Goodman's and Mr.

15    Bolitho's attendance at the March 8, 2018 meeting with NHTSA, where this slide

16    deck was used.

17          1845. Moreover, because ZF Passive Safety USA's affiliates would not have

18    sent or approved the four written communications described above without ZF

19    Passive Safety USA's contributions and approval, ZF Passive Safety USA was one

20    of the Defendants who jointly caused the delivery of these four communications to

21    NHTSA. Accordingly, its participation in these communications violated the mail

22    fraud statute at least four times. 18 U.S.C. § 1341.

23          1846. As explained in sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above,

24    each of the four documents described above contained misleading statements about

25    the ACU Defect. ZF Passive Safety USA specifically approved the transmittal of

26    the final versions of these documents to NHTSA, and intended for the misleading

27    statements contained therein to avoid, minimize, and/or delay recalls of Toyota

28    Class Vehicles. Avoiding, minimizing, and/or delaying recalls of Toyota Class

Vehicles enabled the continuation of the scheme to defraud consumers. Because ZF Passive Safety USA's affiliates would not have sent or approved the written communications noted in the preceding paragraph without ZF Passive Safety USA's contributions and approval, ZF Passive Safety USA was one of the Defendants who caused the delivery of these four communications to NHTSA. Accordingly, its participation in these communications violated the mail fraud statute at least four times. (18 U.S.C. § 1341).

1847. As explained in Section IV.E.1.c. above, ZF Passive Safety USA worked with ZF Electronics USA, ZF Automotive USA, and nonparty Toyota Japan to design the readiness indicators installed in all Toyota Class Vehicles. Specifically, ZF Passive Safety USA assisted with a design of ACUs that would cause the readiness indicator not to illuminate at the point of sale or lease, even though the Toyota Class Vehicle's safety systems were not ready to deploy in crash events with negative transients due to the ACU Defect. When ZF Passive Safety USA assisted with this design, it knew nonparty Toyota Japan would ship the Toyota Class Vehicles to dealers and that consumers would buy the vehicles without the airbag warning lamp illuminating at the point of sale or lease. Because Toyota Sales USA would not have shipped Toyota Class Vehicles without ZF Passive Safety USA's assistance in designing misleading readiness indicators, ZF Passive Safety USA jointly caused each shipment of Toyota Class Vehicle, in violation of the mail fraud act (18 U.S.C. § 1341).

### vii. ZF Automotive USA violated the mail fraud statute multiple times in furtherance of the Toyota-ZF-ST Enterprise's fraudulent scheme.

1848. ZF Automotive USA drafted and/or edited the following misleading statements to NHTSA, as discussed in Sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above:

a.   The slide deck presentation dated February 5, 2016 (which ZF
     TRW Corp. mailed to NHTSA on March 14, 2016);

b.   The slide deck presentation dated July 19, 2016 (which, upon
     information and belief, was mailed to NHTSA in July or August
     2016);

c.   The September 2016 letter signed by Marc Bolitho (which ZF
     Electronics USA mailed to NHTSA in September 2016); and

d.   The slide deck presentation dated March 8, 2018 (which ZF
     TRW Corp. mailed to NHTSA on March 12, 2018).

1849. ZF Automotive USA caused the delivery via mail or private interstate carrier of the February 5, 2016 slide deck, the July 19, 2016 slide deck, and the March 8, 2018 slide deck to NHTSA. ZF Automotive USA's role in causing the delivery of these presentations is evidenced by its admission in a 573 Defect Report that it attended the three meetings with NHTSA where these presentations were used on its behalf.

1850. Upon information and belief, ZF Automotive USA caused the delivery of the September 2016 letter via mail or private interstate carrier by giving requisite approval prior to the transmittal of the letter.

1851. As explained in sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above, each of these four documents contained misleading statements about Toyota Class Vehicles and the ACU Defect. ZF Automotive USA specifically approved the transmittal of the final versions of these documents to NHTSA, and intended for the misleading statements contained therein to avoid, minimize, and/or delay recalls of Toyota Class Vehicles. Avoiding, minimizing, and/or delaying recalls of Toyota Class Vehicles enabled the continuation of the scheme to defraud consumers. Because ZF Automotive USA's affiliates would not have sent or approved the written communications noted in the preceding paragraph without ZF Automotive USA's contributions and approval, ZF Automotive USA was one of the Defendants

who caused the delivery of these four communications to NHTSA. Accordingly, its participation in these communications violated the mail fraud statute at least four times. (18 U.S.C. § 1341).

1852. As explained in Section IV.E.1.c. above, ZF Automotive USA worked with ZF Passive Safety USA, ZF Electronics USA, and nonparty Toyota Japan to design the readiness indicators installed in Toyota Class Vehicles. Specifically, ZF Automotive USA assisted with a design of ACUs that would cause the readiness indicator not to illuminate at the point of sale or lease, even though the Toyota Class Vehicle's safety systems were not ready to deploy in crash events with negative transients due to the ACU Defect. When ZF Automotive USA assisted with this design, it knew Toyota Sales USA would ship the Toyota Class Vehicles to dealers and that consumers would buy the vehicles without the airbag warning lamp illuminating at the point of sale or lease. Because Toyota Sales USA would not have shipped Toyota Class Vehicles without ZF Automotive USA's affirmative assistance in designing misleading readiness indicators, ZF Automotive USA jointly caused each shipment of Toyota Class Vehicle, in violation of the mail fraud act (18 U.S.C. § 1341).

### viii. ZF TRW Corp. violated the mail fraud statute multiple times in furtherance of the Toyota-ZF-ST Enterprise's fraudulent scheme.

1853. Prior to their delivery to NHTSA, ZF TRW Corp. reviewed, drafted and/or edited the following misleading statements to NHTSA, as discussed in Sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above:

    a.    The slide deck presentation dated February 5, 2016 (which ZF TRW Corp. mailed to NHTSA on March 14, 2016);

    b.    The slide deck presentation dated July 19, 2016 (which, upon information and belief, was mailed to NHTSA in July or August 2016);

c.      The September 2016 letter signed by Marc Bolitho[27] (which ZF Electronics USA mailed to NHTSA in September 2016); and

d.      The slide deck presentation dated March 8, 2018 (which ZF TRW Corp. mailed to NHTSA on March 12, 2018).

1854. ZF TRW Corp. caused the transmittal of the February 5, 2016 slide deck via mail or private interstate carrier. ZF TRW Corp.'s role in the transmittal is confirmed by the cover letter, which is signed: "Very truly yours, ZF TRW Automotive Holdings Corp." with a signature from Sheri Roberts, the Senior Counsel of the company. ZF TRW Corp.'s causal role is further confirmed by a footer on every page of the slide deck itself, which reads: "This document is the property of ZF TRW and is disclosed in confidence. It may not be copied, disclosed to others, or used for manufacturing without the written consent of ZF TRW" Based on this footer, ZF TRW Corp. gave requisite written consent to the transmittal of the document to NHTSA.

1855. ZF TRW Corp. caused the transmittal of the July 19, 2016 slide deck via mail or private interstate carrier. ZF TRW Corp.'s causal role is confirmed by a footer on every page of the slide deck itself, which reads: "This document is the property of ZF TRW and is disclosed in confidence. It may not be copied, disclosed to others, or used for manufacturing without the written consent of ZF TRW." Based on this footer, ZF TRW Corp. gave requisite written consent to the transmittal of the document to NHTSA.

1856. Upon information and belief, ZF TRW Corp. also gave requisite prior authorization for the delivery of the September 2016 letter.

1857. ZF TRW Corp. caused the transmittal of the March 8, 2018 slide deck to NHTSA via mail or private interstate carrier. ZF TRW Corp.'s causal role is

---

[27] Mr. Bolitho was simultaneously an employee of ZF Passive Safety USA, the Vice President of Passive Safety for ZF Electronics USA, and Director of Passive Safety Engineering for ZF TRW Corp.

confirmed by the cover letter included with the mailing of the slide deck. The cover letter is on the letter head of an "Active & Passive Safety Technology" business unit. Because this is a reference to ZF TRW Corp.,[28] ZF TRW Corp. must have reviewed and approved the transmittal of the slide deck to NHTSA.

1858. As explained in sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above, each of these four documents described above contained misleading statements about Toyota Class Vehicles and the ACU Defect. ZF TRW Corp. specifically approved the transmittal of the final versions of these documents to NHTSA, and intended for the misleading statements contained therein to avoid, minimize, and/or delay recalls of Toyota Class Vehicles. Avoiding, minimizing, and/or delaying recalls of Toyota Class Vehicles enabled the continuation of the scheme to defraud consumers. Because ZF TRW Corp.'s affiliates would not have sent or approved the written communications noted in the preceding paragraph without ZF TRW Corp.'s contributions and approval, ZF TRW Corp. was one of the Defendants who caused the delivery of these four communications to NHTSA. Accordingly, its participation in these communications violated the mail fraud statute at least four times. (18 U.S.C. § 1341).

> ### ix. ZF Germany violated the mail and wire fraud statutes multiple times in furtherance of the Toyota-ZF-ST Enterprise's fraudulent scheme.

1859. Prior to their delivery to NHTSA, ZF Germany reviewed and/or edited the following misleading statements to NHTSA, as discussed in Sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above:

---

[28] According to ZF AG's 2017 Annual Report, the "Active & Passive Safety Technology Division" was "established by ZF Group to manage the business activities of ZF TRW after its acquisition." Because ZF TRW Corp. is the only corporate entity with "ZF TRW" as part of its corporate name, this letter was also sent on behalf of ZF TRW Corp.

a. The slide deck presentation dated February 5, 2016 (which ZF TRW Corp. mailed to NHTSA on March 14, 2016);

b. The slide deck presentation dated July 19, 2016 (which, upon information and belief, was mailed to NHTSA in July or August 2016);

c. The September 2016 letter signed by Marc Bolitho (which ZF Electronics USA mailed to NHTSA in September 2016); and

d. The slide deck presentation dated March 8, 2018 (which ZF TRW Corp. mailed to NHTSA on March 12, 2018).

1860. ZF Germany caused the delivery of these communications via mail and wire. The three presentations bear copyright legends attributing ownership to ZF Germany. Accordingly, sending these presentations must have required its involvement and consent. Moreover, the slide decks dated February 5, 2016 and July 19, 2016 identify ZF Germany as the corporate author on the title page.

1861. As explained in sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above, each of these documents described above contained misleading statements about Toyota Class Vehicles and the ACU Defect. ZF Germany specifically approved the transmittal of the final versions of these documents to NHTSA, and intended for the misleading statements contained therein to avoid, minimize, and/or delay recalls of Toyota Class Vehicles. Avoiding, minimizing, and/or delaying recalls of Toyota Class Vehicles enabled the continuation of the scheme to defraud consumers. Because ZF Germany's affiliates would not have sent or approved the written communications noted in the preceding paragraph without ZF Germany's contributions and approval, ZF Germany was one of the Defendants who caused the delivery of these four communications to NHTSA. Accordingly, its participation in these communications violated the mail fraud statute at least four times. (18 U.S.C. § 1341).

1
2
3

**x.    ST USA violated the mail fraud statute multiple times in furtherance of the Toyota-ZF-ST Enterprise's fraudulent scheme.**

4      1862. ST USA regularly received orders from ZF Electronics USA for DS84

5   ASICs, including all the defective DS84 ASICs used in Toyota Class Vehicles. In

6   response to these orders ST USA would work with its affiliate, ST Malaysia, to

7   help it manufacture and then ship DS84 ASICs to ST USA's so-called "ST Micro

8   LAX Hub" near Los Angeles, California. Between 2007 and the present, ST USA

9   caused ST Malaysia to ship well over ten million defective DS84 ASICs to this

10  location. In discovery, ST USA has produced approximately 9,700 invoices sent to

11  ZF Electronics USA from the time period between 2014 and the present alone.

12  Each invoice notes the defective DS84 ASICs were made in Malaysia, where ST

13  Malaysia operated. The invoice dates from these documents provide an

14  approximate date for these shipments. Plaintiffs have extracted approximate

15  shipping dates from these invoices, which are presented as exemplars in Exhibit

16  21.[29]

17     1863. ST USA also shipped well over ten million defective DS84 ASICs to

18  ZF Electronics USA at a facility with the following address: 902 South 2nd Street,

19  Marshall, Illinois 62441. As explained above, Exhibit 21 provides exemplar

20  approximate shipment dates based on an incomplete set of invoices produced by ST

21  USA.[30]

22  ────────────────

23  [29] ST USA made similar shipments for Toyota Class Vehicles between 2009 and
24  2014, but is withholding invoices for these shipments from discovery. Upon
    information and belief, the invoices for this time period will show a similar
25  regularity of shipments of DS84 ASICs from Malaysia.

26  [30] ST USA made similar shipments between 2007 and 2014, but is withholding
    invoices for these shipments from discovery. Upon information and belief, the
27  invoices for this time period will show a similar regularity of shipments of DS84
    ASICs from the STMicro LAX Hub to the ZF Electronics USA's manufacturing
28  facility in Illinois.

1864. When ST USA required ST Malaysia to make these shipments and then made its own shipments to ZF Electronics USA, it knew ZF Electronics USA would place the DS84 ASICs into DS84 ACUs, including those that would be installed in Toyota Class Vehicles that are marketed to U.S. consumers. ST USA was also aware of Toyota USA's, Toyota Sales USA's, and nonparty Toyota Japan's practice of making reassuring statements about safety, airbags, and seatbelts in consumer-facing Monroney labels, certification labels, in-vehicle labels, owner's manuals, and advertising for all Toyota Class Vehicles. ST USA knew these statements were false because it knew the Toyota Class Vehicles, DS84 ACU, and DS84 ASIC were defective. Accordingly, because ST USA caused shipments of well over ten million defective DS84 ASICs with the purpose of executing a fraudulent scheme with the other Enterprise members, each of the DS84 ASIC shipments caused by ST USA violated the mail fraud statute (18 U.S.C. § 1341).

xi. **ST Malaysia violated the mail fraud statute multiple times in furtherance of the Toyota-ZF-ST Enterprise's fraudulent scheme.**

1865. Between 2007 and the 2018, ST USA regularly worked with its affiliate, ST Malaysia, to help it manufacture and ship DS84 ASICs to ST USA's so-called "ST Micro LAX Hub" near Los Angeles, California. During that time period, ST Malaysia shipped well over ten million defective DS84 ASICs to this location. ST USA has produced approximately 9,700 invoices sent to ZF Electronics USA from the time period between 2014 and the present. Each invoice notes the defective DS84 ASICs were made in Malaysia, where ST Malaysia operated. The invoice dates from these documents provide an approximate date for these shipments. Plaintiffs have extracted approximate shipping dates from these invoices, which are presented as exemplars in Exhibit 21.[31]

---

[31] ST USA made similar shipments between 2007 and 2014, but is withholding invoices for these shipments from discovery. Upon information and belief, the

1866. When ST Malaysia made these shipments, it knew ZF Electronics USA would place the DS84 ASICs into DS84 ACUs, including those ACUs that would be installed in Toyota Class Vehicles that are marketed to U.S. consumers. ST Malaysia was also aware of Toyota USA's, Toyota Sales USA's, and nonparty Toyota Japan's practice of making reassuring statements about safety, airbags, and seatbelts in consumer-facing Monroney labels, certification labels, in-vehicle labels, owner's manuals, and advertising for all Toyota Class Vehicles. ST Malaysia knew these statements were false because it knew the Toyota Class Vehicles, DS84 ACU, and DS84 ASIC were defective. Accordingly, because ST Malaysia caused shipments of well over ten million defective DS84 ASICs with the purpose of executing a fraudulent scheme with the other Enterprise members, each of the DS84 ASIC shipments made by ST Malaysia violated the mail fraud statute (18 U.S.C. § 1341).

> **b.** **Toyota USA, Toyota Sales USA, Toyota Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Malaysia, and nonparty Toyota Japan advanced their fraudulent scheme by concealing material information about a serious safety defect that they had a duty to disclose.**

1867. The uses of mail and wire described in the section above violated the mail and wire fraud statutes because they furthered a fraudulent scheme to affirmatively mislead consumers and NHTSA.

1868. In addition, these same uses of the mail and wire *also* violated the mail and wire fraud statutes because, while they sent or caused to be sent these mailings, Toyota USA, Toyota Sales USA, Toyota Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Malaysia, and nonparty Toyota Japan had duties to disclose the ACU Defect and failed to do so in order to advance their scheme.

---

invoices for this time period will show a similar regularity of shipments.

1869. Toyota USA, Toyota Sales USA, Toyota Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, ST Malaysia, and nonparty Toyota Japan each knew for years that the defective DS84 ACUs and ASICs in the Toyota Class Vehicles are uniquely vulnerable to EOS. *See* Section IV.D.5. above.

1870. To further the goals of the Toyota-ZF-ST Enterprise and to their mutual gain, Toyota USA, Toyota Sales USA, Toyota Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, ST Malaysia, and Toyota Japan concealed what they knew about the existence, scope, and material safety risks of the ACU Defect in the Toyota Class Vehicles.

1871. Their careful efforts to conceal the ACU Defect in the Toyota Class Vehicles were critically important to the viability of their scheme. A decision by any one Defendant or nonparty-Enterprise member to tell the truth about the ACU Defect and its impact of vehicle safety to consumers or to NHTSA would have been an existential threat to the Toyota-ZF-ST Enterprise. Instead, and in pursuit of ill-gotten profits, they each kept key information about the ACU Defect hidden for years. This concealment of material facts about the ACU Defect was grounded in and advanced their scheme to defraud consumers through the continued sale of Toyota Class Vehicles, and avoidance of costly recalls and their attendant reputational harms.

1872. Toyota USA, Toyota Sales USA, Toyota Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, ST Malaysia, and nonparty Toyota Japan's concealment of the ACU Defect violated several independent duties to disclose it.[32]

---

[32] As vehicle manufacturers and component parts suppliers, Defendants are also subject to statutory duties to disclose known safety defects to consumers and to NHTSA pursuant to the Safety Act and its attendant regulations. *See, e.g.*, 49

1        a.    Toyota USA, Toyota Sales USA, Toyota Engineering USA, ZF

2               Electronics USA, ZF Passive Safety USA, ZF Automotive USA,

3               ZF TRW Corp., ZF Germany, ST USA, ST Italy, ST Malaysia,

4               and nonparty Toyota Japan each had a duty to disclose the ACU

5               Defect because of their exclusive knowledge and far superior

6               information about the ACU Defect.

7        b.    These Defendants and nonparty Toyota Japan knew about the

8               vulnerability of the DS84 ACU and ASIC to EOS through their

9               exclusive access to information about their design, development,

10             and testing, and through their confidential and proprietary

11             investigations into suspicious incidents. Given the ACU

12             Defect's hidden and technical nature, Plaintiffs and consumers

13             lack the sophisticated expertise in vehicle components and

14             electrical phenomena that would be necessary to discover the

15             ACU Defect on their own.

16        c.    In addition, Toyota USA, Toyota Sales USA, Toyota

17             Engineering USA, ZF Electronics USA, ZF Passive Safety

18             USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST

19

20  U.S.C. § 30118(c) ("A manufacturer of a motor vehicle . . . shall notify the Secretary by certified mail or electronic mail, and the owners, purchasers, and

21  dealers of the vehicle . . . as provided in section 30119(d) of this section, if the manufacturer . . . learns the vehicle . . . contains a defect and decides in good faith

22  that the defect is related to motor vehicle safety."); 49 U.S.C. §30119(d) (manufacturers must notify "each person registered . . . as the owner and whose

23  name and address are reasonably ascertainable"); 49 C.F.R. §573.6(a) ("Each manufacturer shall furnish a report to the NHTSA for each defect . . . in his items of

24  original . . . equipment that he . . . determines to be related to motor vehicle

25  safety."). Plaintiffs previously pled Defendants had a duty to disclose based on these provisions of the Safety Act, but the Court dismissed an omissions theory

26  based these alleged duties. Plaintiffs reserve the right to appeal this decision at a

27  later date, but do not rely upon the Safety Act as a basis for their omissions theory in this pleading.

28

USA, ST Italy, ST Malaysia, and nonparty Toyota Japan also each had a duty to disclose because they knew that a defect in the Toyota Class Vehicles and their DS84 ACUs and ASICs gave rise to serious safety concerns for the consumers who use the vehicles. As sophisticated and well-funded corporate entities that generate billions of dollars in annual revenue from work in the automotive industry, each of these Defendants and nonparty Toyota Japan knew that this information would have been material to consumers. For example, a February 3, 2004, prospectus filed by ZF TRW Corp. with the SEC observed that "85 percent of recent auto purchasers stated that they look for vehicle safety information before making their final decision." Nonetheless, Defendants and nonparty Toyota Japan still did not disclose it.

d.  Toyota USA, Toyota Sales USA, Toyota Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, and nonparty Toyota Japan also each had a duty to disclose the ACU Defect because of the actions they took to conceal the ACU Defect in the Toyota Class Vehicles from consumers. Each of these Defendants and nonparty Toyota Japan acted to suppress the truth about the ACU Defect through their misleading representations to NHTSA. *See* Sections IV.F.2., IV.F.4., IV.F.8., IV.F.14., IV.F.20., and IV.F.22. Because a truthful and accurate disclosure to NHTSA would have been material to NHTSA's decision whether to require a recall or expand its investigation into the DS84 ACUs and ASICs, the affirmative steps they took to mislead NHTSA about the ACU Defect also precluded the

Toyota Plaintiffs and Nationwide Toyota Class members from an opportunity that otherwise have led to their discovery of the truth about the ACU Defect.

e.   Finally, Toyota USA, Toyota Sales USA, Toyota Engineering USA, and nonparty Toyota Japan affirmatively presented reassuring information about the Toyota Class Vehicles' airbags, seatbelts, and overall safety to consumers (*see* Sections IV.E.1 and I.V.E.2. above). Because they opted to make these representations to consumers about these topics, and because it knew information about the ACU Defect that made those representations misleading or untrue, Toyota USA, Toyota Engineering, Toyota Sales USA, and nonparty Toyota Japan were under a separate duty to disclose the full truth about the ACU Defect that materially undermined the reassuring information they presented, or caused to be presented, to consumers.

1873.  Toyota USA, Toyota Sales USA, Toyota Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, ST Malaysia, and nonparty Toyota Japan knew and intended that NHTSA would rely on their and the other members of the Toyota-ZF-ST Enterprise's material omissions about the Toyota Class Vehicles to approve them for importation, marketing, and sale to consumers in the United States. And conversely, they also understood that disclosing the ACU Defect would require them to recall and fix the Toyota Class Vehicles, which would negatively impact the profits of the Toyota-ZF-ST Enterprise.

1874.  Toyota USA, Toyota Sales USA, Toyota Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, ST Malaysia, and nonparty Toyota Japan also

knew and intended that consumers would rely on their and the other members of the Toyota-ZF-ST Enterprise's material omissions when deciding to purchase or lease the Toyota Class Vehicles. The Toyota Plaintiffs' reliance on this concealment is demonstrated by the fact that they paid money for Toyota Class Vehicles that never should have been introduced into the U.S. stream of commerce, and that they overpaid for vehicles with defective safety systems without knowledge of the ACU Defect.

<blockquote>

**c.** **The Toyota-ZF-ST Enterprise was an association-in-fact enterprise with a common purpose of misleading consumers and NHTSA regarding the ACU Defect in Toyota Class Vehicles.**

</blockquote>

1875. The Toyota-ZF-ST Enterprise had a common purpose and ongoing organization and functioned as a continuing unit.

<blockquote>

**i.** **The Toyota-ZF-ST Enterprise had a common purpose.**

</blockquote>

1876. The common purpose of the Toyota-ZF-ST Enterprise was to perpetuate a fraudulent scheme to maximize sales and leases of Toyota Class Vehicles while hiding the ACU Defect from purchasers and lessees. Because all of the Enterprise members' continued profits from this scheme ultimately depended on consumers purchasing or leasing Toyota Class Vehicles, the Enterprise needed to convince consumers of a false premise: that Toyota Class Vehicles had properly functioning airbags and seatbelts. Toward this end, the Enterprise needed to mislead consumers. For this scheme to work, it was also essential for the Enterprise to conceal the ACU Defect from NHTSA, because the agency could halt the sale of Toyota Class Vehicles and require recalls that necessarily require public notice of a defect. The expense of these recalls would undermine the profitability of the scheme.

1877. This common purpose served the interests of all members of the Toyota-ZF-ST Enterprise. By concealing and minimizing the ACU Defect, Toyota

USA, Toyota Sales USA, Toyota Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, ST Malaysia, and the nonparty-Enterprise members (Toyota Japan and the Toyota manufacturing subsidiaries) maximized their revenue by selling as many Toyota Class Vehicles as possible while avoiding or limiting the substantial costs to recall and repair the Toyota Class Vehicles and their defective DS84 ACUs and ASICs.

1878. The common purpose of the Toyota-ZF-ST Enterprise is evidenced by Toyota USA's, Toyota Sales USA's, Toyota Engineering USA's, ZF Electronics USA's, ZF Passive Safety USA's, ZF Automotive USA's, and nonparty Toyota Japan's repeated, confidential consultations with one another about suspicious crashes involving Toyota Class Vehicles, problems with the design of the DS84 ACU and ASIC, observations of EOS on DS84 ACUs and ASICs, and dangerous safety system malfunctions in Toyota Class Vehicles. As the Court has held, consultations about "observed evidence of EOS in Class Vehicles" among Defendants "support[s] a reasonable inference" of a "common purpose of misleading consumers and NHTSA as to the existence of a defect in the ACUs." ECF 396 at 61.

1879. The common purpose of the Toyota-ZF-ST Enterprise is further evidenced by ST USA, ST Italy, and ST Malaysia's repeated communications with ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA about observations of EOS in Toyota Class Vehicles. ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA would regularly share this information with Toyota Japan, Toyota USA, Toyota Engineering USA, and Toyota Sales USA by copying excerpts of the reports received from ST USA, ST Italy, and ST Malaysia and sending them to Toyota Japan, who would then share them with Toyota USA, Toyota Engineering USA, and Toyota Sales USA.

1880. The common purpose of the Toyota-ZF-ST Enterprise is also evidenced by coordinated efforts by Toyota Japan, Toyota USA, Toyota Engineering USA, Toyota Sales USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, and ZF Germany to mislead NHTSA about the existence and scope of the ACU Defect by wrongly blaming wire harnesses for safety system malfunctions that were caused by the ACU Defect.

### ii. The Toyota-ZF-ST Enterprise had an ongoing organization.

1881. The participation of separate entities or individuals that have an existence outside an alleged enterprise is evidence of an ongoing organization with its own structure, separate and apart from its members. Toyota USA, Toyota Engineering USA, Toyota Sales USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, ST Malaysia, the nonparty-Enterprise members (Toyota Japan and the Toyota manufacturing subsidiaries) each existed separately from the Toyota-ZF-ST Enterprise.

a. During the relevant period, Toyota Japan contemporaneously designed, manufactured, and sold many vehicles that do not contain defective DS84 ACUs and ASICs.

b. During the relevant period, Toyota Engineering USA, Toyota USA, and Toyota Sales USA contemporaneously provided services to Toyota Japan relating to a large volume of vehicles that do not contain defective DS84 ACUs and ASICs.

c. During the relevant period, the Toyota manufacturing subsidiaries manufactured Toyota vehicles that do not contain defective DS84 ACUs and ASICs.

d. During the relevant period, ST USA, ST Italy, and ST Malaysia contemporaneously sold, designed, and/or manufactured many

1    other products aside from the defective DS84 ASICs used in the

2    defective DS84 ACUs.

3    e.    During the relevant period, ZF Passive Safety USA, ZF

4    Electronics USA, and ZF Automotive USA contemporaneously

5    designed, made, and/or sold many other automotive parts aside

6    from the defective DS84 ACUs.

7    f.    During the relevant time period, ZF TRW Corp. and ZF

8    Germany also engaged in a wide variety of business activities

9    unrelated to the defective DS84 ACUs.

10   1882. Another hallmark of an ongoing organization is members with

11   delineated roles that further the organization's goals. Each member performed

12   important and separate roles within the Toyota-ZF-ST Enterprise organization.

