Steve A. Miller (State Bar No. 171815)
Steve A. Miller, PC
1625 Larimer Street, No. 2906
Denver, CO 80202
Ph# 303-892-9933
Fax: 303-892-8925
Email: sampc01@gmail.com

Jonathan E. Fortman (40319MO)
FortmanSpann, LLC
250 St. Catherine Street
Florissant, MO 63031
Ph# (314) 522-2312
Fax: (314) 524-1519
Email: jef@fortmanlaw.com

John C. Kress (53396 MO)
Kress Law, LLC
P.O. Box 6525
St. Louis, MO 63125
Ph.#: (314) 631-3883
Fax: (314) 332-1534
Email: jckress@thekresslawfirm.com

Attorneys for Objectors Diane Haase and John Kress

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**LOS ANGELES DIVISION**

| | |
|---|---|
| IN RE ZF-TRW AIRBAG CONTROL UNITS PRODUCTS LIABILITY LITIGATION | ) Case No. 2:19-ml-02905-JAK-MRW<br>)<br>) **OBJECTION OF CLASS**<br>) **MEMBER DIANE HAASE**<br>) **& JOHN KRESS TO CLASS**<br>) **ACTION SETTLEMENT**<br>) **& NOTICE OF APPEARANCE**<br>) **OF COUNSEL**<br>)<br>) Date:     Nov. 16, 2023<br>) Time:        11:00 a.m.<br>) Courtroom: 10B<br>) Judge: John A. Kronstadt<br>) |

Comes now Diane Haase, address 12755 Turkey Creek Lane, Marthasville, MO 63357,

with a phone number of (206) 605-4189, who is the owner of a Toyota Corolla, 2014 VIN #2T1BURHEXEC193868, purchased on or about September 2, 2016 and who received her notification via postcard of her status as a class member (available to the parties upon request of counsel), and John Kress, address of 11269 Gravois Road, St. Louis, MO 63126, phone number 314 631-3883 owner of a Toyota Tundra, 2015, VIN # 5TFUW5F18FX444742, purchased on or about April 2, 2015 who received notification via postcard of his status as a class member, with a Class Member ID of 73609J3WM6GP5, and hereby objects to the proposed class settlement in this case. Pursuant to this Court's requirement for counsel to disclose objections as noted in Question 29 of the FAQs on the airbagcontrolsettlement.com webpage counsel Miller, Fortman and Kress have filed objections on behalf of class members objecting to settlements in approximately 3-4 cases during the past five (5) years. In response to Question 29 of the FAQs page, neither Objector Haase or Kress have objected to a class action settlement in the last five (5) years. The signatures of objectors are attached hereto and incorporated by reference herein.

Undersigned counsel does not intend on appearing at the fairness hearing, and Haase and Kress object to the approval of this settlement, attorneys' fees and expenses. This Settlement should be denied for the reasons set forth below, and applies to the entire class. The undersigned counsel hereby attest and swear they represent Diane Haase and John Kress, and give their Notice of Appearance in this MDL.

## **LEGAL STANDARD**

"[T]he district judge has a heavy duty to ensure that any settlement is 'fair, reasonable, and adequate' and that the fee awarded plaintiffs' counsel is entirely appropriate." _Piambino v. Bailey_, 757 F.2d 1112, 1139 (11th Cir. 1985) ("_Piambino II_"). This duty is "akin to the high duty of care that the law requires of fiduciaries." _Figueroa_

*v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1320 (S.D. Fla. 2007) (quoting *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 652 (7th Cir. 2006)). This judicial duty to protect the rights of the absent plaintiffs extends to the class certification decision, obliging district courts to conduct a "rigorous analysis" to ensure compliance with Rule 23 certification prerequisites. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). The burden of proving these prerequisites resides with certification proponents. *Valley Drug Co. v. Geneva Pharms., Inc.,* 350 F.3d 1181, 1187 (11th Cir. 2003). Aside from trial manageability concerns, that burden is no lighter for a settlement-only class certification. Rule 23(a) and (b)(3) requirements are "designed to protect absentees by blocking unwarranted or overbroad class definition" and "demand undiluted, even heightened attention in the settlement context." *Amchem Prods., Inc. v. Windsor,* 521 US. 591, 620 (1997).