13   a.    ZF Electronics USA, ZF Passive Safety USA, and ZF

14   Automotive USA jointly designed the defective DS84 ACU for

15   use in the Toyota Class Vehicles, with Toyota Japan's, ST

16   Italy's, and ST USA's input.

17   b.    ST Italy and ST USA jointly designed the defective DS84 ASIC,

18   with input from ZF Electronics USA, ZF Passive Safety USA,

19   and ZF Automotive USA.

20   c.    ST Malaysia manufactured the defective DS84 ASICs and

21   shipped them to ST USA in California.

22   d.    ST USA sold and shipped the defective DS84 ASIC to ZF

23   Electronics USA.

24   e.    Nonparty Toyota Japan designed the Toyota Class Vehicles, and

25   made many of them in Japan. Toyota Japan required any

26   company that made Toyota Class Vehicles to strictly follow its

27   designs. For the Toyota Class Vehicles made by Toyota Japan,

28   Toyota Japan added permanent labels to each vehicle that

certified compliance with U.S. Federal safety standards, as well as readiness indicators and in-vehicle airbag labels and imprints.

f.    The nonparty Toyota manufacturing subsidiaries made Toyota Class Vehicles by strictly following the mandatory design specifications provided by Toyota Japan. For the Toyota Class Vehicles made by these subsidiaries, Toyota Japan's mandatory designs required the manufacturer to add permanent labels to each vehicle that certified compliance with U.S. Federal safety standards, as well as readiness indicators and in-vehicle airbag labels and imprints.

g.    Toyota USA responded to NHTSA's investigation on behalf of Toyota Japan, Toyota Engineering USA, and Toyota Sales USA. Toyota USA also oversaw the content of Monroney labels and shared responsibility for those labels on Toyota Class Vehicles with Toyota Sales USA. Toyota USA also oversaw and approved the content of Monroney labels for the Toyota Class Vehicles.

h.    Toyota Sales USA created the Monroney labels for Toyota Class Vehicles and caused them to be affixed to each Toyota Class Vehicles prior to their shipment to authorized Toyota dealers. It also distributed the Toyota Class Vehicles to dealers, so they could be sold to consumers with misleading Monroney labels and the in-vehicle statements required by Toyota Japan's mandatory design specifications. Toyota Sales USA was also responsible for all misleading advertising to consumers.

i.    Toyota Engineering USA was responsible for procuring the defective DS84 ACUs from ZF Electronics USA. Toyota Engineering USA also filed misleading statements with NHTSA

purporting to justify the decision not to recall many of the
Toyota Class Vehicles.

         j.       ZF TRW Corp. and ZF Germany approved actions taken by ZF
Electronics USA, ZF Passive Safety USA, and ZF Automotive
USA, and participated directly in making misleading statements
to NHTSA about the ACU Defect.

         k.      Each of the Defendants separately ensured that NHTSA and
consumers did not discover the ACU Defect.

1883. The Enterprise members dedicated personnel to the Toyota-ZF-ST
Enterprise's common goals, which further evidences the ongoing structure of the
Toyota-ZF-ST Enterprise. For example, ZF Electronics USA, ZF Passive Safety
USA, and ZF Automotive USA dedicated an entire applications team to implement
the defective DS84 ACUs in Toyota Class Vehicles in 2008. Tom Wilson, a ZF
Passive Safety USA employee, was a member of this team.

1884. When the passenger safety systems in Toyota vehicles repeatedly
malfunctioned due to the ACU Defect over the course of several years (starting at
least as early as 2010), Toyota USA, Toyota Engineering USA, Toyota Sales USA,
and nonparty Toyota Japan routinely sought the involvement and assistance of ZF
Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ST Italy, ST USA,
and ST Malaysia. These Defendants repeatedly coordinated, directly or indirectly,
with Toyota USA, Toyota Engineering USA, Toyota Sales USA, and Toyota Japan
on the ACU Defect and related malfunctions, including by assigning several
investigations for Toyota Class Vehicles to the same personnel. For example, ZF
Electronics USA, ZF Passive Safety USA, and ZF Automotive USA assigned
Emanuel Goodman with the task of analyzing DS84 ACUs from Toyota Class
Vehicles.

1885. In 2018 and 2019, in-house lawyers and senior executives for ZF
Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ST USA, and ST
Italy repeatedly spoke with each other concerning NHTSA's investigation into the
DS84 ACUs and Toyota Class Vehicles.

1886. Nonparty Toyota Japan, on the other hand, dedicated members of a
Toyota Japan design group called "3SJ" to participate in weekly meetings about the
ACU Defect with ZF Electronics USA, ZF Passive Safety USA, and ZF
Automotive USA between 2018 and 2019. During those years, this group held
approximately weekly conference calls with the ZF team consisting of Emanuel
Goodman and Raad Konja, among others. Moreover, although ZF Automotive
USA and its subsidiaries contracted with Toyota Engineering USA, ZF Automotive
USA treated Toyota Japan's Group Manager Tsutomu Kondo as its primary point
of contact with regards to the ACUs with the DS84 ASIC.

1887. When NHTSA began to investigate the defective DS84 ACUs in 2015,
ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF Germany,
and ZF TRW Corp. maintained the organization of the Toyota-ZF-ST Enterprise by
sending excerpts of their misleading communications with NHTSA to Toyota
Japan, ST USA, ST Italy, and ST Malaysia. Upon information and belief, Toyota
Japan would share this information with Toyota Engineering USA, Toyota USA,
and Toyota Sales USA. This allowed the participants in the Toyota-ZF-ST
Enterprise to coordinate their efforts to downplay the ACU Defect and avoid and
minimize recalls.

### iii.  The Toyota-ZF-ST Enterprise functioned as a continuing unit.

1888. The Toyota-ZF-ST Enterprise continued to function for several years,
at least during the time period of 2008 to the present. Although Toyota Sales USA
stopped distributing new Class Vehicles with the DS84 ACU in 2018 or 2019,
Toyota Class Vehicles continue to sell on the used car market with misleading in-

vehicle statements and consumer-facing marketing (such as vehicle brochures) made by the Toyota-ZF-ST Enterprise.

1889. During this protracted time of ongoing sale and production of the Toyota Class Vehicles, the members of the Toyota-ZF-ST Enterprise remained stable, with Toyota USA, Toyota Engineering USA, Toyota Sales USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ST USA, ST Malaysia, ST Italy, and the nonparty-Enterprise members (Toyota Japan and the Toyota Manufacturing subsidiaries) remaining active members of the Toyota-ZF-ST Enterprise. ZF Germany, on the other hand, started to participate in the Toyota-ZF-ST Enterprise shortly after acquiring ZF TRW Corp. in 2015.

> **d.    The Toyota-ZF-ST Enterprise's pattern of racketeering caused Toyota Plaintiffs and the Nationwide Toyota Class members to overpay for Toyota Class Vehicles at the point of sale or lease.**

1890. Toyota Plaintiffs and Nationwide Toyota Class members are "person[s] injured in his or her business or property" by reason of the Toyota-ZF-ST Enterprise's RICO violations, within the meaning of 18 U.S.C. § 1964. Toyota Plaintiffs and Nationwide Toyota Class members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

1891. Because of the Toyota-ZF-ST Enterprise's pattern of racketeering activity, Toyota Plaintiffs and Nationwide Toyota Class members have been injured in their business and/or property through their overpayment at the time of purchase or lease for Toyota Class Vehicles with an undisclosed safety defect.

1892. By making misleading statements and omissions at or before the point of sale or lease, the Toyota-ZF-ST Enterprise directly or indirectly obtained money from Toyota Plaintiffs and the Nationwide Toyota Class by means of materially false or fraudulent misrepresentations and omissions of material facts. Had the

1   Toyota Plaintiffs known what the Toyota-ZF-ST Enterprise members knew about
2   the ACU Defect, Toyota Plaintiffs and Nationwide Toyota Class members would
3   not have purchased the Toyota Class Vehicles, or would not have paid as much as
4   they did for them.

5       1893. Had Toyota USA, Toyota Sales USA, Toyota Engineering USA, ZF
6   Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp.,
7   ZF Germany, ST USA, ST Malaysia, or nonparty Toyota Japan not concealed, and
8   instead decided to disclose, the information they knew about the ACU Defect and
9   its impact on vehicle safety, Plaintiffs would have learned of the disclosure.

10      a.   Toyota Plaintiffs and Nationwide Toyota Class members would
11           have learned about the ACU Defect through any of the channels
12           through the Toyota Class Vehicles were marketed to them. In
13           other words, had Toyota Sales USA, Toyota USA, and/or
14           nonparty Toyota Japan made a disclosure in *any* of the places in
15           which it otherwise communicated information about the Toyota
16           Class Vehicles, Toyota Plaintiffs and Nationwide Toyota Class
17           members would have seen it. This includes in Toyota Class
18           Vehicle brochures and other advertising, on Monroney labels,
19           certification labels, in-vehicle airbag labels, airbag warning
20           lamps, and in owner's manuals.

21      b.   Further, Toyota Plaintiffs and Nationwide Toyota Class
22           members would have learned about the ACU Defect at the times
23           and places that they purchased or leased their Toyota Class
24           Vehicles. For example, had Toyota USA or Toyota Sales USA
25           made a disclosure about the ACU Defect to authorized Toyota
26           dealerships, sales personnel at the dealerships would have
27           passed on that material information to consumers at the time of
28           the contemplated purchases.

c.    Had any of the Defendants listed above or nonparty Toyota Japan disclosed the true scope and existence of the ACU Defect to NHTSA, Toyota Plaintiffs and Nationwide Toyota Class members would have learned of it because NHTSA would have considered this information material to its decision to require a recall, which information would have been made public and passed onto impacted consumers.

d.    Had any of the Defendants listed above or nonparty Toyota Japan disclosed the true scope and existence of the ACU Defect to consumers or the public, either through press releases, on their websites, or in any other public channel or forum, Toyota Plaintiffs and Nationwide Toyota Class members would have learned of it due to the materiality of this information about a serious safety defect in millions of vehicles. Given the seriousness of the information and the number of vehicles impacted, the news media and consumer forums and blogs would pick up the story. This is particularly so in the wake of the massive Takata recall and litigation, which confirmed the strong public interest in airbags and vehicle safety. For example, an April 23, 2019 article available on ConsumerReports.com described NHTSA's expanded investigation into the DS84 ACUs to be "the agency's most in-depth look at airbags since the recall of more than 56 million airbags made by Takata."

1894. The Toyota-ZF-ST Enterprise's misleading statements to NHTSA between 2016 and the present were essential to the scheme because NHTSA would not have allowed continued sale of unremedied Toyota Class Vehicles with defective DS84 ACUs and ASICs. At the very least, these misleading statements delayed NHTSA's broader investigation of the Toyota Class Vehicles until April

2019, when NHTSA launched an Engineering Analysis covering all unrecalled Toyota Class Vehicles. Upon information and belief, ZF Electronics USA stopped making DS84 ACUs for the 2020 model year based in large part on this investigation. Accordingly, ZF Electronics USA would have stopped making DS84 ACUs if NHTSA had launched a broader investigation in 2016. For this reason, the Toyota Plaintiffs who purchased and leased Toyota Class Vehicles after the first misleading statement to NHTSA by the Toyota-ZF-ST Enterprise would have avoided purchasing or leasing their Toyota Class Vehicles entirely, or they would have paid less for them.

1895. Consumers are the only direct victims of the Toyota-ZF-ST Enterprise's alleged fraudulent and misleading statements to NHTSA. NHTSA has not suffered any reported, direct injury as a result of such conduct.

1896. Damages will not be difficult to ascertain; the Toyota Plaintiffs and the Nationwide Toyota Class members' damages are the difference between what they paid for Toyota Class Vehicles without an ACU Defect, and the value of the Toyota Class Vehicles they actually received. In the similar *Takata* airbag litigation, for example, plaintiffs also alleged overpayment damages suffered at the point of sale based on a dangerous airbag defect. Plaintiffs' experts in that case performed a conjoint analysis using surveys of consumers and found that the price premium paid by class members was at least ten percent of the purchase price. A similar analysis could be performed in this litigation. Other methodologies are also viable.

1897. All victims of Defendants' alleged conduct who claim to have overpaid for the purchase or lease of Toyota Class Vehicles are within the alleged Nationwide Toyota Class. Consequently, there are no issues with respect to reapportion or multiple recovery.

**6.      Nationwide Count 6: Violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(d), on Behalf of the Toyota Nationwide Class Against Toyota USA, Toyota Sales USA, Toyota Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia.**

1898. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1899. It is unlawful "for any person to conspire to violate" 18 U.S.C. § 1962(c). *See* 18 U.S.C. § 1962(d). To conspire in violation of section 1962(c), the defendant must be "aware of the essential nature and scope of the enterprise." ECF 396 at 77. Enterprise members conspire to violate section 1962(c) when "two or more people agree[] to commit a crime" and "knowingly and willfully participate[] in the agreement. . . . The illegal agreement need not be express as long as its existence can be inferred from the words, actions, or interdependence of activities and persons involved." *Id*. A defendant who "agreed to facilitate a scheme" violates section 1962(d) even if he "does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense." *Salinas v. United States*, 522 U.S. 52, 65-66 (1997).

1900. As explained in the section below, Toyota USA, Toyota Sales USA, Toyota Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, ST Malaysia and nonparty Toyota Japan were aware of the essential nature and scope of the Toyota-ZF-ST Enterprise. Count 5 describes this Enterprise.

1901. As explained in the section below, based on their words, actions, and/or interdependence, Toyota USA, Toyota Sales USA, Toyota Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany and nonparty Toyota Japan agreed to facilitate the following acts of mail and wire fraud:

a. Toyota Sales USA's interstate shipments between 2010 and 2019 of millions of Toyota Class Vehicles with misleading Monroney labels, readiness indicators, in-vehicle airbag labels and imprints, and owner's manuals, and

b. ZF Electronics USA's interstate shipments between 2010 and 2019 of millions of DS84 ACUs to the nonparty-Enterprise-member Toyota manufacturing subsidiaries.

1902. As explained in the section below, based on their words, actions, and/or interdependence, ZF Electronics USA, ZF Passive Safety USA, ST USA, ST Italy, and ST Malaysia also agreed to facilitate the following acts of mail fraud:

a. ZF Electronics USA's interstate shipments between 2010 and 2019 of millions of DS84 ACUs to the nonparty-Enterprise-member Toyota manufacturing subsidiaries;

b. ST Malaysia's interstate shipments between 2010 and 2019 of millions of DS84 ASICs to ST USA in California; and

c. ST USA's interstate shipments between 2010 and 2019 of millions DS84 ASICs to ZF Electronics USA in Illinois.

1903. The words, actions, or interdependence of activities of each of these Defendants support the inference of agreement.

1904. Accordingly, Toyota USA, Toyota Sales USA, Toyota Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia each violated 18 U.S.C. § 1962(d).

1905. These violations caused the same injuries and damages described in the prior Count. This Count incorporates by reference the allegations as to injury, damages, and causation from the prior Count.

1906. Toyota USA, Toyota Sales USA, Toyota Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp.,

ZF Germany, ST USA, and ST Malaysia each violated 18 U.S.C. § 1962(c) and injured the business or property of the Toyota Plaintiffs and the Nationwide Toyota Class. The Toyota Plaintiffs claim damages for themselves and the Nationwide Toyota Class members under 18 U.S.C. § 1964(c).

> **a.** **Toyota USA, Toyota Sales USA, Toyota Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia were all aware of the essential nature and scope of the Toyota-ZF-ST Enterprise.**

1907. Each Defendant named in this Count was aware of the essential nature and scope of the Toyota-ZF-ST Enterprise, even if some specific details about the Enterprise's illegal activities and members were unknown.

> **i.** **Toyota Japan, Toyota USA, Toyota Sales USA, and Toyota Engineering USA understood the nature and scope of the Toyota-ZF-ST Enterprise's fraudulent scheme.**

1908. Toyota USA, Toyota Sales USA, Toyota Engineering USA, and nonparty Toyota Japan were aware of the essential nature and scope of the Toyota-ZF-ST Enterprise.

1909. Nonparty Toyota Japan always knew of the activities of Toyota Sales USA, Toyota USA, and Toyota Engineering USA and their role in the Enterprise because it owns these companies and monitors their activities. Likewise, Toyota USA knew of the activities of Toyota Sales USA and Toyota Engineering USA and their role in the Enterprise because it owns these companies and monitors their activities.

1910. As explained in Section IV.D.5. above, Toyota USA, Toyota Engineering USA, Toyota Sales USA and nonparty Toyota Japan knew about the nature and scope of the ACU Defect.

1911. Between 2008 and 2019, Toyota USA, Toyota Sales USA, Toyota Engineering USA, and nonparty Toyota Japan knew that the STMicroelectronics companies were responsible for designing and manufacturing the DS84 ASIC for the DS84 ACUs used in Toyota Class Vehicles.

1912. Between 2008 and the present, Toyota USA, Toyota Sales USA, Toyota Engineering USA, and nonparty Toyota Japan have continuously tracked the volume of sales of Toyota makes and models in the United States. Accordingly, during the relevant time period, they knew roughly how many Toyota Class Vehicles would likely sell in the United States.

1913. During each year between 2008 and the present, Toyota USA, Toyota Sales USA, Toyota Engineering USA, and nonparty Toyota Japan knew that reassuring certification labels, in-vehicle airbag labels and imprints, and readiness indicators would be placed in Toyota Class Vehicles prior to the shipment to dealers in the United States. They knew this would occur because Toyota Japan's mandatory designs required these statements to be placed in Toyota Class Vehicles. Toyota USA, Toyota Sales USA, Toyota Engineering USA, and nonparty Toyota Japan knew that consumers would rely on some or all of these in-vehicle labels when purchasing or leasing Toyota Class Vehicles.

1914. During each year between 2008 and the present, Toyota USA, Toyota Sales USA, Toyota Engineering USA, and nonparty Toyota Japan knew that Toyota Sales USA would advertise the Toyota Class Vehicles as safe vehicles with properly functioning airbags and seatbelts. Toyota USA, Toyota Sales USA, Toyota Engineering USA, and nonparty Toyota Japan knew that consumers would rely on such advertisements when purchasing or leasing Toyota Class Vehicles.

1915. During each year between 2008 and the present, Toyota USA, Toyota Sales USA, Toyota Engineering USA, and nonparty Toyota Japan knew that Toyota Sales USA would ship Toyota Class Vehicles with owner's manuals that include misleading statements about the safety systems, airbags, and seatbelts of the

Toyota Class Vehicles. Likewise, each of these Defendants and nonparty Toyota Japan knew that Toyota Sales USA and Toyota USA would create and affix Monroney stickers with misleading statements about airbags and seatbelts to Toyota Class Vehicles. Toyota USA, Toyota Sales USA, Toyota Engineering USA, and nonparty Toyota Japan knew that consumers would rely on the Monroney labels and manuals when purchasing or leasing Toyota Class Vehicles.

1916. During each year between 2008 and the present, Toyota USA, Toyota Sales USA, Toyota Engineering USA, and nonparty Toyota Japan knew that complying with Toyota Japan's mandatory design specifications for Toyota Class Vehicles would require Toyota Engineering USA to place orders with ZF Electronics USA, and for ZF Electronics USA to use mail or private interstate carriers to ship the defective DS84 ACUs to the plants that manufacture Toyota Class Vehicles.

1917. During each year between 2008 and the present, Toyota USA, Toyota Sales USA, Toyota Engineering USA, and nonparty Toyota Japan knew that Toyota Sales USA would, as a result of its direction to do so, cause the Toyota Class Vehicles to ship from manufacturing plants to automobile dealers across the United States.

1918. Nonparty Toyota Japan and Toyota USA knew in 2016 that ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., and ZF Germany had made misleading statement to NHTSA about the ACU Defect because in early 2016 they received copies of the misleading slide deck dated February 5, 2016.

### ii.   ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA, ZF TRW Corp., and ZF Germany understood the nature and scope of the Toyota-ZF-ST Enterprise's fraudulent scheme.

1919. ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA, ZF TRW Corp., and ZF Germany were aware of the essential nature and scope of the Toyota-ZF-ST Enterprise.

1920. As explained in Section IV.D.1., IV.D.2., and IV.D.5. above, ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA, ZF TRW Corp., and ZF Germany were aware of the nature and scope of the ACU Defect.

1921. ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA, ZF TRW Corp., and ZF Germany knew the approximate number of Toyota Class Vehicles because it made the ACUs for those vehicles.

1922. ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA, ZF TRW Corp., and ZF Germany knew that nonparty Toyota Japan or its subsidiaries would, consistent with common practice in the automotive industry, make reassuring statements about the Toyota Class Vehicle's safety systems, airbags, and seatbelts.

### iii.   ST USA, ST Italy, and ST Malaysia understood the nature and scope of the Toyota-ZF-ST Enterprise's fraudulent scheme.

1923. ST USA, ST Italy, and ST Malaysia were aware of the essential nature and scope of the Toyota-ZF-ST Enterprise.

1924. As explained in Section IV.D.1., IV.D.2., and IV.D.5. above, ST USA, ST Italy, and ST Malaysia were aware of the nature and scope of the ACU Defect.

1925. Upon information and belief, ST Italy, ST Malaysia, and ST USA knew the defective DS84 ASICs would be installed the Toyota Class Vehicles. These companies also understood that automakers like the Toyota Defendants

would, consistent with common practice in the automotive industry, advertise their safety systems to consumers, and that those safety systems would not work properly as a result of the DS84 ASIC's vulnerability to EOS.

1926. ST USA, ST Malaysia, and ST Italy were aware of the large scope of the Toyota-ZF-ST Enterprise, among other reasons because ST Malaysia and ST USA made and sold the DS84 ASICs for the Toyota Class Vehicles and all these companies had access to records that showed that millions of defective DS84 ASICs were shipping to Illinois per ZF Electronics USA's instructions.

> **b.** **Toyota USA, Toyota Sales USA, Toyota Engineering USA, ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA, ZF TRW Corp., ZF Germany, and nonparty Toyota Japan agreed that one or more members of the Enterprise would commit at least two predicate acts of mail or wire fraud in furtherance of the Toyota-ZF-ST Enterprise's fraudulent scheme.**

1927. ZF Passive Safety USA, ZF Electronics USA, ZF Automotive USA, Toyota USA, Toyota Sales USA, Toyota Engineering USA, and nonparty Toyota Japan began conspiring in furtherance of the Toyota-ZF-ST Enterprise's fraudulent scheme in 2008.

1928. ZF Germany joined the conspiracy in or around 2015, when it acquired ZF TRW Corp.

1929. When nonparty Toyota Japan agreed to use the defective DS84 ACU and ASIC in Toyota Class Vehicles, Toyota USA, Toyota Sales USA, Toyota Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, and nonparty Toyota Japan mutually understood and intended that this agreement would prompt Toyota Engineering USA to cause ZF Electronics USA to ship DS84 ACUs across state lines and Toyota Sales USA to ship the Toyota Class Vehicles with misleading statements about the passive safety system, airbags, and seatbelts therein.

a.    In 2008, nonparty Toyota Japan agreed with ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA on the design specifications for the DS84 ACU installed in Toyota Class Vehicles. Toyota Japan, ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA continued to agree on specifications for Toyota Class Vehicles with the DS84 ACU for every model year until 2019.

b.    Between 2009 and 2019, Toyota Sales USA used mail and wire to advertise the Toyota Class Vehicles as safe vehicles with properly-functioning airbags and seatbelts, and used private interstate carriers to ship the Toyota Class Vehicles with misleading Monroney labels, airbag labels and imprints, certification labels, readiness indicators, and owner's manuals. ZF Passive Safety USA, ZF Electronics USA, ZF Automotive USA, Toyota USA, Toyota Engineering USA, and nonparty Toyota Japan all knew that Toyota Sales USA was doing this and would do this.

c.    When nonparty Toyota Japan agreed with ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA on specifications for the DS84 ACUs in Toyota Class Vehicles, Toyota Japan, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, and ZF TRW Corp. (and ZF Germany after 2015) had a mutual understanding that this agreement would cause Toyota Engineering USA to send orders for hundreds of thousands of DS84 ACUs every year via mail or wire to ZF Electronics USA.

d.    When nonparty Toyota Japan agreed with ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA on

1    specifications for the DS84 ACUs in Toyota Class Vehicles,

2    Toyota Japan, ZF Electronics USA, ZF Passive Safety USA, ZF

3    Automotive USA, and ZF TRW Corp. (and ZF Germany after

4    2015) had a mutual understanding that this agreement would

5    cause ZF Electronics USA to ship hundreds of thousands of

6    DS84 ACUs via private interstate carrier to the nonparty-

7    Enterprise-member Toyota manufacturing plants every year.

8        1930. As explained in Count 5 above, the shipments of Toyota Class

9    Vehicles by Toyota Sales USA, the orders by Toyota Engineering USA for DS84

10   ACUs, and the shipments by ZF Electronics USA of the DS84 ACUs violated the

11   mail fraud statute because they furthered the Toyota-ZF-ST Enterprise's fraudulent

12   scheme to cause consumers to purchase or lease vehicles that contain the ACU

13   Defect. To accomplish this goal, the DS84 ACUs needed to be shipped before they

14   could be installed in the vehicles.

15       a.    ZF Passive Safety USA, ZF Electronics USA, ZF Automotive

16             USA, and nonparty Toyota Japan facilitated these mail fraud act

17             violations by collaborating on the defective design of the DS84

18             ACU, the readiness indicators, and Toyota Class Vehicles.

19       b.    Nonparty Toyota Japan further facilitated these mail fraud

20             violations by (1) requiring all manufacturers of Toyota Class

21             Vehicles to install the DS84 ACUs therein, and (2) placing the

22             misleading certification labels, readiness indicators, and airbag

23             labels and imprints within the Toyota Class Vehicles it made in

24             Japan, and requiring the nonparty-Enterprise-member Toyota

25             manufacturing subsidiaries that made Toyota Class Vehicles in

26             North America to do the same.

27       c.    ZF TRW Corp. facilitated the scheme because, upon

28             information and belief, its approval was required for the launch

1  of the DS84 ACU, which was one of the company's most

2  popular ACUs.

3      d.   ZF Germany facilitated the scheme because, upon information

4  and belief, its approval was required to continue the sales of the

5  DS84 ACU.

6      e.   Toyota USA facilitated this scheme by overseeing and

7  approving the misleading Monroney labels that Toyota Sales

8  USA placed, or caused to be placed, on Toyota Class Vehicles.

9      1931. The conspiracy among Toyota USA, Toyota Sales USA, Toyota

10  Engineering, ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA,

11  ZF TRW Corp., ZF Germany, and nonparty Toyota Japan is further evidenced by

12  their coordinated efforts to cover up the ACU Defect.

13      a.   For several years, Toyota USA, Toyota Sales USA, Toyota

14  Engineering, ZF Automotive USA, ZF Electronics USA, ZF

15  Passive Safety USA, and nonparty Toyota Japan uncovered

16  evidence that DS84 ASICs and DS84 ACUs were failing as a

17  result of EOS, but they maintained the confidentiality of these

18  incidents among each other.

19      b.   ZF Automotive USA, ZF Electronics USA, ZF Passive Safety

20  USA, and nonparty Toyota Japan repeatedly coordinated with

21  each other in response to NHTSA's investigation. In 2016, ZF

22  Electronics USA alerted Toyota Japan to NHTSA's

23  investigation of the DS84 ACUs and sent excerpted copies of

24  ZF's misleading February 5, 2016 slide deck to NHTSA as part

25  of an effort to coordinate with Toyota Japan to conceal the ACU

26  Defect. Between 2018 and 2019, ZF Electronics USA, ZF

27  Passive Safety USA, ZF Automotive USA, and nonparty Toyota

28  Japan met every week to discuss the ACU Defect.

1932. The joint activities of ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., and ZF Germany in support of their misleading statements to NHTSA were predicate acts and also show agreement by these Defendants to advance the fraudulent scheme.

1933. ZF Electronics USA's placement of orders for DS84 ASICs and shipments of DS84 ACUs were predicate acts and also show agreement by ZF Electronics USA to advance the fraudulent scheme.