It is a fundamental principal that "Appellate review of a settlement agreement is generally extremely limited", but where class counsel has negotiated a settlement before certification has occurred requires that courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interest and that of certain class members to infect the negotiations". Dennis v.Kellogg Co., 697 F.3rd at 864, citing In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 947 (9th Cir. 2011). Therefore, in order to approve a settlement "requires a higher standard of fairness" along with "a more probing inquiry than may normally be required under Rule 23(e)." Kellogg Co., 697 F.3[rd] at 864. Surviving appellate review under these circumstances requires that "the district court must show it has explored comprehensively all factors" and must give a "reasoned response" to all

nonfrivolous objections. Id.

District courts are required to look for "subtle signs that class counsel have allowed

pursuit of their own self-interest . . . to infect negotiations." Allen v. Bedolla, 787 F.d 1218, 1224

(9th Cir., 2015), citing Bluetooth, 654 F.3d at 938.  The 9th Circuit identifies "three subtle signs"

as 1) "when counsel receive a disproportionate distribution of the settlement," 2) "when the

parties negotiate a 'clear sailing arrangement' (i.e., an arrangement where defendant will not

object to a certain fee request by class counsel); and 3) "when the parties create a reverter that

returns unclaimed fees to the defendant." Id.


**The parties should be required before the fairness hearing to disclose the identity of
the cy pres beneficiaries to which they intend to donate class members payout
money so that class members are informed of where the remaining funds would be
dispersed, and have the opportunity to inform this Court of their approval or
rejection of such donation.**

Recognizing that some of the settlement funds will remain even after a "residual

distribution", the parties foreshadow the likelihood of such speculative payment structure

by informing "If there are any Settlement funds that remain after paying all eligible

claims and other settlement costs . . . then the remaining balance shall be distributed cy

pres." (FAQs, #22 "What happens to any unclaimed funds in the Settlement?"). The

"recipients" or beneficiaries of the class members money, is "subject to the agreement of

the parties and court approval."   With a claims deadline date of no earlier than December

16, 2026, it will be three (3) or more years before class members have any information on

a cy pres distribution. This is too long of period, and the identity of the cy pres

beneficiaries should be disclosed now.

The 9th Circuit will "review a district court's approval of a proposed class action settlement, including a proposed cy pres settlement distribution, for abuse of discretion." <u>Dennis v. .Kellogg Co.</u> 697 F.3d858, 864 (9th Cir. Sept. 4, 2012) citing <u>Nachshin v. AOL. LLC,</u> 663 F.3d 1034, 1038 (9th Cir. 2011). A trial court abuses its discretion "when it fails to apply the correct legal standard or basis its decision on unreasonable findings of fact." <u>Id.</u>

Cy pres is antiquated language for the timeless equitable doctrine "cy pres comme possible", or French for "as near as possible." <u>Id</u> at 865. Historically developed in the area of estates and trusts, as a means of effectuating a testator's intent in making charitable gifts, it has appeared frequently in our federal courts "where the proof of individual claims would be burdensome or distribution of damages costly." <u>Kellogg Co.</u>, 697 F.3rd at 865; <u>Nachshin,</u> 663 F.3d at l038. This Court is aware that "not just any worthy recipient can qualify as an appropriate cy pres beneficiary." <u>Id</u>. The 9th Circuit requires that "there be a driving nexus between the plaintiff class and cy pres beneficiaries" <u>Kellogg Co.</u>, 697 F. 3rd at 865; <u>Nachshin,</u> 663 F.3d at 1038. A cy pres award must be "guided by (1) the objectives of the underlying statute(s) and (2) the interests of the silent class members," and must not benefit a group "too remote from the plaintiff class," <u>Kellogg Co.</u>, 697 F.3rd at 865 <u>Six Mexican Workers v. Arizona Citrus Growers,</u> 904 F.2d 1301, 1308 (9th Cir., 1990).

Furthermore, Class Counsel fail to reconcile it with the more stringent requirements found by the Kellogg Court: A cy pres award must be "guided by (1) the objectives of the underlying statute(s) and (2) the interests of the silent class members," and must not benefit a group "too remote from the plaintiff class," Kellogg Co.. 697 F.3rd at 865 Six Mexican Workers v. Arizona Citrus Growers. 904 F.2d 1301, 1308 (9th Cir., 1990). In <u>Kellogg</u>, the Court pointed out that the cy pres provision failed the first prong of the test, because Kellogg was accused of

misrepresenting that its cereal improved the attentiveness of the consumer, these misrepresentations were the basis of the Plaintiffs' cause of action, "not the nutritional value of Frosted Mini-Wheats. Thus, the appropriate cy pres recipients are not charities that feed the needy, but organizations dedicated to protecting consumers from or redressing injuries caused by, false advertising." Kellogg, Co.. 697 F.3d at 867. Likewise, here this lawsuit is about fraud and defective airbags installed in Toyota vehicles over a period of years.