1934. The success of the Toyota-ZF-ST Enterprise's fraudulent scheme depended upon ZF Passive Safety USA, ZF Electronics USA, ZF Automotive USA, Toyota USA, Toyota Sales USA, Toyota Engineering USA, and nonparty Toyota Japan's cooperation. All these companies had to maintain strict confidentiality about the ACU Defect for the scheme to continue. Moreover, the Toyota companies depended on the ZF companies for the manufacture of the defective ACUs, whereas the ZF companies could not reach consumers of Toyota Class Vehicles without the agreement of nonparty Toyota Japan. This interdependence evidences the agreement to further the fraudulent scheme.

1935. The actions detailed above and throughout the Complaint as to each member of the Toyota-ZF-ST Enterprise were foreseeable to the other members of the Toyota-ZF-ST Enterprise given their direct relationship to and furtherance of the common goals of the scheme.

      c.     **ST USA, ST Italy, ST Malaysia, ZF Automotive USA, ZF Electronics USA, and ZF Passive Safety USA agreed on the commission of multiple violations of the mail fraud statute in furtherance of the Toyota-ZF-ST Enterprise's fraudulent scheme.**

1936. ST Italy, ST Malaysia, and ST USA began conspiring with ZF Passive Safety USA, ZF Electronics USA, and ZF Automotive USA in 2005, when the two supplier groups began the joint design of an ACU ASIC with unique vulnerability to EOS. By 2008, all these companies knew about internal thermal testing that

confirmed the weakness of the ASIC. They held multiple meetings about this issue.
Documents sent to Toyota Japan by ZF Electronics USA and ZF Passive Safety
USA in 2008 expressly noted the risk that a negative transient could travel up the
front sensor lines, reach the DS84 ASIC, and cause airbag failures during a crash.
In spite of this early knowledge, and after the years already sunk into development
work for the cheaper ACU, they proceeded to launch and use the DS84 ACU for
millions of Class Vehicles for more than a decade.

  1937. Even after learning that DS84 ACUs and ASICs had malfunctioned
due to EOS during crashes, ST Italy, ST Malaysia, ST USA, ZF Passive Safety
USA, ZF Electronics USA, and ZF Automotive USA continued to sell and send
shipments of the parts. When doing so, these companies all knew that Toyota USA,
Toyota Sales USA, and nonparty Toyota Japan would coordinate to cause the
Toyota Class Vehicles to be presented to consumers with misleading certification
labels, airbag labels and imprints, and readiness indicators.

  1938. Several actions by ST Italy, ST Malaysia, and ST USA further support
an inference of agreements with ZF Passive Safety USA, ZF Electronics USA, and
ZF Automotive USA to commit at least two predicate acts in furtherance of the
conspiracy:

    a. Between September 2009 and 2018, ST USA, ST Italy, and ST
      Malaysia regularly communicated with ZF Automotive US Inc.,
      ZF Electronics USA, and ZF Passive Safety USA about
      observations of EOS in DS84 ASICs, including some ASICs
      from Toyota vehicles. ST USA, ST Italy, and ST Malaysia's
      DS84 ASIC team confirmed EOS damage on ASICs retrieved
      from at least two Toyota vehicles with airbag failures during
      crashes.

    b. Upon information and belief, in 2016, ZF Automotive USA, ZF
      Electronics USA, and ZF Passive Safety USA sent each ST

Defendant excerpted copies of its misleading statements from its February 5, 2016 slide deck.

    c.    Between 2009 and 2018 at the very least, ST USA and ST Malaysia continuously violated the mail fraud act in furtherance of the Toyota-ZF-ST Enterprise by shipping defective DS84 ASICs with a mutual understanding that some of these ASICs would be installed in Toyota Class Vehicles, as explained above.

    d.    Between 2008 and 2018 at the very least, ST USA, ST Italy, and ST Malaysia maintained public silence about the ACU Defect, despite the observed evidence of the DS84 ASIC's and ACU's unusual vulnerability to transients.

1939. The actions detailed above and throughout the Complaint as to each member of the Toyota-ZF-ST Enterprise were foreseeable to the other members of the Toyota-ZF-ST Enterprise given their direct relationship to and furtherance of the common goals of the scheme.

1940. The success of the Toyota-ZF-ST Enterprise's fraudulent scheme depended upon ST USA, ST Italy, and ST Malaysia, ZF Passive Safety USA, ZF Electronics USA, and ZF Automotive USA's cooperation. All these companies had to maintain strict confidentiality about the ACU Defect for the scheme to continue. Moreover, the ZF companies depended upon the ST companies for the manufacture of the defective ASICs, whereas the ST companies depended upon the ZF companies for a viable path to profit from the consumers of Class Vehicles. This interdependence evidences the agreement to further the fraudulent scheme.

**7. Nationwide Count 7: Violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(c), on Behalf of the Nationwide Honda Class Against Honda Japan, Honda USA, Honda Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia.**

1941. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1942. Pursuant to 18 U.S.C. § 1962(c): "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Honda Japan, Honda USA, Honda Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia are "persons" under 18 U.S.C. § 1961(3) because each was capable of holding "a legal or beneficial interest in property."

1943. A violation of 18 U.S.C. § 1962(c) has four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." ECF 396 at 59 (quoting *Sedima v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

1944. Honda Japan, Honda USA, Honda Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia, and several nonparties formed the Honda-ZF-ST Enterprise. The members of this Enterprise included Defendants Honda Japan, Honda USA, Honda Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia. The Honda-ZF-ST Enterprise also included several nonparty individuals and corporations, for example, the Honda manufacturing subsidiaries that built

vehicles for distribution throughout the United States.[33] Discovery will likely reveal several additional members of the Honda-ZF-ST Enterprise that are not currently known to the Honda Plaintiffs.

1945. Honda Japan, Honda USA, Honda Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia are liable under 18 U.S.C. § 1962(c) because they conducted or participated in the conduct of the affairs of an "association-in-fact enterprise"—i.e. the Honda-ZF-ST Enterprise—through a pattern of racketeering activity. In other words, each of these Defendants committed at least two predicate acts in furtherance of the Enterprise's fraudulent scheme.

1946. 18 U.S.C. § 1964(c) provides for a civil remedy for any violation of 18 U.S.C. § 1962 for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." In addition to proving a violation of § 1962, this remedy requires proximate cause of a cognizable injury. ECF 396 at 59.

1947. Honda Japan, Honda USA, Honda Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia each violated 18 U.S.C. § 1962(c) and injured the business or property of the Honda Plaintiffs and the Nationwide Honda Class. The Honda Plaintiffs claim damages for themselves and the Nationwide Honda Class members under 18 U.S.C. § 1964(c).

---

[33] These manufacturing subsidiaries include Honda Manufacturing of Alabama; Honda Manufacturing of Indiana, LLC; Honda De México S.A. de C.V. and Honda of Canada Mfg.

a. **Honda Japan, Honda USA, Honda Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia each committed at least two predicate acts of mail and wire fraud in furtherance of the Honda-ZF-ST Enterprise's fraudulent scheme to affirmatively mislead consumers and NHTSA.**

1948. The members of the Honda-ZF-ST Enterprise devised a scheme for the purpose of defrauding consumers and NHTSA by concealing or minimizing the ACU Defect in Honda Class Vehicles through a pattern of affirmatively misleading statements.

1949. In the alternative, the Honda-ZF-ST Enterprise members devised an illicit scheme for the purpose of obtaining money by fraudulent pretenses to maximize the sale of Honda Class Vehicles, which ultimately provided revenue to the Honda-ZF-ST Enterprise members.

1950. To carry out, or attempt to carry out, the fraudulent schemes, Honda Japan, Honda USA, Honda Engineering USA, the nonparty Honda manufacturing subsidiaries, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia—each of whom is a person associated-in-fact with the Honda-ZF-ST Enterprise—knowingly conducted or participated, directly or indirectly, in the affairs of the Honda-ZF-ST Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c). In furtherance of the schemes, the Defendant Honda-ZF-ST Enterprise members each committed *at least* two acts in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud), as described in the subsections below.

i. **Honda Japan violated the mail and wire fraud statutes multiple times in furtherance of the Honda-ZF-ST Enterprise's fraudulent scheme.**

1951. Honda Japan violated the mail fraud statute multiple times by causing misleading certification labels, readiness indicators, airbag labels and imprints, and owner's manuals to be placed within every Honda Class Vehicle prior to shipment to the dealers that sell or lease the vehicles to U.S. consumers. Honda Japan caused the inclusion of these misleading statements within every Honda Class Vehicle with full knowledge and the specific intent that Honda USA would distribute the Honda Class Vehicles to dealers across the United States using private or commercial interstate carriers. Accordingly, Honda Japan "knowingly cause[d]" the Honda Class Vehicles with misleading statements "to be delivered by . . . such carrier[s]," in violation of 18 U.S.C. § 1341.

a. Honda Japan was directly responsible for including these misleading statements in all Honda Class Vehicles made in Japan. Upon information and belief, Honda Japan placed the misleading certification labels, airbag warning lamps, and airbag labels and imprints in the Japanese-made Honda Class Vehicles when Honda Japan manufactured them at and then shipped them from its plants in Japan, including at the following address: 1907 Hirata-cho, Suzuka-shi, Mie Pref., Japan. The certification labels for these Japanese-made vehicles bore Honda Japan's corporate name, "Honda Motor Co., Ltd." The Honda Class Vehicles made by Honda Japan have vehicle identification numbers that begin with the letter "J." Honda Japan has records in its possession that will identify the dates when it transferred these Honda Class Vehicles to Honda USA with the purpose of distributing them to the United States for sale to consumers. The

Honda Plaintiffs do not have access to these confidential records that provide the precise dates of transfer.

b.   While the nonparty-Enterprise members (Honda Manufacturing of Alabama; Honda Manufacturing of Indiana, LLC; Honda De México S.A. de C.V. and Honda of Canada Mfg.) also made Honda Class Vehicles and placed permanent certification labels on them under their own names, they had no discretion to depart from the mandatory Honda Class Vehicle designs created by Honda Japan. Accordingly, Honda Japan, as the entity responsible for designing these vehicles, was at least jointly responsible for the certifications for these vehicles. Honda Japan was also responsible for the misleading airbag warning lamps and in-vehicle airbag labels and imprints placed within these Honda Class Vehicles because Honda Japan's designs required the inclusion of these misleading statements within the Honda Class Vehicles.

c.   Honda Japan was also responsible for the misleading content of the owner's manuals for Honda Class Vehicles. Honda Japan reviewed and approved the contents of the manuals from Honda USA at the time of their publication. Insofar as Honda USA effectuated the shipments of the owner's manuals within Honda Class Vehicles to dealers in the United States, it also acted as Honda Japan's distribution agent.

1952. Although the precise shipment dates for all Honda Class Vehicles are not known to the Honda Plaintiffs, on information and belief, these shipments occurred in all years in or about 2012 to 2019. Plaintiffs were exposed to in-vehicle misleading statements prior to, and at the point of, sale or lease. The dates and locations of these transactions are alleged above in Section II.B.4.

1953. Each shipment of a Honda Class Vehicle or Vehicles to a dealer was a violation of the mail fraud statute (18 U.S.C. § 1341) because Honda Japan knew the certification labels, airbag warning labels, in-vehicle airbag labels and imprints, and owner's manuals in all Honda Class Vehicles were misleading and would further the scheme to defraud consumers into purchasing or leasing Honda Class Vehicles.

1954. When Honda USA distributed the Honda Class Vehicles to dealers in the United States, it acted as Honda Japan's agent.

1955. Honda Japan separately violated the mail fraud act (18 U.S.C. § 1341) by placing orders with ZF Electronics USA that caused ZF Electronics USA to ship defective DS84 ACUs by private or commercial interstate carrier. This allegation is based on the inclusion of a Japanese address and contact in a chart produced by the domestic ZF Defendants to NHTSA that identifies DS84 ACU shipments for Honda Class Vehicles. *See* Ex. 20 (ZF-MDL-679). These orders for shipments furthered the Honda-ZF-ST Enterprise's fraudulent scheme because Honda Japan's use of the defective DS84 ACUs in Honda Class Vehicles was essential to the cost-saving goal behind the scheme. Honda Japan made this orders for ZF Electronics USA to make deliveries knowing that the defective DS84 ACUs would be placed in the Honda Class Vehicles and that Honda USA would market the vehicles to U.S. consumers as safe. Accordingly, each of Honda Japan's orders and ZF Electronics USA's shipments of the DS84 ACU violated the mail fraud statute (18 U.S.C. § 1341).

1956. The precise dates and locations of each particular order for, and shipment of, DS84 ACUs are not known to the Honda Plaintiffs because they have no visibility into the shipments to automobile manufacturers and Defendants have not produced documents that show that information. However, a chart produced by the domestic ZF Defendants to NHTSA identifies the precise volume of DS84 ACUs shipped for each year for each model of Honda Class Vehicles, and identifies

Marshall, Illinois as the shipping location. Exhibit 20 includes highlighting added by Plaintiffs to identify the particular information about shipping locations, volumes, vehicle makes and models, and shipping years contained in this chart. *See* Ex. 20 (ZF-MDL-679) at 692-698. Upon information and belief, the shipping address for each of these shipments by ZF Electronics USA from Marshall, Illinois was 902 South 2nd Street, Marshall, Illinois 62441. The information available in this chart is sufficient for the Honda Defendants to identify the precise dates of shipments and the recipient addresses because the Honda Defendants will have backup information that shows additional details about the underlying shipments.

ii.     **Honda Engineering USA violated the mail and wire fraud statutes multiple times in furtherance of the Honda-ZF-ST Enterprise's fraudulent scheme.**

1957. Honda Engineering USA violated the mail fraud statute multiple times by causing misleading certification labels, readiness indicators, and airbag labels and imprints to be placed within the Honda Class Vehicles it manufactured in Ohio prior to shipment to the dealers that sell or lease the vehicles to U.S. consumers. Honda Engineering USA caused the inclusion of these misleading statements within every Honda Class Vehicle it manufactured with full knowledge and the specific intent that Honda USA would distribute the Honda Class Vehicles to dealers across the United States using private interstate carriers. Accordingly, Honda Engineering USA "knowingly cause[d]" the Honda Class Vehicles with misleading statements "to be delivered by . . . such carrier[s]," in violation of 18 U.S.C. § 1341.

a.     Honda Engineering USA was directly responsible for including all of these misleading statements in the Honda Class Vehicles it made in the United States. Upon information and belief, Honda Engineering USA placed the misleading certification labels, airbag warning lamps, and airbag labels and imprints in the

Honda Class Vehicles when it manufactured them at its plant, including at the following address: 24000 Honda Pkwy, Marysville, OH 43040 and 11000 State Route 347, East Liberty, OH 43319-9407. The certification labels for these vehicles bore Honda Engineering USA's previous corporate name, "Honda of America Mfg." The Honda Class Vehicles made by Honda Engineering USA have vehicle identification numbers that begin with a numeric digit, i.e. "1" or "5." Honda Engineering USA has records in its possession that will identify the dates when it transferred these Class Vehicles to Honda USA with the purpose of distributing them throughout the United States for sale to consumers. The Honda Plaintiffs do not have access to these confidential records that provide the precise dates of transfer.

1958. Although the precise shipment dates for all Honda Class Vehicles are not known to the Honda Plaintiffs, on information and belief, these shipments occurred in all years in or about 2010 to 2019. The Honda Plaintiffs were exposed to in-vehicle misleading statements prior to, and at the point of, sale or lease. The dates and locations of these transactions are alleged above in Section II.B.4. Honda Engineering USA built the Honda Class Vehicles belonging to Plaintiff Rubio, Plaintiff Huitzil, Plaintiff McPherson, Plaintiff Chaiken, and Plaintiff Namakkal, and was therefore directly responsible for placing these misleading statements in their vehicles.

1959. Each shipment of a Honda Class Vehicle or Vehicles to a dealer was a violation of the mail fraud statute (18 U.S.C. § 1341) because Honda Engineering USA knew the certification labels, airbag warning labels, and in-vehicle airbag labels and imprints, in all Honda Class Vehicles were misleading and would further the scheme to defraud consumers into purchasing or leasing Honda Class Vehicles.

1960. Honda Engineering USA separately violated the mail fraud act (18 U.S.C. § 1341) by placing orders with ZF Electronics USA that caused ZF Electronics USA to ship defective DS84 ACUs by private or commercial interstate carrier to Honda Engineering USA at the following address: 24000 Honda Pkwy, Marysville, OH 43040 and 11000 State Route 347, East Liberty, OH 43319-9407, and to the nonparty-Enterprise members Honda manufacturing companies in Canada, Mexico, Alabama, and Indiana, including to the following addresses: 1800 Honda Dr, Lincoln, AL 35096; 2755 N Michigan Ave, Greensburg, IN 47240; La Luz Sur, 38140 Celaya, Gto., Mexico; 4700 Industrial Pkwy, Alliston, ON L9R 1A2, Canada. These shipments furthered the Honda-ZF-ST Enterprise's fraudulent scheme because Honda Engineering USA's use of the defective DS84 ACUs in Honda Class Vehicles was essential to the cost-saving goal behind the scheme. Honda Engineering USA caused ZF Electronics USA to make these deliveries knowing that the defective DS84 ACUs would be placed in the Honda Class Vehicles and that Honda USA would market the vehicles to U.S. consumers as safe. Accordingly, each of Honda Engineering USA's orders and ZF Electronics USA's shipments of the DS84 ACU violated the mail fraud statute (18 U.S.C. § 1341).

1961. The precise dates and locations of each particular order for, and shipment of, DS84 ACUs are not known to the Honda Plaintiffs because they have no visibility into the shipments to automobile manufacturers and Defendants have not produced documents that show that information. However, a chart produced by the domestic ZF Defendants to NHTSA identifies the precise volume of DS84 ACUs shipped for each year for each model of Honda Class Vehicles, and identifies Marshall, Illinois as the shipping location. Exhibit 20 includes highlighting added by Plaintiffs to identify the particular information about shipping locations, volumes, vehicle makes and models, and shipping years contained in this chart. *See* Ex. 20 (ZF-MDL-679) at 692-698. Upon information and belief, the shipping address for each of these shipments by ZF Electronics USA from Marshall, Illinois

was 902 South 2nd Street, Marshall, Illinois 62441. Honda Engineering USA received shipments to its Ohio plants at the addresses noted above. Likewise, the Honda manufacturing subsidiaries received shipments at the following addresses: 1800 Honda Dr, Lincoln, AL 35096; 2755 N Michigan Ave, Greensburg, IN 47240; La Luz Sur, 38140 Celaya, Gto., Mexico; 4700 Industrial Pkwy, Alliston, ON L9R 1A2, Canada.

1962. The information available in this chart is sufficient for Defendants to identify the precise dates of shipments and the recipient addresses because Defendants will have backup information that shows additional details about the underlying shipments.

### iii. Honda USA violated the mail and wire fraud statutes multiple times in furtherance of the Honda-ZF-ST Enterprise's fraudulent scheme.

1963. Honda USA committed mail fraud every time it shipped, or caused to be shipped, a Honda Class Vehicle to dealers in the United States. For every Honda Class Vehicle, Honda USA delivered, or caused delivery of, each vehicle by private or commercial interstate carrier to automobile dealerships across the United States. Honda USA delivered millions of Class Vehicles to execute the Honda-ZF-ST Enterprise's scheme to defraud consumers and NHTSA.

a. These deliveries furthered the scheme because Honda USA sent the vehicles to the dealerships where consumers would purchase or lease them and because, prior to shipping the Honda Class Vehicles, Honda Japan, Honda Engineering USA, and/or the nonparty Honda manufacturing subsidiaries had affixed, or caused to be affixed, to the vehicles misleading certification labels (*see* Section IV.E.1.b. above), readiness indicators (*see* Section IV.E.1.c. above), and airbag labels and imprints (*see* Section IV.E.1.d. above).

b. Moreover, Honda USA created the Monroney labels for the Honda Class Vehicles and caused them to be affixed to each Honda Class Vehicle prior to shipment. Shipment of the Honda Class Vehicles with these misleading Monroney labels furthered the Honda-ZF-ST Enterprise's scheme because consumers relied upon the labels when purchasing or leasing them. Honda USA distributed the Honda Class Vehicles to dealers, so they could be sold to consumers with misleading Monroney labels.

c. Finally, prior to shipping the vehicles, also ensured that each Class Vehicle came with an owner's manual with misleading statements about the vehicle's safety system (*see* Section IV.E.2.b.v. above). Honda USA owns the copyright interest in these manuals.

1964. Honda USA knew the Monroney labels, certification labels, readiness indicators, airbag labels and imprints, and owners' manuals shipped with each Honda Class Vehicle were misleading because the Honda Class Vehicles all contained the ACU Defect.

1965. Although the precise shipment dates for all Honda Class Vehicles are not known to the Honda Plaintiffs, on information and belief, these shipments occurred in all years in or about 2010 to 2019. The Honda Plaintiffs were exposed to in-vehicle misleading statements prior to, and at the point of, sale or lease. The dates and locations of these transactions are alleged above in Section II.B.4.

1966. Starting in 2012, Honda USA also transmitted, or caused to be transmitted, tens (perhaps hundreds) of thousands of advertisements which stressed the safety of Honda Class Vehicles using mail, wire, radio, or television communications in interstate commerce. Honda USA's misleading advertisements are too numerous to recite completely, given the nationwide scope and decade-long duration of the Honda-ZF-ST Enterprise's fraudulent scheme. Examples of these

advertisements are collected in Section IV.E.2.a.iv. and Exhibit 11. Each such mailed advertisement—including brochures sent to dealerships for display to consumers or print advertisements in newspapers or magazines—was a violation of the mail fraud statute (18 U.S.C. § 1341). Each such internet-based, radio, and television advertisement was a violation of the wire fraud statute (18 U.S.C. § 1343). Honda USA knew these advertisements assuring consumers of the safety of Honda Class Vehicles were misleading and would further the scheme to defraud consumers into purchasing or leasing Honda Class Vehicles.

### iv.   ZF Electronics USA violated the mail fraud statute multiple times in furtherance of the Honda-ZF-ST Enterprise's fraudulent scheme.

1967. ZF Electronics USA drafted and/or edited the following misleading statements to NHTSA, as discussed in Sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above:

      a.    The slide deck presentation dated February 5, 2016 (which ZF TRW Corp. mailed to NHTSA on March 14, 2016);

      b.    The slide deck presentation dated July 19, 2016 (which, upon information and belief, was mailed to NHTSA in July or August 2016);

      c.    The September 2016 letter signed by Marc Bolitho[34] (which ZF Electronics USA mailed to NHTSA in September 2016); and

      d.    The slide deck presentation dated March 8, 2018 (which ZF TRW Corp. mailed to NHTSA on March 12, 2018).

1968. As explained in sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above, each of these transmittals contained misleading statements about Honda Class

---

[34] Mr. Bolitho was simultaneously an employee of ZF Passive Safety USA, the Vice President of Passive Safety for ZF Electronics USA, and Director of Passive Safety Engineering for ZF TRW.

1 Vehicles and/or the ACU Defect. ZF Electronics USA specifically approved the

2 transmittal of the final versions of these documents to NHTSA, and intended for the

3 misleading statements contained therein to avoid, minimize, and/or delay recalls of

4 Honda Class Vehicles. Avoiding, minimizing, and/or delaying recalls of Honda

5 Class Vehicles enabled the continuation of the scheme to defraud consumers.

6      1969. ZF Electronics USA caused the delivery of the February 5, 2016 slide

7 deck to NHTSA. ZF Electronics USA's causal role in the delivery is evidenced by

8 the fact that its Vice President of Passive Safety Marc Bolitho signed an affidavit of

9 confidentiality that was enclosed with the mailing of the February 5, 2016 slide

10 deck.

11      1970. Because the July 19, 2016 slide deck closely resembles the February 5,

12 2016 slide deck, the same personnel and companies were likely responsible for

13 sending it via mail or private interstate carrier to NHTSA. Accordingly, upon

14 information and belief, ZF Electronics USA caused this delivery to NHTSA too.

15      1971. ZF Electronics USA caused the delivery of the March 8, 2018 slide

16 deck to NHTSA. ZF Electronics USA's causal role in the delivery is evidenced by

17 the fact that its Technical Specialist, Emanuel Goodman, signed the affidavit of

18 confidentiality that was enclosed with the mailing of the March 8, 2018 slide deck.

19 ZF Electronics USA's causal role in the delivery is further evidenced by Mr.

20 Goodman's and Mr. Bolitho's attendance at the March 8, 2018 meeting with

21 NHTSA, where this slide deck was used.

22      1972. Moreover, because ZF Electronics USA's affiliates would not have

23 sent or approved the four written communications described above without ZF

24 Electronics USA's contributions and approval, ZF Electronics USA was one of the

25 Defendants who jointly caused the delivery of these four communications to

26 NHTSA. Accordingly, its participation in these communications violated the mail

27 fraud statute at least four times. 18 U.S.C. § 1341.

28

1973. As explained in Section IV.E.1.c. above, ZF Electronics USA worked with ZF Passive Safety USA, ZF Automotive USA, and Honda Japan to design the readiness indicators installed in Honda Class Vehicles. Specifically, ZF Electronics USA assisted with a design of ACUs that would cause the readiness indicator not to illuminate at the point of sale or lease, even though the Honda Class Vehicle's safety systems were not ready to deploy in foreseeable crash events with negative transients due to the ACU Defect. When ZF Electronics USA assisted with this design, it knew Honda USA would ship the Honda Class Vehicles to dealers and that consumers would buy Honda Class Vehicles without the airbag warning lamp illuminating at the point of sale or lease. Because Honda USA would not have shipped Honda Class Vehicles without ZF Electronics USA's assistance in designing misleading readiness indicators, ZF Electronics USA jointly caused each shipment of a Honda Class Vehicle, in violation of the mail fraud act (18 U.S.C. § 1341).

1974. ZF Electronics USA received orders from Honda Japan and Honda Engineering USA for the defective DS84 ACUs used in every Honda Class Vehicle and shipped them by private or commercial interstate carrier to Honda Japan in Japan, Honda Engineering USA in Ohio, and the nonparty-Enterprise-member Honda manufacturing subsidiaries based in Canada, Mexico, Alabama, and Indiana. These shipments furthered the Honda-ZF-ST Enterprise's fraudulent scheme because the use of DS84 ACUs in Honda Class Vehicles was essential to the cost-saving goal behind the scheme. When ZF Electronics USA shipped the defective DS84 ACUs to the nonparty Honda manufacturing subsidiaries, it knew they would be installed in the Honda Class Vehicles that are marketed to U.S. consumers. ZF Electronics USA was also specifically aware of Honda Japan's, Honda Engineering USA's, and Honda USA's practice of making reassuring statements about safety, airbags, and seatbelts in consumer-facing Monroney labels, certification labels, in-vehicle labels, owner's manuals, and advertising for all Honda Class Vehicles. ZF

1 Electronics USA knew these statements were false because it knew the Honda
2 Class Vehicles, DS84 ACU, and DS84 ASIC were defective. Accordingly, because
3 ZF Electronics USA shipped each defective DS84 ACU with the purpose of
4 executing a fraudulent scheme with the other Enterprise members, each of ZF
5 Electronics USA's shipments of the defective DS84 ACU violated the mail fraud
6 statute (18 U.S.C. § 1341). The particularities of these shipments are discussed
7 above. Exhibit 20 includes highlighting added by Plaintiffs to identify the particular
8 information about shipping locations, volumes, vehicle makes and models, and
9 shipping years contained in this chart. *See* Ex. 20 (ZF-MDL-679) at 686-691. Upon
10 information and belief, the shipping address for each of these shipments by ZF
11 Electronics USA from Marshall, Illinois was 902 South 2nd Street, Marshall,
12 Illinois 62441.

13      1975. ZF Electronics USA also separately violated the mail fraud act (18
14 U.S.C. § 1341) by placing orders with ST USA that required ST USA to ship
15 millions of defective DS84 ASICs to ZF Electronics USA at a facility with the
16 following address: 902 South 2nd Street, Marshall, Illinois 62441. When ZF
17 Electronics USA placed these orders, it knew it would install these DS84 ASICs
18 into DS84 ACUs, including those that would be installed in the Honda Class
19 Vehicles that are marketed to U.S. consumers. ZF Electronics USA was also
20 specifically aware of Honda Japan's, Honda Engineering USA's, and Honda USA's
21 practice of making reassuring statements about safety, airbags, and seatbelts in
22 consumer-facing Monroney labels, certification labels, in-vehicle labels, owner's
23 manuals, and advertising for all Honda Class Vehicles. ZF Electronics USA knew
24 these statements were false because it knew the Honda Class Vehicles, DS84 ACU,
25 and ASIC were defective. Accordingly, because ZF Electronics USA caused
26 shipments of defective DS84 ASICs with the purpose of executing a fraudulent
27 scheme with the other Enterprise members, each of the DS84 ASIC shipments
28 caused by ZF Electronics USA violated the mail fraud statute (18 U.S.C. § 1341).