The parties must inform the class members and this Court of the intended potential cy pres beneficiaries, so that this issue is properly before the Court. For example, what cy pres beneficiary would best be guided by the interests of the unrecalled vehicle class members? A cy pres for automobile owners that might be subject to recall?  Class Counsel and Toyota should be required to disclose this information now, so that class members have the opportunity to be informed now instead of a date uncertain in the future and can determine if the beneficiaries are the right "fit" for a gift of their Settlement funds.

In the 9th Circuit, "when the selection of cy pres beneficiaries is not tethered to the nature of the lawsuit and the interests of the silent class members, the selection process may answer to the whims and self interests of the parties, their counsel or the court." Nachshin v. AOL. LLC, 663 F.3d 1034, 1039 (9th Cir., 2011) ("Lawyers and judges have grown accustomed to controlling these pots of money, and they enjoy distributing them to favored charities, alma maters and the like."). The Parties' proposed settlement is silent on this issue, without providing who that beneficiary would be under a cy pres gift.

Even if the parties can somehow satisfy the rigid standards under Kellogg, Co., the planned donations still fail. This Court must ensure that the settlement here "retains some connection to the plaintiff class and the underlying claims, however, a cy pres award must

qualify as "the next best distribution" to giving the funds directly to class members." <u>Kellogg Co.</u>, 697 F.3rd at 865; <u>Six Mexican Workers</u>, 904 F.2d at 1309. The parties should be required to disclose what they believe may be left of the Settlement amount that would be donated instead of paid out to the class members.  The parties should be required to provide a breakdown of the Settlement, showing how the funds may wind up as a donation, and the amount or range of funds.

This rigorous test of "whether the distribution of the approved class settlement complies with our standards governing cy pres awards" is applied in addition to the trial court "asking whether the class settlement, taken as a whole, is fair, reasonable, and adequate to all concerned." <u>Kellogg, Co.</u>, 697 F.3rd at 865.  What would be an appropriate beneficiary that has similar interests to class members who never received a benefit, might have their vehicle recalled at future date? No beneficiary exists that relates to "Unrecalled class members."

This settlement should be denied, and the parties required to inform the class members and this Court what the specific plans are for any cy pres distribution that may occur on an uncertain date years in the future.

**The proposed Settlement should be denied as the relief provided to the class members is inadequate to compensate them for the harm caused by Defendant's actions, as the relief offered is vastly disproportionate to damages available to the class members.**

In the Ninth Circuit,

"the assumption in scrutinizing a class action settlement agreement must be, and has always been, that the members of the class retain an interest in assuring that the fees to be paid class counsel are not unreasonably high, the likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise obtain."

*Staton v. Boeing*, 327 F.3d 938, 964 (9th Cir., 2003), see *Court Awarded Attorney Fees, Report of the Third Circuit Task Force*, 108 F.R.D 237, 266 (1985).   Here, the fees sought by Class Counsel are unreasonably high, given the low benefit to the class members. No payments of up to $250 are guaranteed to issue to class members from the settlement fund, other than reimbursement for earmarked "reasonable" expenses associated with the repair/removal of the defective airbag for those Recalled Vehicle Class Members.  Unrecalled Vehicle class members receive nothing, but release their claims against Toyota (Doc # 756-3, p. 33-36). Unrecalled Vehicle Owners are included in the Settlement only to insulate Toyota from future litigation when their airbags are recalled. Yet nothing is paid to these class members.

It is true that "when a large attorney's fee means a smaller recovery to plaintiff, a significant conflict of interest between client and attorney is created." *Staton*, 327 F.3d at 964.  Here, Class Counsel seeks a fee of 25 Million Dollars, or 39% of the Settlement Fund of 65 Million Dollars. This settlement should be denied.

**This settlement should be denied as the "outreach program" "loaner vehicles" and "Extended Warranty" are tantamount to a coupon settlement that provides in kind compensation instead of economic recovery to Class Members in question, and for which this Court cannot ascertain a true value until the class members have availed themselves of this "benefit."**

The "outreach program" is nothing more than notifying the class members that they own, may own, or did own a vehicle subject to recall for a defective airbag, and encourage the class member to have Toyota fix, repair or replace the airbag. (FAQ's #20 "What is the Outreach Program?").  Indeed, the "goal of the Outreach Program is to maximize the completion of the Recall." Id.  Essentially, class members are offered a "coupon" for a "free" airbag replacement,

8

by virtue of being a class member in the "recalled vehicles" class.  The only thing missing is an
actual coupon delivered in the mail. Instead, it is a paperless system that Defendant will employ
to contact class members and encourage participation in the recall.  The recall benefits Toyota,
because it gives each Toyota dealership the opportunity to make additional money from each
class member by inspecting each vehicle and recommending any repairs needed in addition to
the airbag replacement.