ST USA has produced approximately 9,700 such invoices from the time period between 2014 and the present. Plaintiffs have extracted approximate shipping dates from these invoices, which are presented as exemplars in Exhibit 21.[35]

> **v.**     **ZF Passive Safety USA violated the mail fraud statute multiple times in furtherance of the Honda-ZF-ST Enterprise's fraudulent scheme.**

1976. ZF Passive Safety USA drafted and/or edited the following misleading statements to NHTSA, as discussed in Sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above:

    a.     The slide deck presentation dated February 5, 2016 (which ZF TRW Corp. mailed to NHTSA on March 14, 2016);

    b.     The slide deck presentation dated July 19, 2016 (which, upon information and belief, was mailed to NHTSA in July or August 2016);

    c.     The September 2016 letter signed by Marc Bolitho[36] (which ZF Electronics USA mailed to NHTSA in September 2016); and

    d.     The slide deck presentation dated March 8, 2018 (which ZF TRW Corp. mailed to NHTSA on March 12, 2018).

1977. As explained in sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above, each of these transmittals contained misleading statements about Honda Class Vehicles and/or the ACU Defect. ZF Passive Safety USA specifically approved the transmittal of the final versions of these documents to NHTSA, and intended for the misleading statements contained therein to avoid, minimize, and/or delay recalls of

---

[35] ST USA made similar shipments relevant to the Honda Class Vehicles at least between 2009 and 2014, but ST USA is presently withholding invoices for these shipments from discovery. Upon information and belief, the invoices for this time period will show similar regularity of shipments.

[36] Mr. Bolitho was simultaneously an employee of ZF Passive Safety USA, the Vice President of Passive Safety for ZF Electronics USA, and Director of Passive Safety Engineering for ZF TRW.

1  Honda Class Vehicles. Avoiding, minimizing, and/or delaying recalls of Honda

2  Class Vehicles enabled the continuation of the scheme to defraud consumers.

3      1978. ZF Passive Safety USA caused the delivery of the February 5, 2016

4  slide deck to NHTSA. ZF Passive Safety USA's causal role in the delivery is

5  evidenced by the fact that its employee Marc Bolitho signed an affidavit of

6  confidentiality that was enclosed with the mailing of the February 5, 2016 slide

7  deck. Although Mr. Bolitho also simultaneously served as a Vice President for ZF

8  Electronics USA and a Director of Passive Safety Engineering for ZF TRW Corp.,

9  ZF Passive Safety USA alone paid his salary.

10     1979. Because the July 19, 2016 slide deck closely resembles the February 5,

11  2016 slide deck, the same personnel and companies were likely responsible for

12  sending it via mail or private interstate carrier to NHTSA. Accordingly, upon

13  information and belief, ZF Passive Safety USA caused this delivery too.

14     1980. ZF Passive Safety USA caused the delivery of the March 8, 2018 slide

15  deck to NHTSA. ZF Passive Safety USA's causal role in the delivery is evidenced

16  by the fact that its longtime employee, Emanuel Goodman, signed the affidavit of

17  confidentiality that was enclosed with the mailing of the March 8, 2018 slide deck.

18  Although Mr. Goodman also served as the Technical Specialist for ZF Electronics

19  USA, ZF Passive Safety USA alone paid his salary. ZF Passive Safety USA's

20  causal role in the delivery is further evidenced by Mr. Goodman's and Mr.

21  Bolitho's attendance at the March 8, 2018 meeting with NHTSA, where this slide

22  deck was used.

23     1981. Moreover, because ZF Passive Safety USA's affiliates would not have

24  sent or approved the four written communications described above without ZF

25  Passive Safety USA's contributions and approval, ZF Passive Safety USA was one

26  of the Defendants who jointly caused the delivery of these four communications to

27  NHTSA. Accordingly, its participation in these communications violated the mail

28  fraud statute at least four times. 18 U.S.C. § 1341.

1982. As explained in sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above, each of the four documents described above contained misleading statements about Honda Class Vehicles and/or the ACU Defect. ZF Passive Safety USA specifically approved the transmittal of the final versions of these documents to NHTSA, and intended for the misleading statements contained therein to avoid, minimize, and/or delay recalls of Honda Class Vehicles. Avoiding, minimizing, and/or delaying recalls of Honda Class Vehicles enabled the continuation of the scheme to defraud consumers. Because ZF Passive Safety USA's affiliates would not have sent or approved the written communications noted in the preceding paragraph without ZF Passive Safety USA's contributions and approval, ZF Passive Safety USA was one of the Defendants who caused the delivery of these four communications to NHTSA. Accordingly, its participation in these communications violated the mail fraud statute at least four times. (18 U.S.C. § 1341).

1983. As explained in Section IV.E.1.c. above, ZF Passive Safety USA worked with ZF Electronics USA, ZF Automotive USA, and Honda Japan to design the readiness indicators installed in all Honda Class Vehicles. Specifically, ZF Passive Safety USA assisted with a design of ACUs that would cause the readiness indicator not to illuminate at the point of sale or lease, even though the Honda Class Vehicle's safety systems were not ready to deploy in crash events with negative transients due to the ACU Defect. When ZF Passive Safety USA assisted with this design, it knew Honda USA would ship the Honda Class Vehicles to dealers and that consumers would buy the vehicles without the airbag warning lamp illuminating at the point of sale or lease. Because Honda USA would not have shipped Honda Class Vehicles without ZF Passive Safety USA's assistance in designing misleading readiness indicators, ZF Passive Safety USA jointly caused each shipment of Honda Class Vehicle, in violation of the mail fraud act (18 U.S.C. § 1341).

### vi. ZF Automotive USA violated the mail fraud statute multiple times in furtherance of the Honda-ZF-ST Enterprise's fraudulent scheme.

1984. ZF Automotive USA drafted and/or edited the following misleading statements to NHTSA, as discussed in Sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above:

      a.   The slide deck presentation dated February 5, 2016 (which ZF TRW Corp. mailed to NHTSA on March 14, 2016);

      b.   The slide deck presentation dated July 19, 2016 (which, upon information and belief, was mailed to NHTSA in July or August 2016);

      c.   The September 2016 letter signed by Marc Bolitho (which ZF Electronics USA mailed to NHTSA in September 2016); and

      d.   The slide deck presentation dated March 8, 2018 (which ZF TRW Corp. mailed to NHTSA on March 12, 2018).

1985. ZF Automotive USA caused the delivery via mail or private interstate carrier of the February 5, 2016 slide deck, the July 19, 2016 slide deck, and the March 8, 2018 slide deck to NHTSA. ZF Automotive USA's role in causing the delivery of these presentations is evidenced by its admission in a 573 Defect Report that it attended the three meetings with NHTSA where these presentations were used on its behalf.

1986. Upon information and belief, ZF Automotive USA caused the delivery of the September 2016 letter via mail or private interstate carrier by giving requisite approval prior to the transmittal of the letter.

1987. As explained in sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above, each of these four documents contained misleading statements about Honda Class Vehicles and/or the ACU Defect. ZF Automotive USA specifically approved the transmittal of the final versions of these documents to NHTSA, and intended for the

misleading statements contained therein to avoid, minimize, and/or delay recalls of Honda Class Vehicles. Avoiding, minimizing, and/or delaying recalls of Honda Class Vehicles enabled the continuation of the scheme to defraud consumers. Because ZF Automotive USA's affiliates would not have sent or approved the written communications noted in the preceding paragraph without ZF Automotive USA's contributions and approval, ZF Automotive USA was one of the Defendants who caused the delivery of these four communications to NHTSA. Accordingly, its participation in these communications violated the mail fraud statute at least four times. (18 U.S.C. § 1341).

1988. As explained in Section IV.E.1.c. above, ZF Automotive USA worked with ZF Passive Safety USA, ZF Electronics USA, and Honda Japan to design the readiness indicators installed in Honda Class Vehicles. Specifically, ZF Automotive USA assisted with a design of ACUs that would cause the readiness indicator not to illuminate at the point of sale or lease, even though the Honda Class Vehicle's safety systems were not ready to deploy in crash events with negative transients due to the ACU Defect. When ZF Automotive USA assisted with this design, it knew would ship the Honda Class Vehicles to dealers and that consumers would buy the vehicles without the airbag warning lamp illuminating at the point of sale or lease. Because Honda USA would not have shipped Honda Class Vehicles without ZF Automotive USA's affirmative assistance in designing misleading readiness indicators, ZF Automotive USA jointly caused each shipment of Honda Class Vehicle, in violation of the mail fraud act (18 U.S.C. § 1341).

### vii. ZF TRW Corp. violated the mail fraud statute multiple times in furtherance of the Honda-ZF-ST Enterprise's fraudulent scheme.

1989. Prior to their delivery to NHTSA, ZF TRW Corp. reviewed, drafted and/or edited the following misleading statements to NHTSA, as discussed in Sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above:

a.     The slide deck presentation dated February 5, 2016 (which ZF TRW Corp. mailed to NHTSA on March 14, 2016);

b.     The slide deck presentation dated July 19, 2016 (which, upon information and belief, was mailed to NHTSA in July or August 2016);

c.     The September 2016 letter signed by Marc Bolitho[37] (which ZF Electronics USA mailed to NHTSA in September 2016); and

d.     The slide deck presentation dated March 8, 2018 (which ZF TRW Corp. mailed to NHTSA on March 12, 2018).

1990. ZF TRW Corp. caused the transmittal of the February 5, 2016 slide deck via mail or private interstate carrier. ZF TRW Corp.'s role in the transmittal is confirmed by the cover letter, which is signed: "Very truly yours, ZF TRW Automotive Holdings Corp." with a signature from Sheri Roberts, the Senior Counsel of the company. ZF TRW Corp.'s causal role is further confirmed by a footer on every page of the slide deck itself, which reads: "This document is the property of ZF TRW Corp. and is disclosed in confidence. It may not be copied, disclosed to others, or used for manufacturing without the written consent of ZF TRW." Based on this footer, ZF TRW Corp. gave requisite written consent to the transmittal of the document to NHTSA.

1991. ZF TRW Corp. caused the transmittal of the July 19, 2016 slide deck via mail or private interstate carrier. ZF TRW Corp.'s causal role is confirmed by a footer on every page of the slide deck itself, which reads: "This document is the property of ZF TRW and is disclosed in confidence. It may not be copied, disclosed to others, or used for manufacturing without the written consent of ZF TRW."

---

[37] Mr. Bolitho was simultaneously an employee of ZF Passive Safety USA, the Vice President of Passive Safety for ZF Electronics USA, and Director of Passive Safety Engineering for ZF TRW

1   Based on this footer, ZF TRW Corp. gave requisite written consent to the

2   transmittal of the document to NHTSA.

3   1992. Upon information and belief, ZF TRW Corp. also gave requisite prior

4   authorization for the delivery of the September 2016 letter.

5   1993. ZF TRW Corp. caused the transmittal of the March 8, 2018 slide deck

6   to NHTSA via mail or private interstate carrier. ZF TRW Corp.'s causal role is

7   confirmed by the cover letter included with the mailing of the slide deck to

8   NHTSA. The cover letter is on the letter head of an "Active & Passive Safety

9   Technology" business unit. Because this is a reference to ZF TRW Corp.,[38] ZF

10  TRW Corp. must have reviewed and approved the transmittal of the slide deck to

11  NHTSA.

12  1994. As explained in sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above,

13  each of these four documents described above contained misleading statements

14  about Honda Class Vehicles and/or the ACU Defect. ZF TRW Corp. specifically

15  approved the transmittal of the final versions of these documents to NHTSA, and

16  intended for the misleading statements contained therein to avoid, minimize, and/or

17  delay recalls of Honda Class Vehicles. Avoiding, minimizing, and/or delaying

18  recalls of Honda Class Vehicles enabled the continuation of the scheme to defraud

19  consumers. Because ZF TRW Corp.'s affiliates would not have sent or approved

20  the written communications noted in the preceding paragraph without ZF TRW

21  Corp.'s contributions and approval, ZF TRW Corp. was one of the Defendants who

22  caused the delivery of these four communications to NHTSA. Accordingly, its

23  participation in these communications violated the mail fraud statute at least four

24  times. (18 U.S.C. § 1341).

25  _____

26  [38] According to ZF AG's 2017 Annual Report, the "Active & Passive Safety

27  Technology Division" was "established by ZF Group to manage the business
    activities of ZF TRW after its acquisition." Because ZF TRW Corp. is the only

28  corporate entity with "ZF TRW" as part of its corporate name, this letter was also
    sent on behalf of ZF TRW Corp.

**viii.  ZF Germany violated the mail and wire fraud statutes multiple times in furtherance of the Honda-ZF-ST Enterprise's fraudulent scheme.**

1995. Prior to their delivery to NHTSA, ZF Germany reviewed and/or edited the following misleading statements to NHTSA, as discussed in Sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above:

  a.  The slide deck presentation dated February 5, 2016 (which ZF TRW Corp. mailed to NHTSA on March 14, 2016);

  b.  The slide deck presentation dated July 19, 2016 (which, upon information and belief, was mailed to NHTSA in July or August 2016);

  c.  The September 2016 letter signed by Marc Bolitho (which ZF Electronics USA mailed to NHTSA in September 2016); and

  d.  The slide deck presentation dated March 8, 2018 (which ZF TRW Corp. mailed to NHTSA on March 12, 2018).

1996. ZF Germany caused the delivery of these communications via mail and wire. The three presentations bear copyright legends attributing ownership to ZF Germany. Accordingly, sending these presentations must have required its involvement and consent. Moreover, the slide decks dated February 5, 2016 and July 19, 2016 identify ZF Germany as the corporate author on the title page.

1997. As explained in sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above, each of these documents described above contained misleading statements about Honda Class Vehicles and/or the ACU Defect. ZF Germany specifically approved the transmittal of the final versions of these documents to NHTSA, and intended for the misleading statements contained therein to avoid, minimize, and/or delay recalls of Honda Class Vehicles. Avoiding, minimizing, and/or delaying recalls of Honda Class Vehicles enabled the continuation of the scheme to defraud consumers. Because ZF Germany's affiliates would not have sent or approved the written

communications noted in the preceding paragraph without ZF Germany's contributions and approval, ZF Germany was one of the Defendants who caused the delivery of these four communications to NHTSA. Accordingly, its participation in these communications violated the mail fraud statute at least four times. (18 U.S.C. § 1341).

### ix. ST USA violated the mail fraud statute multiple times in furtherance of the Honda-ZF-ST Enterprise's fraudulent scheme.

1998. ST USA regularly received orders from ZF Electronics USA for DS84 ASICs, including all the defective DS84 ASICs used in Honda Class Vehicles. In response to these orders ST USA would work with its affiliate, ST Malaysia, to help it manufacture and then ship DS84 ASICs to ST USA's so-called "ST Micro LAX Hub" near Los Angeles, California. Between 2007 and the present, ST USA caused ST Malaysia to ship well over ten million defective DS84 ASICs to this location. In discovery, ST USA has produced approximately 9,700 invoices sent to ZF Electronics USA from the time period between 2014 and the present alone. Each invoice notes the defective DS84 ASICs were made in Malaysia, where ST Malaysia operated. The invoice dates from these documents provide an approximate date for these shipments. Plaintiffs have extracted approximate shipping dates from these invoices, which are presented as exemplars in Exhibit 21.[39]

1999. ST USA also shipped well over ten million defective DS84 ASICs to ZF Electronics USA at a facility with the following address: 902 South 2nd Street, Marshall, Illinois 62441. As explained above, Exhibit 21 provides exemplar

[39] ST USA made similar shipments for Honda Class Vehicles between 2010 and 2014, but is withholding invoices for these shipments from discovery. Upon information and belief, the invoices for this time period will show a similar regularity of shipments of DS84 ASICs from Malaysia.

approximate shipment dates based on an incomplete set of invoices produced by ST USA.[40]

2000. When ST USA required ST Malaysia to make these shipments and then made its own shipments to ZF Electronics USA, it knew ZF Electronics USA would place the DS84 ASICs into DS84 ACUs, including those that would be installed in Honda Class Vehicles that are marketed to U.S. consumers. ST USA was also aware of Honda Japan's, Honda Engineering USA's, and Honda USA's practice of making reassuring statements about safety, airbags, and seatbelts in consumer-facing Monroney labels, certification labels, in-vehicle labels, owner's manuals, and advertising for all Honda Class Vehicles. ST USA knew these statements were false because it knew the Honda Class Vehicles, DS84 ACU, and ASIC were defective. Accordingly, because ST USA caused shipments of well over ten million defective DS84 ASICs with the purpose of executing a fraudulent scheme with the other Enterprise members, each of the DS84 ASIC shipments caused by ST USA violated the mail fraud statute (18 U.S.C. § 1341).

> x.   **ST Malaysia violated the mail fraud statute multiple times in furtherance of the Honda-ZF-ST Enterprise's fraudulent scheme.**

2001. Between 2007 and the 2018, ST USA regularly worked with its affiliate, ST Malaysia, to help it manufacture and ship DS84 ASICs to ST USA's so-called "ST Micro LAX Hub" near Los Angeles, California. During that time period, ST Malaysia shipped well over ten million defective DS84 ASICs to this location. ST USA has produced approximately 9,700 invoices sent to ZF Electronics USA from the time period between 2014 and the present alone. Each

---

[40] ST USA made similar shipments between 2007 and 2014, but is withholding invoices for these shipments from discovery. Upon information and belief, the invoices for this time period will show a similar regularity of shipments of DS84 ASICs from the STMicro LAX Hub to the ZF Electronics USA's manufacturing facility in Illinois.

invoice notes the defective DS84 ASICs were made in Malaysia, where ST Malaysia operated. The invoice dates from these documents provide an approximate date for these shipments. Plaintiffs have extracted approximate shipping dates from these invoices, which are presented as exemplars in Exhibit 21.[41]

2002. When ST Malaysia made these shipments, it knew ZF Electronics USA would place the DS84 ASICs into DS84 ACUs, including those ACUs that would be installed in Honda Class Vehicles that are marketed to U.S. consumers. ST Malaysia was also aware of Honda Japan's, Honda Engineering USA's, and Honda USA's practice of making reassuring statements about safety, airbags, and seatbelts in consumer-facing Monroney labels, certification labels, in-vehicle labels, owner's manuals, and advertising for all Honda Class Vehicles. ST Malaysia knew these statements were false because it knew the Honda Class Vehicles, DS84 ACU, and ASIC were defective. Accordingly, because ST Malaysia caused shipments of well over ten million defective DS84 ASICs with the purpose of executing a fraudulent scheme with the other Enterprise members, each of the DS84 ASIC shipments made by ST Malaysia violated the mail fraud statute (18 U.S.C. § 1341).

      **b.**     **Honda Japan, Honda USA, Honda Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia advanced their fraudulent scheme by concealing material information about a serious safety defect that they had a duty to disclose.**

2003. The uses of mail and wire described in the section above violated the mail and wire fraud statutes because they furthered a fraudulent scheme to affirmatively mislead consumers and NHTSA.

---

[41] ST USA made similar shipments between 2007 and 2014, but is withholding invoices for these shipments from discovery. Upon information and belief, the invoices for this time period will show a similar regularity of shipments.

2004.  In addition, these same uses of the mail and wire *also* violated the mail and wire fraud statutes because, while they sent or caused to be sent these mailings, Honda Japan, Honda USA, Honda Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia had duties to disclose the ACU Defect and failed to do so in order to advance their scheme.

2005.  Honda Japan, Honda USA, Honda Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia each knew for years that the defective DS84 ACUs and ASICs in the Honda Class Vehicles are uniquely vulnerable to EOS. *See* Section IV.D.6. above.

2006.  To further the goals of the Honda-ZF-ST Enterprise and to their mutual gain, Honda Japan, Honda USA, Honda Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia concealed what they knew about the existence, scope, and material safety risks of the ACU Defect in the Honda Class Vehicles.

2007.  Their careful efforts to conceal the ACU Defect in the Honda Class Vehicles were critically important to the viability of their scheme. A decision by any one Defendant or nonparty-Enterprise member to tell the truth about the ACU Defect and its impact of vehicle safety to consumers or to NHTSA would have been an existential threat to the Honda-ZF-ST Enterprise. Instead, and in pursuit of ill-gotten profits, they each kept key information about the ACU Defect hidden for years. This concealment of material facts about the ACU Defect was grounded in and advanced their scheme to defraud consumers through the continued sale of Honda Class Vehicles, and avoidance of costly recalls and their attendant reputational harms.

2008.  Honda Japan, Honda USA, Honda Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany,

1  ST USA, ST Italy, and ST Malaysia's concealment of the ACU Defect violated

2  several independent duties to disclose it.[42]

3              a.    Honda Japan, Honda USA, Honda Engineering USA, ZF

4                    Electronics USA, ZF Passive Safety USA, ZF Automotive USA,

5                    ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia each

6                    had a duty to disclose the ACU Defect because of their

7                    exclusive knowledge and far superior information about the

8                    ACU Defect. These Defendants knew about the vulnerability of

9                    the DS84 ACU and ASIC to EOS through their exclusive access

10                   to information about their design, development, and testing, and

11                   through their confidential and proprietary investigations into

12                   suspicious incidents. Given the ACU Defect's hidden and

13                   technical nature, Plaintiffs and consumers lack the sophisticated

14                   expertise in vehicle components and electrical phenomena that

15                   would be necessary to discover the ACU Defect on their own.

16

17  _____

18  [42] As vehicle manufacturers and component parts suppliers, Defendants are also

19  subject to statutory duties to disclose known safety defects to consumers and to
    NHTSA pursuant to the Safety Act and its attendant regulations. *See*, e.g., 49

20  U.S.C. § 30118(c) ("A manufacturer of a motor vehicle . . . shall notify the
    Secretary by certified mail or electronic mail, and the owners, purchasers, and

21  dealers of the vehicle . . . as provided in section 30119(d) of this section, if the

22  manufacturer . . . learns the vehicle . . . contains a defect and decides in good faith
    that the defect is related to motor vehicle safety."); 49 U.S.C. §30119(d)

23  (manufacturers must notify "each person registered . . . as the owner and whose

24  name and address are reasonably ascertainable"); 49 C.F.R. §573.6(a) ("Each
    manufacturer shall furnish a report to the NHTSA for each defect . . . in his items of

25  original . . . equipment that he . . . determines to be related to motor vehicle

26  safety."). Plaintiffs previously pled Defendants had a duty to disclose based on
    these provisions of the Safety Act, but the Court dismissed an omissions theory

27  based these alleged duties. Plaintiffs reserve the right to appeal this decision at a
    later date, but do not rely upon the Safety Act as a basis for their omissions theory

28  in this pleading.

b.  In addition, Honda Japan, Honda USA, Honda Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia also each had a duty to disclose because they knew that a defect in the Honda Class Vehicles and their DS84 ACUs and ASICs gave rise to serious safety concerns for the consumers who use the vehicles. As sophisticated and well-funded corporate entities that generate billions of dollars in annual revenue from work in the automotive industry, each of these Defendants knew that this information would have been material to consumers. For example, a February 3, 2004, prospectus filed by ZF TRW Corp. with the SEC observed that "85 percent of recent auto purchasers stated that they look for vehicle safety information before making their final decision." Nonetheless, Defendants still did not disclose it.

c.  ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., and ZF Germany also each had a duty to disclose the ACU Defect because of the actions they took to conceal the ACU Defect in the Honda Class Vehicles from consumers. Each of these Defendants acted to suppress the truth about the ACU Defect through their misleading representations to NHTSA. *See* Sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above. Because a truthful and accurate disclosure to NHTSA would have been material to NHTSA's decision whether to require a recall or expand its investigation into the DS84 ACUs and ASICs, the affirmative steps they took to mislead NHTSA about the ACU Defect also precluded Honda Plaintiffs and Nationwide Honda Class members from an opportunity that

1        otherwise have led to their discovery of the truth about the ACU

2        Defect.

3             d.    Finally, Honda Japan, Honda USA, and Honda Engineering

4                 USA affirmatively presented reassuring information about the

5                 Honda Class Vehicles' airbags, seatbelts, and overall safety to

6                 consumers (*see* Sections IV.E.1 and I.V.E.2. above). Because

7                 they opted to make these representations to consumers about

8                 these topics, and because they knew information about the ACU

9                 Defect that made those representations misleading or untrue,

10             Honda Japan, Honda USA, and Honda Engineering USA were

11             under a separate duty to disclose the full truth about the ACU

12             Defect that materially undermined the reassuring information

13             they presented, or caused to be presented, to consumers.

14       2009. Honda Japan, Honda USA, Honda Engineering USA, ZF Electronics

15  USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany,

16  ST USA, and ST Malaysia knew and intended that NHTSA would rely on their and

17  the other members of the Honda-ZF-ST Enterprise's material omissions about the

18  Honda Class Vehicles to approve them for importation, marketing, and sale to

19  consumers in the United States. And conversely, they also understood that

20  disclosing the ACU Defect would require them to recall and fix the Honda Class

21  Vehicles, which would negatively impact the profits of the Honda-ZF-ST

22  Enterprise.

23       2010. Honda Japan, Honda USA, Honda Engineering USA, ZF Electronics

24  USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany,

25  ST USA, and ST Malaysia also knew and intended that consumers would rely on

26  their and the other members of the Honda-ZF-ST Enterprise's material omissions

27  when deciding to purchase or lease the Honda Class Vehicles. The Honda

28  Plaintiffs' reliance on this concealment is demonstrated by the fact that they paid

money for Honda Class Vehicles that never should have been introduced into the U.S. stream of commerce, and that they overpaid for vehicles with defective safety systems without knowledge of the ACU Defect.

> **c.    The Honda-ZF-ST Enterprise was an association-in-fact enterprise with a common purpose of misleading consumers and NHTSA regarding the ACU Defect in Honda Class Vehicles.**

2011. The Honda-ZF-ST Enterprise had a common purpose and ongoing organization and functioned as a continuing unit.

> **i.    The Honda-ZF-ST Enterprise had a common purpose, ongoing organization, and functioned as continuing unit.**

2012. The common purpose of the Honda-ZF-ST Enterprise was to perpetuate a fraudulent scheme to maximize sales and leases of Honda Class Vehicles while hiding the ACU Defect from purchasers and lessees. Because all of the Enterprise members' continued profits from this scheme ultimately depended on consumers purchasing or leasing Honda Class Vehicles, the Enterprise needed to convince consumers of a false premise: that Honda Class Vehicles had properly functioning airbags and seatbelts. Toward this end, the Enterprise needed to mislead consumers. For this scheme to work, it was also essential for the Enterprise to conceal the ACU Defect from NHTSA, because the agency could halt the sale of Honda Class Vehicles and mandate recalls that necessarily require public notice of a defect. The expense of these recalls would undermine the profitability of the scheme.

2013. This common purpose served the interests of all members of the Honda-ZF-ST Enterprise. By concealing and minimizing the ACU Defect, Honda Japan, Honda USA, Honda Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST

Italy, ST Malaysia, and the nonparty-Enterprise members maximized their revenue by selling as many Honda Class Vehicles as possible while avoiding or limiting the substantial costs to recall and repair the Vehicles and their defective DS84 ACUs and ASICs.

2014. The common purpose of the Honda-ZF-ST Enterprise is evidenced by Honda Japan's, Honda USA's, ZF Electronics USA's, ZF Passive Safety USA's, and ZF Automotive USA's repeated, confidential consultations with one another about suspicious crashes and test results involving Honda vehicles with the DS84 ACU, problems with the design of the DS84 ACU and ASIC, observations of EOS on DS84 ACUs and ASICs, and dangerous safety system malfunctions in Honda Class Vehicles. As the Court has held, consultations about "observed evidence of EOS in Class Vehicles" among Defendants "support[s] a reasonable inference" of a "common purpose of misleading consumers and NHTSA as to the existence of a defect in the ACUs." ECF 396 at 61.