Class Counsel instead promotes this restatement of a legal obligation- the fixing of
defective airbags- as a significant benefit to the class, promoting the idea that the "Outreach
Program" has a value of 3.5 Million Dollars, further watering down the actual money available
to class members, as it is deducted from the 78.5 Million, along with other noted deductions
(Doc # 815, p. 28, p. 38, lines 21-28).

Ordinarily, a coupon settlement is viewed as a rarity, and considered unique when
discovered or presented to a court by the parties. Managing Class Action Litigation: A Pocket
Guide for Judges, Barbara J. Rothstein & Thomas Willging, 3rd ed., 2010, p. 18 (referred to
herein as "Pocket Guide '^("Coupon settlements were rare even before the passage of CAFA.").
Courts typically seek information from the parties as to whether the coupons are transferrable,
can be discounted or converted to cash, "compare favorably with bargains generally available to
a frugal shopper" and whether the coupons are likely to be redeemed by class members. Id .

A "coupon settlement" is rejected where "in kind compensation" is proposed as the relief
provided to class members. Svnfuel Technologies v. DHL Express (USA),463 F.3d 646, 654 (7th
Cir., 2006). In Svnfuel. the court of appeals rejected a settlement where the class members were
to receive pre-paid Letter Express envelopes instead of cash, with the court determining that the
proposed settlement only benefited those class members who would continue to utilize

Defendant's services and that the fairness of the settlement "must be evaluated primarily based on how it compensates class members for these past injuries." Id. ("Our confidence in the fairness of the settlement is further undermined by the agreement's bias toward compensating class members with pre-paid Letter Express envelopes instead of cash."). Here, only particular models and years of Toyota automobiles may qualify for this paperless coupon-Objector Haase and the rest of the "recalled vehicles" class members. The Outreach program does not compensate for past injuries, although it is transferrable to a new owner of the vehicle- leaving the class member with nothing more than a chance at receiving up to $250 after at least 3 years. Indeed, the only way to avail oneself of the benefit is to do more business with Toyota- by having an authorized dealership perform the replacement/repair of the defective airbag.

Compensation in kind "is worth less than cash of the same nominal value since, as is typical with coupons, some percentage of the pre-paid envelopes claimed by class members will never be used and, as a result with not constitute a cost to Airborne [Defendant]. Svnfuel Technologies, 463 F.3d at 654, citing In re Mexico Money Transfer Litig.. 267 F.3d 743, 748 (7th Cir. 2001). Indeed, here the Defendant receives a credit of 10 Million Dollars, resulting in this amount deducted from the amount actually paid into the Settlement Fund, for merely offering a "to provide future loner vehicles and reimbursements." (Doc # 815, p. 28, lines 21-25). This does not take into account the number of class members that won't respond to the recall. Nor does this arbitrary valuation take into account that Toyota may be in a position to perform the work on the airbag without a loaner vehicle being necessary to the class member.  Instead, it is Toyota that reaps the benefit of this credit and offer of a coupon for a loaner vehicle.

The modern view is for courts to view coupon based settlements with skepticism, as the reality is that most consumers will not redeem the coupons that are issued, making the relief

obtained worthless to the consumer. See Christopher R. Leslie, "The Need to Study Coupon

Settlements in Class Action Litigation". 18 GEO. J. Legal Ethics 1395, 1396-97 (2005)

(Identifying three problems with coupon settlements: 1) it is doubtful that they "provide

meaningful compensation to most class members"; 2) they often "fail to disgorge ill-gotten gains

from the defendant; and 3) they may force class members "to do future business with the

defendant.") accord, Svnfuel Technologies, 463 F.3dat 653.

     The parties present an "Extended Warranty" and allege it has a value of $69,300,000 for

those class members with Recalled Vehicles (Doc # 815, p. 39, lines 9-19). This warranty is

represented as available to those class members who obtain a "Recall repair". Id.  Incredibly, the

Extended Warranty is alleged to have a value of "60% of that for Toyota Class Members with

Unrecalled Vehicles".  Id.  However, the parties admit the warranty only has a value to class

members such as Kress, an Unrecalled Vehicle class member "should a recall be required." This

Extended Warranty has zero value now, and also for settlement purposes.  The Extended

Warranty does not cover the entire vehicle; only the parts related to the repair or replacement of

the airbag. FAQs #19 "How does the Extended New Parts Warranty Work?").  All Toyota is

offering is that the airbags repair/replacement and parts is guaranteed for 12 years.