2015. The common purpose of the Honda-ZF-ST Enterprise is further evidenced by ST USA, ST Italy, and ST Malaysia's repeated communications with ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA about observations of EOS, including in Honda Class Vehicles. ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA would regularly share this information with Honda Japan. On information and belief, Honda Japan would share this information with its subsidiaries Honda USA and Honda Engineering USA. This allowed the participants in the Honda-ZF-ST Enterprise to coordinate their efforts to downplay the ACU Defect and avoid and minimize recalls.

2016. The common purpose of the Honda-ZF-ST Enterprise is also evidenced by coordinated efforts by Honda Japan, Honda USA, Honda Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, and ZF Germany to implement changes to the DS84 ASIC in some Honda Class Vehicles. These changes confirmed an agreement by Honda Motor Co., Ltd., ZF ASE, ZF

PSS, and ZF Automotive US Inc. that observed malfunctions in DS84 ACUs in Honda Class Vehicles were serious enough to necessitate design changes. These changes, while inadequate, did not apply to all Honda Class Vehicles, including those already on the road.

### ii.    The Honda-ZF-ST Enterprise had an ongoing organization.

2017. The participation of separate entities or individuals that have an existence outside an alleged enterprise is evidence of an ongoing organization with its own structure, separate and apart from its members. Honda Japan, Honda USA, Honda Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia each existed separately from the Honda-ZF-ST Enterprise.

a.    During the relevant period, Honda Japan contemporaneously designed, manufactured, and sold many vehicles that do not contain defective DS84 ACUs and ASICs.

b.    During the relevant period, Honda Engineering USA contemporaneously manufactured and sold many vehicles that do not contain defective DS84 ACUs and ASICs.

c.    During the relevant period, the Honda manufacturing subsidiaries manufactured Honda vehicles that do not contain defective DS84 ACUs and ASICs.

d.    During the relevant period, Honda USA and Honda Engineering USA contemporaneously provided services to Honda Japan relating to a large volume of vehicles that do not contain defective DS84 ACUs and ASICs.

e.    During the relevant period, ST USA, ST Italy, and ST Malaysia contemporaneously sold, designed, and/or manufactured many

1    other products aside from the defective DS84 ASICs used in the

2    defective DS84 ACUs.

3       f.    During the relevant period, ZF Passive Safety USA, ZF

4    Electronics USA, and ZF Automotive USA contemporaneously

5    designed, made, and/or sold many other automotive parts aside

6    from the defective DS84 ACUs.

7       g.    ZF TRW Corp. and ZF Germany also engaged in a wide variety

8    of business activities unrelated to the defective DS84 ACUs.

9    2018. Another hallmark of an ongoing organization is members with

10   delineated roles that further the organization's goals. Each member performed

11   important and separate roles within the Honda-ZF-ST Enterprise organization.

12      a.    ZF Electronics USA, ZF Passive Safety USA, and ZF

13   Automotive USA jointly designed the defective DS84 ACU for

14   use in the Honda Class Vehicles, with Honda Japan's, ST

15   Italy's, and ST USA's input.

16      b.    ST Italy and ST USA jointly designed the defective DS84 ASIC,

17   with input from ZF Electronics USA, ZF Passive Safety USA,

18   and ZF Automotive USA.

19      c.    ST Malaysia manufactured the defective DS84 ASICs and

20   shipped them to ST USA in California.

21      d.    ST USA sold and shipped the defective DS84 ASIC to ZF

22   Electronics USA.

23      e.    Honda Japan designed the Honda Class Vehicles, and made

24   many of them in Japan. Honda Japan required any company that

25   made Honda Class Vehicles to strictly follow its designs. For the

26   Honda Class Vehicles made by Honda Japan, Honda Japan

27   added permanent labels to each vehicle that certified compliance

28

1        with U.S. Federal safety standards, as well as readiness

2        indicators and in-vehicle airbag labels and imprints.

3    f.    Honda Engineering USA made many of the Honda Class

4        Vehicles in the United States; Honda Engineering USA also

5        placed permanent labels in each Honda Class Vehicle it made

6        that certified compliance with U.S. Federal safety standards, as

7        well as readiness indicators and in-vehicle airbag labels and

8        imprints.

9    g.    The nonparty Honda manufacturing subsidiaries made Honda

10       Class Vehicles by strictly following the mandatory design

11       specifications provided by Honda Japan. For the Honda Class

12       Vehicles made by these subsidiaries, Honda Japan's mandatory

13       designs required the manufacturer to add permanent labels to

14       each vehicle that certified compliance with U.S. Federal safety

15       standards, as well as readiness indicators and in-vehicle airbag

16       labels and imprints.

17    h.    Honda USA responded to NHTSA's investigation of the Honda

18       Class Vehicles for the Honda Defendants. Honda USA also

19       created the Monroney labels for Honda Class Vehicles and

20       caused them to be affixed to each Honda Class Vehicles prior to

21       their shipment to authorized Honda dealers. It also distributed

22       the Honda Class Vehicles to dealers, so they could be sold to

23       consumers with misleading Monroney labels and the in-vehicle

24       statements required by Honda Japan's mandatory design

25       specifications. Honda USA was also responsible for misleading

26       advertising to consumers.

27    i.    ZF TRW Corp. and ZF Germany approved actions taken by ZF

28       Electronics USA, ZF Passive Safety USA, and ZF Automotive

USA, and participated directly in making misleading statements
to NHTSA about the ACU Defect.

    j.    Each of the Defendants separately ensured that NHTSA and
consumers did not discover the ACU Defect.

2019. When the passenger safety systems in Honda vehicles with the DS84
ACU repeatedly malfunctioned due to the ACU Defect over the course of several
years (starting at least as early as 2012), Honda Japan sought the involvement and
assistance of ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA,
ST Italy, ST USA, and ST Malaysia. These Defendants coordinated, directly or
indirectly, with Honda Japan on the ACU Defect and related malfunctions. For
example, ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA
assigned Emanuel Goodman with the task of attending inspections and analyzing
DS84 ACUs from multiple Honda Class Vehicles. ████████████████████
█████████████████████████████████████████████████████████
████████████████████████

2020. The Enterprise members dedicated personnel to the Honda-ZF-ST
Enterprise's scheme, which further evidences the ongoing structure of the
Enterprise. For example, Honda Japan used its Chief Engineer Nobuhiro Koyota as
its primary point of contact with ZF Electronics USA, ZF Passive Safety USA, ZF
Automotive USA relating to the defective DS84 ACU. Establishing a regular point
of contact further organized the Honda-ZF-ST Enterprise.

2021. When NHTSA began to investigate the defective DS84 ACUs in 2015,
ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF Germany,
and ZF TRW Corp. maintained the organization of the Honda-ZF-ST Enterprise by
sending excerpts of their misleading communications with NHTSA to Honda
Japan, ST USA, ST Italy, and ST Malaysia. Upon information and belief, Honda
Japan would share this information with Honda Engineering USA and Honda USA.

1   This allowed the participants in the Honda-ZF-ST Enterprise to coordinate their

2   efforts to downplay the ACU Defect and avoid and minimize recalls.

3       2022. Finally, faced with numerous consumer complaints of malfunctions in

4   the Honda Class Vehicles with known symptoms of the ACU Defect, including

5   airbag non-deployments, Honda USA repeatedly closed consumer complaints about

6   airbag non-deployments in Honda Class Vehicles without inspecting or

7   investigating whether the vehicles had an ACU malfunction. Honda USA's practice

8   of doing so—for more than 300 incidents between 2012 and 2019— avoided

9   further investigation or suspicion into the prevalence of the ACU Defect in Honda

10  Class Vehicles, and further avoided the creation of a written record regarding the

11  same.

12              ### iii.   The Honda-ZF-ST Enterprise functioned as a
13                         continuing unit.

14      2023. The Honda-ZF-ST Enterprise continued to function for several years,

15  at least during the time period of 2009 to the present. Although Honda Japan and

16  Honda USA stopped distributing new Honda Class Vehicles with the DS84 ACU in

17  or about 2019, Honda Class Vehicles continue to sell on the used car market with

18  misleading in-vehicle statements and consumer-facing marketing (such as vehicle

19  brochures) made by the Honda-ZF-ST Enterprise.

20      2024. During this protracted time of ongoing sale and production of the

21  Honda Class Vehicles, the members of the Honda-ZF-ST Enterprise remained

22  stable, with Honda Japan, Honda USA, Honda Engineering USA, ZF Electronics

23  USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ST USA, ST

24  Malaysia, ST Italy, and the nonparty Honda Manufacturing subsidiaries remaining

25  active members of the Enterprise. ZF Germany, on the other hand, started to

26  participate in the Honda-ZF-ST Enterprise shortly after acquiring ZF TRW Corp. in

27  2015.

28

**d.    The Honda-ZF-ST Enterprise's pattern of racketeering caused Honda Plaintiffs and the Nationwide Honda Class members to overpay for Honda Class Vehicles at the point of sale or lease.**

2025. Honda Plaintiffs and Nationwide Honda Class members are "person[s] injured in his or her business or property" by reason of the Honda-ZF-ST Enterprise's RICO violations, within the meaning of U.S.C. § 1964(c). Honda Plaintiffs and Nationwide Honda Class members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

2026. Because of the Honda-ZF-ST Enterprise's pattern of racketeering activity, Honda Plaintiffs and Nationwide Honda Class members have been injured in their business and/or property through their overpayment at the time of purchase or lease for Honda Class Vehicles with an undisclosed safety defect.

2027. By making misleading statements and omissions at or before the point of sale or lease, the Honda-ZF-ST Enterprise directly or indirectly obtained money from Honda Plaintiffs and the Nationwide Honda Class by means of materially false or fraudulent misrepresentations and omissions of material facts. Had the Honda Plaintiffs known what the Honda-ZF-ST Enterprise members knew about the ACU Defect, Honda Plaintiffs and Nationwide Honda Class members would not have purchased the Honda Class Vehicles, or would not have paid as much as they did for them.

2028. Had Honda Japan, Honda USA, Honda Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, or ST Malaysia not concealed, and instead decided to disclose, the information they knew about the ACU Defect and its impact on vehicle safety, Plaintiffs would have learned of the disclosure.

a.     Honda Plaintiffs and Nationwide Honda Class members would have learned about the ACU Defect through any of the channels through the Honda Class Vehicles were marketed to them. In other words, had Honda Japan, Honda USA, and/or Honda Engineering USA made a disclosure in *any* of the places in which it otherwise communicated information about the Honda Class Vehicles, Honda Plaintiffs and Nationwide Honda Class members would have seen it. This includes in Honda Class Vehicle brochures and other advertising, on Monroney labels, certification labels, in-vehicle airbag labels, airbag warning lamps, and in owner's manuals.

b.     Further, Honda Plaintiffs and Nationwide Honda Class members would have learned about the ACU Defect at the times and places that they purchased or leased their Class Vehicles. For example, had Honda USA made a disclosure about the ACU Defect to authorized Honda dealerships, sales personnel at the dealerships would have passed on that material information to consumers at the time of the contemplated purchases.

c.     Had any of the Defendants listed above disclosed the true scope and existence of the ACU Defect to NHTSA, Honda Plaintiffs and Nationwide Honda Class members would have learned of it because NHTSA would have considered this information material to its decision to require a recall, which information would have been made public and passed onto impacted consumers.

d.     Had any of the Defendants listed above disclosed the true scope and existence of the ACU Defect to consumers or the public, either through press releases, on their websites, or in any other

public channel or forum, Honda Plaintiffs and Nationwide
Honda Class members would have learned of it due to the
materiality of this information about a serious safety defect in
millions of vehicles. Given the seriousness of the information
and the number of vehicles impacted, the news media and
consumer forums and blogs would pick up the story. This is
particularly so in the wake of the massive Takata recall and
litigation, which confirmed the strong public interest in airbags
and vehicle safety. For example, an April 23, 2019 article
available on ConsumerReports.com described NHTSA's
expanded investigation into the DS84 ACUs to be "the agency's
most in-depth look at airbags since the recall of more than 56
million airbags made by Takata."

2029. The Honda-ZF-ST Enterprise's misleading statements to NHTSA
between 2016 and the present were essential to the scheme because NHTSA would
not have allowed continued sale of unremedied Honda Class Vehicles with
defective DS84 ACUs. At the very least, these misleading statements delayed
NHTSA's broader investigation of the Honda Class Vehicles until April 2019,
when NHTSA launched an Engineering Analysis covering all unrecalled Honda
Class Vehicles. Upon information and belief, ZF Electronics USA stopped making
DS84 ACUs for the 2020 model year based in large part on this investigation.
Accordingly, ZF Electronics USA would have stopped making DS84 ACUs if
NHTSA had launched a broader investigation in 2016. For this reason, Plaintiffs
who purchased and leased Honda Class Vehicles after the first misleading statement
to NHTSA by the Honda-ZF-ST Enterprise would have avoided purchasing or
leasing their Honda Class Vehicles entirely, or they would have paid less for them.

2030. Consumers are the only direct victims of the Honda-ZF-ST Enterprise's alleged fraudulent and misleading statements to NHTSA. NHTSA has not suffered any reported, direct injury as a result of such conduct.

2031. Damages will not be difficult to ascertain; the Honda Plaintiffs and the Nationwide Honda Class members' damages are the difference between what they paid for Honda Class Vehicles without an ACU Defect, and the value of the Honda Class Vehicles they actually received. In the similar *Takata* airbag litigation, for example, plaintiffs also alleged overpayment damages suffered at the point of sale based on a dangerous airbag defect. Plaintiffs' experts in that case performed a conjoint analysis using surveys of consumers and found that the price premium paid by class members for class vehicles was at least ten percent of the purchase price. A similar analysis could be performed in this litigation. Other methodologies are also viable.

2032. All victims of Defendants' alleged conduct who claim to have overpaid for the purchase or lease of Honda Class Vehicles are within the alleged Nationwide Honda Class. Consequently, there are no issues with respect to reapportionment or multiple recovery.

**8.     Nationwide Count 8: Violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(d), on Behalf of the Honda Nationwide Class Against Honda Japan, Honda USA, Honda Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia.**

2033. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2034. It is also unlawful "for any person to conspire to violate" 18 U.S.C. § 1962(c). *See* 18 U.S.C. § 1962(d). To conspire in violation of section 1962(c), the defendant must be "aware of the essential nature and scope of the enterprise." ECF 396 at 77. Enterprise members conspire to violate section 1962(c) when "two or

more people agree[] to commit a crime" and "knowingly and willfully participate[] in the agreement. . . . The illegal agreement need not be express as long as its existence can be inferred from the words, actions, or interdependence of activities and persons involved." *Id*. A defendant who "agreed to facilitate a scheme" violates section 1962(d) even if he "does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense." *Salinas v. United States*, 522 U.S. 52, 65-66 (1997).

2035. As explained in the section below, Honda Japan, Honda USA, Honda Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia were aware of the essential nature and scope of the Honda-ZF-ST Enterprise. Count 7 describes this Enterprise.

2036. As explained in the section below, based on their words, actions, and/or interdependence, Honda Japan, Honda USA, Honda Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., and ZF Germany, agreed to facilitate the following acts of mail and wire fraud:

        a.    Honda USA's interstate shipments between 2012 and 2019 of millions of Honda Class Vehicles with misleading Monroney labels, readiness indicators, in-vehicle airbag labels and imprints, and owner's manuals, and

        b.    ZF Electronics USA's interstate shipments between 2012 and 2019 of millions of DS84 ACUs to Honda Japan and Honda Engineering USA.

2037. As explained in the section below, based on their words, actions, and/or interdependence, ZF Electronics USA, ZF Passive Safety USA, ST USA, ST Italy, and ST Malaysia also agreed to facilitate the following acts of mail fraud:

        a.    ZF Electronics USA's interstate shipments between 2012 and 2019 of millions of DS84 ACUs to Honda Japan and Honda Engineering USA;

        b.    ST Malaysia's interstate shipments between 2012 and 2019 of millions of DS84 ASICs to ST USA in California; and

        c.    ST USA's interstate shipments between 2012 and 2019 of millions DS84 ASICs to ZF Electronics USA in Illinois.

2038. The words, actions, or interdependence of activities of each of these Defendants support the inference of agreement.

2039. ZF TRW Corp. Accordingly, Honda Japan, Honda USA, Honda Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia each violated 18 U.S.C. § 1962(d).

2040. These violations caused the same injuries and damages described in the prior Count. This Count incorporates by reference the allegations as to injury, damages, and causation from the prior Count.

2041. Honda Japan, Honda USA, Honda Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia each violated 18 U.S.C. § 1962(d) and injured the business or property of the Honda Plaintiffs and the Nationwide Honda Class. The Honda Plaintiffs claim damages for themselves and the Nationwide Honda Class members under 18 U.S.C. § 1964(c).

**a.    Honda Japan, Honda USA, Honda Engineering USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia were all aware of the essential nature and scope of the Honda-ZF-ST Enterprise.**

2042. Each Defendant named in this Count was aware of the essential nature and scope of the Honda-ZF-ST Enterprise, even if some specific details about the Enterprise's illegal activities and members were unknown.

**i.    Honda Japan, Honda USA, and Honda Engineering USA understood the nature and scope of the Honda-ZF-ST Enterprise's fraudulent scheme.**

2043. Honda Japan, Honda USA, and Honda Engineering USA were aware of the essential nature and scope of the Honda-ZF-ST Enterprise.

2044. Honda Japan always knew of the activities of Honda USA and Honda Engineering USA and their role in the Enterprise because it owns these companies and monitors their activities.

2045. As explained in Section IV.D.6. above, Honda Japan, Honda USA, Honda Engineering USA, and knew about the nature and scope of the ACU Defect.

2046. Between 2009 and 2019, Honda Japan, Honda USA, and Honda Engineering USA knew that the STMicroelectronics companies were responsible for designing and manufacturing the DS84 ASIC for the DS84 ACUs used in Honda Class Vehicles.

2047. Between 2012 and the present, Honda Japan, Honda USA, and Honda Engineering USA have continuously tracked the volume of sales of Honda makes and models in the United States. Accordingly, during the relevant time period, they knew roughly how many Honda Class Vehicles would likely sell in the United States.

2048. During each year between 2012 and the present, Honda Japan, Honda USA, and Honda Engineering USA knew that reassuring certification labels, in-

vehicle airbag labels and imprints, and readiness indicators would be placed in Honda Class Vehicles prior to the shipment to dealers in the United States. They knew this would occur because Honda Japan's mandatory designs required these statements to be placed in Honda Class Vehicles. Honda Japan, Honda USA, and Honda Engineering USA knew that consumers would rely on some or all of these in-vehicle labels when purchasing or leasing Honda Class Vehicles.

2049. During each year between 2012 and the present, Honda Japan, Honda USA, and Honda Engineering USA knew that Honda USA would advertise the Honda Class Vehicles as safe vehicles with properly functioning airbags and seatbelts. Honda Japan, Honda USA, and Honda Engineering USA knew that consumers would rely on such advertisements when purchasing or leasing Honda Class Vehicles.

2050. During each year between 2012 and the present, Honda Japan, Honda USA, and Honda Engineering USA knew that Honda USA would ship Honda Class Vehicles with owner's manuals that include misleading statements about the safety systems, airbags, and seatbelts of the Honda Class Vehicles. Likewise, each of these Defendants knew that Honda USA would create and affix Monroney stickers with misleading statements about airbags and seatbelts to Honda Class Vehicles. Honda Japan, Honda USA, and Honda Engineering USA knew that consumers would rely on the Monroney labels and manuals when purchasing or leasing Honda Class Vehicles.

2051. During each year between 2009 and the present, Honda Japan, Honda USA, and Honda Engineering USA knew that complying with Honda Japan's mandatory design specifications for Honda Class Vehicles would require Honda Japan and Honda Engineering USA to place orders with ZF Electronics USA, and for ZF Electronics USA to use mail or private interstate carriers to ship the defective DS84 ACUs to Honda Japan in Japan, Honda Engineering USA in Ohio,

and the plants that manufacture Honda Class Vehicles in Alabama, Indiana, Mexico and Canada.

2052. During each year between 2009 and the present, Honda Japan, Honda USA, and Honda Engineering USA knew that Honda USA would, as a result of its direction to do so, cause the Honda Class Vehicles to ship from manufacturing plants to automobile dealers across the United States.

2053. Honda Japan knew in 2016 that ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., and ZF Germany had made misleading statement to NHTSA about the defect because it received copies of the misleading slide deck dated February 5, 2016 in early 2016. On information and belief, Honda Japan shared this information with its subsidiaries.

ii.  **ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA, ZF TRW Corp., and ZF Germany understood the nature and scope of the Honda-ZF-ST Enterprise's fraudulent scheme.**

2054. ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA, ZF TRW Corp., and ZF Germany were aware of the essential nature and scope of the Honda-ZF-ST Enterprise.

2055. As explained in Sections IV.D.1., IV.D.2., IV.D.6. above, ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA, ZF TRW Corp., and ZF Germany were aware of the nature and scope of the ACU Defect.

2056. ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA, ZF TRW Corp., and ZF Germany knew the approximate number of Honda vehicles with the DS84 ACU because it made the ACUs for those vehicles.

2057. ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA, ZF TRW Corp., and ZF Germany knew that Honda Japan or its subsidiaries would, consistent with common practice in the automotive industry, make reassuring statements about the Honda Class Vehicle's safety systems, airbags, and seatbelts.

### iii. ST USA, ST Italy, and ST Malaysia understood the nature and scope of the Honda-ZF-ST Enterprise's fraudulent scheme.

2058. ST USA, ST Italy, and ST Malaysia were aware of the essential nature and scope of the Honda-ZF-ST Enterprise.

2059. As explained in Sections IV.D.1., IV.D.2., IV.D.6 above, ST USA, ST Italy, and ST Malaysia were aware of the nature and scope of the ACU Defect.

2060. Upon information and belief, ST Italy, ST Malaysia, and ST USA knew the defective DS84 ASICs would be installed in some of Honda's U.S. vehicles. These companies also understood that automakers like the Honda Defendants would, consistent with common practice in the automotive industry, advertise their safety systems to consumers.

2061. ST USA, ST Malaysia, and ST Italy were aware of the scope of the Honda-ZF-ST Enterprise, because ST Malaysia and ST USA made and sold the DS84 ASICs for the Honda Class Vehicles and all these companies had access to records which showed that millions of defective DS84 ASICs shipping to Illinois per ZF Electronics USA's instructions.

### b. Honda Japan, Honda USA, Honda Engineering USA, ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA, ZF TRW Corp., and ZF Germany agreed that one or more members of the Enterprise would commit at least two predicate acts of mail or wire fraud in furtherance of the Honda-ZF-ST Enterprise's fraudulent scheme.

2062. Honda Japan, ZF Passive Safety USA, ZF Electronics USA, ZF Automotive USA, Honda USA, and Honda Engineering USA began conspiring in furtherance of the Honda-ZF-ST Enterprise's fraudulent scheme in 2009.

2063. ZF Germany joined the conspiracy in or around 2015, when it acquired with ZF TRW Corp.

2064. When Honda Japan agreed to use the defective DS84 ACU and ASIC in Honda Class Vehicles, Honda Japan, Honda USA, Honda Engineering USA, ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA mutually understood and intended that this agreement would prompt Honda Engineering USA and Honda Japan to cause ZF Electronics USA to ship DS84 ACUs across interstate lines and Honda USA to ship the Honda Class Vehicles with misleading statements about the passive safety system, airbags, and seatbelts therein.

    a.    In 2009, Honda Japan agreed with ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA on the design specifications for the DS84 ACU installed in Honda Class Vehicles. Honda Japan, ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA continued to agree on specifications for Honda Class Vehicles with the DS84 ACU for every model year until 2019.

    b.    Between 2012 and 2019, Honda USA used mail and wire to advertise the Honda Class Vehicles as safe vehicles with properly-functioning airbags and seatbelts, and used private interstate carriers to ship the Honda Class Vehicles with misleading Monroney labels, airbag labels and imprints, certification labels, readiness indicators, and owner's manuals. Honda Japan, ZF Passive Safety USA, ZF Electronics USA, ZF Automotive USA, and Honda Engineering USA all knew that Honda USA was doing this and would do this.

    c.    When Honda Japan agreed with ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA on specifications for the DS84 ACUs in Honda Class Vehicles, Honda Japan, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, and ZF TRW Corp. (and ZF Germany after 2015) they had a

mutual understanding that this agreement would cause Honda Japan and Honda Engineering USA to send orders for hundreds of thousands of DS84 ACUs every year via mail or wire to ZF Electronics USA.

    d.    When Honda Japan agreed with ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA on specifications for the DS84 ACUs in Honda Class Vehicles, Honda Japan, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, and ZF TRW Corp. (and ZF Germany after 2015) had a mutual understanding that this agreement would cause ZF Electronics USA to ship hundreds of thousands of DS84 ACUs via private interstate carrier to Honda Japan and Honda Engineering USA.

2065. As explained in Count 7 above, the shipments of Honda Class Vehicles by Honda USA, the orders by Honda Japan and Honda Engineering USA for DS84 ACUs, and the shipments by ZF Electronics USA of the DS84 ACUs violated the mail fraud statute because they furthered the Honda-ZF-ST Enterprise's fraudulent scheme to cause consumers to purchase or lease vehicles that contain the ACU Defect. To accomplish this goal, the DS84 ACUs needed to be shipped before they could be installed in the vehicles.

    a.    Honda Japan, ZF Passive Safety USA, ZF Electronics USA, and ZF Automotive USA facilitated these mail fraud act violations by collaborating on the defective design of the ACU, the readiness indicators, and Honda Class Vehicles.

    b.    Honda Japan further facilitated these mail fraud violations by requiring (1) all manufacturers of Honda Class Vehicles to install the DS84 ACUs therein, and (2) placing the misleading certification labels, readiness indicators, and airbag labels and imprints within the Honda Class Vehicles it made in Japan, and

requiring the nonparty-Enterprise-member Honda
manufacturing subsidiaries that made Honda Class Vehicles in
North America to do the same.

    c.    ZF TRW Corp. facilitated the scheme because, upon
information and belief, its approval was required for the launch
of the DS84 ACU, which was one of the company's most
popular ACUs.

    d.    ZF Germany facilitated the scheme because, upon information
and belief, its approval was required to continue the sales of the
DS84 ACU.

    e.    Honda USA facilitated this scheme by overseeing and approving
the misleading Monroney labels that it placed, or caused to be
placed, on Honda Class Vehicles.

    f.    Honda Engineering USA facilitated this scheme by placing the
misleading certification labels, readiness indicators, and airbag
labels and imprints within the Honda Class Vehicles it made in
the United States.

2066. The conspiracy among Honda Japan, Honda USA, Honda Engineering
USA, ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA, ZF
TRW Corp., and ZF Germany is further evidenced by their coordinated efforts to
cover up the ACU Defect.

    a.    For several years, Honda Japan, ZF Automotive USA, ZF
Electronics USA, ZF Passive Safety USA uncovered evidence
of ASIC EOS on DS84 ACUs and DS84 ASICs, but they
maintained confidentiality of these incidents amongst each
other.

    b.    Honda Japan, ZF Automotive USA, ZF Electronics USA, and
ZF Passive Safety USA also repeatedly coordinated in response

to NHTSA's investigation. In 2016, ZF Electronics USA alerted Honda Japan to NHTSA's investigation of the DS84 ACUs and sent excerpted copies of the misleading February 5, 2016 slide deck to NHTSA as part of an effort to coordinate with Honda Japan.

2067. The joint activities of ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., and ZF Germany in support of their misleading statements to NHTSA were predicate acts and also show agreement by these Defendants to advance the fraudulent scheme.

2068. ZF Electronics USA's placement of orders for DS84 ASICs and shipments of DS84 ACUs were predicate acts and also show agreement by ZF Electronics USA to advance the fraudulent scheme.