     This is not compensation, but savy marketing aimed at automobiles owners that will very

likely need additional work performed, such as oil changes, tune ups, etc. It is a means to assist

Toyota in making more money from the Class Members. These paperless coupons for the

"outreach program", "Loaner Vehicle Program" and "Extended Warranty" will be directed

toward at least 5.3 million class members (Doc # 815, p. 30, lines 6-9).

     Indeed, forcing Class Members to do future business with Toyota is a problem that this

Court should look into further. Svnfuel Technologies, supra. Without offering the Class

Members in question the option of receiving cash refunds, it instead forces these particular Class Members to "do future business with Toyota." Geoffrey P. Miller & Lori Singer, "Nonpecuniary Class Action Settlements." 60 Law & Contemp. Probs, 97, 108 (1997) (noting that for many consumers "the right to receive a discount [or a coupon] will be worthless.") accord, Svnfuel Technologies. 463 F.3d at 653. A coupon settlement may benefit certain groups of the class more than others. In re General Motors Corp. Pick-Up Truck Fuel Tank, 55 F.3d 768 (3rd Cir. 1995). Here, the only class members that will benefit are those class members who Toyota has deemed eligible to participate in the program-the Recalled Vehicle class members.

In addition, CAFA requires this Court to scrutinize the proposed coupon settlement "and restricts the use of unredeemed coupons in calculating fees for class counsel. Pocket Guide, p. 18 ("It is important to discern whether attorney fees are being calculated using the face value of the coupons instead of the value of coupons actually redeemed."). The Pocket Guide strongly suggests that trial courts"... hold back the portion of any attorney fee awards that is linked with coupons, discounts, or other nonmonetary benefits until after the redemption period has ended and the value of the benefits can be established by calculating class members' actual use." (Pocket Guide, p. 34, A. Evaluating monetary and nonmonetary results achieved).

Here, it is necessary for this Court to refrain from establishing a value for the outreach program, loaner vehicle program, and extended warranty program until such time as the utilization rates are provided to the Court. After such point in time, then this Court should ascertain each programs respective value, and its corresponding value to Class Counsel in an award of attorneys' fees. This approach is consistent with the Pocket Guide, "Determining the precise value to the class of the rare beneficial coupon settlement, though, calls for hard data on

class members' redemption of the coupons (Pocket Guide, p. 18, Hot Button Indicators-1. Coupons).

This Court should also establish these programs have zero value for unrecalled vehicle class members, including Kress. Class Counsel should not be awarded fees for until such time as the rate of use of these respective programs is established, and the fees awarded should be related to the usage of these programs.

**Class Counsels' fee request should be denied because the Outreach Program, and Extended Warranty cannot form the basis for a common fund of $147,800,000 as Unrecalled Vehicle owners/class members are prohibited from participating, and such programs are merely offered to increase customer utilization of Toyota dealership services.**

The Common Fund exception "entitles a plaintiff to a fee award only if he has created, discovered, increased or preserved a fund to which others also have a claim." B.P. North America Trading. Inc. v. Vessell Panamax Nova, 784 F.2d 975, 977 (9th Cir., 1986). It is acknowledged the "Outreach Program" is nothing more than a customer service device that "will significantly increase recall completion rates for Subject Vehicles in the Recall" (FAQs.#20 "What is the Outreach Program?"). The 3.5 Million Dollars payable by Toyota for the Outreach Program is "to be paid (by Toyota) separate and apart from the funds deposited by Toyota" in the Settlement Fund (Doc #756-3, p. 24, G. "Outreach Program"). Yet Class Counsel includes this 3.5 Million in the valuation of a "Common Fund", alleged to be $147,800,000 (Doc #815, p. 37, lines 1-4).

The goal, or purpose of the "Outreach Program" is "to maximize the completion of the recall." Id.  It has zero value to the class members. Instead, it has value to Defendant, as a means of providing notice to "gin up" or increase the repairs made by the dealership through increasing the utilization rate of the recall participation.  In this manner Defendant offers a service that is of no additional cost that provides additional remuneration to Defendant by contacting class

13

members and encouraging them to bring their vehicles to a Toyota dealership to then charge class members for other repairs or services unrelated to the airbag recall ("While your vehicle airbag was inspected we noticed you need new tires . . . ).