2069. The success of the Honda-ZF-ST Enterprise's fraudulent scheme depended upon Honda Japan, ZF Passive Safety USA, ZF Electronics USA, ZF Automotive USA, Honda USA, and Honda Engineering USA's cooperation. All these companies had to maintain strict confidentiality about the ACU Defect for the scheme to continue. Moreover, the Honda companies depended on the ZF companies for the manufacture of the defective ACUs, whereas the ZF companies could not reach consumers of Honda Class Vehicles without the agreement of Honda Japan. This interdependence evidences the agreement to further the fraudulent scheme.

2070. The actions detailed above and throughout the Complaint as to each member of the Honda-ZF-ST Enterprise were foreseeable to the other members of the Honda-ZF-ST Enterprise given their direct relationship to and furtherance of the common goals of the scheme.

**i.     ST USA, ST Italy, ST Malaysia, ZF Automotive USA, ZF Electronics USA, and ZF Passive Safety USA agreed on the commission of multiple violations of the mail fraud statute in furtherance of the Honda-ZF-ST Enterprise's fraudulent scheme.**

2071. ST Italy, ST Malaysia, and ST USA began conspiring with ZF Passive Safety USA, ZF Electronics USA, and ZF Automotive USA in 2005, when the two supplier groups began the joint design of an ACU ASIC with unique vulnerability to ASIC EOS. By 2008, all these companies knew about internal thermal testing that confirmed the weakness of the ASIC. They held multiple meetings about this issue. In spite of this early knowledge, and after the years already sunk into development work for the cheaper ACU, they proceeded to launch and use the DS84 ACU for millions of Class Vehicles for more than a decade.

2072. Even after learning that DS84 ACUs and ASICs had malfunctioned due to EOS during crashes, ST Italy, ST Malaysia, ST USA, ZF Passive Safety USA, ZF Electronics USA, and ZF Automotive USA continued to sell and send shipments of the parts. When doing so, these companies all knew that Honda Japan, Honda USA, and Honda Engineering USA would coordinate to cause the Honda Class Vehicles with the defective DS84 ACU and ASIC to be presented to consumers with misleading certification labels, airbag labels and imprints, and readiness indicators.

2073. Several actions by ST Italy, ST Malaysia, and ST USA further support an inference of agreements with ZF Passive Safety USA, ZF Electronics USA, and ZF Automotive USA to commit at least two predicate acts in furtherance of the conspiracy:

a.     Between September 2009 and 2018, ST USA, ST Italy and ST Malaysia regularly communicated with ZF Automotive USA, ZF Electronics USA, and ZF Passive Safety USA about observations of EOS in DS84 ASICs, including some ASICs

from Honda vehicles. ST USA, ST Italy, and ST Malaysia's DS84 ASIC team observed EOS damage on ASICs retrieved from at least two Honda vehicles.

b.  Upon information and belief, in 2016, ZF Automotive USA, ZF Electronics USA, and ZF Passive Safety USA sent each ST Defendant excerpted copies of its misleading statements from its February 5, 2016 slide deck.

c.  Between 2009 and 2019 at the very least, ST USA and ST Malaysia continuously violated the mail fraud act in furtherance of the Honda-ZF-ST Enterprise by shipping DS84 ASICs, with a mutual understanding that some of these ASICs would be installed in Honda Class Vehicles, as explained above.

d.  Between 2008 and 2019 at the very least, ST USA, ST Italy, and ST Malaysia maintained public silence about the ACU Defect, despite the DS84 ASIC's and ACU's unusual vulnerability to transients.

2074. The actions detailed above and throughout the Complaint as to each member of the Honda-ZF-ST Enterprise were foreseeable to the other members of the Honda-ZF-ST Enterprise given their direct relationship to and furtherance of the common goals of the scheme.

2075. The success of the Honda-ZF-ST Enterprise's fraudulent scheme depended upon ST USA, ST Italy, and ST Malaysia, ZF Passive Safety USA, ZF Electronics USA, and ZF Automotive USA's cooperation. All these companies had to maintain strict confidence about the ACU Defect for the scheme to continue. Moreover, the ZF companies depended upon the ST companies for the manufacture of the defective ASICs, whereas the ST companies depended upon the ZF companies for a viable path to profit from the consumers of Class Vehicles. This interdependence evidences the agreement to further the fraudulent scheme.

**9. Nationwide Count 9: Violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(c), on Behalf of the Nationwide Mitsubishi Class Against Mitsubishi USA, Mitsubishi Japan, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia.**

2076. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2077. Pursuant to 18 U.S.C. § 1962(c): "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Mitsubishi USA, Mitsubishi Japan, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia are "persons" under 18 U.S.C. § 1961(3) because each was capable of holding "a legal or beneficial interest in property."

2078. A violation of 18 U.S.C. § 1962(c) has four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." ECF 396 at 59 (quoting *Sedima v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

2079. Mitsubishi USA, Mitsubishi Japan, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia, and several nonparties formed the Mitsubishi-ZF-ST Enterprise. The members of this Enterprise included Defendants Mitsubishi Japan, Mitsubishi USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia. Discovery will likely reveal several additional members of the Mitsubishi-ZF-ST Enterprise that are not currently known to the Mitsubishi Plaintiffs.

2080. Mitsubishi Japan, Mitsubishi USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST

Malaysia are liable under 18 U.S.C. § 1962(c) because they conducted or participated in the conduct of the affairs of an "association-in-fact enterprise"—i.e., the Mitsubishi-ZF-ST Enterprise—through a pattern of racketeering activity. In other words, each of these Defendants committed at least two predicate acts in furtherance of the Enterprise's fraudulent scheme.

2081. 18 U.S.C. § 1964(c) provides for a civil remedy for any violation of 18 U.S.C. § 1962 for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." In addition to proving a violation of 1962, this remedy requires proximate cause of a cognizable injury. ECF 396 at 59.

2082. Mitsubishi Japan, Mitsubishi USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia each violated 18 U.S.C. § 1962(c) and injured the business or property of the Mitsubishi Plaintiffs and the Nationwide Mitsubishi Class. The Mitsubishi Plaintiffs claim damages for themselves and the Nationwide Mitsubishi Class members under 18 U.S.C. § 1964(c).

      a.      **Mitsubishi USA, Mitsubishi Japan, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia each committed at least two predicate acts of mail and wire fraud in furtherance of the Mitsubishi-ZF-ST Enterprise's fraudulent scheme to affirmatively mislead consumers and NHTSA.**

2083. The members of the Mitsubishi-ZF-ST Enterprise devised a scheme for the purpose of defrauding consumers and NHTSA by concealing or minimizing the ACU Defect in Mitsubishi Class Vehicles through a pattern of affirmatively misleading statements.

2084. In the alternative, the Mitsubishi-ZF-ST Enterprise members devised an illicit scheme for the purpose of obtaining money by fraudulent pretenses because they had the purpose of maximizing the sale of Mitsubishi Class Vehicles, which ultimately provided revenue to the Mitsubishi-ZF-ST Enterprise members.

2085.  To carry out, or attempt to carry out the fraudulent schemes, Mitsubishi USA, Mitsubishi Japan, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia—each of whom is a person associated-in-fact with the Enterprise—did knowingly conduct or participate, directly or indirectly, in the affairs of the Mitsubishi-ZF-ST Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c). In furtherance of the scheme to defraud, the Mitsubishi-ZF-ST Enterprise members each committed *at least* two acts in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud), as described in the subsections below.

> i.  **Mitsubishi Japan violated the mail and wire fraud statutes multiple times in furtherance of the Mitsubishi-ZF-ST Enterprise's fraudulent scheme.**

2086.  Mitsubishi Japan violated the mail fraud statute multiple times by causing misleading certification labels, readiness indicators, airbag labels and imprints, and owner's manuals to be placed within every Mitsubishi Class Vehicle prior to their shipment to the dealers that sell or lease the vehicles to consumers. Mitsubishi Japan caused the inclusion of these misleading statements within every Mitsubishi Class Vehicle with full knowledge and the specific intent that Mitsubishi USA would distribute the Mitsubishi Class Vehicles to dealers across the United States using private interstate carriers. Accordingly, Mitsubishi Japan "knowingly cause[d]" the Mitsubishi Class Vehicles with misleading statements "to be delivered by . . . such carrier[s]," in violation of 18 U.S.C. § 1341.

> a.  Mitsubishi Japan was directly responsible for including all of these misleading statements in the Mitsubishi Class Vehicles. Upon information and belief, Mitsubishi Japan placed the misleading certification labels, airbag warning lamps, and airbag labels and imprints in the Mitsubishi Class Vehicles when it

manufactured them in Japan, including at its manufacturing plant in Mizushima, Japan at following address: 1, Kaigan-dori 1-chome, Mizushima, Kurashiki, Okayama Prefecture 712-8501. The certification labels bore Mitsubishi Japan's corporate name, "Mitsubishi Motors Corporation." The Mitsubishi Class Vehicles made by Mitsubishi Japan have vehicle identification numbers that begin with the letter "J." Mitsubishi Japan has records in its possession that will identify the dates (between approximately 2012 and 2017) and locations when it shipped the Mitsubishi Class Vehicles to the United States and to Mitsubishi USA, with the purpose of distributing them in the United States for sale to consumers. Plaintiffs do not have access to these confidential records that provide the precise dates and locations.

b. Mitsubishi Japan was also responsible for the content of the owner's manuals for Mitsubishi Class Vehicles. It owns the copyright interest in these manuals, which state also they were "Printed in Japan." Insofar as Mitsubishi USA effectuated the shipments of the owner's manuals within Mitsubishi Class Vehicles to dealers in the United States, it acted as Mitsubishi Japan's distribution agent for Mitsubishi Japan's copyright material. Upon information and belief, the publication of these owner's manuals occurred at or around the commencement of public sales for each model year.

2087. Although the precise shipment dates for all Mitsubishi Class Vehicles are not known to the Mitsubishi Plaintiffs, on information and belief, these shipments occurred in all years in or about 2012 to 2017, and originated from Mitsubishi's production facilities in Japan, including its Mizushima facility at: 1, Kaigan-dori 1-chome, Mizushima, Kurashiki, Okayama Prefecture 712-8501.

1  Plaintiffs were exposed to in-vehicle misleading statements prior to, and at the

2  point of, sale or lease. The dates and locations of these transactions are alleged

3  above in Section II.B.5.

4      2088. Each shipment of a Mitsubishi Class Vehicle or Vehicles to a dealer

5  was a violation of the mail fraud statute (18 U.S.C. § 1341) because Mitsubishi

6  Japan knew the certification labels, airbag warning labels, in-vehicle airbag labels

7  and imprints, and owner's manuals in all Mitsubishi Class Vehicles were

8  misleading and would further the scheme to defraud consumers into purchasing or

9  leasing Mitsubishi Class Vehicles.

10      2089. When Mitsubishi USA distributed the Mitsubishi Class Vehicles to

11  dealers in the United States, it acted as Mitsubishi Japan's agent.

12      2090. Mitsubishi Japan separately violated the mail fraud act (18 U.S.C.

13  § 1341) by placing orders with ZF Electronics USA that caused ZF Electronics

14  USA to ship defective DS84 ACUs by private or commercial interstate carrier to

15  Mitsubishi Japan in Japan. These shipments furthered the Mitsubishi-ZF-ST

16  Enterprise's fraudulent scheme because Mitsubishi Japan's use of the defective

17  DS84 ACUs in Mitsubishi Class Vehicles was essential to the cost-saving goal

18  behind the scheme. Mitsubishi Japan caused ZF Electronics USA to make these

19  deliveries knowing it would install the defective DS84 ACUs in the Mitsubishi

20  Class Vehicles and market the vehicles to U.S. consumers as safe. Accordingly,

21  each of Mitsubishi USA's orders and ZF Electronics USA's shipments of the DS84

22  ACU violated the mail fraud statute (18 U.S.C. § 1341).

23      2091. The precise dates and locations of each particular shipment of DS84

24  ACUs are not known to the Mitsubishi Plaintiffs because they have no visibility

25  into the shipments to from ZF Electronics USA to Mitsubishi Japan as Defendants

26  have not produced documents that show that information. However, a chart

27  produced by the domestic ZF Defendants to NHTSA identifies the precise volume

28  of DS84 ACUs shipped for each year for each model of Mitsubishi Class Vehicles,

and identifies Marshall, Illinois as the shipping location. Exhibit 20 includes highlighting added by Plaintiffs to identify the particular information about shipping locations, volumes, vehicle makes and models, and shipping years contained in this chart. *See* Ex. 20 (ZF-MDL-679) at 684. Upon information and belief, the shipping address for each of these shipments by ZF Electronics USA from Marshall, Illinois was 902 South 2nd Street, Marshall, Illinois 62441. Upon information and belief, these ACUs were shipped to Mitsubishi Japan's production facilities including to the following address in Mizushima, Japan: 1, Kaigan-dori 1-chome, Mizushima, Kurashiki, Okayama Prefecture 712-8501. The information available in this chart is sufficient for Defendants to identify the precise dates of shipments and the recipient addresses because Defendants will have backup information that shows additional details about the underlying shipments.

      **ii.**    **Mitsubishi USA violated the mail and wire fraud statutes multiple times in furtherance of the Mitsubishi-ZF-ST Enterprise's fraudulent scheme.**

2092. Mitsubishi USA committed mail fraud every time it shipped, or caused to be shipped, a Mitsubishi Class Vehicle to dealers in the United States. For every Mitsubishi Class Vehicle, Mitsubishi USA delivered, or caused delivery of, each vehicle by private or commercial interstate carrier to automobile dealerships across the United States. Mitsubishi USA delivered these tens of thousands of Class Vehicles to execute the Mitsubishi-ZF-ST Enterprise's scheme to defraud consumers and NHTSA.

      a.    These deliveries furthered the scheme because Mitsubishi USA sent the vehicles to the dealerships where consumers would purchase or lease them and because, prior to shipping the Mitsubishi Class Vehicles, Mitsubishi Japan had affixed, or caused to be affixed, to the vehicles misleading certification labels (*see* Section IV.E.1.b. above), readiness indicators (*see*

Section IV.E.1.c. above), and airbag labels and imprints (*see* Section IV.E.1.d. above).

b.  Moreover, prior to shipping each Mitsubishi Class Vehicle, Mitsubishi USA approved the content for Monroney labels for each make and model. Mitsubishi USA would then cause these misleading labels to be placed on the Mitsubishi Class Vehicles prior to shipment to dealers. Shipment of the Mitsubishi Class Vehicles with these misleading Monroney labels furthered the Mitsubishi-ZF-ST Enterprise's scheme because consumers relied upon the labels when purchasing or leasing the Vehicles.

2093. Mitsubishi USA knew the Monroney labels, certification labels, readiness indicators, airbag labels and imprints, and owners' manuals shipped with each Mitsubishi Class Vehicle were misleading because the Mitsubishi Class Vehicles all contained the ACU Defect.

2094. Although the precise shipment dates for all Mitsubishi Class Vehicles are not known to the Mitsubishi Plaintiffs, on information and belief, these shipments occurred in all years in or about 2012 to 2017. Plaintiffs were exposed to in-vehicle misleading statements prior to, and at the point of, sale or lease. The dates and locations of these transactions are alleged above in Section II.B.5.

2095. Starting in 2012, Mitsubishi USA also transmitted, or caused to be transmitted, thousands of advertisements which stressed the safety of Mitsubishi Class Vehicles using mail, wire, radio, or television communications in interstate commerce. Mitsubishi USA's misleading advertisements are too numerous to recite completely, given the nationwide scope and years-long duration of the Mitsubishi-ZF-ST Enterprise's fraudulent scheme. Examples of these advertisements are collected in Section IV.E.2.a.v. and Exhibit 12. Each such mailed advertisement— including brochures sent to dealerships for display to consumers or print advertisements in newspapers or magazines—was a violation of the mail fraud

statute (18 U.S.C. § 1341). Each such internet-based, radio, and television advertisement was a violation of the wire fraud statute (18 U.S.C. § 1343). Mitsubishi USA knew advertisements assuring the safety of Mitsubishi Class Vehicles were misleading and would further the scheme to defraud consumers into purchasing or leasing Mitsubishi Class Vehicles.

2096. Mitsubishi USA also effectuated shipments of the owner's manuals within Mitsubishi Class Vehicles to dealers in the United States, and acted as Mitsubishi Japan's distribution agent for its copyrighted material in doing so. Mitsubishi USA knew the owner's manuals were misleading and would further the scheme to defraud consumers into purchasing or leasing Mitsubishi Class Vehicles. Accordingly, each shipment of an owner's manual was a separate violation of the mail fraud statute (18 U.S.C. § 1341).

### iii. ZF Electronics USA violated the mail and wire fraud statutes multiple times in furtherance of the Mitsubishi-ZF-ST Enterprise's fraudulent scheme.

2097. ZF Electronics USA drafted and/or edited the following misleading statements to NHTSA, as discussed in Sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above:

a. The slide deck presentation dated February 5, 2016 (which ZF TRW Corp. mailed to NHTSA on March 14, 2016);

b. The slide deck presentation dated July 19, 2016 (which, upon information and belief, was mailed to NHTSA in July or August 2016);

c. The September 2016 letter signed by Marc Bolitho[43] (which was mailed to NHTSA in September 2016); and

d. The slide deck presentation dated March 8, 2018 (which ZF

---

[43] Mr. Bolitho was simultaneously an employee of ZF Passive Safety USA, the Vice President of Passive Safety for ZF Electronics USA, and Director of Passive Safety Engineering for ZF TRW Corp.

1   TRW Corp. mailed to NHTSA on March 12, 2018).

2   2098. As explained in sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above,

3   each of these transmittals contained misleading statements about the ACU Defect.

4   ZF Electronics USA specifically approved the transmittal of the final versions of

5   these documents to NHTSA, and intended for the misleading statements contained

6   therein to avoid, minimize, and/or delay recalls of Mitsubishi Class Vehicles.

7   Avoiding, minimizing, and/or delaying recalls of Mitsubishi Class Vehicles enabled

8   the continuation of the scheme to defraud consumers.

9   2099. ZF Electronics USA caused the delivery of the February 5, 2016 slide

10  deck to NHTSA. ZF Electronics USA's causal role in the delivery is evidenced by

11  the fact that its Vice President of Passive Safety Marc Bolitho signed an affidavit of

12  confidentiality that was enclosed with the mailing of the February 5, 2016 slide

13  deck.

14  2100. Because the July 19, 2016 slide deck closely resembles the February 5,

15  2016 slide deck, the same personnel and companies were likely responsible for

16  sending it via mail or private interstate carrier to NHTSA. Accordingly, upon

17  information and belief, ZF Electronics USA caused this delivery to NHTSA too.

18  2101. ZF Electronics USA caused the delivery of the March 8, 2018 slide

19  deck to NHTSA. ZF Electronics USA's causal role in the delivery is evidenced by

20  the fact that its Technical Specialist, Emanuel Goodman, signed the affidavit of

21  confidentiality that was enclosed with the mailing of the March 8, 2018 slide deck.

22  ZF Electronics USA's causal role in the delivery is further evidenced by Mr.

23  Goodman's and Mr. Bolitho's attendance at the March 8, 2018 meeting with

24  NHTSA, where this slide deck was used.

25  2102. Moreover, because ZF Electronics USA's affiliates would not have

26  sent or approved the four written communications described above without ZF

27  Electronics USA's contributions and approval, ZF Electronics USA was one of the

28  Defendants who jointly caused the delivery of these four communications to

1    NHTSA. Accordingly, its participation in these communications violated the mail

2    fraud statute at least four times. 18 U.S.C. § 1341.

3        2103. As explained in Section IV.E.1.c. above, ZF Electronics USA worked

4    with ZF Passive Safety USA, ZF Automotive USA, and Mitsubishi Japan to design

5    the readiness indicators installed in Mitsubishi Class Vehicles. Specifically, ZF

6    Electronics USA assisted with a design of ACUs that would cause the readiness

7    indicator not to illuminate at the point of sale or lease, even though the Mitsubishi

8    Class Vehicle's safety systems were not ready to deploy in foreseeable crash events

9    with negative transients due to the ACU Defect. When ZF Electronics USA assisted

10    with this design, it knew Mitsubishi Japan and Mitsubishi USA would ship the

11    Mitsubishi Class Vehicles to dealers and that consumers would buy Mitsubishi

12    Class Vehicles without the airbag warning lamp illuminating at the point of sale or

13    lease. Because Mitsubishi Japan and Mitsubishi USA would not have shipped

14    Mitsubishi Class Vehicles without ZF Electronics USA's assistance in designing

15    misleading readiness indicators, ZF Electronics USA jointly caused each shipment

16    of a Mitsubishi Class Vehicle, in violation of the mail fraud act (18 U.S.C. § 1341).

17        2104. ZF Electronics USA received orders from Mitsubishi Japan for the

18    defective DS84 ACUs used in every Mitsubishi Class Vehicle and shipped them by

19    private or commercial interstate carrier to Mitsubishi Japan in Japan. These

20    shipments furthered the Mitsubishi-ZF-ST Enterprise's fraudulent scheme because

21    Mitsubishi Japan's use of the defective DS84 ACUs in Mitsubishi Class Vehicles

22    was essential to the cost-saving goal behind the scheme. When ZF Electronics USA

23    shipped the defective DS84 ACUs to Mitsubishi Japan, it knew they would be

24    installed in the Mitsubishi Class Vehicles that are marketed to U.S. consumers. ZF

25    Electronics USA was also specifically aware of Mitsubishi Japan and Mitsubishi

26    USA's practices of making reassuring statements about safety, airbags, and

27    seatbelts in consumer-facing Monroney labels, certification labels, in-vehicle labels,

28    owner's manuals, and advertising for all Mitsubishi Class Vehicles. ZF Electronics

USA knew these statements were false because it knew the Mitsubishi Class Vehicles, DS84 ACU, and DS84 ASIC were defective. Accordingly, because ZF Electronics USA shipped each defective DS84 ACU with the purpose of executing a fraudulent scheme with its conspirators, each of ZF Electronics USA's shipments of the defective DS84 ACU violated the mail fraud statute (18 U.S.C. § 1341).

2105. The particularities of these shipments are discussed above. Exhibit 20 includes highlighting added by Plaintiffs to identify the particular information about shipping locations, volumes, vehicle makes and models, and shipping years contained in this chart. *See* Ex. 20 (ZF-MDL-679) at 684. As this same document indicates, the DS84 ASICs were shipped in each year from 2012 to 2017 from Marshall, Illinois. Upon information and belief, the shipping address for each of these shipments by ZF Electronics USA from Marshall, Illinois was 902 South 2nd Street, Marshall, Illinois 62441. Upon information and belief, the receiving address for these shipments was Mitsubishi Japan's production facilitates in Japan, including to the following address in Mizushima, Japan: 1, Kaigan-dori 1-chome, Mizushima, Kurashiki, Okayama Prefecture 712-8501.

2106. ZF Electronics USA also separately violated the mail fraud act (18 U.S.C. § 1341) by placing orders with ST USA that required ST USA to ship millions of defective DS84 ASICs to ZF Electronics USA at a facility with the following address: 902 South 2nd Street, Marshall, Illinois 62441. When ZF Electronics USA placed these orders, it knew it would place these DS84 ASICs into DS84 ACUs, including those that would be installed in the Mitsubishi Class Vehicles that are marketed to U.S. consumers. ZF Electronics USA was also specifically aware of Mitsubishi Japan and Mitsubishi USA's practices of making reassuring statements about safety, airbags, and seatbelts in consumer-facing Monroney labels, certification labels, in-vehicle labels, owner's manuals, and advertising for all Mitsubishi Class Vehicles. ZF Electronics USA knew these statements were false because it knew the Mitsubishi Class Vehicles, DS84 ACU,

and ASIC were defective. Accordingly, because ZF Electronics USA caused shipments of defective DS84 ASICs with the purpose of executing a fraudulent scheme with its conspirators, each of the DS84 ASIC shipments caused by ZF Electronics USA violated the mail fraud statute (18 U.S.C. § 1341). ST USA has produced approximately 9,700 such invoices from the time period between 2014 and the present alone. Plaintiffs have extracted approximate shipping dates from these invoices, which are presented as exemplars in Exhibit 21.[44]

        **iv.**    **ZF Passive Safety USA violated the mail and wire fraud statutes multiple times in furtherance of the Mitsubishi-ZF-ST Enterprise's fraudulent scheme.**

2107. ZF Passive Safety USA drafted and/or edited the following misleading statements to NHTSA, as discussed in Sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above:

    a.    The slide deck presentation dated February 5, 2016 (which ZF TRW Corp. mailed to NHTSA on March 14, 2016);

    b.    The slide deck presentation dated July 19, 2016 (which, upon information and belief, was mailed to NHTSA in July or August 2016);

    c.    The September 2016 letter signed by Marc Bolitho[45] (which was mailed to NHTSA in September 2016); and

    d.    The slide deck presentation dated March 8, 2018 (which ZF TRW Corp. mailed to NHTSA on March 12, 2018).

---

[44] ST USA made similar shipments between 2007 and 2014, but ST USA is presently withholding invoices for these shipments from discovery. Upon information and belief, the invoices for this time period will show similarly regularity of shipments.

[45] Mr. Bolitho was simultaneously an employee of ZF Passive Safety USA, the Vice President of Passive Safety for ZF Electronics USA, and Director of Passive Safety Engineering for ZF TRW Corp.

2108. As explained in sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above, each of these transmittals contained misleading statements about the ACU Defect. ZF Passive Safety USA specifically approved the transmittal of the final versions of these documents to NHTSA, and intended for the misleading statements contained therein to avoid, minimize, and/or delay recalls of Mitsubishi Class Vehicles. Avoiding, minimizing, and/or delaying recalls of Mitsubishi Class Vehicles enabled the continuation of the scheme to defraud consumers.

2109. ZF Passive Safety USA caused the delivery of the February 5, 2016 slide deck to NHTSA. ZF Passive Safety USA's causal role in the delivery is evidenced by the fact that its employee Marc Bolitho signed an affidavit of confidentiality that was enclosed with the mailing of the February 5, 2016 slide deck. Although Mr. Bolitho also simultaneously served as a Vice President for ZF Electronics USA and a Director of Passive Safety Engineering for ZF TRW Corp., ZF Passive Safety USA alone paid his salary.

2110. Because the July 19, 2016 slide deck closely resembles the February 5, 2016 slide deck, the same personnel and companies were likely responsible for sending it via mail or private interstate carrier to NHTSA. Accordingly, upon information and belief, ZF Passive Safety USA caused this delivery too.

2111. ZF Passive Safety USA caused the delivery of the March 8, 2018 slide deck to NHTSA. ZF Passive Safety USA's causal role in the delivery is evidenced by the fact that its longtime employee, Emanuel Goodman, signed the affidavit of confidentiality that was enclosed with the mailing of the March 8, 2018 slide deck. Although Mr. Goodman also served as the Technical Specialist for ZF Electronics USA, ZF Passive Safety USA alone paid his salary. ZF Passive Safety USA's causal role in the delivery is further evidenced by Mr. Goodman's and Mr. Bolitho's attendance at the March 8, 2018 meeting with NHTSA, where this slide deck was used.

2112. Moreover, because ZF Passive Safety USA's affiliates would not have sent or approved the four written communications described above without ZF Passive Safety USA's contributions and approval, ZF Passive Safety USA was one of the Defendants who jointly caused the delivery of these four communications to NHTSA. Accordingly, its participation in these communications violated the mail fraud statute at least four times. 18 U.S.C. § 1341.

2113. As explained in sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above, each of the four documents described above contained misleading statements about the ACU Defect. ZF Passive Safety USA specifically approved the transmittal of the final versions of these documents to NHTSA, and intended for the misleading statements contained therein to avoid, minimize, and/or delay recalls of Mitsubishi Class Vehicles. Avoiding, minimizing, and/or delaying recalls of Mitsubishi Class Vehicles enabled the continuation of the scheme to defraud consumers. Because ZF Passive Safety USA's affiliates would not have sent or approved the written communications noted in the preceding paragraph without ZF Passive Safety USA's contributions and approval, ZF Passive Safety USA was one of the Defendants who caused the delivery of these four communications to NHTSA. Accordingly, its participation in these communications violated the mail fraud statute at least four times. (18 U.S.C. § 1341).