Class members cannot receive cash for waiving a communication or contact from Defendant that facilitates completion of the recall. It cannot be given any cash value. Yet Class Counsel relies upon it as a source of establishing a basis for attorneys' fees, claiming 3.5 Million Dollars will be expended by Toyota on the Outreach Program (Doc # 815, p. 38, Lines 24-28). Unrecalled Vehicle owners are barred from participating in this program, and it also has zero value. Yet class members likely will pay more than this amount, as the "Settlement Fund may also be utilized for additional outreach and notice costs that the parties jointly agree, after consulting with the Settlement Special Master . . ." (FAQs, # 10 "What does the Settlement provide?"). Here, it is anticipated that several more million dollars will be allocated to the advertisement of the airbag recall to those class members with Recalled Vehicles. This is an unlawful reverter of funds. Instead of making it clear that funds revert back to Defendant, it is disguised as furtherance of the "Outreach program".

Further inflating the value of the "common fund" is the "Extended Warranty", or the "Extended New Parts Warranty" as it is referred to in the FAQs. (FAQs #19 "How does the Extended New Parts Warranty work?"). Class Counsel claims a value of $69,300,000 for Toyota agreeing to repair or replace the airbag and parts associated with such repair for a 12 year period (Doc #815, p. 39, lines 11-16; FAQs #19). Incredibly, for the privilege of further insulating Toyota from liability for its airbags, and further providing a defense if a failure occurs, Defendant not only agrees to pay for the repairs and labor on the replacement of the new airbag, but Class Counsel uses this as an opportunity to inflate the value of the settlement. This

program, or warranty is not provided to Unrecalled vehicle class members such as Kress, and others across the U.S. It has zero value for the class members, and zero value for Kress and the other Unrecalled Vehicle class members.

The Outreach Program and Extended Warranty do not provide any fund of monies for which the class members are entitled, or "to which others have a claim." <u>B.P. North America</u>, supra.  This Court should deny the attorneys' fee request, and calculate a percentage of the fund based on the actual cash delivered to class members. At minimum, this Court should prohibit calculating a fee based on a percentage of the fund that includes the alleged value of the Extended Warranty and the Outreach Program.

**The Settlement should be denied because Class Counsel has allowed their self interests to infect the negotiations, with a disproportionate distribution of attorneys' fees requested, a clear sailing provision and the presence of a reverter.**

Sixty-Five Million Dollars ($65,000,000.00) is the full cash payment that constitutes the Settlement Fund (Doc # 815, p. 11, lines 5-6).  Class Counsel seeks attorneys' fees of Twenty Five Million Dollars ($25,000,000.00) (Doc #815, p. 37, lines 1-3).  Class Counsel seeks almost half of the Settlement Fund earmarked for Class Member recovery as attorneys' fees. This is a disproportionate distribution, resulting in roughly payment of 39% of the Settlement Fund to Class Counsel as attorneys' fees.  A payment of 39% of the settlement fund as attorneys' fees is one of the "subtle signs" that class counsel have "allowed pursuit of their own self-interests . . . to infect negotiations." <u>Allen v. Bedolla</u>, 787 F.3d 1218, 1224 (9th Cir., 2015), quoting <u>In re Bluetooth Headset Prods. Liab. Litig.</u>, 654 F.3d 935, 947 (9th Cir. 2011).

A "clear sailing arrangement" occurs where the defendant will not object to a certain fee request. <u>Id.</u> Here, the Amended Settlement Agreement between the parties alleges "they have not discussed the amount of fees and expenses to be paid prior to agreement on the terms of this

Agreement." (Doc # 756-3, p. 38, VIII "Attorneys' Fees and Expenses and Individual Plaintiff Awards").  Nevertheless, the parties had to know the fee award sought by Class Counsel would be exhorbitant, and dwarf the recovery of the class members. The parties knew they were not offering any compensation to an entire set of class members-the Unrecalled Vehicle Owners- and were negotiated only "potential residual distribution payments" if any payment at all, to this group, but only after paying up to $250 as a "potential" distribution to Recalled Vehicle Owners (Doc # 756-3, p. 22, C. "Residual Distribution").

The parties knew the class members were not being prioritized during the negotiations. They agreed the "Residual Distributions" would only be considered for payment after "all other payments listed in Section III.A.,3 have been made . . ." Id.  Class members who sought cash payments of up to $250 were not a priority during negotiations, as Section III.A3 contemplates settlements with other defendants "in connection with this Agreement", along with separate settlement funds. (Doc #756-3, p. 19, III. "Settlement Relief" A. "Qualified Settlement Fund" at 3).  Toyota class members were not a priority during the negotiations, and certainly not the Unrecalled Vehicle class members, who are only receive a potential Residual Distribution after the Recalled Vehicle owners.