2114. As explained in Section IV.E.1.c. above, ZF Passive Safety USA worked with ZF Electronics USA, ZF Automotive USA, and Mitsubishi Japan to design the readiness indicators installed in all Mitsubishi Class Vehicles. Specifically, ZF Passive Safety USA assisted with a design of ACUs that would cause the readiness indicator not to illuminate at the point of sale or lease, even though the Mitsubishi Class Vehicle's safety systems were not ready to deploy in crash events with negative transients due to the ACU Defect. When ZF Passive Safety USA assisted with this design, it knew that Mitsubishi Japan and Mitsubishi USA would ship the Mitsubishi Class Vehicles to dealers and that consumers would

buy the vehicles without the airbag warning lamp illuminating at the point of sale or lease. Because Mitsubishi Sales USA would not have shipped Mitsubishi Class Vehicles without ZF Passive Safety USA's assistance in designing misleading readiness indicators, ZF Passive Safety USA jointly caused each shipment of Mitsubishi Class Vehicle, in violation of the mail fraud act (18 U.S.C. § 1341).

**v.    ZF Automotive USA violated the mail and wire fraud statutes multiple times in furtherance of the Mitsubishi-ZF-ST Enterprise's fraudulent scheme.**

2115. ZF Automotive USA drafted and/or edited the following misleading statements to NHTSA, as discussed in Sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above:

a.    The slide deck presentation dated February 5, 2016 (which ZF TRW Corp. mailed to NHTSA on March 14, 2016);

b.    The slide deck presentation dated July 19, 2016 (which, upon information and belief, was mailed to NHTSA in July or August 2016);

c.    The September 2016 letter signed by Marc Bolitho (which was mailed to NHTSA in September 2016); and

d.    The slide deck presentation dated March 8, 2018 (which ZF TRW Corp. mailed to NHTSA on March 12, 2018).

2116. ZF Automotive USA caused the delivery via mail or private interstate carrier of the February 5, 2016 slide deck, the July 19, 2016 slide deck, and the March 8, 2018 slide deck to NHTSA. ZF Automotive USA's role in causing the delivery of these presentations is evidenced by its admission in a 573 Defect Report that it attended the three meetings with NHTSA where these presentations were used on its behalf.

2117. Upon information and belief, ZF Automotive USA caused the delivery of the September 2016 letter via mail or private interstate carrier by giving requisite approval prior to the transmittal of the letter.

2118. As explained in sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above, each of these four documents contained misleading statements about the ACU Defect. ZF Automotive USA specifically approved the transmittal of the final versions of these documents to NHTSA, and intended for the misleading statements contained therein to avoid, minimize, and/or delay recalls of Mitsubishi Class Vehicles. Avoiding, minimizing, and/or delaying recalls of Mitsubishi Class Vehicles enabled the continuation of the scheme to defraud consumers. Because ZF Automotive USA's affiliates would not have sent or approved the written communications noted in the preceding paragraph without ZF Automotive USA's contributions and approval, ZF Automotive USA was one of the Defendants who caused the delivery of these four communications to NHTSA. Accordingly, its participation in these communications violated the mail fraud statute at least four times. (18 U.S.C. § 1341).

2119. As explained in Section IV.E.1.c. above, ZF Automotive USA worked with ZF Passive Safety USA, ZF Electronics USA, and Mitsubishi Japan to design the readiness indicators installed in Mitsubishi Class Vehicles. Specifically, ZF Automotive USA assisted with a design of ACUs that would cause the readiness indicator not to illuminate at the point of sale or lease, even though the Mitsubishi Class Vehicle's safety systems were not ready to deploy in crash events with negative transients due to the ACU Defect. When ZF Automotive USA assisted with this design, it knew Mitsubishi USA would ship the Mitsubishi Class Vehicles to dealers and that consumers would buy the vehicles without the airbag warning lamp illuminating at the point of sale or lease. Because Mitsubishi Sales USA would not have shipped Mitsubishi Class Vehicles without ZF Automotive USA's affirmative assistance in designing misleading readiness indicators, ZF Automotive

USA jointly caused each shipment of Mitsubishi Class Vehicle, in violation of the mail fraud act (18 U.S.C. § 1341).

### vi. ZF TRW Corp. violated the mail and wire fraud statutes multiple times in furtherance of the Mitsubishi-ZF-ST Enterprise's fraudulent scheme.

2120. Prior to their delivery to NHTSA, ZF TRW Corp. reviewed, drafted and/or edited the following misleading statements to NHTSA, as discussed in Sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above:

    a. The slide deck presentation dated February 5, 2016 (which ZF TRW Corp. mailed to NHTSA on March 14, 2016);

    b. The slide deck presentation dated July 19, 2016 (which, upon information and belief, was mailed to NHTSA in July or August 2016);

    c. The September 2016 letter signed by Marc Bolitho[46] (which was mailed to NHTSA in September 2016); and

    d. The slide deck presentation dated March 8, 2018 (which ZF TRW Corp. mailed to NHTSA on March 12, 2018).

2121. ZF TRW Corp. caused the transmittal of the February 5, 2016 slide deck via mail or private interstate carrier. ZF TRW Corp.'s role in the transmittal is confirmed by the cover letter, which is signed: "Very truly yours, ZF TRW Automotive Holdings Corp." with a signature from Sheri Roberts, the Senior Counsel of the company. ZF TRW Corp.'s causal role is further confirmed by a footer on every page of the slide deck itself, which reads: "This document is the property of ZF TRW and is disclosed in confidence. It may not be copied, disclosed to others, or used for manufacturing without the written consent of ZF TRW."

---

[46] Mr. Bolitho was simultaneously an employee of ZF Passive Safety USA, the Vice President of Passive Safety for ZF Electronics USA, and Director of Passive Safety Engineering for ZF TRW Corp.

1  Based on this footer, ZF TRW Corp. gave requisite written consent to the
2  transmittal of the document to NHTSA.

3      2122. ZF TRW Corp. caused the transmittal of the July 19, 2016 slide deck
4  via mail or private interstate carrier. ZF TRW Corp.'s causal role is confirmed by a
5  footer on every page of the slide deck itself, which reads: "This document is the
6  property of ZF TRW and is disclosed in confidence. It may not be copied, disclosed
7  to others, or used for manufacturing without the written consent of ZF TRW."
8  Based on this footer, ZF TRW Corp. gave requisite written consent to the
9  transmittal of the document to NHTSA.

10      2123. Upon information and belief, ZF TRW Corp. also gave requisite prior
11  authorization for the delivery of the September 2016 letter.

12      2124. ZF TRW Corp. caused the transmittal of the March 8, 2018 slide deck
13  to NHTSA via mail or private interstate carrier. ZF TRW Corp.'s causal role is
14  confirmed by the cover letter included with the mailing of the slide deck. The cover
15  letter is on the letter head of an "Active & Passive Safety Technology" business
16  unit. Because this is a reference to ZF TRW Corp.,[47] ZF TRW Corp. must have
17  reviewed and approved the transmittal of the slide deck to NHTSA.

18      2125. As explained in sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above,
19  each of these four documents described above contained misleading statements
20  about the ACU Defect. ZF TRW Corp. specifically approved the transmittal of the
21  final versions of these documents to NHTSA, and intended for the misleading
22  statements contained therein to avoid, minimize, and/or delay recalls of Mitsubishi
23  Class Vehicles. Avoiding, minimizing, and/or delaying recalls of Mitsubishi Class
24  Vehicles enabled the continuation of the scheme to defraud consumers. Because ZF

25  ――――――――――――

26  [47] According to ZF AG's 2017 Annual Report, the "Active & Passive Safety
27  Technology Division" was "established by ZF Group to manage the business
   activities of ZF TRW after its acquisition." Because ZF TRW Automotive Holdings
28  Corp. is the only corporate entity with "ZF TRW" as part of its corporate name, this
   letter was also sent on behalf of ZF TRW Corp.

TRW Corp.'s affiliates would not have sent or approved the written communications noted in the preceding paragraph without ZF TRW Corp.'s contributions and approval, ZF TRW Corp. was one of the Defendants who caused the delivery of these four communications to NHTSA. Accordingly, its participation in these communications violated the mail fraud statute at least four times. (18 U.S.C. § 1341).

> **vii. ZF Germany violated the mail and wire fraud statutes multiple times in furtherance of the Mitsubishi-ZF-ST Enterprise's fraudulent scheme.**

2126. Prior to their delivery to NHTSA, ZF Germany reviewed and/or edited the following misleading statements to NHTSA, as discussed in Sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above:

> a. The slide deck presentation dated February 5, 2016 (which ZF TRW Corp. mailed to NHTSA on March 14, 2016);
>
> b. The slide deck presentation dated July 19, 2016 (which, upon information and belief, was mailed to NHTSA in July or August 2016);
>
> c. The September 2016 letter signed by Marc Bolitho (which was mailed to NHTSA in September 2016); and
>
> d. The slide deck presentation dated March 8, 2018 (which ZF TRW Corp. mailed to NHTSA on March 12, 2018).

2127. ZF Germany caused the delivery of these communications via mail and wire. The three presentations bear copyright legends attributing ownership to ZF Germany. Accordingly, sending these presentations must have required its involvement and consent. Moreover, the slide decks dated February 5, 2016 and July 19, 2016 identify ZF Germany as the corporate author on the title page.

2128. As explained in sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above, each of these transmittals contained misleading statements about the ACU Defect.

ZF Germany specifically approved the transmittal of the final versions of these

documents to NHTSA, and intended for the misleading statements contained

therein to avoid, minimize, and/or delay recalls of Mitsubishi Class Vehicles.

Avoiding, minimizing, and/or delaying recalls of Mitsubishi Class Vehicles enabled

the continuation of the scheme to defraud consumers. Because ZF Germany's

affiliates would not have sent or approved the written communications noted in the

preceding paragraph without ZF Germany's contributions and approval, ZF

Germany was one of the Defendants who caused the delivery of these four

communications to NHTSA. Accordingly, its participation in these communications

violated the mail fraud statute at least four times. (18 U.S.C. § 1341).

### viii. ST USA violated the mail and wire fraud statutes multiple times in furtherance of the Mitsubishi-ZF-ST Enterprise's fraudulent scheme.

2129. ST USA regularly received orders from ZF Electronics USA for DS84

ASICs, including all the defective DS84 ASICs used in Mitsubishi Class Vehicles.

In response to these orders ST USA would work with its affiliate, ST Malaysia, to

help it manufacture and ship DS84 ASICs to ST USA's so-called "ST Micro LAX

Hub" near Los Angeles, California. Between 2007 and the present, ST USA caused

ST Malaysia to ship well over ten million defective DS84 ASICs to this location. In

discovery, ST USA has produced approximately 9,700 invoices sent to ZF

Electronics USA from the time period between 2014 and the present alone. Each

invoice notes the defective DS84 ASICs were made in Malaysia, where ST

Malaysia operated. The invoice dates from these documents provide an

approximate date for these shipments. Plaintiffs have extracted approximate

shipping dates from these invoices, which are presented as exemplars in Exhibit

21.[48]

---

[48] ST USA made similar shipments for Mitsubishi Class Vehicles between 2012
and 2014, but is withholding invoices for these shipments from discovery. Upon

2130. ST USA also shipped well over ten million defective DS84 ASICs to ZF Electronics USA at a facility with the following address: 902 South 2nd Street, Marshall, Illinois 62441. As explained above, Exhibit 21 provides exemplar approximate shipment dates based on an incomplete set of invoices produced by ST USA.[49]

2131. When ST USA required ST Malaysia to make these shipments and then made its own shipments to ZF Electronics USA, it knew ZF Electronics USA would place the DS84 ASICs into DS84 ACUs, including those that would be installed in Mitsubishi Class Vehicles that are marketed to U.S. consumers. ST USA was also aware of Mitsubishi Japan's and Mitsubishi USA's practices of making reassuring statements about safety, airbags, and seatbelts in consumer-facing Monroney labels, certification labels, in-vehicle labels, owner's manuals, and advertising for all Mitsubishi Class Vehicles. ST USA knew these statements were false because it knew the Mitsubishi Class Vehicles, DS84 ACU, and ASIC were defective. Accordingly, because ST USA caused shipments of well over ten million defective DS84 ASICs with the purpose of executing a fraudulent scheme with its conspirators, each of the DS84 ASIC shipments caused by ST USA violated the mail fraud statute (18 U.S.C. § 1341).

### ix. ST Malaysia violated the mail and wire fraud statutes multiple times in furtherance of the Mitsubishi-ZF-ST Enterprise's fraudulent scheme.

2132. Between 2007 and the 2018, ST USA regularly required worked with its affiliate, ST Malaysia, to help it manufacture and ship DS84 ASICs to ST USA's

---

information and belief, the invoices for this time period will show a similar regularity of shipments of DS84 ASICs from Malaysia.

[49] ST USA made similar shipments between 2007 and 2014, but is withholding invoices for these shipments from discovery. Upon information and belief, the invoices for this time period will show a similar regularity of shipments of DS84 ASICs from the STMicro LAX Hub to the ZF Electronics USA's manufacturing facility in Illinois.

 1   so-called "ST Micro LAX Hub" near Los Angeles, California. During that time

 2   period, ST Malaysia shipped well over ten million defective DS84 ASICs to this

 3   location. ST USA has produced approximately 9,700 invoices sent to ZF

 4   Electronics USA from the time period between 2014 and the present alone. Each

 5   invoice notes the defective DS84 ASICs were made in Malaysia, where ST

 6   Malaysia operated. The invoice dates from these documents provide an

 7   approximate date for these shipments. Plaintiffs have extracted approximate

 8   shipping dates from these invoices, which are presented as exemplars in Exhibit

 9   21.[50]

10        2133. When ST Malaysia made these shipments, it knew ZF Electronics

11   USA would place the DS84 ASICs into DS84 ACUs, including those ACUs that

12   would be installed in Mitsubishi Class Vehicles that are marketed to U.S.

13   consumers. ST Malaysia was also aware of Mitsubishi Japan's and Mitsubishi

14   USA's practices of making reassuring statements about safety, airbags, and

15   seatbelts in consumer-facing Monroney labels, certification labels, in-vehicle labels,

16   owner's manuals, and advertising for all Mitsubishi Class Vehicles. ST Malaysia

17   knew these statements were false because it knew the Mitsubishi Class Vehicles,

18   DS84 ACU, and ASIC were defective. Accordingly, because ST Malaysia caused

19   shipments of well over ten million defective DS84 ASICs with the purpose of

20   executing a fraudulent scheme with its conspirators, each of the DS84 ASIC

21   shipments made by ST Malaysia violated the mail fraud statute (18 U.S.C. § 1341).

22

23

24

25

26

27   [50] ST USA made similar shipments between 2007 and 2014, but is withholding
     invoices for these shipments from discovery. Upon information and belief, the
28   invoices for this time period will show a similar regularity of shipments.

**b.** **Mitsubishi USA, Mitsubishi Japan, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia advanced their fraudulent scheme by concealing material information about a serious safety defect that they had a duty to disclose.**

2134. The uses of mail and wire described in the sections above violated the mail and wire fraud statutes because they furthered a fraudulent scheme to affirmatively mislead consumers and NHTSA.

2135. In addition, these same uses of the mail and wire *also* violated the mail and wire fraud statutes because, when they sent or caused to be sent these mailings, Mitsubishi Japan, Mitsubishi USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia had duties to disclose the ACU Defect and failed to do so in order to advance their scheme.

2136. Mitsubishi USA, Mitsubishi Japan, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST Malaysia each knew for years that the defective DS84 ACUs in the Mitsubishi Class Vehicles are uniquely vulnerable to EOS. *See* Section IV.D.7. above.

2137. To further the goals of the Mitsubishi-ZF-ST Enterprise and to their mutual gain, Mitsubishi USA, Mitsubishi Japan, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia concealed what they knew about the existence, scope, and material safety risks of the ACU Defect in the Mitsubishi Class Vehicles.

2138. Their careful efforts to conceal the ACU Defect in the Mitsubishi Class Vehicles were critically important to the viability of their scheme. A decision by any one Defendant or nonparty-Enterprise member to tell the truth about the ACU Defect and its impact of vehicle safety to consumers or to NHTSA would have been an existential threat to the Mitsubishi-ZF-ST Enterprise. Instead, and in pursuit of ill-gotten profits, they each kept key information about the ACU Defect

hidden for years. This concealment of material facts about the ACU Defect was grounded in and advanced their scheme to defraud consumers through the continued sale of Mitsubishi Class Vehicles, and avoidance of costly recalls and reputational harms.

2139. Mitsubishi USA, Mitsubishi Japan, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia's concealment of the ACU Defect violated several independent duties to disclose it.[51]

        a.    Mitsubishi USA, Mitsubishi Japan, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia each had a duty to disclose the ACU Defect because of their exclusive knowledge and far superior information about the ACU Defect. These Defendants knew about the vulnerability of the DS84 ACU and ASIC to EOS through their exclusive access to information about their design, development, and testing, and

---

[51] As vehicle manufacturers and component parts suppliers, Defendants are also subject to statutory duties to disclose known safety defects to consumers and to NHTSA pursuant to the Safety Act and its attendant regulations. *See*, e.g., 49 U.S.C. § 30118(c) ("A manufacturer of a motor vehicle . . . shall notify the Secretary by certified mail or electronic mail, and the owners, purchasers, and dealers of the vehicle . . . as provided in section 30119(d) of this section, if the manufacturer . . . learns the vehicle . . . contains a defect and decides in good faith that the defect is related to motor vehicle safety."); 49 U.S.C. §30119(d) (manufacturers must notify "each person registered . . . as the owner and whose name and address are reasonably ascertainable"); 49 C.F.R. §573.6(a) ("Each manufacturer shall furnish a report to the NHTSA for each defect . . . in his items of original . . . equipment that he . . . determines to be related to motor vehicle safety."). Plaintiffs previously pled Defendants had a duty to disclose based on these provisions of the Safety Act, but the Court dismissed an omissions theory based these alleged duties. Plaintiffs reserve the right to appeal this decision at a later date, but do not rely upon the Safety Act as a basis for their omissions theory in this pleading.

through their confidential and proprietary investigations into suspicious incidents. Given the ACU Defect's hidden and technical nature, Plaintiffs and consumers lack the sophisticated expertise in vehicle components and electrical phenomena that would be necessary to discover the ACU Defect on their own.

b. In addition, Mitsubishi USA, Mitsubishi Japan, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia also each held a duty to disclose because they knew that a defect in the Mitsubishi Class Vehicles and their DS84 ACUs gave rise to serious safety concerns for the consumers who use the vehicles. As sophisticated and well-funded corporate entities that generate billions of dollars in annual revenue from work in the automotive industry, each of these Defendants knew that this information would have been material to consumers. For example, a February 3, 2004, prospectus filed by ZF TRW Corp. with the SEC observed that "85 percent of recent auto purchasers stated that they look for vehicle safety information before making their final decision." Nonetheless, Defendants still did not disclose it.

c. Mitsubishi USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., and ZF Germany also each had a duty to disclose because of the actions they took to conceal the ACU Defect in the Mitsubishi Class Vehicles from consumers. Each of the ZF Defendants listed here acted to suppress the truth about the ACU Defect through their misleading representations to NHTSA. *See* Sections IV.F.2., IV.F.4., IV.F.8., and IV.F.14. above.  Because a truthful and

accurate disclosure to NHTSA would have been material to
NHTSA's decision whether to require a recall or expand its
investigation into the DS84 ACUs, the affirmative steps they
took to mislead NHTSA about the ACU Defect also precluded
Mitsubishi Plaintiffs and Nationwide Mitsubishi Class members
from an opportunity that otherwise could have led to their
discovery of the truth about the ACU Defect. Mitsubishi USA,
for its part, engaged in a routine pattern and practice of failing to
respond to and investigate crashes reported by consumers with
airbag failures, thereby avoiding further investigation and a
written record of the ACU Defect in Mitsubishi Class Vehicles.

        d.      Finally, Mitsubishi USA and Mitsubishi Japan affirmatively
disclosed information about the Mitsubishi Class Vehicles'
airbags, seatbelts, and overall safety to consumer (*see* Sections
IV.E.1 and I.V.E.2. above). Because they opted to make these
representations to consumers about these topics, and because
they knew other information about the ACU Defect that made
those representations misleading or untrue, Mitsubishi USA and
Mitsubishi Japan were under separate duties to disclose the full
truth about the ACU Defect that materially qualified the
information they provided.

2140. Mitsubishi USA, Mitsubishi Japan, ZF Electronics USA, ZF Passive
Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST
Malaysia knew and intended that NHTSA would rely on their and the other
members of the Mitsubishi-ZF-ST Enterprise's material omissions made about the
Mitsubishi Class Vehicles to approve them for importation, marketing, and sale to
consumers in the United States. And conversely, they also understood that
disclosing the ACU Defect would require them to recall and fix the Mitsubishi

1  Class Vehicles, which would negatively impact the profits of the Mitsubishi-ZF-ST
2  Enterprise.

3       2141. Mitsubishi USA, Mitsubishi Japan, ZF Electronics USA, ZF Passive
4  Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, and ST
5  Malaysia also knew and intended that consumers would rely on their and the other
6  members of the Mitsubishi-ZF-ST Enterprise's material omissions when deciding
7  to purchase or lease the Mitsubishi Class Vehicles. The Mitsubishi Plaintiffs'
8  reliance on this concealment is demonstrated by the fact that they paid money for
9  Mitsubishi Class Vehicles that never should have been introduced into the U.S.
10  stream of commerce, and that they overpaid for vehicles with defective safety
11  systems without knowledge of the ACU Defect.

12
          c.     **The Mitsubishi-ZF-ST Enterprise was an association-in-fact**
13                **enterprise with a common purpose of misleading consumers**
14                **and NHTSA regarding the ACU Defect in Mitsubishi Class**
                  **Vehicles.**
15

16       2142. The Mitsubishi-ZF-ST Enterprise had a common purpose and ongoing
17  organization and functioned as a continuing unit

18
              i.     **The Mitsubishi-ZF-ST Enterprise had a common**
19                   **purpose and ongoing organization and functioned as a**
                     **continuing unit.**
20

21       2143. The common purpose of the Mitsubishi-ZF-ST Enterprise was to
22  perpetuate a fraudulent scheme to maximize sales and leases of Mitsubishi Class
23  Vehicles while hiding the ACU Defect from purchasers and lessees. Because all of
24  the Mitsubishi-ZF-ST Enterprise members' continued profits from this scheme
25  ultimately depended on consumers choosing to purchase Mitsubishi Class Vehicles,
26  the Mitsubishi-ZF-ST Enterprise needed to convince consumers of a false premise:
27  that Mitsubishi Class Vehicles had properly functioning airbags and seatbelts. For
28  this scheme to work, it was essential for the Mitsubishi-ZF-ST Enterprise to

conceal the ACU Defect from NHTSA, because the agency could halt the sale of Mitsubishi Class Vehicles and mandate recalls that necessarily require public notice of a defect. The expense of these recalls would undermine the profitability of the scheme.

2144. This common purpose served the interests of all members of the Mitsubishi-ZF-ST Enterprise. By concealing and minimizing the ACU Defect, Mitsubishi USA, Mitsubishi Japan, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia maximized their revenue by selling as many Mitsubishi Class Vehicles as possible while avoiding or limiting the substantial costs to recall and repair the Vehicles and their defective DS84 ACUs.

2145. The common purpose of the Mitsubishi-ZF-ST Enterprise is also evidenced by coordinated efforts by Mitsubishi USA, Mitsubishi Japan, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, and ZF Germany avoid NHTSA's discovery if the ACU Defect in the Mitsubishi Class Vehicles and to ensure a united front through sharing information about the ACU Defect that ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, and ZF Germany presented to NHTSA.

2146. The common purpose of the Mitsubishi-ZF-ST Enterprise is evidenced by Mitsubishi USA's, Mitsubishi Japan's, ZF Electronics USA's, ZF Passive Safety USA's, and ZF Automotive USA's confidential consultations with one another about problems with the design of the DS84 ACU, observations of EOS on DS84 ACUs, and dangerous safety system malfunctions in vehicles with DS84 ACUs, including in a Mitsubishi Class Vehicle. As the Court has held, consultations about "observed evidence of EOS in Class Vehicles" among Defendants "support[s] a reasonable inference" of a "common purpose of misleading consumers and NHTSA as to the existence of a defect in the ACUs." ECF 396 at 61.

2147. The common purpose of the Mitsubishi-ZF-ST Enterprise is further

evidenced by, ST USA, ST Italy, and ST Malaysia's communications with ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA about observations of EOS in a Mitsubishi Class Vehicle, including after recalls for other vehicles with the same DS84 ACUs used in Mitsubishi Class Vehicles had already been initiated. ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA shared this information with Mitsubishi USA by copying excerpts of the reports received from ST USA, ST Italy, and ST Malaysia and sending them to Mitsubishi USA.

### ii. The Mitsubishi-ZF-ST Enterprise had an ongoing organization.

2148. The participation of separate entities or individuals that have an existence outside an alleged enterprise is evidence of an ongoing organization with its own structure, separate and apart from its members. Mitsubishi USA, Mitsubishi Japan, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia each existed separately from the Mitsubishi-ZF-ST Enterprise.

    a. During the relevant period, Mitsubishi Japan contemporaneously designed, manufactured, and sold many vehicles that do not contain defective DS84 ACUs.

    b. During the relevant period, Mitsubishi USA contemporaneously provided services to Mitsubishi Japan relating to a large volume of Mitsubishi vehicles that do not contain defective DS84 ACUs.

    c. During the relevant period, ST USA, ST Italy, and ST Malaysia contemporaneously sold, designed, and/or manufactured many other products aside from the defective DS84 ASICs used in the defective DS84 ACUs.

    d. During the relevant period, ZF Passive Safety USA, ZF

Electronics USA, and ZF Automotive USA contemporaneously designed, made, and/or sold many other automotive parts aside from the defective DS84 ACUs.

e. ZF TRW Corp. and ZF Germany also engaged in a wide variety of business activities unrelated to the defective DS84 ACUs.

2149. Another hallmark of an ongoing organization is members with delineated roles that further the organization's goals. Each Defendant performed important but separate roles within the Mitsubishi-ZF-ST Enterprise organization.

a. ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA jointly designed the defective DS84 ACU for use in the Mitsubishi Class Vehicles, with Mitsubishi Japan's, ST Italy's, and ST USA's input.

b. ST Italy and ST USA jointly designed the defective DS84 ASIC, with input from ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA

c. ST Malaysia manufactured the defective DS84 ASICs and shipped them to ST USA in California.

d. ST USA sold and shipped the defective DS84 ASIC to ZF Electronics USA.

e. Mitsubishi Japan designed the Mitsubishi Class Vehicles and made them in Japan, and then shipped them to the United States. Mitsubishi Japan added permanent labels to each vehicle that certified compliance with U.S. Federal safety standards, as well as readiness indicators and in-vehicle airbag labels and imprints, prior to doing so.

f. Mitsubishi USA responded to NHTSA's investigation on behalf of Mitsubishi Japan. Mitsubishi USA created the Monroney labels for Mitsubishi Class Vehicles and caused them to be

affixed to each Mitsubishi Class Vehicles prior to their shipment to authorized Mitsubishi dealers. It also distributed the Mitsubishi Class Vehicles to dealers, so they could be sold to consumers with misleading Monroney labels and the in-vehicle statements. Mitsubishi USA was also responsible for misleading advertising to consumers.

    g.    ZF TRW Corp. and ZF Germany approved actions taken by ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA, and knowingly approved and participated directly in making misleading statements to NHTSA about the ACU Defect.

    h.    Each of the Defendants separately ensured that NHTSA and consumers did not discover the ACU Defect.

2150. The Enterprise members dedicated to the Mitsubishi-ZF-ST Enterprise's scheme, which further evidences the ongoing structure of the Enterprise. For example, ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA dedicated an entire applications team to implement the defective DS84 ACUs in Mitsubishi Class Vehicles in 2012. This included ZF Passive Safety USA employee William Wong, who served on ZF's Mitsubishi applications team, among others. ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ST USA, ST Italy, and ST Malaysia also dedicated personnel and resources to analyze EOS occurrences DS84 ACUs, including in Mitsubishi Class Vehicles. Moreover, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ST USA, and ST Italy held regular meetings in 2016 concerning the EOS issues, just as NHTSA was investigating the same defective DS84 ACUs used in Mitsubishi Class Vehicles.