The parties agreed that "Toyota reserves the right to oppose Co-Lead Counsel's motion (for attorneys fees)." (Doc # 756-3, p. 38).  Toyota's Brief in Support of Motion for Final Approval is devoid of any reference to attorneys' fees, much less any language contesting the motion of Class Counsel seeking a fee of 39% of the Settlement Fund (Doc #816, p. 1-27). Toyota did not contest the fee application, because it receives reverters, disguised as relief to the class.

Here, the "Settlement Fund may also be utilized for additional outreach and notice costs

16

that the parties jointly agree, after consulting with the Settlement Special Master . . ." (FAQs, # 10 "What does the Settlement provide?").  It is anticipated that several more million dollars will be allocated to the notification of class members of the airbag recall, to those class members with Recalled Vehicles.  This is certain to occur without notice to the class, and without any objection by any class member since notice to the class will not be requested, much less required.  And with good reason. This is a reverter of funds. Instead of making it clear that funds revert back to Defendant, it is disguised as furtherance of the "Outreach program".  Indeed, claiming more notice is necessary to the class members to remind them that their vehicle airbag is subject to recall allows more advertising, and increases utilization of Toyota's numerous dealerships resulting in more profit from vehicle sales and repairs and maintenance.  The amount is undecided, because it will be influenced by the number of claims filed, and the amount of actual cash expended, among a variety of factors. While it is true the reverted funds turned over to the "Outreach Program" require approval of the Court, such agreement to transfer funds is a red flag for this Court that the Defendant is receiving a "Kickback."

A reverter is one of the signs that indicate that a settlement may be unfair, unreasonable or inadequate to the class members. In re Bluetooth Headset Products Liab. Litig., 654 F.3d 935, 943 (9th Cir., 2011).  District courts have an obligation to investigate, examine and develop the record to support a decision to approve the settlement in light of the parties agreement to expend additional funds on the "outreach program" at a later date and time. Id. at 947.  This Court should require the parties to show what specifically is purchased by Toyota for 3.5 Million Dollars. Is the Outreach Program administered by a subcontractor, or third party? Is this money paid to Toyota dealerships? Why is additional funding needed for the Outreach Program?

Here, another reverter is masked as an agreement by the parties to provide Toyota with a

"Credit". The Loaner Vehicle program intentionally opaque, as it appears to give Toyota dealers the option of not providing a "loaner vehicle" and instead forcing class members to make a claim for reimbursement (If a class member. . . is not provided with a loaner vehicle while the Recall is being performed, then that Class Member may submit a claim for reimbursement from the Settlement Fund . . .") (FAQs #21 "What is the Rental Car Reimbursement, Loaner Vehicle, and Outreach Program?").  What is clear is Toyota receives a 10 Million Dollar credit against the Settlement Amount for "providing Future Loaner Vehicles and Future Outreach Programs" *Id.* The terms of the settlement do not require payment of the 10 Million Dollars into the Settlement Fund (Doc #815, p. 38, lines 26-28). Instead, this amount is deducted off the top, turning a 75 Million Dollar settlement into a 65 Million simply by agreeing the credit is "for future loaner vehicles and outreach." Id.  But the parties both receive the advantage for the so called "credit": the Defendant can claim it paid more money toward a settlement that never left the bank, while Class Counsel claims such amount goes toward the inflated value of the settlement for purposes of establishing attorneys' fees.

**The attorneys' fee request of 39% of the Settlement Fund sought by Class Counsel is not supported by the result obtained for the class members and should be denied, and a negative multiplier used on the fee request, substantially reducing the fee award.**

Class Counsel requests a fee of 25 Million Dollars from a Settlement fund that consists of only 65 Million Dollars. An entire subclass, Unrecalled Vehicle Owners, receive no benefits at all from the settlement, and only has a chance to receive a "potential" Residual Distribution Payment of up to $250, once the Recalled Vehicle Class receives their payment.