2151. Mitsubishi Japan, on the other hand, dedicated its employee Mikuni Fukutaro as its primary point of contact with ZF Electronics USA, ZF Passive

Safety USA, and ZF Automotive USA relating to the defective DS84 ACU. Establishing a regular point of contact further organized the Mitsubishi-ZF-ST Enterprise.

2152. As the passenger safety systems in Mitsubishi Class Vehicles malfunctioned with known symptoms of the ACU Defect, including airbag nondeployments—and with similar malfunctions for other vehicles with the DS84 ACU already well-known at the time—Mitsubishi USA *repeatedly* closed consumer complaints about airbag non-deployments in Mitsubishi Class Vehicles without inspecting or investigating whether the vehicles had an ACU malfunction. Mitsubishi USA's practice of doing so—for more than 50 incidents between 2014 and 2019— avoided further investigation into the prevalence of malfunctions due to the ACU Defect in Mitsubishi Class Vehicles, and further avoided the creation of a written record regarding the same. Further, when faced with a suspicious malfunction in a Mitsubishi Class Vehicle in 2017, Mitsubishi USA sought the involvement and assistance of ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA.

2153. When NHTSA began to investigate the defective DS84 ACUs in 2015, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF Germany, and ZF TRW Corp. maintained the organization of the Mitsubishi-ZF-ST Enterprise by sending their joint communications and other information they presented to NHTSA to Mitsubishi Japan, Mitsubishi USA, ST USA, ST Italy, and ST Malaysia. This allowed the participants in the Mitsubishi-ZF-ST Enterprise to coordinate their efforts to downplay the ACU Defect in Mitsubishi Class Vehicles and avoid and minimize recalls.

### iii. The Mitsubishi-ZF-ST Enterprise functioned as a continuing unit.

2154. The Mitsubishi-ZF-ST Enterprise continued for several years, at least during the time period of 2012 to the present. Although Mitsubishi USA stopped

distributing new Mitsubishi Class Vehicles with the DS84 ACU in or about 2017 or 2018, Mitsubishi Class Vehicles continue to sell on the used car market with misleading in-vehicle statements and consumer-facing marketing (such as vehicle brochures) made by the Mitsubishi-ZF-ST Enterprise.

2155. During this time, the members of the Mitsubishi-ZF-ST Enterprise remained stable, with Mitsubishi USA, Mitsubishi Japan, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ST USA, ST Malaysia, and ST Italy remaining active members for years of ongoing production and sales of the Mitsubishi Class Vehicles. ZF Germany, on the other hand, started to participate in the Mitsubishi-ZF-ST Enterprise shortly after acquiring ZF TRW Corp. in 2015.

**d.    The Mitsubishi-ZF-ST Enterprise's pattern of racketeering caused Mitsubishi Plaintiffs and the Nationwide Mitsubishi Class members to overpay for Mitsubishi Class Vehicles at the point of sale or lease.**

2156. Mitsubishi Plaintiffs and Nationwide Mitsubishi Class members are "person[s] injured in his or her business or property" by reason of the Mitsubishi-ZF-ST Enterprise's RICO violations, within the meaning of U.S.C. § 1964(c). Mitsubishi Plaintiffs and Nationwide Mitsubishi Class members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

2157. Because of the Mitsubishi-ZF-ST Enterprise's pattern of racketeering activity, Mitsubishi Plaintiffs and Nationwide Mitsubishi Class members have been injured in their business and/or property through their overpayment at the time of purchase or lease for Mitsubishi Class Vehicles with an undisclosed safety defect.

2158. By making misleading statements and omissions at or before the point of sale or lease, the Mitsubishi-ZF-ST Enterprise directly or indirectly obtained money from Mitsubishi Plaintiffs and the Nationwide Mitsubishi Class by means of materially false or fraudulent misrepresentations and omissions of material facts.

1  Had the Mitsubishi Plaintiffs known what the Mitsubishi-ZF-ST Enterprise

2  members knew about the ACU Defect, Mitsubishi Plaintiffs and Nationwide

3  Mitsubishi Class members would not have purchased the Mitsubishi Class

4  Vehicles, or would not have paid as much as they did for them.

5      2159. Had Mitsubishi USA, Mitsubishi Japan, ZF Electronics USA, ZF

6  Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA,

7  ST Italy, or ST Malaysia not concealed, and instead decided to disclose, the

8  information they knew about the ACU Defect and its impact on vehicle safety,

9  Mitsubishi Plaintiffs would have learned of the disclosure.

10      a.  Mitsubishi Plaintiffs and Nationwide Mitsubishi Class members

11          would have learned about the ACU Defect through any of the

12          channels in which the Mitsubishi Class Vehicles were marketed

13          to them. In other words, had Mitsubishi USA or Mitsubishi

14          Japan made a disclosure in *any* of the places in which they

15          otherwise communicated information about the Mitsubishi Class

16          Vehicles, Mitsubishi Plaintiffs and Nationwide Mitsubishi Class

17          members would have seen it. This includes in Mitsubishi USA's

18          brochures and other advertising, on Monroney labels, and in

19          Mitsubishi Japan's certification labels, in-vehicle airbag labels,

20          airbag warning lamps, and in owner's manuals.

21      b.  Further, Mitsubishi Plaintiffs and Nationwide Mitsubishi Class

22          members would have learned about the ACU Defect at the times

23          and places that they purchased or leased their Class Vehicles.

24          For example, had Mitsubishi USA made a disclosure about the

25          ACU Defect to its authorized Mitsubishi USA dealerships, sales

26          personnel at the dealerships would have passed on that material

27          information to consumers at the time of the contemplated

28          purchases.

c.  Had any of the Defendants listed above disclosed the true scope and existence of the ACU Defect to NHTSA, Mitsubishi Plaintiffs and Nationwide Mitsubishi Class members would have learned of it because NHTSA would have considered this information material to its decision to require a recall, which information would have been made public and passed onto impacted consumers.

d.  Had any of the Defendants listed above disclosed the true scope and existence of the ACU Defect to consumers or the public, either through press releases, on their websites, or in any other public channel or forum, Mitsubishi Plaintiffs and Nationwide Mitsubishi Class members would have learned of it due to the materiality of this information about a serious safety defect in hundreds of thousands vehicles. Given the seriousness of the information and the number of vehicles impacted, the news media and consumer forums and blogs would pick up the story. This is particularly so in the wake of the massive Takata recall and litigation, which confirmed the strong public interest in airbags and vehicle safety. For example, an April 23, 2019 article available on ConsumerReports.com described NHTSA's expanded investigation into the DS84 ACUs to be "the agency's most in-depth look at airbags since the recall of more than 56 million airbags made by Takata."

2160. The Mitsubishi-ZF-ST Enterprise's misleading statements and omissions to NHTSA between 2016 and the present were essential to the scheme because NHTSA would not have allowed continued sale of Mitsubishi Class Vehicles with defective DS84 ACUs. At the very least, these misleading statements delayed NHTSA's broader investigation of the Mitsubishi Class Vehicles until

April 2019, when NHTSA launched an Engineering Analysis covering all Mitsubishi Class Vehicles. Upon information and belief, ZF Electronics USA stopped making DS84 ACUs for the 2020 model year based in large part on this investigation. Accordingly, ZF Electronics USA would have stopped making DS84 ACUs if NHTSA had launched a broader investigation in 2016. For this reason, Plaintiffs who purchased and leased Mitsubishi Class Vehicles after the first misleading statement to NHTSA by the Mitsubishi-ZF-ST Enterprise would have avoided purchasing or leasing their Mitsubishi Class Vehicles entirely, or they would have paid less for them.

2161. Consumers are the only direct victims of the Mitsubishi-ZF-ST Enterprise's alleged fraudulent and misleading statements to NHTSA. NHTSA has not suffered any reported, direct injury as a result of such conduct.

2162. Damages will not be difficult to ascertain; the Mitsubishi Plaintiffs and the Nationwide Mitsubishi Class members' damages are, among others, the difference between what they bargained and paid for – Mitsubishi Class Vehicles without an ACU Defect – and the value of the Mitsubishi Class Vehicles they actually received. In the similar *Takata* airbag litigation, for example, plaintiffs also alleged overpayment damages suffered at the point of sale based on a dangerous airbag defect. Plaintiffs' experts in that case performed a conjoint analysis using surveys of consumers and found that the price premium paid by class members for class vehicles was at least ten percent of the purchase price. A similar analysis could be performed in this litigation. Other methodologies are also viable.

2163. All victims of Defendants' alleged conduct who claim to have overpaid for the purchase or lease of Mitsubishi Class Vehicles are within the alleged Nationwide Mitsubishi Class. Consequently, there are no issues with respect to reapportionment or multiple recovery.

**10. Nationwide Count 10: Violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(d), on Behalf of the Nationwide Mitsubishi Class Against Mitsubishi Japan, Mitsubishi USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia.**

2164. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

2165. It is also unlawful "for any person to conspire to violate" 18 U.S.C. § 1962(c). *See* 18 U.S.C. § 1962(d). To conspire in violation of section 1962(c), the defendant must be "aware of the essential nature and scope of the enterprise." ECF 396 at 77. Enterprise members conspire to violate section 1962(c) when "two or more people agree[] to commit a crime" and "knowingly and willfully participate[] in the agreement. . . . The illegal agreement need not be express as long as its existence can be inferred from the words, actions, or interdependence of activities and persons involved." *Id*. A defendant who "agreed to facilitate a scheme" violates section 1962(d) even if he "does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense." *Salinas v. United States*, 522 U.S. 52, 65-66 (1997).

2166. As explained in the section below, Mitsubishi Japan, Mitsubishi USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia were aware of the essential nature and scope of the Mitsubishi-ZF-ST Enterprise. Count 9 describes this Enterprise.

2167. As explained in the section below, based on their words, actions, and/or interdependence, Mitsubishi Japan, Mitsubishi USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., and ZF Germany agreed to facilitate the following acts of mail and wire fraud:

a.   Mitsubishi's interstate shipments between 2012 and 2017 of thousands of Mitsubishi Class Vehicles with misleading Monroney labels, readiness indicators, in-vehicle airbag labels and imprints, and owners' manuals, and

b.   ZF Electronics USA's interstate shipments between 2012 and 2017 of tens of thousands of DS84 ACUs to Mitsubishi Japan.

2168.   As explained in the section below, based on their words, actions, and/or interdependence, ZF Electronics USA, ZF Passive Safety USA, ST USA, ST Italy, and ST Malaysia also agreed to facilitate the following acts of mail fraud:

a.   ZF Electronics USA's interstate shipments between 2012 and 2017 of thousands of DS84 ACUs to Mitsubishi in Japan;

b.   ST Malaysia's interstate shipments between 2012 and 2017 of thousands of DS84 ASICs to ST USA in California; and

c.   ST USA's interstate shipments between 2012 and 2017 of thousands of DS84 ASICs to ZF Electronics USA in Illinois.

2169.   The words, actions, or interdependence of activities of each of these Defendants support the inference of agreement.

2170.   Accordingly, Mitsubishi Japan, Mitsubishi USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia each violated 18 U.S.C. § 1962(d).

2171.   These violations caused the same injuries and damages described in the prior Count. This Count incorporates by reference the allegations as to injury, damages, and causation from the prior Count.

2172.   Mitsubishi Japan, Mitsubishi USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia each violated 18 U.S.C. § 1962(c) and injured the business or property of the Mitsubishi Plaintiffs and the Nationwide Mitsubishi Class. The

Mitsubishi Plaintiffs claim damages for themselves and the Nationwide Mitsubishi Class members under 18 U.S.C. § 1964(c).

> **a.** **Mitsubishi Japan, Mitsubishi USA, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., ZF Germany, ST USA, ST Italy, and ST Malaysia were all aware of the essential nature and scope of the Mitsubishi-ZF-ST Enterprise.**

2173. Each Defendant named in this Count was aware of the essential nature and scope of the Mitsubishi-ZF-ST Enterprise, even if some specific details about the Enterprise's illegal activities and members were unknown.

> **i.** **Mitsubishi Japan and Mitsubishi USA understood the nature and scope of the Mitsubishi-ZF-ST Enterprise's fraudulent scheme.**

2174. Mitsubishi Japan and Mitsubishi USA were aware of the essential nature and scope of the Mitsubishi-ZF-ST Enterprise.

2175. Mitsubishi Japan always knew of the activities of Mitsubishi USA and its role in the Enterprise because it owns the company and monitors its activities.

2176. As explained in Section IV.D.7. above, Mitsubishi Japan and Mitsubishi USA knew about the nature and scope of the ACU Defect.

2177. Between 2012 and 2017, Mitsubishi Japan and Mitsubishi USA knew that the STMicroelectronics companies were responsible for designing and manufacturing the DS84 ASIC for the DS84 ACUs used in Mitsubishi Class Vehicles.

2178. Between 2012 and the present, Mitsubishi Japan and Mitsubishi USA continuously tracked the volume of sales of Mitsubishi makes and models in the United States. Accordingly, during the relevant time period, they knew roughly how many Mitsubishi Class Vehicles would likely sell in the United States.

2179. During each year between 2012 and the present, Mitsubishi Japan and Mitsubishi USA knew that reassuring certification labels, in-vehicle airbag labels

and imprints, and readiness indicators would be placed in Mitsubishi Class Vehicles prior to the shipment to dealers in the United States. They knew this would occur because Mitsubishi Japan's mandatory designs required these statements to be placed in Mitsubishi Class Vehicles. Mitsubishi Japan and Mitsubishi USA knew that consumers would rely on some or all of these in-vehicle labels when purchasing or leasing Mitsubishi Class Vehicles.

2180. During each year between 2012 and the present, Mitsubishi Japan knew that Mitsubishi USA would advertise the Mitsubishi Class Vehicles as safe vehicles with properly functioning airbags and seatbelts. Mitsubishi Japan and Mitsubishi USA knew that consumers would rely on such advertisements when purchasing or leasing Mitsubishi Class Vehicles.

2181. During each year between 2012 and the present, Mitsubishi Japan knew that Mitsubishi USA would ship Mitsubishi Class Vehicles with the owners' manuals that Mitsubishi Japan authored, which include misleading statements about the safety systems, airbags, and seatbelts of the Mitsubishi Class Vehicles. Likewise, Mitsubishi Japan knew that Mitsubishi USA would create and affix Monroney stickers with misleading statements about airbags and seatbelts to Mitsubishi Class Vehicles. Mitsubishi Japan and Mitsubishi USA knew that consumers would rely on the Monroney labels and manuals when purchasing or leasing Mitsubishi Class Vehicles.

2182. During each year between 2012 and the present, Mitsubishi USA knew that complying with Mitsubishi Japan's mandatory design specifications for Mitsubishi Class Vehicles would require Mitsubishi Japan to place orders with ZF Electronics USA, and for ZF Electronics USA to use mail or private interstate carriers to ship the defective DS84 ACUs to Mitsubishi Japan in Japan.

2183. During each year between 2012 and the present, Mitsubishi Japan knew that Mitsubishi USA would, as a result of its direction to do so, cause the

1    Mitsubishi Class Vehicles to ship from their port of entry to automobile dealers
2    across the United States.

3          2184. Mitsubishi Japan knew in 2016 that ZF Electronics USA, ZF Passive
4    Safety USA, ZF Automotive USA, ZF TRW Corp., and ZF Germany had made
5    misleading statement to NHTSA about the defect because in early 2016 they
6    received copies of the misleading slide deck dated February 5, 2016.

7                    ii.      **ZF Automotive USA, ZF Electronics USA, ZF Passive**
8                             **Safety USA, ZF TRW Corp., and ZF Germany**
9                             **understood the nature and scope of the Mitsubishi-ZF-**
                             **ST Enterprise's fraudulent scheme.**
10

11         2185. ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA,
12   ZF TRW Corp., and ZF Germany were aware of the essential nature and scope of
13   the Mitsubishi-ZF-ST Enterprise.

14         2186. As explained in Sections IV.D.1., IV.D.2., and IV.D.7., above, ZF
15   Automotive USA, ZF Electronics USA, ZF Passive Safety USA, ZF TRW Corp.,
16   and ZF Germany were aware of the nature and scope of the ACU Defect.

17         2187. ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA,
18   ZF TRW Corp., and ZF Germany knew the approximate number of Mitsubishi
19   Class Vehicles with the DS84 ACU because it made the ACUs for those vehicles.

20         2188. ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA,
21   ZF TRW Corp., and ZF Germany knew that Mitsubishi Japan or its subsidiaries
22   would, consistent with common practice in the automotive industry, make
23   reassuring statements about the Mitsubishi Class Vehicle's safety systems, airbags,
24   and seatbelts.

25
26
27
28

### iii. ST USA, ST Italy, and ST Malaysia understood the nature and scope of the Mitsubishi-ZF-ST Enterprise's fraudulent scheme.

2189. ST USA, ST Italy, and ST Malaysia were aware of the essential nature and scope of the Mitsubishi-ZF-ST Enterprise.

2190. As explained in Sections IV.D.1., IV.D.2., and IV.D.7. above, ST USA, ST Italy, and ST Malaysia were aware of the nature and scope of the ACU Defect.

2191. Upon information and belief, ST Italy, ST Malaysia, and ST USA knew the defective DS84 ASICs would be installed in the Mitsubishi Class Vehicles. These companies also understood that automakers like the Mitsubishi Defendants would, consistent with common practice in the automotive industry, advertise their safety systems to consumers, and that those safety systems would not work properly as a result of the DS84 ASIC's vulnerability to EOS.

2192. ST USA, ST Malaysia, and ST Italy were aware of the large scope of the Mitsubishi-ZF-ST Enterprise, among other reasons because ST Malaysia and ST USA made and sold the DS84 ASICs for the Mitsubishi Class Vehicles and all these companies had access to records that showed that thousands of defective DS84 ASICs were shipping to Illinois per ZF Electronics USA's instructions.

### b. Mitsubishi Japan, Mitsubishi USA, ZF Automotive USA, ZF Electronics USA, ZF Passive Safety USA, ZF TRW Corp., and ZF Germany agreed that one or more members of the Enterprise would commit at least two predicate acts of mail or wire fraud in furtherance of the Mitsubishi-ZF-ST Enterprise's fraudulent scheme.

2193. Mitsubishi Japan, ZF Passive Safety USA, ZF Electronics USA, ZF Automotive USA, and Mitsubishi USA began conspiring in furtherance of the Mitsubishi-ZF-ST Enterprise's fraudulent scheme in 2012.

2194. ZF Germany joined the conspiracy in or around 2015, when it acquired ZF TRW Corp.

2195. When Mitsubishi Japan agreed to use the defective DS84 ACU and ASIC in Mitsubishi Class Vehicles in 2012, Mitsubishi Japan, Mitsubishi USA, ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA mutually understood and intended that this agreement prompt Mitsubishi Japan to cause ZF Electronics USA to ship DS84 ACUs across state lines and Mitsubishi USA to ship the Mitsubishi Class Vehicles with misleading statements about the passive safety system, airbags, and seatbelts therein.

a. In 2012, Mitsubishi Japan agreed with ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA on the design specifications for the DS84 ACU installed in Mitsubishi Class Vehicles. Mitsubishi Japan, ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA continued to agree on specifications for Mitsubishi Class Vehicles with the DS84 ACU for every model year until 2017.

b. Between 2012 and 2017, Mitsubishi USA used mail and wire to advertise the Mitsubishi Class Vehicles as safe vehicles with properly-functioning airbags and seatbelts, and used private interstate carriers to ship the Mitsubishi Class Vehicles with misleading Monroney labels, airbag labels and imprints, certification labels, readiness indicators, and owner's manuals. Mitsubishi Japan knew that Mitsubishi USA was doing this and would do this.

c. When Mitsubishi Japan agreed with ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA on specifications for the DS84 ACUs in Mitsubishi Class Vehicles, Mitsubishi Japan, ZF Electronics USA, ZF Passive Safety USA, ZF

Automotive USA, and ZF TRW Corp. (and ZF Germany after 2015) had a mutual understanding that this agreement would cause Mitsubishi Japan to send orders for tens of thousands of DS84 ACUs every year via mail or wire to ZF Electronics USA.

    d.    When Mitsubishi Japan agreed with ZF Electronics USA, ZF Passive Safety USA, and ZF Automotive USA on specifications for the DS84 ACUs in Mitsubishi Class Vehicles, Mitsubishi Japan, ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, and ZF TRW Corp. (and ZF Germany after 2015) had a mutual understanding that this agreement would cause ZF Electronics USA to ship tens of thousands of DS84 ACUs via private interstate carrier to Mitsubishi Japan in Japan.

2196. As explained in Count 9 above, the shipments of Mitsubishi Class Vehicles by Mitsubishi USA, the orders by Mitsubishi Japan for DS84 ACUs, and the shipments by ZF Electronics USA of the DS84 ACUs violated the mail fraud statute because they furthered the Mitsubishi-ZF-ST Enterprise's fraudulent scheme to cause consumers to purchase or lease vehicles that contain the ACU Defect. To accomplish this goal, the DS84 ACUs needed to be shipped before they could be installed in the vehicles.

    a.    Mitsubishi Japan, ZF Passive Safety USA, ZF Electronics USA, and ZF Automotive USA facilitated these mail fraud act violations by collaborating on the defective design of the ACU, the readiness indicators, and Mitsubishi Class Vehicles.

    b.    Mitsubishi Japan further facilitated these mail fraud violations by, prior to shipment: (1) installing the DS84 ACUs in Mitsubishi Class Vehicles and (2) placing the misleading certification labels, readiness indicators, and airbag labels and imprints within the Mitsubishi Class Vehicles.

1   c. ZF TRW Corp. facilitated the scheme because, upon

2      information and belief, its approval was required for the launch

3      of the DS84 ACU, which was one of the company's most

4      popular ACUs.

5   d. ZF Germany facilitated the scheme because, upon information

6      and belief, its approval was required to continue the sales of the

7      DS84 ACU.

8   e. Mitsubishi USA facilitated this scheme by authoring and

9      affixing misleading Monroney labels on Mitsubishi Class

10     Vehicles.

11  2197. The conspiracy among Mitsubishi Japan, Mitsubishi USA, ZF

12 Automotive USA, ZF Electronics USA, ZF Passive Safety USA, ZF TRW Corp.,

13 and ZF Germany is further evidenced by their coordinated efforts to cover up the

14 ACU Defect.

15   a. Mitsubishi Japan, Mitsubishi USA, ZF Automotive USA, ZF

16      Electronics USA, ZF Passive Safety USA uncovered evidence

17      of ASIC EOS on DS84 ACUs and DS84 ASICs and related

18      malfunctions, but they maintained confidentiality amongst each

19      other.

20   b. Mitsubishi Japan, ZF Automotive USA, ZF Electronics USA,

21      and ZF Passive Safety USA also coordinated in response to

22      NHTSA's investigation. In 2016, ZF Electronics USA alerted

23      Mitsubishi Japan to NHTSA's investigation of the DS84 ACUs

24      and sent excerpted copies of the misleading February 5, 2016

25      slide deck to NHTSA as part of an effort to coordinate with

26      Mitsubishi Japan.

27   c. Likewise, ZF Automotive USA warned Mitsubishi USA when it

28      provided information to NHTSA in September 2016 that would

alert NHTSA to the presence of the DS84 ACU in the
Mitsubishi Class Vehicles.

2198. The joint activities of ZF Electronics USA, ZF Passive Safety USA, ZF Automotive USA, ZF TRW Corp., and ZF Germany in support of their misleading statements to NHTSA were predicate acts and also show agreement by these Defendants to advance the fraudulent scheme.

2199. ZF Electronics USA's placement of orders for DS84 ASICs and shipments of DS84 ACUs were predicate acts and also show agreement by ZF Electronics USA to advance the fraudulent scheme.

2200. The success of the Mitsubishi-ZF-ST Enterprise's fraudulent scheme depended upon Mitsubishi Japan, ZF Passive Safety USA, ZF Electronics USA, ZF Automotive USA, and Mitsubishi USA. All these companies had to maintain strict confidence about the ACU Defect for the scheme to continue. Moreover, the Mitsubishi companies depended on the ZF companies for the manufacture of the defective ACUs, whereas the ZF companies could not reach consumers of Mitsubishi Class Vehicles without the agreement of Mitsubishi Japan. This interdependence evidences the agreement to further the fraudulent scheme.

2201. The actions detailed above and throughout the Complaint as to each member of the Mitsubishi-ZF-ST Enterprise were foreseeable to the other members of the Mitsubishi-ZF-ST Enterprise given their direct relationship to and furtherance of the common goals of the scheme.

**i. ST USA, ST Italy, ST Malaysia, ZF Automotive USA, ZF Electronics USA, and ZF Passive Safety USA agreed on the commission of multiple violations of the mail fraud statute in furtherance of the Mitsubishi-ZF-ST Enterprise's fraudulent scheme.**

2202. ST Italy, ST Malaysia, and ST USA began conspiring with ZF Passive Safety USA, ZF Electronics USA, and ZF Automotive USA in 2005, when the two supplier groups began the joint design of an ACU ASIC with unique vulnerability

to ASIC EOS. By 2008, all these companies knew about internal thermal testing that confirmed the weakness of the ASIC. They held multiple meetings about this issue. In spite of this early knowledge, and after the years already sunk into development work for the cheaper ACU, they proceeded to launch and use the DS84 ACU for millions of Class Vehicles for more than a decade.

2203. Even after learning that DS84 ACUs and ASICs had malfunctioned due to EOS during crashes, ST Italy, ST Malaysia, ST USA, ZF Passive Safety USA, ZF Electronics USA, and ZF Automotive USA continued to sell and send shipments of the parts. When doing so, these companies all knew that Mitsubishi Japan and Mitsubishi USA would coordinate to cause the Mitsubishi Class Vehicles with the defective DS84 ACU and ASIC to be presented to consumers with misleading certification labels, airbag labels and imprints, and readiness indicators.

2204. Several actions by ST Italy, ST Malaysia, and ST USA support an inference of agreements with ZF Passive Safety USA, ZF Electronics USA, and ZF Automotive USA to commit at least two predicate acts in furtherance of the conspiracy:

    a.    Between September 2009 and 2018, ST USA, ST Italy, and ST Malaysia regularly communicated with ZF Automotive USA, ZF Electronics USA, and ZF Passive Safety USA about observations of EOS in DS84 ASICs. ST USA, ST Italy, and ST Malaysia's DS84 ASIC team confirmed EOS damage on ASICs retrieved from at least one Mitsubishi Class Vehicle.

    b.    Upon information and belief, in 2016, ZF Automotive USA, ZF Electronics USA, and ZF Passive Safety USA sent each ST Defendant excerpted copies of its misleading statements from its February 5, 2016 slide deck.

    c.    Between 2009 and 2018 at the very least, ST USA and ST Malaysia continuously violated the mail fraud act in furtherance

1             of the Mitsubishi-ZF-ST Enterprise by shipping DS84 ASICs,

2             with a mutual understanding that some of these ASICs would be

3             installed in Mitsubishi Class Vehicles as explained above.

4       d.       Between 2009 and 2018 at the very least, ST USA, ST Italy, and

5             ST Malaysia maintained public silence about the ACU Defect,

6             despite the observed evidence of the DS84 ASIC's and ACU's

7             unusual vulnerability to transients.

8     2205. The actions detailed above and throughout the Complaint as to each

9 member of the Mitsubishi-ZF-ST Enterprise were foreseeable to the other members

10 of the Mitsubishi-ZF-ST Enterprise given their direct relationship to and

11 furtherance of the common goals of the scheme.

12     2206. The success of the Mitsubishi-ZF-ST Enterprise's fraudulent scheme

13 depended upon ST USA, ST Italy, and ST Malaysia, ZF Passive Safety USA, ZF

14 Electronics USA, and ZF Automotive USA's cooperation. All these companies had

15 to maintain strict confidence about the ACU Defect for the scheme to continue.

16 Moreover, the ZF companies depended upon the ST companies for the manufacture

17 of the defective ASICs, whereas the ST companies depended upon the ZF

18 companies for a viable path to profit from the consumers of Class Vehicles. This

19 interdependence evidences the agreement to further the fraudulent scheme.

20

21                     **[Continued in Volume III]**

22

23

24

25

26

27

28