A negative multiplier should be applied to the fee award sought. The application

of a multiplier is "appropriate only in rare or exceptional cases." *Perdue v. Kenny, 559 U.S. 542, 554 (2010); accord In re Hyundai and Kia Fuel Economy Litigation, 926 F.3d 539, 581 (9th Cir. 2019) (dissenting opinion).* The primary consideration among factors driving whether or not to apply a positive or negative multiplier is "the benefit obtained for the class." *Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 942 (9th Cir. 2011).* A multiplier of less than one, or a negative multiplier "suggests that the negotiated fee award is reasonable and fair valuation of the services rendered to the class by class counsel." *Chun-Hoon v. McKee Foods Corp., 716 F.Supp 2d 848, 854 (N.D. Cal. 2010).* When the result achieved is not the expected outcome, "a negative multiplier evinces that undertaking this litigation was not a wise use of class counsel's time and resources." *Id.* A multiplier may be adjusted upward or downward by the district court, and the most critical consideration is the "Benefit obtained for the class." In Re Bluetooth, 654 F.3d at 942.

Here, Class Counsel claims a "moderate" multiplier of 2.17, alleging that their multiplier is actually below the lodestar multipliers in large recoveries between 69.6 and 175.5 Million Dollars (Doc #815, p. 51, lines 2-9; 10-13). Class Counsel continues to inflate the value of the settlement, attributing value to extended leases, notice of recall programs and other non-compensatory "benefits" that only serve to restate a legal obligation, or benefit Toyota by inducing class members to pay for repairs and services. Class Counsel failed to provide for any recovery for the Unrecalled Vehicle Owner subclass. Even the Recalled Vehicle Subclass is only permitted to make claims for unreimbursed expenses related to the airbag defect.  Neither class is guaranteed a

payment of up to $250. These payments are qualified as "potential." The benefits to the class are paltry, and particularly for the Unrecalled Vehicle Class members are unavailable, while those members waive the right to bring suit against Toyota if their airbags are subject to recall without receiving any benefit.

This Court should consider applying a negative multiplier of -1, or a zero multiplier due to the lack of benefits offered to the Unrecalled Vehicle class members and the fact that payment to all class members of up to $250 is not a guaranteed payment at all, but only possible many years from the settlement approval date.

Should this Court decide the settlement is worth 147.8 Million Dollars, it constitutes a "megafund" as inflated by Class Counsel, then awarding 25 Million Dollars (cleverly noted as 16.9 percent of this inflated settlement) constitutes a windfall for Class Counsel when evaluated against the actual time invested and result obtained. In re *Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942-943 (9*th* Cir. 2011). Other courts recognize the larger the fund, a downward turn of such percentage occurs as the amount of the settlement climbs above 100 Million Dollars. *High Tech Emp. Antitrust Litig.*, No. 11-CV-02509 (N.D. Cal. Sept. 2015) (fees awarded of 10.5 percent of $435 Million Dollar settlement).

**CONCLUSION:**

This Court should deny the proposed settlement because it fails to provide relief to millions of class members- the Unrecalled Vehicle owners.  If this settlement is

approved, this Court should qualify the non-cash based relief as a coupon settlement, and
only provide attorney's fees after the utilization rate of the Extended Warranty, Outreach
Program, and Loaner Program are available and reviewed. This Court should order the
parties to provide increased monetary recovery for the class members, or enter an order
that carves out more of the fund to be utilized to pay claims. If settlement is approved, the
Fees awarded should be subject to a negative multiplier that reflects the value of the
settlement to each class member and should a common fund percentage be awarded it
should be based on the actual money paid into the settlement fund-65 Million Dollars.

Respectfully submitted,

_____/s/ Steve A. Miller_____
Steve A. Miller (State Bar No. 171815)
Steve A. Miller, PC
1625 Larimer Street, No. 2905
Denver, CO 80202
Ph# 303-892-9933
Fax: 303-892-8925
Email: sampc01@gmail.com

Jonathan E. Fortman (40319MO)
Law Office of Jonathan E. Fortman, LLC
250 St. Catherine Street
Florissant, MO 63031
Ph# (314) 522-2312
Email:  jef@fortmanlaw.com

John C. Kress (53396MO)
The Kress Law Firm, LLC
P.O. Box 6525
St. Louis, MO  63125
Ph.#:  (314) 631-3883
Fax:  (314) 332-1534
Email:  jckress@thekresslawfirm.com

Attorneys for Objectors Diane Haase and John
Kress

## <u>CERTIFICATE OF SERVICE</u>

A true copy of the foregoing has been served upon all parties by operation of the court's ECF system.

_____ /s/ Steve A. Miller_____

I, Diane Haase, have placed my signature below, concerning the objection I made in
the case of In re ZF-TRW Airbag Control Units Products Liability Litigation
concerning my Toyota.


DIANE HAASE

I, John Kress, have placed my signature below, concerning the objection I made in the case of In re ZF-TRW Airbag Control Units Products Liability Litigation concerning my Toyota.

_____

JOHN KRESS